DMP:CRH/JMH/EHS
F. #2017R00906

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -
                                     No. 21-CR-265 (S-1) (PKC)

MICHAEL MCMAHON,

                Defendant.

– – – – – – – – – – – –X

## THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT MICHAEL MCMAHON'S MOTION FOR DISCOVERY AND AN EVIDENTIARY HEARING REGARDING PROSECUTORIAL MISCONDUCT

                                   BREON PEACE
                                   United States Attorney
                                   Eastern District of New York

Craig R. Heeren
J. Matthew Haggans
Ellen H. Sise
Assistant United States Attorneys

Scott A. Claffee
Trial Attorney
National Security Division
Special Assistant United States Attorney
(Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND AND PROCEDURAL POSTURE.................................................. 3

    I.    Operation Fox Hunt and Targeting of the Victims by the PRC Government..................... 3

    II.    April 2017 Stalking and Attempted Repatriation Operation............................................. 3

    III.    The Defendant's Motion ................................................................................................. 7

ARGUMENT ............................................................................................................................... 9

    I.    The Standard for Selective Prosecution Claims "Is A Demanding One"............................ 9

        A.    Legal Standard................................................................................................................ 9

        B.    Discovery For Vindictive and Selective Prosecution Claims Is Rarely Granted ....... 10

    II.    The Mere "Specter" of Vindictive Prosecution Does Not Entitle McMahon to Any Discovery ............................................................................................................................... 11

CONCLUSION............................................................................................................................ 17

TABLE OF AUTHORITIES

**Cases**

Bordenkircher v. Hayes,
    434 U.S. 357 (1978) ................................................................................................................... 9

North Carolina v. Pearce,
    395 U.S. 711 (1969) ................................................................................................................... 9

Oyler v. Boles,
    368 U.S. 448 (1962) ................................................................................................................... 9

United States v. Armstrong,
    517 U.S. 456 (1996) .............................................................................................................. 9, 10

United States v. Avenatti,
    433 F. Supp. 3d 552 (S.D.N.Y. 2020) ...................................................................................... 11

United States v. Aviv,
    923 F. Supp. 35 (S.D.N.Y. 1996) ............................................................................................ 13

United States v. Berrios,
    501 F.2d 1207 (2d Cir. 1974) ................................................................................................... 12

United States v. Bout,
    No. 08-CR-365 (SAS), 2011 WL 3369797 (S.D.N.Y. Aug. 2, 2011) ...................................... 13

United States v. Bout,
    731 F.3d 233 (2d Cir. 2013) .......................................................................................... 11, 12, 13

United States v. Dean,
    119 F. Supp. 2d 81 (D. Conn. 2000) ........................................................................................ 12

United States v. Goodwin,
    457 U.S. 368 (1982) ............................................................................................................. 10, 13

United States v. Johnson,
    171 F.3d 139 (2d Cir. 1999) ................................................................................................. 9, 12

United States v. King,
    126 F.3d 394 (2d Cr. 1997) ...................................................................................................... 10

United States v. Koh,
    199 F.3d 632 (2d Cir. 1999) ................................................................................................. 10, 13

United States v. Lin,
    No. 22-MJ-251 (MMH) (E.D.N.Y.) .......................................................................................... 15

i

United States v. Parker,
    No. 08-CR-6270 (MWP), 2009 WL 3754017 (W.D.N.Y. Oct. 21, 2009) ............................ 13

United States v. Pham,
    No. 12-CR-423 (AJN), 2022 WL 993119 (S.D.N.Y. Apr. 1, 2022) ...................................... 11

United States v. Romano,
    487 Fed. Appx. 607 (2d Cir. 2012) ...................................................................................... 11

United States v. Sanders,
    211 F.3d 711 (2d Cir. 2000) .......................................................................................... 10, 11, 12

United States v. Sattar,
    314 F. Supp. 2d 279 (S.D.N.Y. 2004) .................................................................................. 13

United States v. Schmucker,
    471 U.S. 1001 (1985) ............................................................................................................ 16

United States v. Schmucker,
    721 F.2d 1046 (6th Cir. 1983) .............................................................................................. 16

