CRH/MAA/IC
F. #2017R00906

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                        No. 21-CR-265 (S-1) (PKC)

HU JI,
LI MINJUN,
TU LAN,
ZHU FENG,
      also known as "Johnny Zhu,"
KUANG ZEBIN,
MICHAEL MCMAHON,
ZHAI YONGQIANG,
ZHENG CONGYING and
ZHU YONG,
      also known as "Jason Zhu,"

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

MEMORANDUM OF LAW IN SUPPORT OF THE
GOVERNMENT'S MOTIONS IN LIMINE TO ADMIT CERTAIN EVIDENCE
AND PRECLUDE CERTAIN EVIDENCE AND ARGUMENTS AT TRIAL

                                BREON PEACE
                                United States Attorney
                                Eastern District of New York

Craig R. Heeren
Meredith A. Arfa
Irisa Chen
Assistant United States Attorneys

Christine Bonomo
Trial Attorney
National Security Division

      (Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

RELEVANT BACKGROUND .................................................................................................... 2

ARGUMENT ................................................................................................................................ 5

I. The Court Should Admit Defendants' Statements as Party-Opponent Admissions When
   Offered by the Government ................................................................................................... 5

   A. The Trial Defendants' Pre-Arrest Statements ................................................................ 5

   B. The Trial Defendants' Post-Arrest Statements .............................................................. 7

   C. The Court Should Preclude Defendants from Admitting Additional Portions of their
      Statements .................................................................................................................... 11

II. The Court Should Admit Zhu Feng's False Statements as Acts in Furtherance of the
    Conspiracy and as Proof Relevant to Aiding-and-Abetting Liability ............................... 13

   A. Zhu Feng's False and Misleading Statements ............................................................. 14

   B. Legal Framework ......................................................................................................... 15

   C. Zhu Feng's False Statements to Law Enforcement Are Admissible Evidence Related
      to the Conspiracy Offenses ......................................................................................... 16

   D. Zhu Feng's False Statements to Law Enforcement Are Admissible Evidence Related
      to Proof of Aiding and Abetting Zhu's Violation of Section 951 ............................... 18

III. Statements Among and Between the Conspirators, and By Conspirators to Others About
     the Conspiracy, Are Admissible Co-Conspirator Statements ........................................... 19

   A. Legal Framework ......................................................................................................... 19

   B. Statements by the Trial Defendants to Other Conspirators, or to Others to Further the
      Conspiracy, Are Admissible Non-Hearsay ................................................................. 22

   C. Statements By and Between Other Co-Conspirators Are Admissible Non-Hearsay . 24

IV. Notice of Admissibility of Proffer-Protected Statements by Zhu Yong If Zhu Violates the
    Terms of His Proffer Agreement ....................................................................................... 26

   A. Legal Framework ......................................................................................................... 27

   B. Admissibility of Zhu's Proffer Statements at Trial .................................................... 28

V. The Court Should Admit Threats and Commands Made to the Victims as Non-Hearsay 28

VI. The Court Should Admit Certain Additional Bad Acts by Defendant McMahon as Intrinsic Evidence of the Crimes.................................................................... 30

A. Legal Framework ...................................................................................... 31

B. McMahon's Solicitation and Procurement of Information from Law Enforcement and NJMVC Databases in Violation of Privacy Laws Is Admissible............................. 32

C. McMahon's Use of Personal Bank Accounts and Failure to Report Money Received From Co-Conspirators as Income Is Admissible......................................... 35

VII. The Court Should Preclude Evidence or Argument Suggesting Selective Prosecution or Impugning or Otherwise Challenging the Government's Conduct of the Investigation .. 37

A. Legal Framework ...................................................................................... 38

B. The Government's Motive and Conduct of the Investigation Are Irrelevant at Trial 38

VIII. The Court Should Preclude Evidence or Argument Regarding Prior Good Acts or Compliance with the Law as Irrelevant ........................................................... 40

IX. The Court Should Preclude Evidence or Argument About the Existence of Absence of Classified Information as Irrelevant.................................................................. 42

X. The Court Should Preclude Improper Use of Agent Reports to Impeach Witnesses That Were Interviewed.......................................................................................... 44

XI. The Court Should Limit Public Disclosure of Personal Identifiable Information of the Victims and their Family Members and Certain Other Exhibits Containing Highly Sensitive Information about the Victims ........................................................... 47

XII. The Court Should Preclude Evidence or Argument Relating to Defenses That Required Prior Notice Under Rules 12.1, 12.2 and 12.3 of the Federal Rules of Criminal Procedure 50

CONCLUSION................................................................................................ 52

TABLE OF AUTHORITIES

**Cases**

Bourjaily v. United States,
    483 U.S. 171 (1987)............................................................................................... 20
Bowden v. Keane,
    237 F.3d 125 (2d Cir. 2001).......................................................................... 48, 50
Brown v. Artuz,
    283 F.3d 492 (2d Cir. 2002).................................................................................. 50
Crawford v. Washington,
    541 U.S. 36 (2004)................................................................................................. 17
Dep't of Navy v. Egan,
    484 U.S. 518 (1988).............................................................................................. 43
Funk v. Belneftekhim,
    No. 14-CV-0376 (BMC), 2018 WL 11169575 (E.D.N.Y. Nov. 30, 2018) ............. 12
Grunewald v. United States,
    353 U.S. 391   (1957)........................................................................................... 16
Huddleston v. United States,
    485 U.S. 681, 691-92 (1988) ............................................................................... 32
Lugosch v. Pyramid Co.,
    435 F.3d 110 (2d Cir. 2006)................................................................................... 6
Old Chief v. United States,
    519 U.S. 172, 183 (1997)...................................................................................... 32
Palermo v. United States,
360 U.S. 343 (1959).................................................................................................. 46
Press-Enterprise Co. v. Superior Court of California, Riverside Cnty.,
464 U.S. 501 (1984).................................................................................................. 47
Richardson v. Marsh,
481 U.S. 200 (1987)..................................................................................................... 9
Ryan v. Miller,
303 F.3d 231 (2d Cir. 2002)........................................................................................ 7
Shephard v. United States,
290 U.S. 96 (1933)................................................................................................... 12
Taylor v. Illinois,
484 U.S. 400 (1980)................................................................................................. 51
United States v. Abcasis,
785 F. Supp. 1113 (E.D.N.Y. 1992) ......................................................................... 51
United States v. Abouammo,
No. 19-CR-621 (EMC), ECF No. 290 (N.D.Cal. June 10, 2022)............................ 49
United States v. Abuhamra
    389 F.3d 309 (2d Cir. 2004).............................................................................. 48
United States v. Alamonte
    956 F.2d 27 (2d Cir. 1992)............................................................................ 45, 46
United States v. Amato
    15 F.3d 230 (2d Cir. 1994)................................................................................. 22
United States v. Amodeo
    71 F.3d 1044 (2d Cir. 1995)........................................................................... 6, 29

United States v. Aref
    533 F.3d 72 (2d Cir. 2008)................................................................. 6
United States v. Ashburn
    76 F. Supp. 3d 401 (E.D.N.Y. 2014) ................................................ 8, 9, 10
United States v. Ashraf
    320 F. App'x 26 (2d Cir. 2009) ....................................................... 21
United States v. Badia
    827 F.2d 1458 (11th Cir. 1987) ...................................................... 42
United States v. Baez
    349 F.3d 90 (2d Cir. 2003)............................................................. 34
United States v. Barrett
    153 F. Supp. 3d 552 (E.D.N.Y. 2015) ............................................ 36
United States v. Barrow
    400 F.3d 109 (2d Cir. 2005)........................................................... 27
United States v. Bergstein
    788 F. App'x 742 (2d Cir. 2019) .................................................... 35
United States v. Best
    219 F.3d 192 (2d Cir. 2000)........................................................... 18
United States v. Black
    No. 13-CR-316 (DLI), 2014 WL 5783067 (E.D.N.Y. Nov. 5, 2014) ...... 36
United States v. Blake
    195 F. Supp. 3d 605 (S.D.N.Y. 2016)............................................. 11
United States v. Bruton
    391 U.S. 123 (1968) ...................................................................... 7, 28
United States v. Carboni
    204 F.3d 39 (2d Cir. 2000)............................................................. 31
United States v. Cardascia
    951 F.2d 474 (2d Cir. 1991)........................................................... 12
United States v. Conception
    983 F.2d 369 (2d Cir. 1992)........................................................... 31, 34
United States v. Damti
    109 F. App'x 454 (2d Cir. 2004) .................................................... 41, 42
United States v. Davidson
    308 F. Supp. 2d 461 (S.D.N.Y. 2004)............................................. 11
United States v. Dawkins
    999 F.3d 767 (2d Cir. 2021)........................................................... 41
United States v. Demosthene
    334 F. Supp. 2d 378 (S.D.N.Y. 2004)............................................. 40
United States v. Desena
    260 F.3d 150 (2d Cir. 2001)........................................................... 21
United States v. Diaz
    176 F.3d 52 (2d Cir. 1999)............................................................. 35
United States v. Donovan
    55 F. App'x 16 (2d Cir. 2003) ....................................................... 21, 24
United States v. Downing
    297 F.3d 52 (2d Cir. 2002)............................................................. 32

United States v. Dupree
  870 F.3d 62 (2d Cir. 2017)........................................................................................ 32
United States v. Eisen
  974 F.2d 246 (2d Cir. 1992)............................................................................... 15, 26
United States v. Farhane
  634 F.3d 127 (2d Cir. 2011)..................................................................................... 38
United States v. Fawwaz
  694 F. App'x 847 (2d Cir. 2017) ......................................................................... 21, 22
United States v. Feng Tao
  No. 19-CR-20052 (JAR), ECF No. 214 (D. Kan. Jan. 27, 2022) ............................ 40
United States v. Gonzalez
  110 F.3d 936 (2d Cir. 1997)..................................................................................... 31
United States v. Gonzalez
  399 F. App'x 641 (2d Cir. 2010) ............................................................................. 13
United States v. Gotti
  457 F. Supp. 2d 395 (S.D.N.Y. 2006)...................................................................... 12
United States v. Gupta
  747 F.3d 111 (2d Cir. 2014)........................................................................ 19, 22, 24
United States v. Harper
  No. 05–CR–6068L, 2009 WL 140125 (W.D.N.Y. Jan. 20, 2009) ............................ 13
United States v. Inniss
  No. 18-CR-134 (KAM), 2019 WL 6999912 (E.D.N.Y. Dec. 20, 2019) .................... 32
United States v. Jackson
  180 F.3d 55 (2d Cir. 1999)....................................................................................... 13
United States v. James
  712 F.3d 79 (2d Cir. 2013)....................................................................................... 21
United States v. Jass
  569 F.3d 47 (2d Cir. 2009).......................................................................... 7, 8, 9, 10
United States v. Jeffrey Webb, et al.
  15-CR-252 (PKC), ECF No. 1275 ........................................................................... 39
United States v. Jergensen
  797 F. App'x 4 (2d Cir. 2019) ................................................................................. 16
United States v. Johnson
  507 F.3d 793 (2d. Cir. 2007).................................................................................... 13
United States v. Kahale
  789 F. Supp. 2d 359 (E.D.N.Y. 2009) ..................................................................... 16
United States v. Knox
  687 F. App'x 51 (2d Cir. 2017) ............................................................................... 38
United States v. Kurland
  No. 20 CR 306 (S-1) (NGG), 2022 WL 2669897 (E.D.N.Y. July 11, 2022) ............ 20
United States v. Kuthuru
  665 F. App'x 34 (2d Cir. 2016) ............................................................................... 30
United States v. Leonardi
  623 F.2d 746 (2d Cir. 1980)................................................................................ 45, 46
United States v. Liu
  No. 19-CR-804 (VEC), ECF No. 198 (S.D.N.Y. Mar. 14, 2022)............................. 39