United States v. Stewart,
    590 F.3d 93 (2d Cir. 2009) .................................................................................................... 12

United States v. White,
    972 F.2d 16 (2d Cir. 1992) .................................................................................................... 12

United States v. Williams,
    No. 20-CR-55 (LMA), ECF No. 105 (E.D. La. Jan. 8, 2021) ................................................ 14

United States v. Williams,
    No. 20-CR-55 (LMA), 2020 WL 5960689 (E.D. La. Oct. 8, 2020) ................................. 14, 15

Wayte v. United States,
    470 U.S. 598 (1985) ............................................................................................................. 9, 16

PRELIMINARY STATEMENT

Defendant Michael McMahon ("McMahon") is charged in a Superseding Indictment, together with several other co-defendants, with acting as unlawful agents of the People's Republic of China (the "PRC"), interstate stalking, and conspiracy to commit both offenses, all in connection with the PRC government's "Operation Fox Hunt" campaign. As set forth in more detail in the government's opposition to McMahon's (unsuccessful) motion to dismiss the Superseding Indictment, McMahon was hired to investigate and surveil John Doe #1 and Jane Doe #1 ("the Victims"), helping to carry out a sophisticated international operation whereby PRC officials brought an elderly relative from the PRC to the United States in an attempt to coerce the Victims to return to the PRC. See generally Op. and Order, ECF No. 123 (Feb. 28, 2022) (denying motion to dismiss the Superseding Indictment).

McMahon now paints himself as the victim of a nefarious, retaliatory plot by the government, targeting him for an unjust prosecution because of investigative work he did in a separate criminal case, involving different defendants, allegations, case agents, prosecutors, and a different United States Attorney's Office. See generally ECF No. 146-1 (Aug. 8, 2022) ("the Motion"). In a 30-page brief, the defendant goes into great detail about the prosecution of Paul Bergrin. But the sole link between this case and the Bergrin matter—the matter that McMahon claims is the "real" reason he was arrested—is that one of the agents who participated in McMahon's arrest was also familiar with the Bergrin matter. See Mot. at 13. More tellingly, it was McMahon himself who introduced the Bergrin matter into the dialogue during his arrest. See id. (McMahon's claim that he asked the arresting agents whether his arrest was related to Paul Bergrin, to which one of the agents responded "No, but I know you from that case.").

Because the defendant himself supposed at the moment of his arrest that the two

cases may be, could be, must be related, the defendant demands that this Court should reach the same conclusion. This sort of *post hoc, ergo propter hoc* reasoning falls well short of demonstrating any defect in this prosecution or entitlement to any relief. The Motion utterly fails to point to any meaningful connection between the two cases other than the spurious connection identified by the defendant himself. The Motion also fails to identify any improper conduct by any prosecutor or agent involved in this case.

The Motion should be denied. No hearing is necessary.

## FACTUAL BACKGROUND AND PROCEDURAL POSTURE

The factual background and procedural posture of this case are set out in greater detail in the government's earlier brief in opposition to the defendant's motion to dismiss the Superseding Indictment and will be restated here only as necessary. See generally ECF No. 120 (Jan. 21, 2022). The Court denied that motion on February 28, 2022. See Op. and Order, ECF No. 123. Presently before the Court are the government's motion for a protective order under the Classified Information Procedures Act, see ECF No. 126, and the Motion. See ECF No. 146.

### I.    Operation Fox Hunt and Targeting of the Victims by the PRC Government

As alleged in the Superseding Indictment, the PRC government is engaged in a worldwide initiative to forcibly repatriate PRC citizens living in the United States and other countries who are wanted in the PRC for allegedly committing various crimes. This initiative has been identified by the PRC government as "Operation Fox Hunt" and "Operation Skynet," and described by the PRC as part of a larger anti-corruption effort. To advance these efforts, the PRC government has engaged in unsanctioned, unilateral, and illegal practices, including coercion, extortion, and intimidation, all directed at these "fugitive" targets and their families, to compel cooperation or self-repatriation to the PRC. (See SI ¶ 14). John Doe #1 and Jane Doe #1 were both targets of Operation Fox Hunt.