United States v. Lyle
   919 F.3d 716 (2d Cir. 2019) .......................................................................... 7
United States v. Mahaffy
   No. 05-CR-613, 2007 WL 1094153 (E.D.N.Y. Apr. 10, 2007) ............................ 11
United States v. Maldonado-Rivera
   922 F.2d 934 (2d Cir. 1990) ........................................................................ 20
United States v. Malka
   No. 19 CR 497 (NSR), 2022 WL 1488568 (S.D.N.Y. May 11, 2022) ............... 20, 23
United States v. Mallory
   40 F.4th 166 (4th Cir. 2022) ................................................................... 48, 49
United States v. Marin
   669 F.2d 73 (2d Cir. 1982) ........................................................................ 11
United States v. Mermelstein
   487 F.Supp.2d 242 (E.D.N.Y.2007) ............................................................ 16
United States v. Milstein
   401 F.3d 53 (2d Cir. 2005) .................................................................... 16, 17
United States v. Mostafa
   992 F. Supp. 2d 335 (S.D.N.Y. 2014) .......................................................... 44
United States v. Mulder
   273 F.3d 91 (2d Cir. 2001) ........................................................................ 22
United States v. Osarenkhoe
   439 F. App'x 66 (2d Cir. 2011) ................................................................... 35
United States v. Pascarella
   84 F.3d 61 (2d Cir. 1996) .......................................................................... 35
United States v. Persico
   No. 04-CR-911 (JS), 2007 WL 9759642 (E.D.N.Y. Nov. 6, 2007) ...................... 20
United States v. Pitre
   960 F.2d 1112 (2d Cir. 1992) ................................................................ 29, 32
United States v. Preldakaj
   456 F. App'x 56 (2d Cir. 2012) ................................................................... 38
United States v. Rahme
   813 F.2d 31 (2d Cir. 1987) ........................................................................ 22
United States v. Reese
   933 F. Supp. 2d 579 (S.D.N.Y. 2013) .......................................................... 40
United States v. Regan
   103 F.3d 1072 (2d Cir. 1997) .................................................................... 39
United States v. Rivera
   22 F.3d 430 (2d Cir. 1994) ........................................................................ 20
United States v. Rivera
   No. 13-CR-149 (KAM), 2015 WL 1875658 (E.D.N.Y. Apr. 22, 2015) ................ 34
United States v. Roberts
   660 F.3d 149 (2d Cir. 2011) ...................................................................... 27
United States v. Robinson
   702 F.3d 22 (2d Cir. 2012) ........................................................................ 31
United States v. Roldan-Zapata
   916 F.2d 795 (2d Cir. 1990) ...................................................................... 29

United States v. Rosado
    728 F.2d 89 (2d Cir. 1984) ............................................................... 38
United States v. Russo
    302 F.3d 37 (2d Cir. 2002)..................................................... 17, 20, 24
United States v. Saldarriaga
    204 F.3d 50 (2d Cir. 2000)........................................................ 38, 40
United States v. Scarpa
    897 F.2d 63 (2d Cir. 1990)............................................................. 41
United States v. Scarpa
    913 F.2d 993 (2d Cir. 1990)........................................................... 41
United States v. SKW Metals & Alloys, Inc.
    195 F.3d 83 (2d Cir. 1999)............................................................. 19
United States v. Smith
    426 F.3d 567 (2d Cir. 2005)..................................................... 48, 49
United States v. Stewart
    433 F.3d 273 (2d Cir. 2006)............................................................. 6
United States v. Stewart
    590 F.3d 93 (2d Cir. 2009)............................................................. 43
United States v. Stewart
    No. 03-CR-717 (MGC), 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004)................. 40
United States v. Tarantino
    846 F.2d 1384 (D.C. Cir. 1988)....................................................... 21
United States v. Taylor
    745 F.3d 15 (2d Cir. 2014)............................................................... 8
United States v. Thai
    29 F.3d 785 (2d Cir. 1994)............................................................. 21
United States v. Thomas
    116 F.3d 606 (2d Cir. 1997)........................................................... 39
United States v. Towne
    870 F.2d 880 (2d Cir. 1989)........................................................... 31
United States v. Tutino
    883 F.2d 1125 (2d Cir. 1989)....................................................... 7, 8
United States v. Valenti
    60 F.3d 941 (2d Cir. 1995)............................................................. 36
United States v. Walker
    191 F.3d 326 (2d Cir. 1999)........................................................... 41
United States v. Wallach
    935 F.2d 445 (2d Cir. 1991)........................................................... 36
United States v. Williams
    936 F.2d 698 (2d Cir. 1991)............................................................. 9
United States v. Yousef
    327 F.3d 56 (2d Cir. 2003)............................................................. 11
United States v. Yunis
    867 F.2d 617 (D.C.Cir. 1989) ..................................................... 43, 44
Waller v. Georgia
    467 U.S. 39 (1984)....................................................................... 47

**Statutes**

18 U.S.C. § 1905 ................................................................................................ 34

18 U.S.C. § 2721 ................................................................................................ 33

18 U.S.C. § 3500(e) ........................................................................................... 46

18 U.S.C. § 552a ................................................................................................ 33

18 U.S.C. App. 3, § 5 ........................................................................................ 43

18 U.S.C. App. 3, § 7 ........................................................................................ 43

**Rules**

Fed. R. Crim. P. 12.1(a) .................................................................................... 51

Fed. R. Crim. P. 12.2 ........................................................................................ 51

Fed. R. Crim. P. 12.3 ........................................................................................ 51

Fed. R. Evid. 104(a) .......................................................................................... 20

Fed. R. Evid. 106 .............................................................................................. 12

Fed. R. Evid. 401 ......................................................................................... 29, 34

Fed. R. Evid. 404(b) ............................................................................... 30, 31, 32

Fed. R. Evid. 613 .............................................................................................. 45

Fed. R. Evid. 801(a) .......................................................................................... 19

Fed. R. Evid. 801(d)(2)(A) .................................................................................. 6

Fed. R. Evid. 801(d)(2)(D) ................................................................................ 24

Fed. R. Evid. 803(3) .......................................................................................... 12

Fed. R. Evid. 1101(d)(1) .................................................................................... 20

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its motions in limine to:

(1)  Admit the trial defendants' statements as party-opponent admissions;

(2)  Admit co-defendant Zhu Feng's false statements for non-hearsay purposes;

(3)  Admit statements between and among the co-conspirators involved in this case;

(4)  Provide notice of the potential use of proffer-protected statements against Zhu Yong;

(5)  Admit threats and commands made to victims as non-hearsay;

(6)  Admit certain bad acts by defendant Michael McMahon as direct evidence or, in the alternative, pursuant to Rule 404(b) of the Federal Rules of Evidence;

(7)  Preclude claims of selective prosecution or challenging the government's motive or conduct of the investigation;

(8)  Preclude the admission of evidence of prior good acts;

(9)  Preclude any attempt to seek information about the existence or absence of classified information related to this matter;

(10)  Preclude the defendants' improper use of summary interview reports as "statements" for impeachment purposes;

(11)  Limit public disclosure of personal identifiable information of the victims and family members, and certain exhibits containing sensitive information;

(12)  Precluding evidence or argument relating to defenses that required prior notice under the Federal Rules of Criminal Procedure;

For the reasons set forth herein, the government's motions in limine should be granted.

1

RELEVANT BACKGROUND

Defendants Michael McMahon, Congying Zheng[1] and Zhu Yong (also known as "Jason Zhu") (the "Trial Defendants"), together with co-defendants Hu Ji (also known as "Eric Yan"), Li Minjun, Tu Lan, Zhu Feng (also known as "Johnny Zhu"), and Zhai Yongqiang (collectively, with the Trial Defendants the "Defendants") are charged in a superseding indictment, ECF No. 76 (the "Indictment" or "Ind.") returned on July 21, 2021, by a grand jury sitting in the Eastern District of New York, with conspiracy to act as illegal agents of a foreign government (Count One), a substantive count of acting as an illegal agent of a foreign government (Count Two), conspiracy to engage in interstate stalking (Count Three), and a substantive count of interstate stalking (Count Four), in violation of Title 18, United States Code, Sections 371, 951 and 2261A(1)(b).   Ind. ¶¶ 56-65.[2]   The Defendants were previously charged alongside Jin Hongru, Rong Jing and Kuang Zebin, all of whom subsequently pled guilty to criminal offenses arising out of the same scheme.[3]

The charges arise out of a criminal conspiracy by the Defendants and other individuals who, at the direction of officials of the People's Republic of China (the "PRC"),

---

[1] Defendants' names are written using the naming convention of surname followed by given name, as is common practice for Chinese names, except for defendants McMahon and Zheng, who both indicate a preference for the western convention of surname last.

[2] Defendants Tu Lan and Zhu Feng were additionally charged with obstruction of justice and conspiracy to commit same (Counts Five and Six) in violation of 18 U.S.C. §§ 1512(c)(2) and 1512(k).   See id. at ¶¶ 66-69.

[3] Jin Hongru and Rong Jing were charged by complaint on October 27, 2020.   See Compl. (ECF No. 1).   Both pled guilty, pursuant to an Information, to conspiracy to act as illegal agents of a foreign government and conspiracy to engage in interstate stalking.   See United States v. Rong Jing, No. 21-CR-112 (PKC); United States v. Jin Hongru, No. 21-CR-313 (PKC).   Kuang Zebin was charged in the Superseding Indictment and pled guilty to one count of conspiracy to engage in interstate stalking.   See Minute Entry, dated March 29, 2022.

engaged in an international campaign to threaten, harass, surveil, and intimidate John Doe-1 and Jane Doe-1 (together the "Victims"), as well as their daughter (Jane Doe-3).

The conspiracy was part of the PRC government's international efforts in support of "Operation Fox Hunt," an operation where the PRC government targets Chinese individuals living in foreign countries that the PRC government alleges have committed crimes under PRC law, and seeks to repatriate them to the PRC to face charges.   In or about 2012 and 2014, the PRC government caused the International Criminal Police Organization (also known as "Interpol"), an inter-governmental organization, to issue "red notices" for John Doe-1 and Jane Doe-1 (the "Red Notices").   A red notice is a request to law enforcement worldwide that advises all member states of Interpol if an individual is wanted by the requesting country and contains information about the person's identity and their alleged criminal conduct.   The goal of this conspiracy was to force John Doe-1 and Jane Doe-1 to return to the PRC against their will, and involved efforts to pressure the Victims and their family.   For example, on several occasions between 2011 and 2016, John Doe-1 and other family members were approached by multiple people who indicated they were acting on behalf of the PRC, and who said that John Doe-1 should return to the PRC or he and his family would face severe consequences.

Subsequently, between approximately 2016 and 2019, members of the PRC government directed several individuals, including the Defendants, to engage in unsanctioned and illegal conduct in the United States on behalf of the PRC for the purpose of coercing the Victims to return to the PRC.   In and around April 2017, Trial Defendants Michael McMahon and Zhu Yong, together with several other co-conspirators, participated in a scheme to bring John Doe-1's elderly father ("John Doe-2"), from the PRC to the United States against the father's will and to use the unannounced presence of John Doe-2 to threaten and attempt to coerce John Doe-1's return

to the PRC.   The operation was supervised and directed by several PRC officials, including defendants Hu Ji and Tu Lan.   The operation occurred after several months of surveillance activity by McMahon and others.   Among other things, McMahon obtained information about the Victims from a sensitive federal law enforcement database and accessed and disclosed information from a state vehicle records database, both in violation of relevant law.   McMahon then passed that sensitive information to the PRC officials and his co-conspirators.   Li Minjun, a PRC-based doctor, traveled with John Doe-2 on the long trip from the PRC to New Jersey.   Zhu Yong worked with Michael McMahon, a private investigator, as well as with Zhu Feng and Jin Hongru, to gather intelligence about, surveil and locate John Doe-1 and Jane Doe-1 in the United States before, during and after the compelled travel of John Doe-1's father.

Between approximately May 2017 and July 2018, several conspirators targeted the Victims' daughter, Jane Doe-2, for surveillance and online harassment.   Specifically, Rong Jing and Zhai Yongqiang attempted to hire a private investigator to locate Jane Doe-2, in order to photograph and video record the daughter as part of a campaign to exert pressure on the Victims. Thereafter, an unidentified co-conspirator sent harassing messages over social media to Jane Doe-2 and her friends related to the PRC's interest in repatriating the Victims.

Next, in or about September 2018, two conspirators, Trial Defendant Zheng Congying and co-conspirator Kuang Zebin visited John Doe-1's residence, banged on his front door, walked into his yard, and left a message taped to the residence that threatened John Doe-1 and his family with dire consequences should he fail to return to the PRC.

Several months after that, between approximately February 2019 and April 2019, unidentified co-conspirators caused unsolicited packages to be sent to John Doe-1's residence.

4

These packages contained letters and a video with messages intended to coerce the Victims to return to the PRC.

None of the conspirators, including the Trial Defendants, provided notice to the Attorney General that they were acting as agents of the PRC government or a PRC official, as required by Title 18, United States Code, Section 951 and its implementing regulations.   Thus, in addition to their conduct constituting interstate stalking and conspiracy to do the same, the defendants also were acting as unlawful agents in violation of Section 951.

<u>ARGUMENT</u>

I.   <u>The Court Should Admit Defendants' Statements as Party-Opponent Admissions When Offered by the Government</u>

The government respectfully moves to admit the prior statements of the Trial Defendants if those statements are offered at trial by the government, and to preclude any additional prior statements if offered by the Trial Defendants.

A.   <u>The Trial Defendants' Pre-Arrest Statements</u>

The government intends to offer numerous statements made by the Trial Defendants in its case-in-chief.   For example, with respect to McMahon, such statements may include the following categories: (1) McMahon's statements sent via emails and text messages, including to, among others, █████████████, Hu Ji, █████████████ ██████████████████████████, Zhu Feng, Zhu Yong, and to himself; (2) McMahon's statements in third-party records, including, among others, financial, telephone, and email records; and (3) McMahon's oral statements to conspirators and third parties, including, among others, ████████, Jin Hongru, ██████ and ████████.[4]

---

[4] The government respectfully requests permission to file a redacted version of this brief

With respect to Zheng, such statements may include the following categories: (1) Zheng's oral statements to conspirators and third parties, including, among others, Kuang Zebin; and (2) Zheng's statements in third-party records, including, among others, phone records.   With respect to Zhu, such statements may include the following categories: (1) Zhu's statements sent via email and text message, including to, among others, McMahon and █████ (2) Zhu's statements in third-party records, including, among others, telephone and iCloud records; and (3) Zhu's oral statements to conspirators and third parties, including, among others, █████.