### II.    April 2017 Stalking and Attempted Repatriation Operation

Between approximately September 2016 and April 2017, several co-conspirators stalked John Doe #1 and Jane Doe #1 at the behest of the PRC government. To coerce the Victims to travel to the PRC against their will, the co-conspirators forced John Doe #1's elderly father, John Doe #2, to come to the United States to instruct John Doe #1 to return to the PRC, lest John Doe #1's family members be harmed. (SI ¶¶ 18-39).

3

McMahon was an integral part of the scheme.   He was first hired to investigate the Victims in approximately September 2016 by co-defendant Jason Zhu.  (SI ¶ 9).   Zhu, with the help of another individual, retained McMahon, and directed him to investigate and surveil the Victims.  (SI ¶¶ 18-19, 58(a)).   Although hired indirectly, McMahon had reason to know from the beginning of his retention that John Doe #1 was, in fact, wanted by the PRC government.   On or about October 5, 2016, McMahon sent an email to another individual who worked with him as a private investigator; the subject line read "tlo report says wanted by interpole [sic]."   The attachment to the email provided criminal history information about John Doe #1, which stated that he was "Interpol Most Wanted."   (Compl. ¶ 25).   Nevertheless, over the course of October 2016, McMahon accepted his tasking, and provided information about the Victims to his co-conspirators, including surveillance photographs, banking information, and private personal data such as dates of birth and Social Security numbers.  (SI ¶ 19).   McMahon worked with both Jason Zhu and, later, directly with PRC official and co-defendant Hu Ji, who traveled to the United States from the PRC for this operation.   (Id.)   On or about October 27, 2016, McMahon met Jason Zhu and PRC Official Hu Ji in person at a restaurant in Paramus, New Jersey.   (SI ¶ 58(b) and (c)).

After multiple months of investigative work by McMahon, the conspirators planned an operation to stalk and repatriate the Victims through the coercive use of John Doe #1's elderly father, John Doe #2.   (SI ¶ 20).   In or around late March 2017, Hu Ji emailed McMahon and told him that John Doe #2 (John Doe #1's father) was coming from the PRC to the United States and requested that McMahon "trace" the elderly man they were bringing into the country.   (SI ¶¶ 21, 58(d)).   Hu Ji also sent McMahon photographs of the Victims, as well as of John Doe #2 and his spouse.   (Id.).

4

Around the same time, other co-conspirators were traveling to New Jersey to facilitate the scheme. Co-defendant Zhu Feng, a Queens resident at that time (SI ¶ 4), contacted Hongru Jin, another Queens resident (Compl. ¶ 14(d)), and directed Jin to travel and pick up several "team members" from the airport. (SI ¶ 22). Zhu specifically told a co-conspirator that they were working for the PRC government. (Id.) Zhu Feng also helped prepare false information to help ensure that John Doe #2 would be permitted to enter the United States when he traveled. (SI ¶¶ 23, 58(e)). On or about April 3, 2017, Zhu Feng and co-defendant Tu Lan flew from the PRC and landed at Newark International Airport and, on or about April 5, 2017, John Doe #2 was brought to New Jersey from the PRC by co-defendant Li Minjun, and also landed at Newark International Airport. (SI ¶¶ 24, 58(f), (g)). After landing in the United States, PRC Official Tu Lan met with Zhu Feng and another conspirator (both of whom at the time resided in the Eastern District of New York) at a hotel in New Jersey, and strategized about how to carry out the operation. (SI ¶ 25).

On or about April 5, 2017, John Doe #2 arrived at a house in New Jersey that belonged to Jane Doe #1's relatives. Shortly thereafter, Jane Doe #1 and John Doe #1 were notified of John Doe #2's arrival. At the same time, McMahon, and other co-conspirators were conducting surveillance in front of the residence where John Doe #2 was brought. (SI ¶ 26). The next day, John Doe #1 met his father at a public location, and they returned together to John Doe #1's residence. That same day, McMahon obtained records about John Doe #1 from a government database at the request of Zhu Feng, and contrary to regulations for the use of that database. (SI ¶ 27; Compl. ¶¶ 68-70). John Doe #2 then stayed with his son for several days. During this time, John Doe #2 conveyed to John Doe #1 the harm that would befall his family if John Doe #1 did not return to the PRC. (SI ¶ 28).