The government generally may introduce a defendant's statements into evidence because a statement is not hearsay if it is "offered against an opposing party and . . . was made by the party in an individual or representative capacity." Fed. R. Evid. 801(d)(2)(A).   These statements are well-within the purview of Rule 801(d)(2)(A) and thus are admissible. Additionally, none of these statements are testimonial, as they were not made to law enforcement or with any expectation of future judicial proceedings, and thus do not raise any Confrontation Clause issues.   See United States v. Stewart, 433 F.3d 273, 290 (2d Cir. 2006) (testimonial statements "involve a declarant's knowing responses to structured questioning in an investigative

---

on the public docket and the unredacted version under seal.   The government is sensitive to the need to minimize the amount of information in a criminal case that is filed under seal.   See, e.g., United States v. Aref, 533 F.3d 72, 83 (2d Cir. 2008) (noting "requirement that district courts avoid sealing judicial documents in their entirety unless necessary"); Lugosch v. Pyramid Co., 435 F.3d 110, 120 (2d Cir. 2006) (noting that sealing orders should be "narrowly tailored"). However, sealing is necessary because the brief contains sensitive information, including the identities of victims and third-party witnesses.   United States v. Amodeo, 71 F.3d 1044, 1050-52 (2d Cir. 1995) (privacy interests of third parties may be compelling reason justifying sealing). The government respectfully submits that these reasons constitute a sufficient basis for the Court to make the "specific, on the record findings" necessary to support sealing, Lugosch, 435 F.3d at 120, and accordingly respectfully requests that the Court record those findings and file the unredacted brief under seal.

environment or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings.") (internal quotations and citation omitted).

B.      The Trial Defendants' Post-Arrest Statements

The government additionally intends to offer statements made by each of the Trial Defendants to agents with the FBI following their respective arrests in this case.   To the extent the government seeks to admit for their truth portions of these statements that reference any co-defendant of the declarant, these statements will be offered into evidence only after properly sanitizing them to remove all references to the other defendants, and with an appropriate limiting instruction making clear the statements are admitted only as to the declarant, to ensure that the statements fully comport with Bruton v. United States, 391 U.S. 123, 128 (1968).

"The crux of [The Confrontation Clause of the Sixth Amendment] is that the government cannot introduce at trial statements containing accusations against the defendant unless the accuser takes the stand against the defendant and is available for cross examination." Ryan v. Miller, 303 F.3d 231, 247 (2d Cir. 2002) (citing Bruton, 391 U.S. at 128).   The Second Circuit has made clear that "'a redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names, and where the statement standing alone does not otherwise connect co-defendants to the crimes, may be admitted without violating a co-defendant's Bruton rights.'"   United States v. Jass, 569 F.3d 47, 56 (2d Cir. 2009) (quoting United States v. Tutino, 883 F.2d 1125, 1135 (2d Cir. 1989)); see also United States v. Lyle, 919 F.3d 716, 734 (2d Cir. 2019) (upholding redactions where terms "individual" and "person" were substituted for proper names).   In the Second Circuit, courts apply a two-step analysis in determining whether the redactions and alterations are adequate: (1) whether the redacted confession "indicat[ed] to the jury that the original statement contained actual names," and (2) "whether the redacted confession, even if the very first item

7

introduced at trial would immediately inculpate" the defendant in the charged crime.   See Jass, 569 F.3d at 61 (alteration in original; internal quotations omitted).

Consistent with this approach, courts in this Circuit have allowed proper names to be replaced with the following terms (among others): "another person," "others," "other people," and "another person," the pronoun "he," "this guy," "another guy," and "friend."   See United States v. Taylor, 745 F.3d 15, 28-29 (2d Cir. 2014) (collecting cases) (internal citations omitted); see also Tutino, 883 F.2d at 1135 (approving use of "others," "other people," and "another person" for names of co-defendants in confession of non-testifying defendant).   These examples reflect that the purpose of the substitutions is not to eliminate references to the existence of a confederate but, rather, to use words "that might actually have been said by a person admitting his own culpability in the charged conspiracy while shielding the specific identity of his confederate." United States v. Ashburn, 76 F. Supp. 3d 401, 420 (E.D.N.Y. 2014) (NGG) (quoting Taylor, 745 F.3d at 28) (internal quotations omitted) (upholding government's proposed redactions and substitutions replacing all references to co-defendant's name with "the guy," "the other guy," and a "guy he knows."); Jass, 569 F.3d at 62, 65 (upholding use of "other person" in lieu of co-defendant's name, and finding that terminology "neither manifested obvious indications of alteration, nor otherwise signaled to the jury that the statements had originally contained actual names" (citations and internal quotations omitted)).

Importantly, it does not matter if the jury may be able to draw inferences about the codefendant when the sanitized statement is considered along with other evidence in the case. "The critical inquiry is . . . not whether a jury might infer from other facts (whether evidence admitted at trial or circumstances such as the number of defendants on trial) that a declarant's neutral allusion to a confederate might have referenced the defendant."   Ashburn, 76 F. Supp. 3d

at 421 (alterations in original; quoting Jass, 569 F.3d at 61).   Rather, "the appropriate analysis to be used when applying the Bruton rule requires that [the court] view the redacted confession in isolation from the other evidence introduced at trial."   United States v. Williams, 936 F.2d 698, 700 (2d Cir. 1991).   "If the confession, when so viewed, does not incriminate the defendant, then it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to the defendant."   Id. at 701; see also Jass, 569 F.3d at 62 ("In making this determination, we view the redacted statement in isolation to evaluate its impact on a jury.") (citing Richardson v. Marsh, 481 U.S. 200, 208-09 (1987)).   Thus, the Court's analysis must be as to whether the defendant's redacted statement, viewed in isolation from all other evidence, incriminated the referenced co-defendant.

As set forth in Exhibit 1, the government has proposed substitutions to certain of McMahon's and Zhu's post-arrest statements in accordance with Bruton.[5]   Under Taylor's two-step inquiry, the government's redactions alleviate any Confrontation Clause concerns by substituting co-defendants' names with generic references.   First, the redacted statements do not indicate that the original statement contained actual names.   The government replaced the defendant's names with variations of neutral pronouns or other generic references, consistent with Second Circuit precedent.   See Ashburn, 76 F. Supp. 3d at 420-21; see also Jass, 569 F.3d at 56, 61-62.   Second, each redacted statement, if it were "the very first item introduced at trial," would not "immediately inculpate" the referenced co-defendant in the charged crime.   Jass, 569 F.3d at 61.   As the Second Circuit has held, even in a case with only two co-defendants, a redacted statement that necessarily links the defendants is admissible.   See id. at 62.   In Jass, one defendant confessed and implicated his co-defendant by name several times in the confession.

_____

[5] Zheng's statements do not implicate Bruton considerations.

9

See id. at 63.   The government redacted the co-defendant's name from the confession and replaced it with "the other person."   Id. at 53.   The co-defendant argued that the jury would infer in a two-defendant conspiracy trial that the "other person" in the confession was the co-defendant. Id. at 62.   The Second Circuit rejected this argument, holding that, when viewed in isolation, "it would not have been immediately apparent to a jury that heard only [the defendant's] redacted references to 'another person' that he was specifically inculpating [his co-defendant] in the [crime].   The 'other person' could have been anyone."   Id. at 62.   The same is true here.

The government has not substituted generic references such as "private investigator," "investigator," and "PI," as such references are squarely permitted under Taylor. First, these references do not indicate that the original statements contained actual names – and, indeed, the original statements did not.   See Ashburn, 76 F. Supp. 3d at 420-21; see also Jass, 569 F.3d at 56, 61-62.   Second, if statements including such references were "the very first item introduced at trial," they would not "immediately inculpate" McMahon.   Jass, 569 F.3d at 61. Although that would be true in any event, it is particularly true because the case involves allegations of conduct by other private investigators.   And, as the term "private investigator" is itself generic and can refer to others, it already satisfies Bruton's concern with shielding the "specific identity" of a confederate.[6]

---

[6] The government may also seek to admit statements Zhu made to the government on April 15, 2022—in the presence of Zhu's attorney and in the absence of any proffer agreement governing the government's subsequent use of Zhu's statements—which are memorialized in an FD-302 report.   As reflected in the report, Zhu does not specifically mention any co-defendant, but did refer generally to an "investigator" or "professional investigator."   Accordingly, and consistent with the above, these statements also do not need to be modified according to Bruton.

C.    The Court Should Preclude Defendants from Admitting Additional Portions of their Statements

The Court should preclude the defendants from admitting other portions of their statements, either on cross-examination or in their case-in-chief, because such testimony would constitute hearsay without any exception.   It is well established that a defendant generally is prohibited from introducing his own out-of-court statements at trial.   See United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."); United States v. Blake, 195 F. Supp. 3d 605, 610 (S.D.N.Y. 2016) ("'[W]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible.'" (alteration in original; quoting Marin, 669 F.2d at 84)).   Therefore, a "court may . . . exclude any portion that consists largely of a defendant's own self-serving statements, which, as offered by him, are inadmissible hearsay."   United States v. Mahaffy, No. 05-CR-613 (ILG), 2007 WL 1094153, at *2 (E.D.N.Y. Apr. 10, 2007) (internal quotations omitted); see also United States v. Yousef, 327 F.3d 56, 153 (2d Cir. 2003) (holding that "while the Government was free to introduce the statement as an admission by a party-opponent, [the defendant] had no right to introduce it on his own" (citations omitted)).   As the Sixth Circuit has explained, were the law otherwise, a defendant "could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury."   United States v. McDaniel, 398 F.3d 540, 545 (6th Cir. 2005).   A defendant may offer his prior statements in an "attempt to get [his] side of the . . . story in front of the jury without him[self] testifying and opening him[self] up to cross-examination."   United States v. Davidson, 308 F. Supp. 2d 461, 480 (S.D.N.Y. 2004).

Nor, except in extremely limited circumstances, may a defendant introduce his own out-of-court statements as evidence of his state of mind. The state of mind exception to the hearsay rule allows into evidence "[a] statement of the declarant's then-existing state of mind . . . but not including a statement of memory or belief to prove the fact remembered or believed."  Fed. R. Evid. 803(3).  The state of mind must be relevant, and the statement cannot be offered for any underlying truth.  See Funk v. Belneftekhim, No. 14-CV-0376 (BMC), 2018 WL 11169575, at *3 (E.D.N.Y. Nov. 30, 2018) (denying admission of statements under Rule 803(3) because "[n]either statement shows [declarant's] knowledge or state of mind independent from the truth of what it asserts and it is not clear how [declarant's] state of mind is relevant."). "The exclusion of statement[s] of memory or belief [proffered] to prove the fact remembered or believed is necessary to prevent the exception from swallowing the hearsay rule.  This would be the result of allowing one's state of mind, proved by a hearsay statement, to provide an inference of the happening of an event that produced the state of mind." United States v. Cardascia, 951 F.2d 474, 487 (2d Cir. 1991) (alterations in original; internal quotations omitted).  The statement must be forward-looking and not backward-looking.  See id. (citing Shephard v. United States, 290 U.S. 96, 104 (1933), for proposition that statement, "Dr. Shephard has poisoned me," is not admissible as an existing state of mind because it was backward-looking).

Such testimony is also not admissible pursuant to the rule of completeness.   Under Federal Rule of Evidence 106, courts only permit inclusion of otherwise hearsay testimony where it is "essential to explain an already admitted document, to place the admitted document in context, or to avoid misleading the trier of fact." United States v. Gotti, 457 F. Supp. 2d 395, 397-98 (S.D.N.Y. 2006).  Self-serving exculpatory statements are not admissible by a defendant unless "their exclusion would unfairly distort the meaning of the declarant's non-hearsay statements that

are in evidence." United States v. Harper, No. 05-CR-6068L, 2009 WL 140125, at *5 (W.D.N.Y. Jan. 20, 2009).   Accordingly, the Second Circuit has excluded hearsay statements offered by the defendant that, by their omission, do not distort the admitted statements.   See United States v. Gonzalez, 399 F. App'x 641, 645 (2d Cir. 2010) (affirming district court's decision to exclude portion of defendant's statement where admitted portion did not distort the meaning of the full statement); United States v. Johnson, 507 F.3d 793, 796 (2d. Cir. 2007) (affirming district court's decision to exclude portions of confession that did not explain the admitted portion or place the admitted portion in context, noting that while "[t]he admitted portion of the confession related to . . . plans to execute the robbery, . . . the redacted portion related to the execution of the robbery" (emphasis omitted)).   As the Second Circuit has explained, a defendant may not introduce other parts of the same statement offered in part by the government unless the defendant makes a proper showing that the statements he seeks to introduce have a separate basis for admission.   See United States v. Jackson, 180 F.3d 55, 73 (2d Cir. 1999) (rejecting claim under the completeness doctrine that later portions of conversation provided relevant context and noting that "the portions of the tape proffered by [defendant] consisted largely of [his] own self-serving statements, which, as offered by him, are inadmissible hearsay").   The completeness doctrine does not "require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." Johnson, 507 F.3d at 796 (citations omitted).