5

During this time, McMahon and other co-conspirators continued to surveil John Doe #2 and the Victims.  (SI ¶ 31).   As a result of their continued surveillance, the conspirators were able to learn John Doe #1's address, which was not publicly listed or previously known to the co-conspirators.   Notably, while conducting surveillance, McMahon again showed that he knew he was working for the PRC government, emailing himself a link to an English-language website that discussed the PRC's "Global Dragnet," the PRC's issuance of red notices, and which specifically identified the Victims as two of the targets of this campaign.   (Compl. ¶ 53).

On or about April 7, 2017, PRC official Tu Lan departed from John F. Kennedy International Airport, in Queens, New York ("JFK Airport") on a flight to Beijing, PRC and, on or about April 8, 2017, Li Minjun departed from Newark Airport on a flight to Beijing, PRC.   (SI ¶ 29).   McMahon continued to take directions from his co-conspirators, including the PRC official who returned to the PRC from the Eastern District of New York.   (SI ¶ 58(i)).   For example, on or about April 9, 2017, Tu Lan directed Zhu Feng to "[t]ell Mike" (referring to McMahon) that "he still needs to help find where is [John Doe #1's] father, at [Jane Doe #1's sister's] place or at [John Doe #1's actual residence]?"   (SI ¶ 31).   Tu Lan then messaged Zhu Feng and wrote that "you need to confirm that Mike can execute according to our requirement."   (Id.).

On or about April 11, 2017, McMahon and Zhu Feng discussed additional steps to take targeting John Doe #1, including more aggressive harassment.   Feng stated, "I have to go to China [tomorrow] morning for the meeting.   I will let you know what's the next plan."   McMahon responded, "I think if we harass [John Doe #1].   Park outside his home and let him know we are there.   I did that before on another case."   Feng responded, "We can't harass [John Doe #1] like that lol."   (SI ¶¶ 33, 63(d)).

6

The efforts to persuade John Doe #1 to return to the PRC were ultimately unsuccessful at that time.   (SI ¶ 34).

III.     The Defendant's Motion

The Motion alleges that the prosecution of McMahon is impermissibly motivated by McMahon's work on another criminal case involving Paul Bergrin.   See generally McMahon Aff., ECF No. 146-7 at ¶¶ 9-10, 12 (Aug. 8, 2022) (defendant's descriptions of statements by one of the arresting agents) (hereafter "McMahon Aff.").   McMahon, via affidavit, states that agents arrived to place him under arrest.   McMahon claims that he asked one of the arresting agents, Special Agent Sean McCarthy ("McCarthy"): "Is this about Paul Bergrin?"   Per McMahon, the agent responded: "No, but I know you from that case.   You've been on my board more than once." See McMahon Aff. at ¶ 9.   McMahon also submits affidavits from his spouse and adult son attesting, in sum and substance, to this exchange.   See ECF Nos. 146-8 at ¶¶ 5-6 (affidavit of McMahon's spouse), 146-9 at ¶ 4 (affidavit of McMahon's son).   McMahon also claims that he re-engaged on the subject of Bergrin with Special Agent McCarthy, asking "So you know me from Paul Bergrin?" to which McCarthy responded: "The case agent was my office mate."   McMahon confirmed the identity of the case agent on the Bergrin matter, after which McCarthy stated: "Let's wait until we get to the office to discuss anything else."   See McMahon Aff. at ¶ 12.

At most, McMahon establishes that one of the agents who participated in his arrest knew who McMahon was, because that agent used to work with another agent, and that other agent knew who McMahon was because McMahon had worked on another case that the other agent had worked.   To describe this attenuated chain of connections is itself sufficient to refute the improper causation imagined by the defendant.   It is hardly surprising that a New Jersey-based FBI agent was familiar with a case that the Motion acknowledges was among "the most notorious, high profile cases in New Jersey legal history[.]"   Mot. at 3.