II.   The Court Should Admit Zhu Feng's False Statements as Acts in Furtherance of the Conspiracy and as Proof Relevant to Aiding-and-Abetting Liability

The government respectfully moves to admit at trial certain statements made to federal law enforcement by fugitive co-defendant Zhu Feng.   The statements constitute acts in furtherance of the charged conspiracies to act as illegal agents of the PRC and to commit interstate stalking, and are admissible against Zhu's co-conspirators.   The statements were intended to

13

conceal the conspiracy from law enforcement and to further the conspirators' ability to continue to act in the United States as illegal agents of the PRC.   Zhu's efforts to conceal the conspiracy do not implicate the bar on hearsay or the Trial Defendants' Sixth Amendment confrontation rights.   The statements also are relevant to proving Zhu's guilt of the charged substantive offense under 18 U.S.C. § 951, a necessary predicate to establishing the Trial Defendants' liability under the charged theory that they aided and abetted Zhu's criminal conduct.

     A.    <u>Zhu Feng's False and Misleading Statements</u>

As discussed above, one of the co-conspirators in the scheme was Zhu Feng, a person who helped to surveil the Victims and participated in the April 2017 operation to bring John Doe-1's father to the United States to try to compel John Doe-1's return to the PRC.   At trial, the government anticipates admitting statements made by Zhu Feng on April 12, 2017 to law enforcement and border officials.   Zhu Feng made these statements at Newark Liberty International Airport ("Newark Airport"), as he tried to return to the PRC—on the same flight as John Doe-1's elderly father—after the April 2017 forced repatriation efforts failed and before several other acts in furtherance of the conspiracy occurred.   A transcript of the interview, which was recorded, is attached hereto as Exhibit 2.   During the interview, Zhu Feng made false and misleading statements to law enforcement, in particular about his knowledge of and relationship to PRC Official Tu Lan.   The entirety of the interview was misleading, but Zhu Feng stated, in particular:

- He was merely a "tour guide" for Tu Lan who took Tu to Woodbury Commons for a shopping trip.

- Tu Lan did not meet with anyone else in the United States.

- When asked about Tu Lan's employment, Zhu stated only that she "travels a lot."

- Tu Lan never asked Zhu to do anything specific on his flight back to the PRC.

14

Zhu Feng's statements were false and an attempt to conceal the ongoing conspiracy. Among other things, the evidence demonstrates that Zhu Feng knew that: Tu Lan was a PRC government official; Tu Lan and other PRC officials were trying to compel the Victims to return to the PRC; Tu Lan came to the United States to participate in the April 2017 operation to use John Doe-1's father to coerce John Doe-1's repatriation; Tu Lan directed Zhu Feng to coordinate operations with Trial Defendant Michael McMahon; Tu Lan directed Zhu Feng to surveil and manage John Doe-1's father on the return flight to the PRC.   Zhu Feng specifically directed co-conspirator Jin Hongru to "follow the instructions when working for the Chinese government" and directed McMahon to obtain information about the Victims from New Jersey government motor vehicle records.   The intent behind Zhu Feng's lies were made clear in other admissible evidence.[7] After the interview at Newark Airport, Zhu Feng and Tu Lan discussed deleting their chat communications, and Zhu Feng directed Jin Hongru to "delete all of our chat record" because "[t]here are some problems…[s]omeone in the U.S. will be looking for you."

As discussed above, the conspiracy to stalk and force the repatriation of the Victims continued for several years after the April 12, 2017 interview.

B.   Legal Framework

Acts taken to conceal an ongoing conspiracy are acts in furtherance of that conspiracy and, therefore, are relevant and admissible at trial.   See United States v. Eisen, 974 F.2d 246, 269 (2d Cir. 1992) ("[C]learly, acts or statements designed to conceal an ongoing conspiracy are in furtherance of that conspiracy."); United States v. Kahale, 789 F. Supp. 2d 359,

---

[7] Zhu Feng subsequently met with law enforcement on November 9, 2017, after he returned to the United States from the PRC, and admitted more fully to his involvement in the conspiracy, including his role in the April 2017 operation involving John Doe-1's father.   Zhu was interviewed once more, at Seattle-Tacoma International Airport on June 20, 2018, as he was departing the United States for the PRC.   Zhu is believed to have remained in the PRC.

384 (E.D.N.Y. 2009) (holding that "an act taken to conceal an ongoing illegal agreement . . . constitutes an act in furtherance of the charged conspiracy, and is admissible"); United States v. Mermelstein, 487 F.Supp.2d 242, 261 (E.D.N.Y. 2007) ("Efforts to conceal an ongoing conspiracy may properly be charged as overt acts in furtherance of it." (citing United States v. Milstein, 401 F.3d 53, 72 (2d Cir. 2005)); see also Grunewald v. United States, 353 U.S. 391, 405-06 (1957) (distinguishing "between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime" (emphasis added)); United States v. Jergensen, 797 F. App'x 4, 6 (2d Cir. 2019) (affirming instruction to jury that "acts of concealment done in furtherance of the main criminal objectives of the conspiracy are said to continue a conspiracy," in contrast to acts "done after central objectives of the conspiracy have been attained, for the sole purpose of covering up after a crime" (internal quotation and alterations omitted) (emphasis added)).

C.    Zhu Feng's False Statements to Law Enforcement Are Admissible Evidence Related to the Conspiracy Offenses

Zhu Feng's lies were essential to the success of the conspiracy because the PRC's ability to harass and stalk the Victims depended, in part, on the U.S. government being unaware of the conspirators' true role as PRC agents.   The government intends to urge the fair and obvious inference that Zhu Feng's lies to the law enforcement constituted an effort to conceal the nature of his work on behalf of the PRC to stalk the Victims, and thereby preserve the continuity of PRC operations on U.S. soil.   For example, in the days and weeks after Zhu Feng lied to law enforcement, Zhu and other conspirators continued to communicate with Trial Defendant McMahon about gathering information in the United States about the Victims and the Victims' daughter.

16

Zhu Feng's statements minimizing his involvement with Tu Lan, omitting that he knew she was a PRC government official and denying that he was asked to do anything further for Tu Lan were all clearly designed to obscure the nature of his ongoing conduct on behalf of the PRC and the role of his PRC handlers.   Jurors are entitled to infer that actions that permit co-conspirators to "to reap—and keep—economic gains from their conspiracy" are "more than mere acts of concealment of the crime."   Milstein, 401 F.3d at 72.   So, too, may they infer that Zhu Feng's actions were designed to protect his and his PRC's handlers' ability to continue to "reap— and keep"—the gains from their and the Defendants' work as agents of the PRC, namely their sustained and ongoing efforts to try to compel the Victims to return to the PRC.   While the Victims did not immediately return to the PRC, the impact of the April 2017 Operation involving John Doe-1's father, coupled with later efforts like the threatening note left on the Victims' door and the harassment of their daughter was intended to sustain and increase pressure on the Victims.   By failing to reveal the nature of the conspiracy, Zhu allowed the other parts of the operation to continue without law enforcement interference.

In light of the foregoing, Zhu Feng's lies and omissions to the FBI are admissible against the Trial Defendants because, as co-conspirators, "[e]ach is deemed to have authorized the acts and declarations of the other undertaken to carry out their joint objective."   United States v. Russo, 302 F.3d 37, 45 (2d Cir. 2002); see also Milstein, 401 F.3d at 72 ("Foreseeable acts of one co-conspirator in furtherance of the conspiracy are attributable to all co-conspirators.").

Because Zhu Feng's lies to law enforcement are not being offered for their truth, they do not implicate the Trial Defendants' confrontation rights under the Sixth Amendment.   See, e.g., Crawford v. Washington, 541 U.S. 36, 59 n. 9 (2004) ("The [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter

17

asserted."); Stewart, 433 F.3d at 291 ("Crawford expressly confirmed that the categorical exclusion of out-of-court statements that were not subject to contemporaneous cross-examination does not extend to evidence offered for purposes other than to establish the truth of the matter asserted.").   Nor is there any risk of unfair prejudice, as the statements, although false, contain no particularly inflammatory language or content.

       D.     <u>Zhu Feng's False Statements to Law Enforcement Are Admissible Evidence Related to Proof of Aiding and Abetting Zhu's Violation of Section 951</u>

Zhu Feng's statements are also admissible as evidence that he committed a substantive violation of Section 951, a necessary predicate to establishing that the Trial Defendants aided and abetted Zhu in that violation.   See, e.g., United States v. Best, 219 F.3d 192, 199 (2d Cir. 2000) (observing that to convict a defendant on an aiding and abetting theory, the government must prove, among other things, "that the underlying crime was committed by a person other than the defendant").   The statements' relevance to Zhu Feng's guilt of the substantive offense is that, among other things, they constitute acts in the United States on behalf of the PRC in that they were designed to preserve his ability to continue his work on the PRC's behalf.   Among other things, Zhu Feng was directed to watch over John Doe-1's father on the return trip to the PRC, and disclosing the truth would have made that harder, if not impossible.   The actions are also consistent with other directions provided by PRC officials related to concealment of the criminal scheme.   For example, before the interview, Zhu Feng was directed to take night vision goggles used in the criminal scheme back with him to the PRC.   And after the interview, Zhu Feng was directed to delete communications by PRC official Tu Lan.   Given this other evidence, the government can fairly urge the jury to infer that this conduct was part of Zhu's larger set of actions on behalf of the PRC government, in violation of Section 951, which was aided and abetted by the Trial Defendants.

18

III.    Statements Among and Between the Conspirators, and By Conspirators to Others About the Conspiracy, Are Admissible Co-Conspirator Statements

The government respectfully moves to admit at trial statements made by certain conspirators that were made during and in furtherance of the conspiracy.   The government anticipates admitting (1) statements by the Trial Defendants to one or more of the other charged defendants, as well as by the Trial Defendants to unindicted co-conspirators[8] and (2) statements among and between other co-conspirators regarding the planning, execution, flight from, and attempted concealment of their scheme.

A.    Legal Framework

A statement is not hearsay if "the statement is offered against an opposing party and . . . was made by the party's co-conspirator during and in furtherance of the conspiracy."   Fed. R. Evid. 801(d)(2)(E).   To admit such statements, a court must find by a preponderance of the evidence that (i) "there was a conspiracy"; (ii) "its members included the declarant and the party against whom the statement is offered"; and (iii) "the statement was made during the course of and in furtherance of the conspiracy."   United States v. Gupta, 747 F.3d 111, 123 (2d Cir. 2014). Written as well as oral statements of a co-conspirator, if made in the course of and in furtherance of the conspiracy, are admissible under Rule 801(d)(2)(E).   See, e.g., United States v. SKW Metals & Alloys, Inc., 195 F.3d 83, 88 (2d Cir. 1999) (citing Fed. R. Evid. 801(a)).   In determining whether a party has established a proper foundation for admission of co-conspirator statements, a court may consider hearsay and other evidence not admissible at trial, including the

---

[8] As discussed above, statements by Trial Defendants also constitute party-opponent admissions when admitted against the defendant who made the statement.   But they are separately admissible against the other Trial Defendants pursuant to the co-conspirator statement exclusion from hearsay.

19

proffered statements themselves.   See Fed. R. Evid. 104(a), 1101(d)(1); Bourjaily v. United States, 483 U.S. 171, 178-81 (1987).

"In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged co-conspirator's statement itself."   Gupta, 747 F.3d at 123.   Through this evidence, the government must establish the existence of a conspiracy in which the declarant and the defendant participated.   See United States v. Maldonado-Rivera, 922 F.2d 934, 958 (2d Cir. 1990).   The conspiracy that serves as the basis for admission of co-conspirator statements may, but need not, be a conspiracy alleged in the indictment.   See Russo, 302 F.3d at 45; United States v. Persico, No. 04-CR-911 (JS), 2007 WL 9759642, at *3 (E.D.N.Y. Nov. 6, 2007) (holding that "the statement in question need not further the charged conspiracy" and that, in context of mafia prosecution, statement was admissible because it was "made during the course and in furtherance of the larger conspiracy of La Cosa Nostra").

"The requirement that the challenged statement be 'in furtherance of' the conspiracy is satisfied if the statement's objective is 'designed to promote or facilitate achievement of the goals of the conspiracy.'"   United States v. Malka, 19-CR-497 (NSR), 2022 WL 1488568, at *13 (S.D.N.Y. May 11, 2022) (quoting United States v. Rivera, 22 F.3d 430, 436 (2d Cir. 1994)). Courts in this district have repeatedly held that this standard is "is not very restrictive."   United States v. Kurland, 20-CR-306 (S-1) (NGG), 2022 WL 2669897, at *3 (E.D.N.Y. July 11, 2022) (citing Malka, 2022 WL 1488568, at *13)).   "It permits, for example, introduction of any co-conspirator statement that 'reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy.'"   Malka, 2022 WL 1488568, at *13 (citing United States v. Tarantino, 846 F.2d

20

1384, 1412 (D.C. Cir. 1988)).   Even "statements relating past events meet the in-furtherance test

if they serve some current purpose in the conspiracy." United States v. Thai, 29 F.3d 785, 813

(2d Cir. 1994); see also United States v. James, 712 F.3d 79, 106 (2d Cir. 2013).   "[S]o long as a

co-conspirator statement was in furtherance of the conspiracy, there is no requirement that it have

been in furtherance of the interests of the defendant himself or of any particular co-conspirator."