7

The Motion is long on raising specters, questions, speculation, and conjecture about the Bergrin case as well.   The Motion is short, however, on facts, circumstances, and arguments connecting that case to this one.   The Motion does not even attempt to show that McMahon did anything in the Bergrin prosecution that would theoretically draw the government's vindictive ire. Indeed, the Motion implies that the government's zealous pursuit of Bergrin—convicted of murder, murder conspiracy, and other serious offenses—is somehow evidence of misconduct. See Mot. at 4-5 (noting the case "has also been particularly hard fought by the [g]overnment . . .", at 5 ("Typical is the language of [the government's] most recent briefs . . .").   That another U.S. Attorney's Office would zealously pursue a conspirator—a member of the legal bar—in the murder of a government informant is hardly suspicious.   The Motion also implies that the government has committed some sort of overzealous impropriety for restricting Bergrin's access to communications via special administrative measures, see Mot. at 8 n.4—when Bergrin was convicted of conspiring to murder a government informant.

The Motion's recitation of the Bergrin case's procedural history therefore establishes that a different U.S. Attorney's Office, the District of New Jersey, pursued a separate, serious case involving the murder of a government informant to a guilty verdict, and took additional steps to protect the public and other government informants from that defendant.   Cast against this backdrop, the Motion does little to explain how McMahon's work on the Bergrin matter would have produced a vindictive motive by this U.S. Attorney's Office.

Assuming that the conversations involving the arresting agent, as described by McMahon, occurred in the way McMahon describes them, they fall well short of demonstrating that any discovery on this topic, or any relief whatsoever, is warranted, as set forth in more detail below.

ARGUMENT

I.    The Standard for Selective Prosecution Claims "Is A Demanding One"

    A.    Legal Standard

> A selective prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution.  Our cases delineating the necessary elements to prove a claim of selective prosecution have taken great pains to explain that the standard is a demanding one.  These cases afford a background presumption that the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims.

United States v. Armstrong, 517 U.S. 456, 463-64 (1996) (internal citations and marks omitted).

Federal prosecutors have "broad discretion" to enforce federal criminal law.  Wayte v. United States, 470 U.S. 598, 607 (1985).  "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978).

    That prosecutorial discretion must be exercised consistent with the Constitution. Accordingly, prosecutors may not base a discretionary decision to prosecute upon "an unjustifiable standard such as race, religion, or other arbitrary classification[.]"  Oyler v. Boles, 368 U.S. 448, 456 (1962).  Nor may prosecutors be motivated by a vindictive desire to retaliate against otherwise lawful, constitutional conduct: "[P]enalizing those who choose to exercise constitutional rights would be patently unconstitutional."  North Carolina v. Pearce, 395 U.S. 711, 724 (1969) (internal marks and citation omitted).  "Accordingly, an indictment will be dismissed if there is a finding of actual vindictiveness, or if there is a presumption of vindictiveness that has not been rebutted by objective evidence justifying the prosecutor's action."  United States v. Johnson, 171 F.3d 139, 140 (2d Cir. 1999).

9

To show that a prosecution was motivated by actual vindictiveness, a defendant must show that the decision to file charges was a "direct and unjustifiable penalty" resulting "solely from the defendant's exercise of a protected legal right[.]"    United States v. Goodwin, 457 U.S. 368, 380 n.11, 384, n.19 (1982).    Put another way, a defendant making such a claim has the burden to show that: (1) "the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a stalking horse;" and (2) the defendant "would not have been prosecuted except for the animus." United States v. Koh, 199 F.3d 632, 640 (2d Cir. 1999) (internal marks and citation omitted).

To establish by a presumption that a prosecution was brought with vindictive animus, the defendant has the burden to show that "the circumstances of a case pose a realistic likelihood of such vindictiveness."    See United States v. King, 126 F.3d 394, 397 (2d Cr. 1997) (internal marks and citation omitted).    "The circumstances must present a realistic likelihood of vindictiveness that would be applicable in all cases[.]"    United States v. Sanders, 211 F.3d 711, 717 (2d Cir. 2000) (internal marks and citation omitted).