Gupta, 747 F.3d at 124.

Nothing in the text of Rule 801(d)(2)(E) or in caselaw interpreting the Rule's scope

requires that a statement be communicated to any other member of the conspiracy to qualify as a

co-conspirator statement, so long as it was made during and in furtherance of the conspiracy and

is admitted against a member of the conspiracy.   See, e.g., United States v. Fawwaz, 694 F. App'x

847, 851 (2d Cir. 2017) (holding that list containing "information regarding the current status of

the conspiracy and its membership [was] sufficiently in furtherance of a conspiracy"); United

States v. Ashraf, 320 F. App'x 26, 29 (2d Cir. 2009) (affirming admission of drug ledgers pursuant

to Rule 801(d)(2)(E)); United States v. Donovan, 55 F. App'x 16, 22 (2d Cir. 2003) (affirming

admission of a ledger and a list, each kept by individual conspirators, during the course of securities

fraud conspiracy to track certain commission payments, thereby "further[ing] the operations and

efficiency of the conspiracy"); Malka, 2022 WL 1488568, at *12 (internal citations omitted) ("A

statement need not be made by one co-conspirator to another co-conspirator in order to be in

furtherance of a conspiracy.").

Co-conspirator statements that "provide reassurance, or seek to induce a co-

conspirator's assistance, or serve to foster trust and cohesiveness or inform each other as to the

progress or status of the conspiracy" further the ends of a conspiracy, United States v. Desena, 260

F.3d 150, 159 (2d Cir. 2001), as do statements "that apprise a co-conspirator of the progress of the

conspiracy," United States v. Rahme, 813 F.2d 31, 36 (2d Cir. 1987); see also United States v. Amato, 15 F.3d 230, 234 (2d Cir. 1994), or that "prompt the listener to respond in a way that facilitates the carrying out of criminal activity,"   Gupta, 747 F.3d at 123-25.   For example, courts have found that a list containing "information regarding the current status of the conspiracy and its membership, is sufficiently in furtherance of a conspiracy."   Fawwaz, 694 F. App'x at 851 (summary order).   In United States v. Mulder, as another example, the Second Circuit upheld the admission of a co-conspirator's statements even though they appeared to merely narrate conversations between members of the conspiracy because it kept fellow co-conspirators apprised of the arrangements for their extortion scheme.   273 F.3d 91, 103 (2d Cir. 2001).

B.   Statements by the Trial Defendants to Other Conspirators, or to Others to Further the Conspiracy, Are Admissible Non-Hearsay

The government anticipates admitting emails and text messages between Trial Defendant Michael McMahon and Trial Defendant Zhu Yong, as well as between McMahon and co-defendant Hu Ji. [9]   These communications were often transmitted through ▮▮▮▮▮▮, an unindicted co-conspirator who acted as an intermediary and translator between McMahon, Zhu Yong and Hu Ji.   The statements are regarding the hiring and work by McMahon to gather intelligence, surveil and help harass John Doe-1.   The government will also offer text messages between McMahon and Zhu Feng regarding McMahon's efforts to gather intelligence, surveil and help harass John Doe-1, as well as payment to McMahon for his efforts.

These are quintessential co-conspirator statements that are admissible at trial.   As the evidence described above and offered at trial will establish, there was in fact a conspiracy to engage in interstate stalking, and to do so as illegal agents of the PRC government.   These

_____

[9]   The evidence will show that Hu Ji used the pseudonym "Eric Yan" when communicating with McMahon.

statements were made by a co-conspirator in that conspiracy (one or more of the defendants charged in both the Section 951 and stalking conspiracies), and the statements were made during and to further the conspiracy (discussions about the April 2017 scheme to locate, surveil and harass the Victims).

  The fact that some of these statements were made to ███████ an unindicted co-conspirator and intermediary, does not alter this analysis.   There is evidence to establish that ███ ███ was a participant in the conspiracy, as she helped facilitate the communications between McMahon and Zhu Yong, and knew the purpose of those communications.   Even if she were not a conspirator, and instead only an intermediary, the hearsay exclusions in Rule 801(d)(2) (which encompasses the co-conspirator rule) includes several provisions that permit the admission of statements that were made by a third party on behalf or at the direction of the opposing party.   See Fed. R. Evid. 801(d)(2)(C), (D) (party authorized statement, or made by party's agent or employee).   Here, ███████ was paid by Zhu Yong to hire McMahon and convey messages from Zhu and other conspirators to McMahon in English, and back to those individuals in Chinese. Additionally, and as discussed above, a statement does not need to be made directly by one co-conspirator to another, provided it furthers the conspiracy.   See Malka, 2022 WL 1488568, at *12. Here, the communications centered around furthering or providing updates on the conspiracy; for example, McMahon repeatedly sent reports on his surveillance and other investigative activities to ███████ to be based back to other conspirators.

  For largely the same reasons, messages sent by one of the defendants to himself is also admissible.   For example, McMahon emailed himself an investigative report about John Doe-1.   McMahon's decision to send this message to himself reflects an intent to further the charged conspiracy by (1) ensuring that McMahon would be in a position to relay information about John

Doe-1 to other conspirators and (2) serving as a repository of information about the target of the criminal scheme, permitting him to remember and further refine his role in the conspiracy.   See, e.g., Donovan, 55 F. App'x at 22 (affirming introduction of ledger and list generated "as ways to keep track of the commissions to the coldcallers, thereby indicating that the documents furthered the operations and efficiency of the conspiracy"); Russo, 302 F.3d at 46 (observing that the operation of a criminal conspiracy "requires that information be passed among interested persons").   In a complex scheme such as this one, the conspiracy could only be effectively furthered if the defendants took steps to develop, keep track of, and report accurately on their conduct.

Lastly, statements made by McMahon to two private investigators working for McMahon are also admissible.   McMahon directed the private investigators to assist with his surveillance of the Victims during the April 2017 operation and, at the same time, relied on information from these two persons to help facilitate his own surveillance and investigative activities.   Thus, the statements to the private investigators were clearly made to further the conspiracy.   See Gupta, 747 F.3d at 125 (statement need not be made to a member of the conspiracy to be admissible because "[s]tatements designed to induce the listener's assistance with respect to the conspiracy's goals satisfy the Rule's in-furtherance requirement").   The statements by the private investigators are additionally admissible because they were hired and paid by McMahon, and were made within the scope of their employment relationship with McMahon. Fed. R. Evid. 801(d)(2)(D).

C.    Statements By and Between Other Co-Conspirators Are Admissible Non-Hearsay

The government also anticipates admitting emails, text messages and audio recordings among and between several other co-conspirators.   These statements include:

1.     Chat messages and other communications between and among Zhu Feng, Jin Hongru, Tu Lan, and Hu Ji regarding the planning, execution and flight from the PRC for the April 2017 operation to stalk John Doe-1 and coerce his return to the PRC.

2.     Chat messages between Zhu Feng and Li Feng, a PRC official, in which they discuss the planning of the April 2017 operation, including how they would instruct John Doe-1's elderly father to answer U.S. border entry questions to avoid arousing suspicion.

3.     Two audio recordings, which reflect: (i) a conversation between Zhu Feng, Tu Lan and Jin Hongru at a New Jersey hotel in April 2017, where they discuss the surveillance and harassment of John Doe-1; and (ii) a conversation between Zhu Feng and several other unidentified individuals in which they discuss the relative success of the April 2017 operation.

4.     Chat messages between Zhu Feng and Tu Lan in which they discuss concealing the conspiracy by deleting the contents of their electronic messages.

Each of these categories of statements are relevant and admissible pursuant to the co-conspirator rule.   All but one of the individuals involved in these communications were charged as conspirators in the Indictment.   Li Feng was not charged, but the evidence establishes he was involved in the conspiracy:   Li paid funds to McMahon for his work helping to investigate, surveil and stalk the Victims, and his chat messages with Zhu Feng show that he helped construct answers to questions for the Victim's elderly father when he entered the United States (with Zhu Feng asking Li how they would "beat" the questions that would allow the father to gain entry). Communications about locating the Victims, surveilling the Victims, the logistics of bringing John Doe-1's father to the United States, how the various conspirators would escape from the United States back to the PRC, reporting their activity back to other PRC officials, and their discussion of the relative success (or lack thereof) of the ongoing actions against the Victims are all core to furthering the criminal scheme.

The same is true for text communications between Zhu Feng and Tu Lan where they discuss deleting their communications about the conspiracy.   The statements were made on

April 13, 2017, only a few days after the attempt to coerce John Doe-1 through his father, and involved a specific command from Tu Lan to "delete all the chat content" after Zhu Feng approached John Doe-1's father on the flight back from the United States.   As discussed in more detail above, with regard to Zhu Feng's false statements to law enforcement, acts taken to conceal an ongoing conspiracy are acts in furtherance of that conspiracy and, therefore, are relevant and admissible at trial.   See Eisen, 974 F.2d at 269.   The conspiracy continued for several years after this, and thus a jury could properly conclude that they were done to further the conspiracy.

IV.   Notice of Admissibility of Proffer-Protected Statements by Zhu Yong If Zhu Violates the Terms of His Proffer Agreement

The government hereby notifies the Court and defendant Zhu Yong that it intends to introduce at trial statements made by Zhu during his November 18, 2020 proffer meeting with the government, should an appropriate triggering event occur under the terms of the governing proffer agreement.   Specifically, should the defendant testify or offer evidence or arguments at trial that conflict with the statements he made during the proffer meeting, the government intends to offer evidence of those statements through cross-examination or witness testimony during its case-in-chief or rebuttal case.

As background, on November 18, 2020, Zhu was interviewed by the government team, in the presence of his attorney, pursuant to a proffer agreement signed by both Zhu and his attorney prior to the interview.   The proffer agreement permits the government to use Zhu's statements, among other things: "as substantive evidence to cross-examine [Zhu], should [Zhu] testify"; and "as substantive evidence to rebut, directly or indirectly, any evidence offered or elicited, or factual assertions made, by or on behalf of [Zhu] at any stage of a criminal prosecution (including but not limited to detention hearing, trial or sentencing)."   (See Exhibit 3 (proffer agreement) ¶¶ 3-4.)

26

A.    Legal Framework

A defendant's statements made pursuant to a proffer agreement with the government are admissible if a defendant makes a "factual assertion" at trial—whether by presenting evidence, through questioning or during argument—and the statement sought to be introduced "fairly rebut[s]" that assertion.   United States v. Barrow, 400 F.3d 109, 119 (2d Cir. 2005).    Moreover, rebuttal evidence "is not limited to direct contradiction," but also "encompasses any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary."   Id. at 120-21.

In Barrow, for example, the Second Circuit held enforceable a proffer agreement, where the defendant had admitted during proffer meetings with the government that he regularly sold crack cocaine.   Id. at 115.   At trial, defense counsel stated in his opening that "this is a case of mistaken identity."   Id. at 114.   Defense counsel also cross-examined a detective testifying for the government on discrepancies between the officer's testimony regarding one of the crack sales and his official report and accused the detective of fabricating a meeting with the defendant.   Id. The Barrow court held that both defense counsel's opening statement and cross-examination questions triggered the provision in the proffer agreement, which allowed the admission of the defendant's proffer statements.   Id. at 119-20.   In so doing, the court espoused a two-part inquiry: (1) does the statement, testimony, or question which is alleged to trigger the admissibility of the proffer statement constitute a "factual assertion;" and (2) does the statement sought to be introduced "fairly rebut" that assertion.   Id. at 119.   Notably, the court specifically rejected the contention that the triggering statement must directly contradict the statement sought to be introduced.   Id. at 120 (noting that "proper rebuttal is not limited to direct contradiction"); see also United States v. Roberts, 660 F.3d 149, 158 (2d Cir. 2011) (noting the distinction between

27

questions that challenge perception or recollection, but do not imply that the event did not occur, and questions that accuse the witness of fabricating the event and implicitly assert that no such event took place).

      B.    <u>Admissibility of Zhu's Proffer Statements at Trial</u>

Should Zhu Yong testify or offer evidence or arguments at trial that conflict with the statements he made during the proffer meeting, the government respectfully submits that it should be permitted to offer evidence of those statements through cross-examination or witness testimony during its case-in-chief or rebuttal case.   To the extent the government seeks to admit for their truth statements that reference either of Zhu's co-defendants, these statements will be offered into evidence only after properly sanitizing them to remove all references to the other defendants and ensuring they fully comport with <u>Bruton</u>.