B.    Discovery For Vindictive and Selective Prosecution Claims Is Rarely Granted

Consistent with the background presumption of a "significant barrier" to selective or vindictive prosecution claims, Armstrong, 517 U.S. at 464, the Second Circuit requires a defendant to provide "some evidence tending to show the existence of the essential elements of the defense." Sanders, 211 F.3d at 717 (describing the standard as "rigorous," citing Armstrong, 517 U.S. at 464).    Whether to grant any discovery is a decision within the Court's exercise of discretion.    Sanders, 211 F.3d at 717 (noting that decisions denying discovery on such claims is reviewable "only for abuse of discretion").

Unsurprisingly, the vast majority of efforts to press such claims against this "rigorous" standard in recent years have been denied.    See Sanders, 211 F.3d at 718 (denying

10

discovery and hearing, noting: "It would be too easy for defendants to obtain discovery on vindictive prosecution claims if all that was required was to identify a potential motive for prosecutorial animus."); <u>United States v. Avenatti</u>, 433 F. Supp. 3d 552, 575-76 (S.D.N.Y. 2020) (rejecting claim and denying discovery where defendant Michael Avenatti alleged that the prosecution was borne of animus from the then-President of the United States); <u>United States v. Romano</u>, 487 Fed. Appx. 607 (2d Cir. 2012) (rejecting claim and denying discovery); <u>United States v. Pham</u>, No. 12-CR-423 (AJN), 2022 WL 993119, *10-*12 (S.D.N.Y. Apr. 1, 2022) (rejecting claim and denying discovery where government obtained a superseding indictment with higher potential penalties after plea negotiations did not conclude in plea agreement); <u>United States v. Bout</u>, 731 F.3d 233, 239 (2d Cir. 2013) (rejecting claim and denying discovery where defendant pointed to public statements by senior government officials, including a Deputy National Security Advisor, that the defendant was in their "cross-hairs" and noting: "Even if true, these allegations do not constitute the type of 'animus' that is relevant within the meaning of our cases on vindictive prosecution."). Where the facts and circumstances point just as squarely to the conclusion that the "government's motivation . . . stemmed from [] concern that [the defendant] was engaged in criminal conduct," then "enthusiastic or energetic pursuit" of the prosecution "does not demonstrate vindictive, or even inappropriate conduct." <u>Id.</u> (citing <u>Sanders</u>, 211 F.3d at 718).

II.    <u>The Mere "Specter" of Vindictive Prosecution Does Not Entitle McMahon to Any Discovery</u>

At most—even in the Motion's own parlance—the defendant has raised only "the specter of vindictive prosecution[.]"  Mot. at 2.  The Motion is replete with these kinds of tentative assertions: "The question thus naturally arises[.]"  "Could" McMahon's prosecution have been premised on the fact that "he was the private investigator for a despised defendant?," a "real, and very troubling, question."  <u>Id.</u> at 29.  Raising such a "specter"—merely "identify[ing]

a potential motive"—is patently insufficient to obtain discovery, much less a hearing, much less any relief.  Sanders, 211 F.3d at 717.

To punctuate the point: McMahon's brief cites one case—one—in this Circuit or in any of its constituent districts where discovery or an evidentiary hearing on a claim of vindictive (or selective) prosecution was ultimately approved.  See Mot. at 18-20.  In that case, United States v. Berrios, 501 F.2d 1207, 1211-12 (2d Cir. 1974), the Second Circuit sharply criticized the district court for having granted discovery and a hearing on a claim the Circuit believed "appears frankly to [be] a fishing expedition"; however, and apparently begrudgingly, the Second Circuit concluded that the district court's order to the contrary was not an abuse of discretion.[1]

In all the other cases cited, however, discovery and hearing orders were denied, or, if granted, vacated on appeal.   There was no discovery or hearing in Sanders, 211 F.3d at 718; not in United States v. White, 972 F.2d 16, 20 (2d Cir. 1992) (affirming district court's refusal to grant an evidentiary hearing); not in United States v. Stewart, 590 F.3d 93, 121-23 (2d Cir. 2009) (affirming district court's rejection of claim); not in United States v. Dean, 119 F. Supp. 2d 81, 84 (D. Conn. 2000) (denying motion for discovery and evidentiary hearing and concluding that the claim "does not rise above the level of mere allegations and conjecture drawn from the sequence of events leading to this indictment"); not in Johnson, 171 F.3d at 142   (reversing district court order dismissing indictment—without ordering discovery or an evidentiary hearing—where challenged prosecution followed closely upon acquittal on other federal charges and dismissal of related state charges); not in Bout, 731 F.3d at 239 (affirming district court's rejection of vindictive