V.    <u>The Court Should Admit Threats and Commands Made to the Victims as Non-Hearsay</u>

The government intends to admit several pieces of evidence that reflect threats or commands that were made to the Victims as part of the scheme to coerce their return to the PRC. In particular, the government anticipates that John Doe-1 will testify that ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████[10]

   The government respectfully submits that this testimony and documentary evidence is admissible non-hearsay. First, the information is relevant because it tends to make it more likely that there was, in fact, a years-long conspiracy to engage in interstate stalking of the Victims, as well as to operate in the United States at the direction of the PRC government. See Fed. R. Evid. 401 (evidence is relevant if it has "any tendency to make a fact more or less probable"). That the conduct occurred several years before the charged time conspiracy period does not alter this analysis. "Prior act evidence may be admitted to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed." United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992) (affirming admission of prior narcotics transactions outside of conspiracy). This is especially true where, as is the case here, the prior acts "represent[] only a tiny fraction of the testimony heard by the jury" and are not "any more sensational or disturbing than the crimes . . . charged." See United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990) (affirming admission of pre-existing drug relationship because it "furthered the jury's understanding of how the instant transaction came about and their role in it").[11]

---

[10] ████████████████████████████████████████████████
██████████████████████ Accordingly, the government is filing portions of this section under seal. See Amodeo, 71 F.3d at 1050-52.

[11] It is the government's understanding that, on at least one occasion, John Doe-1's former classmate stated, in sum and substance, that if John Doe-1 refused to return to the PRC, John Doe-1 should instead commit suicide. The government submits that this statement is not unduly prejudicial, because it is consistent with other threats that is direct evidence of the charged

Second, the evidence is admissible as non-hearsay, because the statements are not being offered for their truth.   "Questions and commands are ordinarily not hearsay because they are not offered for the truth of the matter asserted and threats are verbal acts, not hearsay."   United States v. Kuthuru, 665 F. App'x 34, 38 (2d Cir. 2016) (affirming admission of statement "if you can't do your job, you know where the door is.") (cleaned up) (collecting cases).  ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████  Neither is offered for their truth and therefore they are not barred by the hearsay rule.   See id. ("Whether construed as a command, an ultimatum or a threat, [the statement] was not an assertion offered for its truth.").

John Doe-1 is expected to testify that the harassment, stalking and attempts to coerce his travel evolved over time as he resisted repeated threats directed by the PRC government. John Doe-1's testimony about commands and threats made by others prior to the start of the stalking campaign charged in this case is necessary for the jury to understand the relationship between the PRC government, the Victims and the defendants, as well as to understand how the overt stalking scheme came about.

VI.   The Court Should Admit Certain Additional Bad Acts by Defendant McMahon as Intrinsic Evidence of the Crimes

The government moves to admit as direct evidence, or alternatively, other bad acts under Federal Rule of Evidence 404(b) that (i) McMahon solicited and obtained information about the Victims from law enforcement agents and the New Jersey Motor Vehicle Commission

---

offenses.   For example, Trial Defendant Congying Zheng left a note on John Doe-1's door stating "[i]f you are willing to go back to the mainland and spend 10 years in prison, your wife and children will be all right," a similarly disturbing threat, if not more alarming because it implied future harm to John Doe-1's family.

("NJMVC") database in violation of relevant privacy laws, and (ii) McMahon funneled funds received from his co-conspirators into personal bank accounts, including a joint account with his wife and his son's account—not the business account for McMahon Investigative Group, his private investigator company.   Moreover, McMahon failed to report monies received for his private investigator work done at the behest of his co-conspirators as income earned on his tax returns he filed for 2016 and 2017.   As explained below, this evidence is inextricably intertwined with the charged crimes and as such is admissible as direct evidence of the charged crimes. Alternatively, this evidence is admissible as McMahon's "other crimes, wrongs or acts" under Federal Rule of Evidence 404(b) to show McMahon's intent, lack of mistake and knowledge.

A.     Legal Framework

It is well-established that evidence of uncharged acts is admissible as direct evidence of crimes charged in an indictment, and not other crimes evidence under Federal Rule of Evidence 404(b), when the event "arose out of the same transaction or series of transactions as the charged offense, is inextricably intertwined with the evidence regarding the charged offense, or it is necessary to complete the story of the crime on trial."   United States v. Robinson, 702 F.3d 22, 37 (2d Cir. 2012); United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (same); United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989) (same).   In such circumstances, the uncharged acts evidence is appropriately treated as "part of the very act charged."   United States v. Conception, 983 F.2d 369, 392 (2d Cir. 1992).

A "trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment."   United States v. Gonzalez, 110 F.3d 936, 941-42 (2d Cir. 1997) (citation omitted).   Background evidence may be admitted to show, for example, the "circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed."   Id. at 941;

31

see also United States v. Inniss, No. 18-CR-134 (KAM), 2019 WL 6999912, at *4 (E.D.N.Y. Dec. 20, 2019) (same).   Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case."   Old Chief v. United States, 519 U.S. 172, 183 (1997).

The evidence is alternatively admissible under Federal Rule of Evidence 404(b), which permits the introduction of a "crime, wrong, or other act" for purposes such as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."   The Second Circuit has long adopted an inclusionary approach to Rule 404(b), allowing the admission of other act evidence "for any purpose other than to show a defendant's criminal propensity."   Pitre, 960 F.2d at 1118.   A court can admit this evidence of "prior acts as probative of knowledge and intent if the evidence is relevant to the charged offense, i.e., if there is a similarity or connection between the charged and uncharged acts."   United States v. Dupree, 870 F.3d 62, 76 (2d Cir. 2017).   Such evidence is correctly admitted if it is: "(1) offered for a proper purpose; (2) relevant, and (3) substantially more probative than prejudicial.   In addition, (4) at the defendant's request, the district court should give the jury an appropriate limiting instruction."   United States v. Downing, 297 F.3d 52, 58 (2d Cir. 2002) (citing Huddleston v. United States, 485 U.S. 681, 691-92 (1988)).

B.   McMahon's Solicitation and Procurement of Information from Law Enforcement and NJMVC Databases in Violation of Privacy Laws Is Admissible

At trial, the government anticipates introducing evidence that on April 6, 2017 McMahon and Zhu Feng were texting, and McMahon told Zhu Feng that he was following John Doe-1 after John Doe-1 drives to pick up his father, John Doe-2, from his sister's home. McMahon followed John Doe-1 and obtained a photograph of the license plate on John Doe-1's

car.   Zhu Feng then texted McMahon to "plz run info check for plate and the house asap.   We don't need to monitor their activity until we have some info for those."   NJMVC records show that on April 6, 2017, McMahon searched the NJMVC database for John Doe-1's license plate. McMahon then sent a photograph to Zhu Feng depicting the owner and associated address for the vehicle and relayed how the car was financed.   Evidence at trial will also show that defendant McMahon had previously written in an application to obtain access to the NJMVC database that his reason for doing so was "to assist Law Firms regarding investigations."   Moreover, as McMahon's agreement with the NJMVC makes clear, his conduct must abide by applicable federal and New Jersey state privacy laws, including Title 18, United States Code, Section 2721, which prohibits the release and use of certain personal information from State motor vehicle records as McMahon did.

Similarly, the government anticipates introducing evidence that in late October 2016, defendant McMahon provided the social security numbers, dates of birth and driver's license numbers of John Doe-1 and Jane Doe-1 to ████████████████████████████ ████ in an effort to obtain information about the Victims from ████████████████ databases pertaining to their travel in and out of the United States.   At trial, evidence will also show that McMahon did in fact obtain these records and passed them to co-conspirators working for the PRC government.   Indeed, by soliciting and obtaining such information, McMahon conspired to violate several federal laws prohibiting the disclosure of federal records without authorization.[12]

_____

[12]  See, e.g., 18 U.S.C. §§ 552a ("No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the

At the outset, McMahon's work to obtain data about the Victims through extralegal channels is sufficient to meet the low threshold of relevance set forth in Federal Rule of Evidence 401. Here, McMahon faces charges that he acted as an agent of PRC government officials to secure the repatriation of John Doe-1 and Jane Doe-1, that he engaged in interstate stalking, including on an aiding and abetting theory, and that he conspired to do the same. His acts obtaining information about the Victims at the instruction of Zhu Feng, in violation of federal law, are direct evidence of elements of all the charged crimes and show that he acted at the behest of Zhu Feng (who was working for the PRC government) and Hu Ji (who was a PRC government official). As such, the Court should admit evidence that defendant McMahon accessed and acquired information from law enforcement and NJMVC databases in furtherance of the charged conspiracies and at the behest of his co-conspirators who worked for the Chinese government.

Moreover, McMahon's illegal acquisition and use of information from NJMVC and law enforcement databases should be admitted as direct evidence as they are a "part of the very act[s] charged." Conception, 983 F.2d at 392. McMahon's conduct was in furtherance of the charged conspiracies and also establishes elements that McMahon did in fact act as an agent of a foreign government official and aided in the interstate stalking of the Victims. It is well-settled that "uncharged acts may be admissible as direct evidence of the conspiracy itself." See United States v. Baez, 349 F.3d 90, 93 (2d Cir. 2003) (internal quotations omitted); United States v. Rivera, No. 13-CR-149 (KAM), 2015 WL 1875658, at *3 (E.D.N.Y. Apr. 22, 2015) ("An act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the

---

record pertains [subject to certain exceptions that are not relevant].”), 1905 (“an officer or employee of the United States or of any department or agency thereof, . . . publishes, divulges, discloses or makes known in any manner to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation . . . shall be fined under this title, or imprisoned not more than one year, or both.”).

very act charged.") (quoting United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999)) (internal quotations omitted). Further, this evidence speaks to McMahon's intent and understanding of the nature of conspiracies he is charged with involving his surveillance of and probe into the Victims and their families.   As this evidence reflects McMahon's knowledge of his wrongdoing and lack of mistake, it is also admissible under Rule 404(b).   See United States v. Pascarella, 84 F.3d 61, 69 (2d Cir. 1996).

C.   McMahon's Use of Personal Bank Accounts and Failure to Report Money Received From Co-Conspirators as Income Is Admissible

The government also seeks to introduce evidence that in December 2016 and April 2017, instead of directing funds received for his surveillance of and inquiries into the Victims into the business bank account for McMahon Investigative Group, McMahon routed over $13,000 from Chinese official Li Feng and co-conspirators Zhu Feng and others into personal bank accounts for him and his wife as well as a bank account held in the name of his son.   Moreover, a comparison of McMahon Investigative Group bank records and tax returns filed by McMahon show that McMahon did not report the over $13,000 received for his work surveilling the Victims as income in 2016 and 2017.   This, too, is admissible as direct evidence, or alternatively Rule 404(b) evidence, that McMahon knew that the proceeds from Zhu Feng and other co-conspirators were illegal.

Courts routinely admit evidence that a defendant failed to report earnings from alleged criminal conduct at trial to show a defendant's intent or lack of mistake.   See United States v. Bergstein, 788 F. App'x 742, 745 (2d Cir. 2019) (summary order) (explaining that the district court properly admitted the tax returns under Rule 404(b) because they showed "intent and absence of mistake"); United States v. Osarenkhoe, 439 F. App'x 66, 68 (2d Cir. 2011) (summary order) ("Because Thompson denied she had knowingly defrauded New York City's Administration for

35

Children's Services by accepting the adoption subsidy payments, evidence going to her intent and absence of mistake was relevant to the issue in dispute."); United States v. Valenti, 60 F.3d 941, 946 (2d Cir. 1995) (holding that the returns were properly admitted); United States v. Wallach, 935 F.2d 445, 472 (2d Cir. 1991) (finding that the district court did not err in admitting evidence that defendant did not disclose $150,000 lobbying payment as evidence that "concealment of the . . . payments was not innocent"); United States v. Black, No. 13-CR-316 (DLI), 2014 WL 5783067, at *4-5 (E.D.N.Y. Nov. 5, 2014) (explaining that court was persuaded by other circuits that had found that "failure to report significant sums of money in tax filings is relevant to, and evidence of . . . participation in a money laundering conspiracy," but nonetheless "conduct[ing] an analysis under 404(b), as an alternative basis" because the Second Circuit had not yet spoken to the issue).

This Court should admit evidence that McMahon diverted funds received in connection with his surveillance of the Victims into personal accounts, rather than his private investigator business account, as evidence that McMahon knew that his investigative activities were on behalf of individuals working for the PRC government and intended to illegally further the harassment and intimidation of the Victims.  His failure to report such income on his tax returns similarly shows his knowledge.  Where, as here, "[t]he alleged tax fraud evidence . . . would tend to show that defendant sought unlawfully to conceal or disguise fraudulently obtained income from taxation, from which a jury could find that defendant knew the proceeds at issue . . . derived from illegal activity," such evidence should be admitted. United States v. Barrett, 153 F. Supp. 3d 552, 570-71 (E.D.N.Y. 2015) ("[T]he government's evidence of tax fraud is interrelated with and relevant to defendant's knowledge, plan, lack of mistake and motive to engage in the charged conduct.").