---

[1]       The later opinions in Sanders and other Second Circuit cases, coupled with the criticism set out in Berrios itself, at least suggest that Berrios is an outlier.

prosecution claim);[2] not in <u>Goodwin</u>, 457 U.S. at 384 (reviewing and finding no error in prosecutor's decision to bring additional charges after plea negotiations failed to resolve the case, and making no mention of any discovery or hearing on the issue);[3] not in <u>United States v. Sattar</u>, 314 F. Supp. 2d 279, 314 (S.D.N.Y. 2004) (denying discovery and motion for evidentiary hearing where defendants pointed only to "prosecutorial decisions . . . to bring charges that allegedly charged proper crimes" following defendant's earlier, successful motion to dismiss earlier-filed counts); not in <u>United States v. Parker</u>, No. 08-CR-6270 (MWP), 2009 WL 3754017, *4-*5 (W.D.N.Y. Oct. 21, 2009) (report and recommendation denying discovery and evidentiary hearing as simply "too speculative" where defendant claimed prosecution was motivated by an unexpectedly lenient sentence imposed upon defendant in a separate state case); not in <u>United States v. Aviv</u>, 923 F. Supp. 35, 38 (S.D.N.Y. 1996) (denying motion for discovery and evidentiary hearing, noting that defendant had failed to establish an "objective showing that the prosecution would not have been brought even in the absence of vindictiveness"); and not in <u>Koh</u>, 199 F.3d at 639-41 (affirming district court's refusal to grant discovery or hold evidentiary hearing where alumnus of prosecuting office brought the matter to the office's attention).

---

[2]     While the Second Circuit in <u>Bout</u> was silent as to whether discovery or an evidentiary hearing were ordered, the district court's earlier opinion makes clear that no such orders were given.    <u>United States v. Bout</u>, No. 08-CR-365 (SAS), 2011 WL 3369797, at *2 (S.D.N.Y. Aug. 2, 2011) (summarizing Bout's allegations of vindictiveness and concluding they fell "far short of the rigorous standard required to open an investigation into the basis for the Government's prosecution[.]" (internal marks and citations omitted)).

[3]     The opinion below by the Fourth Circuit—reversed by the Supreme Court in <u>Goodwin</u>—does, however, make mention of an affidavit submitted by the United States Attorney, although the circumstances in which the affidavit was submitted are unclear.    <u>United States v. Goodwin</u>, 637 F.2d 250, 252 (4th Cir. 1981), <u>rev'd</u>, <u>Goodwin</u>, 457 U.S. at 384.

The Motion does cite two other cases—outside this Circuit—in which discovery appears to have been authorized, but a close inspection shows that they offer perilously thin support for the defendant's position.    The first is an unpublished district court opinion with a comparatively more significant pre-hearing record of animus.    In <u>United States v. Williams</u>, No. 20-CR-55 (LMA), 2020 WL 5960689 (E.D. La. Oct. 8, 2020), a prominent local attorney, city councilman, and soon-to-be candidate for district attorney was indicted for tax offenses.    The defendant contended that he had been targeted, in part, based upon his status as a "reformist" candidate for district attorney.    According to the defendant, the government's theory of prosecution was premised largely upon proffer statements made by their tax preparer that the public figure had pressured the preparer to take aggressive deductions for business losses and expenses.    The government's discovery showed, however, that the tax preparer had followed a substantially similar approach for all of his tax clients, most of whom drew no meaningful government investigation.    As to one similarly situated client, the district court noted that—when that client denied knowledge of the challenged deductions—the government did not challenge the assertion, terminated the interview, and also ceased interviews of other clients of the same tax preparer, and instead proceeded within three weeks to indict the defendant.    The district court therefore ordered a limited evidentiary hearing to develop the record via, principally, the testimony of the investigating agents.    <u>Williams</u>, 2020 WL 5960689 at *11-*16.[4]