VII.     The Court Should Preclude Evidence or Argument Suggesting Selective Prosecution or
         Impugning or Otherwise Challenging the Government's Conduct of the Investigation

   The Trial Defendants should be precluded from introducing evidence or making

arguments before the jury that seek to impugn or otherwise put at issue the government's conduct

or motive in its prosecution of this matter.   In particular, the government respectfully requests that

the Court preclude the Trial Defendants from referencing the Department of Justice's "China

Initiative," the prosecution of other cases involving private investigators,[13] or the prosecution of

other cases related to the PRC government.   Such evidence is irrelevant to the Defendants'

innocence or guilt and presents a substantial risk of misleading the jury or inviting jury

nullification.[14]

   By way of background, Defendant McMahon has alleged that the pending charges

were improperly brought as a result of either vindictive or selective prosecution.   He has argued

that the government investigated and was prosecuting him in retaliation for his involvement in the

defense of a criminal case in the District of New Jersey, and that this improper motive led the

government to decline "seek[ing] [McMahon's] cooperation in [its] investigation."   See, e.g.

McMahon Brief in Support of Motion for Discovery and Evidentiary Hearing, ECF No. 146-1

("McMahon Br.") at 1, 14, 25, 29 n.13.   The Court rejected McMahon's claims of prosecutorial

misconduct.   See March 21, 2023 Decision and Order, ECF No. 163 ("Mar. 21, 2023 Order") at

22.   Additionally, McMahon and his counsel were interviewed in an article that discussed other

---

  [13] See, e.g., United States v. Farahani, No. 21-CR-430 (S.D.N.Y.) (involving use of a
private investigator in kidnapping conspiracy by individuals associated with Iranian government).

  [14] Although only defendant McMahon has raised allegations about the government's
motive and conduct in connection with this case, the same bases merit preclusion of such evidence
or argument for all Trial Defendants.

private investigators' involvement in federal criminal cases, and McMahon's counsel has indicated that he views the China Initiative as relevant to this trial.

    A.    <u>Legal Framework</u>

       Courts have consistently held—and often give jury instructions reflecting—that arguments regarding the government's decisions during an investigation and its motives and timing in bringing charges are irrelevant, unduly prejudicial, and improperly invite jury nullification.  <u>See</u>, <u>e.g.</u>, <u>United States v. Saldarriaga</u>, 204 F.3d 50, 52 (2d Cir. 2000) (affirming jury charge stating that "[t]he government's function is to give enough evidence to satisfy you beyond a reasonable doubt that the charges are true, and the fact that there are a thousand other things they could have done is wholly irrelevant" (internal quotations and alterations omitted)); <u>United States v. Rosado</u>, 728 F.2d 89, 93 (2d Cir. 1984) (criticizing admission of evidence about the propriety of a prosecution "for turning the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial"); <u>United States v. Preldakaj</u>, 456 F. App'x 56, 60 (2d Cir. 2012) (affirming instruction that "[y]ou have heard reference, in the arguments of defense counsel in this case, to the fact that certain investigative techniques were not used by law enforcement authorities[, but t]he government is not on trial, and law enforcement techniques are not your concern"); <u>United States v. Knox</u>, 687 F. App'x 51, 54-55 (2d Cir. 2017) (instructing jury that "government is not on trial" is "appropriate" (internal quotations omitted)).

    B.    <u>The Government's Motive and Conduct of the Investigation Are Irrelevant at Trial</u>

       Courts consistently exclude a defendant's attack on the prosecution's motivation or methods in initiating its prosecution, including arguments that a defendant was improperly targeted.  <u>See</u>, <u>e.g.</u>, <u>United States v. Farhane</u>, 634 F.3d 127, 167 (2d Cir. 2011) (affirming district

court's ruling precluding defendant from arguing in summation that government had improperly targeted him for prosecution); Loera, 2018 WL 2744701, at *6 (precluding defense arguments to the jury that government's motives were improper).   The Court should do the same here, particularly because the Court already considered and rejected evidence proffered by McMahon about alleged government impropriety and motive.   See generally Mar. 21, 2023 Order.[15]   As the Court has acknowledged in another context, "making argument in the vein of selective prosecution or the government's motive in conducting its investigation; for example, not getting certain evidence or pursuing certain leads and potentially focusing on certain defendants is . . . inappropriate" at trial.   See United States v. Jeffrey Webb, et al., No. 15-CR-252 (PKC), ECF No. 1275, Trial Transcript at 3630:09-3632:12.

McMahon's apparent focus on the "China Initiative," a Department of Justice national security initiative that began in 2018 and has since ended, is particularly inappropriate. The investigation of this case began before the China Initiative commenced.   And, in any event, the China Initiative has no bearing whatsoever on the Trial Defendants' guilt or innocence. Instead, the only purpose would be to confuse the issues before the jury and would be an improper attempt to seek acquittal based on the negative association some have with the initiative, rather than on guilt or innocence.   United States v. Thomas, 116 F.3d 606, 615-16 (2d Cir. 1997) ("trial courts have a duty to forestall or prevent jury nullification.").   Unsurprisingly, several courts have specifically precluded such discussion.   See Order, United States v. Liu, No. 19-CR-804 (VEC), ECF No. 198 at 4-5 (S.D.N.Y. Mar. 14, 2022) (finding that "there is no probative value in eliciting whether any Government witnesses had knowledge of the China Initiative, and whatever limited

---

[15] See also United States v. Regan, 103 F.3d 1072, 1082 (2d Cir. 1997) (explaining that "the selective prosecution defense is an issue for the court rather than the jury").

relevance that knowledge may have is far outweighed by the danger of confusion of the issues for the jury"); Order, United States v. Feng Tao, No. 19-CR-20052 (JAR), ECF No. 214 at 32-34 (D. Kan. Jan. 27, 2022) (granting motion to preclude "any reference to the China Initiative" because "[t]his trial is about Defendant's guilt or innocence, and it should not involve a policy discussion on the China Initiative.").

Discussion of the government's treatment of private investigators in other cases is similarly inappropriate as it likewise has no bearing on the Trial Defendants.   The jury's attention belongs on "the evidence or lack of evidence that had been presented at trial," Saldarriaga, 204 F.3d at 52, not on the government's investigative decisions or motives.   Evidence concerning such matters is irrelevant, and introduction of evidence or argument concerning the timing or motives behind the government's investigation would, in addition, present an unacceptable risk of confusing the issues and misleading the jury.   The Court should preclude any such evidence or argument.   See, e.g., United States v. Stewart, No. 03-CR-717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the defendant]"); United States v. Reese, 933 F. Supp. 2d 579, 583-84 (S.D.N.Y. 2013) ("[A] defendant 'may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case.'") (quoting United States v. Demosthene, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004)).

VIII.   The Court Should Preclude Evidence or Argument Regarding Prior Good Acts or Compliance with the Law as Irrelevant

The government respectfully moves to preclude the Trial Defendants from introducing evidence or making arguments regarding prior good acts or compliance with the law.

In particular, the government seeks to preclude McMahon from eliciting testimony or offering evidence regarding other instances in which he engaged in legal activities as a private investigator.

It is well-settled that evidence that a criminal defendant did not engage in criminal activity on other instances is irrelevant to the charged crimes. Courts, including the Second Circuit, have held that evidence that a defendant engaged in legal, honest conduct on other occasions is simply irrelevant to whether the defendant engaged in the criminal conduct charged by the government. See, e.g., United States v. Scarpa, 897 F.2d 63, 70 (2d Cir. 1990) ("A defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions"); see also United States v. Dawkins, 999 F.3d 767, 792 (2d Cir. 2021) (affirming district court's exclusion of defendant's proffered evidence that he did not bribe certain basketball coaches and reasoning "[n]o less than evidence of a defendant's prior 'bad acts' used to show that he committed the crime charged, such 'good acts' evidence is only relevant if we assume that a defendant acted in conformity with those prior good acts—i.e., if we make the exact propensity inference Rule 404(b)(1) is designed to prohibit"); United States v. Walker, 191 F.3d 326, 336 (2d Cir. 1999) (affirming district court's exclusion of non-fraudulent applications, reasoning "[w]hether [defendant] had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent"). Indeed, "[e]vidence of past "good acts" by a defendant is generally not probative unless a defendant is alleged to have "always" or "continuously" committed "bad acts." United States v. Damti, 109 F. App'x 454, 455-56 (2d Cir. 2004) (citing United States v. Scarpa, 913 F.2d 993, 1010 (2d Cir. 1990), for proposition that "good acts" evidence "would only be relevant if the indictment charged [defendants] with ceaseless criminal conduct" (alterations and emphasis in original).)

41

Here, the government has not alleged that McMahon engaged in "ceaseless" criminal conduct or that he "continuously" committed illegal acts.  See Damti, 109 F. App'x at 456.  The government has charged that McMahon participated in a discrete and specific scheme to threaten, harass, surveil, and intimidate the Victims as part of a campaign to force John Doe-1 to return from the United States to the PRC.  As such, any evidence or argument that McMahon abided by the law while providing private investigation services for other clients (or as a law enforcement officer generally) simply is not probative of whether he committed the charged crimes, and accordingly should be precluded.

IX.    The Court Should Preclude Evidence or Argument About the Existence of Absence of Classified Information as Irrelevant

To the extent the Trial Defendants seek to elicit classified information at trial, they were required to comply with the Classified Information Procedures Act ("CIPA").  Accordingly, and out of an abundance of caution, the government moves to preclude any inquiry or argument about classified information during this trial outside the scope of CIPA.  See, e.g., United States v. Badia, 827 F.2d 1458, 1464–66 (11th Cir. 1987) (precluding inquiry for failure to provide notice under CIPA Section 5).  Publicly disclosing the existence or absence of particular classified information, even in general terms, would tend to reveal classified facts, and therefore create a risk to national security.  Additionally, any answers or argument about the general absence or existence of classified information would be irrelevant and inadmissible.

By way of background, CIPA provides the framework for the handling of classified information in a criminal case.[16]  As is relevant to trial, CIPA Section 5 provides the mechanism for notice of the use of classified information, while CIPA Section 6 provides for a pretrial hearing

---

[16]  The government refers the Court to its CIPA Section 2 filing for a more comprehensive discussion of the statute.  See ECF No. 66.

to make determinations about the use, relevance, or admissibility of classified information.   18

U.S.C. App. 3, §§ 5,6.   Finally, CIPA Section 8 handles limited circumstances not covered by

Sections 5 and 6, such as where an attorney inadvertently asks a question that calls for classified

information, and permits the government to object to any inquiries that may require a witness to

disclose classified information that was not previously held to be admissible.[17]

> The Supreme Court has "recognized the Government's compelling interest in

withholding national security information from unauthorized persons in the course of executive

business" and described the reasons underlying that interest as "too obvious to call for enlarged

discussion."   Dep't of Navy v. Egan, 484 U.S. 518, 527 (1988) (internal quotations and citation

omitted).   This interest applies both to the disclosure of information, as well as to the confirmation

or denial of the existence of such information, which could cause harm to intelligence sources,

methods, and operations by revealing the scope of the government's ability to collect information

on foreign governments (or lack thereof).   As the D.C. Circuit has explained, "much of the

government's security interest in the conversation lies not so much in the contents of the

conversations, as in the time, place, and nature of the government's ability to intercept the

conversations at all." See United States v. Yunis, 867 F.2d 617, 623 (D.C.Cir. 1989).   The Second

Circuit has adopted Yunis's reasoning, and made clear that revealing whether the U.S. intelligence

community obtained information about any particular person would lead to the disclosure of

national security and classified information.   See United States v. Stewart, 590 F.3d 93, 132 (2d

Cir. 2009) (holding that the details of the NSA's operations implicate national security); United

---

[17] CIPA Section 7 permits the government to take an interlocutory expedited appeal to the appellate court if the district court: (1) authorizes the disclosure of classified information; (2) imposes sanctions for nondisclosure of classified information; or (3) refuses to issue a protective order sought by the government to prevent the disclosure of classified information.   18 U.S.C. App. 3, § 7.

States v. Mostafa, 992 F. Supp. 2d 335, 338 (S.D.N.Y. 2014) (holding that the fact of the government's ability to collect information at all is classified).   Accordingly, any witness examination about the scope and contents of intelligence collection related to this case would reveal classified information, was not conducted pursuant to CIPA, and should be precluded.

Likewise, general questions about the existence or non-existence of intelligence information about the Defendants are likewise irrelevant and inadmissible, and thus these lines of inquiry and arguments should also be precluded.   Testimony confirming the existence of classified material (if any does exist) after the Court ordered that any such record may be withheld pursuant to CIPA Section 4 could cause the jury to speculate as to the nature of any such record without giving the defendant a meaningful opportunity to comment on the nature of the records. At the same time, confirming the existence of classified records could damage national security by confirming intelligence sources and methods.   See Yunis, 867 F.2d at 623.   Testimony confirming that no records existed (if that were so) is likewise inadmissible.   A lack of records held by U.S. intelligence agencies could mean, for example, that inculpatory communications were not intercepted, not that they did not occur.   All that would be revealed as a result is a potential gap in intelligence collection, which is not relevant, could cause the jury to draw unsupported inferences and would be highly damaging to the national security of the United States.   And any claims about the lack of a particular type of evidence or records, such as the absence of classified intercepts, would be an argument about law enforcement techniques—an area far outside the jury's concern.