---

[4]    There were also other factors that appear to have motivated the district court's decision, at least in part, including but not limited to: the existence of a longer-term FBI investigation of the same defendant that preceded the tax investigation but had not produced any charges; and the fact that the government had sought and obtained special permission to convene a grand jury to seek this indictment despite then-existing orders suspending grand jury functions on account of the COVID-19 pandemic.    After an evidentiary hearing, the motion to dismiss on the basis of selective and vindictive prosecution in <u>Williams</u> was ultimately denied.    <u>See</u> Op. and Order, No. 20-CR-55 (LMA), ECF No. 105 (E.D. La. Jan. 8, 2021).    The defendants were later acquitted at trial.

Williams is entirely inapposite: McMahon cannot point to a host of hundreds of private investigators who did the same work for the same foreign power but were not prosecuted. To the contrary: the Motion tries to cast McMahon in the shoes of other, uncharged private investigators, but must concede that those others did not behave as McMahon is alleged to have behaved. Instead, those other investigators appear to have contacted federal law enforcement upon being approached and thereafter cooperated in the federal investigation. See Mot. at 16-17 (discussing United States v. Lin, No. 22-MJ-251 (MMH) (E.D.N.Y.), another foreign agent case, but noting: "Faced with this obviously unlawful activity, the private investigator contacted the FBI about the case[.]" (internal marks and citation omitted); see also Mot. at 26 (conceding that another private investigator related to the case was not charged after undertaking "purported," or sham, efforts to locate an adult child of John Doe#1 and Jane Doe#1 at the direction of the FBI). Indeed, in Lin, the private investigator reported to the FBI that he had been contacted by the defendant and participated in multiple monitored calls and text messages with the defendant. Lin, ECF No. 4 ¶¶ 9-26.

As alleged in the Superseding Indictment, McMahon's conduct was different than the other, supposedly-similarly-situated private investigators to whom he draws the Court's eye. McMahon did not "purport" to surveil John Doe#1: he surveilled him. McMahon did not "purport" to discuss a harassment campaign against John Doe#1 with another co-conspirator: he proposed one. McMahon is also alleged to have been aware, from the earliest stages of his involvement, of the PRC government's interest in John Doe#1. And, finally, McMahon complains that he was not offered the opportunity to cooperate and to assist the government's investigation—but his complaint on this score, coming as it does after his arrest, should be viewed with skepticism. The Motion notes that McMahon did contact multiple law enforcement officials

in the course of his investigation, see Mot. at 25 n.11, but fails to grapple with the reality that McMahon continued to serve the harassment campaign directed against John Doe#1 and his family after these contacts, and offered to assist the government only after he was arrested and charged, not before.  See Mot. at 29.

As for the other case in which some discovery was ordered, in United States v. Schmucker, 721 F.2d 1046 (6th Cir. 1983), the Motion fails to point out that Schmucker was later summarily reversed by the Supreme Court.  See United States v. Schmucker, 471 U.S. 1001 (1985) (citing Wayte, 470 U.S. 598 (1985)).  In Wayte, the Supreme Court concluded that discovery on the same question and on the same theory of vindictiveness was unnecessary. Wayte, 470 U.S. at 604 (noting that the government had declined to comply with district court discovery orders on the issue).  The Sixth Circuit's opinion in Schmucker therefore offers no support whatsoever for the defendant's position.

*       *       *

The defendant disputed the government's view of the evidence in his earlier motion to dismiss.   He does so again in the current Motion.   That is his right.   He can vindicate that view of the evidence with a trial jury.

## CONCLUSION

For the foregoing reasons, the Motion should be denied.    No hearing is

necessary.

Dated:        Brooklyn, New York
              October 13, 2022


                                        BREON PEACE
                                        United States Attorney
                                        Eastern District of New York

                          By:      s/
                                   _____
                                   Craig R Heeren
                                   J. Matthew Haggans
                                   Ellen H. Sise
                                   Assistant U.S. Attorneys
                                   (718) 254-7000

                                   Scott A. Claffee
                                   Trial Attorney
                                   National Security Division
                                   Special Assistant U.S. Attorney

17