X.   The Court Should Preclude Improper Use of Agent Reports to Impeach Witnesses That Were Interviewed

In discovery, the government produced summaries of witness interviews prepared by law enforcement.   The government respectfully requests that the Court preclude the defense

44

from introducing the contents of these reports to impeach such witnesses during cross-examination, publishing the contents of the reports to the jury, or otherwise suggesting to the jury that the reports are statements of the witnesses who did not write or adopt them.

A party may impeach a witness with a prior inconsistent statement of that witness, but the statement must be the witness's <u>own</u> statement that he or she either made or adopted.   <u>See</u> Fed. R. Evid. 613; <u>United States v. Alamonte</u>, 956 F.2d 27, 29 (2d Cir. 1992) (concluding that the trial court did not err in refusing to admit prosecutor's notes taken during debriefing of witness and explaining that a "third party's characterization" of a witness's statement thus does not constitute a prior statement of that witness "unless the witness has subscribed to that characterization" or, in other words, endorsed it); <u>United States v. Leonardi</u>, 623 F.2d 746, 757 (2d Cir. 1980) (holding that because "the written statement of the FBI agent was not attributable to [the witness]," it was "properly rejected as a prior inconsistent statement").   As the Second Circuit has explained, the problem with using a third party's summary or characterization of the witness's statement to impeach is "one of relevancy": "If a third party's notes reflect only that note-taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible."   <u>Alamonte</u>, 956 F.2d at 29.

Notably, the Jencks Act governs the discoverability of a witness's prior statements, and its definition of "statement" accords with Fed. R. Evid. 613(a) and applicable case law on proper impeachment using prior inconsistent statements.   Under the Act, a statement means "a written statement made by said witness and signed or otherwise adopted or approved by him," a recording or transcription that "is substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously," or a statement made by a witness to the grand jury.

See 18 U.S.C. § 3500(e).   As the Supreme Court has explained, because the Jencks Act is meant to restrict the defendant's use of discoverable statements for impeachment, "only those statements which could properly be called the witness' own words should be made available to the defense for purposes of impeachment."   Palermo v. United States, 360 U.S. 343, 349, 352 (1959).   And the Court further noted that an "agent's interpretations and impressions" of a witness do not fall within the purview of the Act.   Id. at 352-53.

In this case, the government has provided the defense with broad discovery, including reports summarizing investigators' interviews with government witnesses.   These reports were not reviewed or adopted by any of the government witnesses.   Moreover, they were finished after interviews were completed and reflect the thought processes and interpretations of the agents and officers; they do not constitute verbatim recitals or transcripts of any of the witnesses' statements.[18]   As a result, the statements in these reports are not statements of any of the government's witnesses (other than the reports' authors, if called to testify at trial), cannot be used for impeachment, and should not be read aloud or shown to the jury.[19]   See Alamonte, 956 F.2d at 28; Leonardi, 623 F.2d at 757.   The Court should therefore preclude any use or suggestion by defense counsel that a statement in a law enforcement summary report is a statement of the witness being interviewed.

---

[18]   These reports would, however, constitute prior statements of the agents or officers who prepared the report if they are called as a witness to testify regarding the subject matter contained in the report.

[19]   The government acknowledges that the defense may ask a witness whether he or she made a statement that is reflected in a law enforcement report.   However, if the defense is not satisfied with the witness's answer, the defense may not publish or introduce the report's contents as a prior inconsistent statement.   Additionally, if appropriate and with proper foundation, the defense may attempt to refresh a witness's recollection by showing the witness the report, but only if the defense does so in a manner that does not imply that the report is the witness's own statement or publish its contents to the jury.

XI.  The Court Should Limit Public Disclosure of Personal Identifiable Information of the Victims and their Family Members and Certain Other Exhibits Containing Highly Sensitive Information about the Victims

The government respectfully requests that the Court limit public disclosure of personal identifying information (PII) of the Victims and their family members including names, addresses, and telephone numbers during trial.   Similarly, the government requests that the Court limit public dissemination of certain exhibits that contain highly sensitive information about the victims in this case, including the Red Notices the PRC government disseminated against John Doe-1 and Jane Doe-1 in 2012 and 2014, and correspondence and other documents from John Doe-1's family members who currently reside in the PRC, including materials associated with John Doe-1's mother, father and sister.   Masking this information from the public is necessary to prevent revictimization of the Victims and their families.

The public and the press "have a qualified First Amendment right to attend a public trial," Waller v. Georgia, 467 U.S. 39, 44 (1984), and ordinarily, there is a "presumption of openness" with respect to trial proceedings," Press-Enterprise Co. v. Superior Court of California, Riverside Cnty., 464 U.S. 501, 510 (1984).   A defendant, in turn, also has a Sixth Amendment right to a public trial.   Waller, 467 U.S. at 46.   Nevertheless, the right to a public trial is not absolute and "may give way in certain cases to other rights or interests, such as . . . the government's interest in inhibiting the disclosure of sensitive information."   Id. at 45.

When a limitation to the public trial right is contemplated, the Second Circuit has identified "four prerequisites" to excluding the public from certain criminal proceedings: "(1) the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, (2) the closure must be no broader than necessary to protect that interest, (3) the trial court must consider reasonable alternatives to closing the proceeding, and (4) it must make findings adequate to support the closure."   United States v. Abuhamra, 389 F.3d 309, 329 (2d

47

Cir. 2004).    Notably, where only a partial closure of the courtroom is contemplated, there need

only be a "substantial reason" rather than an "overriding interest" justifying the closure.    See

United States v. Smith, 426 F.3d 567, 575 (2d Cir. 2005) (citation omitted).    The "substantial

reason" standard for narrower courtroom closures requires a less rigorous showing.    As the

Second Circuit has explained:

> If a party seeks a broad closure, it must demonstrate that the interest . . . is
> especially grave, and that the risk that would be posed . . . by not closing
> the courtroom is more than serious.    Conversely, if a party seeks a
> relatively narrow courtroom closing, the burden it must carry is not a heavy
> one.

Bowden v. Keane, 237 F.3d 125, 129 (2d Cir. 2001).

As a preliminary matter, the government's request to limit public disclosure of

certain Victim information does not amount to even a narrow or partial courtroom closure.    The

government requests only that Victims' and their family members' personal identifiable

information and the substance of certain exhibits be masked from public disclosure.[20]    The

government does not seek literal closure of the courtroom to any member of the public at any point

during trial.    Accordingly, implementing the government's requested privacy measures would

not at all inhibit the public from viewing the proceedings to ensure fairness, which is the "core

purpose of the Sixth Amendment public-trial right."    Cf. United States v. Mallory, 40 F.4th 166,

176-77 (4th Cir. 2022) (implementation of silent witness rule to prevent public discussion of

classified information in certain exhibits without effecting any "literal closure of the courtroom"

likely did not implicate the defendant's Sixth Amendment right to a public trial, because "the

ability of interested members of the public to remain in the courtroom . . . still helped to ensure" a

---

[20]  The government is also not requesting that Victim PII and other sensitive Victim information be masked from the Court, court personnel, the Trial Defendants and their counsel, or the members of the jury.

fair proceeding); <u>United States v. Abouammo</u>, No. 19-CR-621 (EMC), ECF No. 290 at 24 (N.D.Cal. June 10, 2022) (granting the government's motion to mask the identities and PII of the victims to the public, noting that the "public does not have an interest in obtaining this information" and suggesting that the masking of such information alone does not constitute a courtroom closure).

Even assuming, however, that the government's requested privacy protections constitute a courtroom closure, such measures are justified here.   To start, the government's requests would qualify as a partial closure at most.   No member of the public would be precluded from attending the trial: the public would simply be precluded from learning certain PII and sensitive information about the Victims and their families during the trial proceedings.   <u>See</u> <u>Smith</u>, 426 F.3d at 571; <u>cf.</u> <u>Mallory</u>, 40 F.4th at 177 (assuming that implementation of silent witness rule to bar public discussion of the classified content of certain exhibits constituted a courtroom closure, "it was certainly much more analogous to a partial closure, rather than a full one").

Substantial reasons, moreover, justify the closure: namely, protection of the Victims and their families from further harm and retaliation.   As discussed above, this case involves allegations that the Trial Defendants conspired with PRC officials to engage in an international campaign to threaten, harass, surveil, and intimidate John Doe-1 and Jane Doe-1 in order to repatriate them to the PRC.   If the Victims' PII and certain other sensitive information were to be made public at trial, such information could be used by interested parties to continue the harassment and intimidation campaign.   Other sensitive information about the Victims, including their communications with family members, could also be used by interested parties to retaliate against the Victims and their family members, many of whom currently reside in the PRC.

49

Masking sensitive information about the Victims and their family members from public disclosure is therefore necessary to prevent re-victimization, harassment of the victims, or retaliation by interested parties within or outside of the United States.   Cf. Brown v. Artuz, 283 F.3d 492, 501 (2d Cir. 2002) ("The safety of a police officer working undercover surely constitutes an overriding interest" when that officer shows "facts that tend to support his fear."); Bowden, 237 F.3d at 130 (holding that a narrow courtroom closure passed muster when the testifying witness, an undercover officer, articulated "a generalized fear that his safety could be endangered by testifying in open court" and "explain[ed] in rough terms the basis of his fear").

Finally, the requested protections sought by the government are no broader than necessary to protect the Victims' privacy, and there are no reasonable alternatives other than those the government has proposed for doing so.   As explained, the Victims and their families are at substantial risk of re-victimization and retaliation.   The measures proposed by the government are limited in nature and tailored to minimize the risk of harm to the Victims while also ensuring public access to the trial proceedings.

For the foregoing reasons, the Court should limit public disclosure of the Victims' and their family members' PII as well as the substance of certain exhibits containing other sensitive information about the Victims.

XII.   The Court Should Preclude Evidence or Argument Relating to Defenses That Required Prior Notice Under Rules 12.1, 12.2 and 12.3 of the Federal Rules of Criminal Procedure

The government respectfully requests that the Court preclude the Trial Defendants from introducing evidence or argument relating to alibi, mental defect, or public authority affirmative defenses.

The Federal Rules of Criminal Procedure require a defendant to provide the government with notice of certain affirmative defenses prior to trial.   Under Rule 12.1, a

defendant is required to provide notice of any alibi or similar defense upon the government's request.   Fed. R. Crim. P. 12.1(a).   If a defendant fails to comply with the rule, the court may exclude any undisclosed witness regarding the defendant's alibi (other than the defendant).   Id. 12.1(e).   Similarly, under Rule 12.2, a defendant who intends to assert a mental defect inconsistent with the state of mind required for the offense charged must provide notice to the government by the pretrial motions deadline.   Id. 12.2(a).   If a defendant fails to comply with this rule, he "cannot rely on an insanity defense."   Id.   Finally, under Rule 12.3, a defendant who "intends to assert a defense of actual or believed exercise of public authority on behalf of a law enforcement agency or federal intelligence agency at the time of the alleged offense," must notify the government by the pretrial motions deadline.   Id. 12.3(a).   If the defendant fails to do so, the court may preclude any evidence related to such a defense, other than the defendant's own testimony.   Id. 12.3(c).   Rules 12.1, 12.2, and 12.3 are designed to prevent unfair surprise and allow the government to prepare adequately for trial.   See, e.g., United States v. Abcasis, 785 F. Supp. 1113, 1116 (E.D.N.Y. 1992) (observing that Rules 12.1 and 12.3 are designed to prevent unfair surprise to the government and ordering the defense to comply 12.3 or risk preclusion of witnesses in support of the defense at trial).

The government has requested reciprocal discovery from the Trial Defendants throughout the course of this case.[21]   To date, the Trial Defendants have provided no notice of their intent to raise any such defenses.   Given that the parties are weeks away from trial, any belated disclosure of such defenses would be prejudicial.   See Taylor v. Illinois, 484 U.S. 400, 416-17 (1980) (upholding trial court's preclusion of defense witness where defendant failed to

---

[21]  The government has not previously specifically requested notice of alibi defense under Rule 12.1.  To the extent necessary, the government makes that request now, and respectfully requests that the Court direct the Trial Defendants to comply with the terms of the rule.

disclose the witness in compliance with discovery rules and the failure was willful and blatant).

Under the authority granted to it in Rules 12.1, 12.2, and 12.3, the Court should therefore bar the

Trial Defendants from introducing evidence or argument related to any of these defenses at trial.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully requests that the Court grant

the government's motions in limine.

Dated:      Brooklyn, New York
           May 1, 2023

BREON PEACE
United States Attorney
Eastern District of New York

By:       /s/
          Craig R. Heeren
          Meredith A. Arfa
          Irisa Chen
          Assistant U.S. Attorneys
          (718) 254-7000

MATTHEW G. OLSEN
Assistant Attorney General
Department of Justice
National Security Division

By:       /s/
          Christine Bonomo
          Trial Attorney