LAW OFFICE OF

# BENJAMIN SILVERMAN

224 WEST 30TH ST., SUITE 302
NEW YORK, NY 10001

TEL (212) 203-8074
FAX (646) 843-3938
Benjamin@bsilvermanlaw.com

January 3, 2025

**By ECF**
Honorable Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn NY 11201

Re: *United States v. Zhu*, 21 Cr. 265 (PKC)

Your Honor:

Like all Chinese children, Zhu Yong spent his youngest years memorizing Tang Dynasty poems. Poetry does not play such a prominent role in English-speaking culture; toddlers in the United States do not stand before adults and recite Shakespeare and Yeats the way Chinese toddlers recite Li Bai and Du Fu. Our brains are not shaped by classical stanzas: when committed to memory at a young age, the verses become part of one's vocabulary, and conversations for the rest of one's life are sprinkled with verses from the terse but evocative Tang poetry.

In a particularly famous poem called *JingYeSi* – sometimes translated as "A Quiet Night's Thought" – the poet Li Bai creates the image of a traveler far from home. The traveler looks up to see the moon and, the poem implies, realizes that loved ones in his hometown are at that very moment enjoying the same moonlight. Li Bai's travels took him up the *Yangzi* River, through the fabled Three Gorges, a distance today covered by a short high speed train ride. But in Li Bai's time, travelers like him had no way to speak with those in their hometowns at the other end of the river; they could only share the same moon at the same time – raising their head to gaze up at its light before lowering it to think about home.

Modern day immigrants like Zhu Yong travel so far that the moon hangs above them while the sun shines on their old homes. But thoughts for far away loved ones never fade. Zhu Yong struggled to create a life here in New York. He chose to raise his son here because it was best for the child even if agonizing, and sometimes just plain miserable, for the immigrant parent. But after his son grew up – becoming a United

Honorable Pamela K. Chen
January 3, 2025
Page 2

States Navy sailor and his father's pride – Mr. Zhu returned to Wuhan in central China to see his family and to eat hot and dry noodles that cannot be found in New York.

On one of those trips, Mr. Zhu was recruited to aid a scheme that has destroyed his life – it led him to be convicted of four felonies, and likely soon to be stripped of his liberty and then his lawful permanent residence in the country where he made his life and where his family will continue to live apart from him. He came to the United States for freedom but recognizes that, because of his mistakes, he may soon see the inside of its jails. And after that he will have to watch his grandson from a distance – so far away that the sun will shine for him only when his son and grandson are asleep at night in New York. The punishments Mr. Zhu faces are substantial. For the reasons below, we respectfully urge the Court to impose a prison sentence that does not exceed 18 months.

## I.    The Sentencing Guidelines

We incorporate and reassert all objections to the Presentence Report filed on December 3, 2024 (Dkt. 324). We stress here a few points in particular:

### A.    Applying U.S.S.G. § 2X5.1

Mr. Zhu was convicted of acting as an unregistered agent for the People's Republic of China (PRC) and conspiring to do the same. These offenses are not referenced to a specific Guideline, and the Court should apply an analogous Guidelines if one can be found. U.S.S.G. § 2X5.1, application note 3 ("The court is required to determine if there is a sufficiently analogous offense guideline, and, if so, to apply the guideline that is most analogous.") (emphasis omitted). "When selecting the most analogous guideline in compliance with U.S.S.G. § 2X5.1, the courts have traditionally looked at definitions of the offenses, made factual findings concerning the defendant's conduct, and decided which guideline is most applicable to those facts." *Minicone v. United States*, 353 F. Supp. 2d 316, 318 (N.D.N.Y. 2005) (citing *United States v. Rahman*, 189 F.3d 88, 150 (2d Cir. 1999)).

Here, the Guideline that best encompasses the charged and proved conduct is the stalking Guideline, U.S.S.G. § 2A6.2. The theory of the case was that unregistered foreign agents operated in New York, New Jersey, and elsewhere to stalk and harass John Doe One. Superseding Indictment ¶ 13; PSR ¶ 54. All other conduct was derivative of and related to this general purpose. The stalking Guideline therefore best encompasses the charged conduct. *United States v. Cothran*, 286 F.3d 173, 178 (3d Cir. 2002) (selecting Guideline that "accurately embodies [the defendant's] conduct.").

If Counts One and Two were appropriately grouped and assigned offense level 22 – as the PSR ascribes to Counts Three and Four – then Mr. Zhu's total offense level would be 26 based on the grouping analysis applied by the PSR. Under the grouping

Honorable Pamela K. Chen
January 3, 2025
Page 3

provision, § 3D1.4(b), the PSR presently finds three units. PSR ¶ 162. If Counts One and Two were added, even as a separate unit with an offense level no higher than the offense level already assessed for Counts 3 and 4, *see* PSR ¶¶ 144-149, then there would be one additional unit added under ¶ 3D1.4, yielding a total offense level of 26, instead of level 25 as presently calculated.[1]

This Guidelines calculation is preferable to what the PSR recommends: providing no calculation at all but then recommending, without sufficient explanation, a 24-month consecutive prison term for Counts One and Two. *See* Sentencing Recommendation at 1. If an analogous Guidelines analysis is properly applied, it would only raise the offense level by one level, meaning the Guidelines would only go up by six to seven months at each end of the range. This illustrates that Probation's 24-month recommendation for Counts One and Two is totally out of proportion with the offenses, and in fact constitutes a recommendation for an upward variance because it is so far above the sentence that would be achieved by a proper Guidelines calculation.

## B.    The Vulnerable Victim Enhancement Does Not Apply

The PSR mistakenly applies the two-level vulnerable victim enhancement in U.S.S.G. § 3A1.1(b)(1). Applying that enhancement here runs afoul of the Second Circuit's "limits on the kinds of conduct that will justify a vulnerable victim enhancement": (1) the "vulnerability of the victim must bear some nexus to the criminal conduct;" (2) "the defendant generally must have singled out the vulnerable victims from a larger class of potential victims;" and (3) "broad generalizations about victims based upon their membership in a class are disfavored where a very substantial portion of the class is not in fact particularly vulnerable to the crime in question." *United States v. McCall*, 174 F.3d 47, 50 (2d Cir. 1998). All three of these limits exist here and each one individually precludes proper application of the vulnerable victim enhancement to Mr. Zhu.

First, there is no evidence that Mr. Zhu "singled out the vulnerable victim[] from a larger class of potential victims" as required to apply this Guideline, *McCall*, 174 F.3d at 50. The PSR describes no involvement by Mr. Zhu in this part of the offense. *See* PSR ¶¶ 55-79. He raised it in his post-arrest statement, which confused the timeline because he

---

[1] The second most analogous Guideline would be for failing to report income taxes, U.S.S.G. § 2T1.1. Like failing to pay taxes, the crime of being an unregistered foreign agent addresses conduct that fails to provide a required notification to the detriment of the government's knowledge and ability to take actions (*e.g.*, surveille or collect taxes). Under § 2T1.1, the base offense level is 6, and there are no enhancements that would apply in this case.

Honorable Pamela K. Chen
January 3, 2025
Page 4

was not prepared in advance of speaking. To counsel's knowledge, no one has ever alleged that he was involved with that affair.

Second, John Doe Two's vulnerability had no nexus to the charged crime. "The correct test calls for an examination of the individual victims' ability to avoid the crime rather than their vulnerability relative to other potential victims of the same crime." *McCall*, 174 F.3d at 51. The PSR states that John Doe Two was forcibly brought to the United States from China as part of an operation to threaten John Doe Two's son. But no one could seriously contend that the Chinese government singled out John Doe Two based on his vulnerability – that is, that the PRC government would have been unable to coerce a young and healthy PRC citizen to come to the United States and so instead had to select and older, disabled person. Any such argument would misunderstand the nature of authority in the PRC and the PRC government's power vis-à-vis its entire citizenry. Thus, even if John Doe Two were forcibly brought here, the PRC government clearly selected John Doe Two based on his relationship to John Doe One, not based on his disability. Thus, John Doe Two's sickness and disability had no nexus to the offense or to John Doe Two's selection or status as a victim. Put differently, John Doe Two's age and physical condition did not make him more susceptible to becoming a victim. *See United States v. O'Neil*, 118 F.3d 65, 75 (2d Cir. 1997) (In determining "vulnerability," courts should "focus not on the likelihood or extent of harm to the [victim] if the crime is successful, but on the extent of the [victim's] ability to protect himself from the crime.").

Third, there is no evidence that Mr. Zhu knew that John Doe Two was infirm, rather than merely elderly. The application note to the Guideline provides that age alone is not a basis to find someone vulnerable: "[I]f the offense guideline provides an enhancement for the age of the victim, this subsection would not be applied unless the victim was unusually vulnerable for reasons unrelated to age." U.S.S.G. § 3A1.1(b)(1), application note 2; *see also O'Neil*, 118 F.3d at 75 (noting that "being elderly is alone insufficient to render an individual 'unusually vulnerable'"). "The Second Circuit has noted the general skepticism in the case law about generalized assumptions about a victim's vulnerability based upon that person's membership in a class." *United States v. Jimenez-Rodriguez*, No. 21-CR-194-2 (EK), 2024 WL 1199991, at *5 (E.D.N.Y. Mar. 20, 2024) (internal quotation marks omitted). Thus, even if Mr. Zhu knew that John Doe Two was an old man who would be brought from China to the United States, that is not enough to warrant the extra deterrence of applying this enhancement – because there is no evidence of any knowledge, much less targeting, of John Doe Two based on his vulnerability or inability to thwart the offense.

Honorable Pamela K. Chen
January 3, 2025
Page 5

### C.    A minor role adjustment is appropriate.

Mr. Zhu should receive a two-level minor role adjustment under U.S.S.G. § 3B1.2(a). He clearly lacked "knowledge or understanding of the scope and structure of the enterprise and the activities of others." *Id.* comment n.4. He was not involved in the actions described in paragraphs 55 through 102 in the PSR – the overwhelming majority of the conspiracy offense conduct. *United States v. Adames*, 901 F.2d 11, 13 (2d Cir. 1990) (lack of knowledge or understanding of scope and structure of enterprise is indicative of minor or minimal role).

In assessing role, the Court should examine Mr. Zhu's conduct against not only his codefendants but also the average defendant convicted of the same offense. *United States v. Ajmal*, 67 F.3d 12, 18 (2d Cir. 1995). Here, the offense centered around stalking. But Mr. Zhu never had any actual contact – in person, on the phone, over the internet, or otherwise – with any of the John Doe or Jane Doe victims. He never even knew about what happened to John Doe Two. He never travelled to California or contacted Jane Doe. He was a backseat passenger in a car the first time that Hu Yi (aka Hu Ji) knocked on John Doe One's door but otherwise did not contact or harass John Doe One. This is not what an average stalking defendant looks like. The stalking offense and Guideline are applied to men who terrorize and harass ex-lovers through in person and cyber stalking activity – maliciously inflicting cruelty, and often victimizing a former loved one over a prolonged period. *E.g.*, *United States v. Humphries*, No. 12 CR. 347 RWS, 2013 WL 5797116, at *2 (S.D.N.Y. Oct. 28, 2013) (applying stalking Guideline where "the Defendant [himself] continued to send Victim-1 emails and other online messages which over time became more frequent and increasingly threatening."). Mr. Zhu did nothing like that. He did not possess that kind of cruel and vicious state of mind. He did not even himself directly contact a victim. He acknowledges that he helped Hu Ji, a Chinese police officer, contact a U.S. investigator. Insofar as this was a critical role in the scheme, it still does not preclude the two-level minor role reduction; after all, a drug swallowing courier is also a but-for part of the scheme for which they are arrested, and the larger four-level adjustments are common in those cases. Mr. Zhu brokered a relationship – he was described by one person as a "middleman," PSR ¶ 41; and this role is notably less involved than a typical "stalker." He was a passenger in the car when Hu Ji and others went to John Doe One's house. One year later he took a photograph that he never shared. Further, insofar as this offense overlaps with being an unregistered foreign agent, his role is also notably less than that of others convicted of FARA offenses, which are listed in part in Section III.F below. For example, he did not steal classified information, betray military secrets, or infiltrate U.S. law enforcement. *See id.* Other Chinese agents were recently the subject of a prisoner swap. *Id.* The Chinese government did not request Zhu Yong because he is a nobody. He is an old man who was used and discarded.

None of this is to detract from how frightening, upsetting, and threatening the conspiracy was for its victims. The conduct was wrong and should never have happened.

Honorable Pamela K. Chen
January 3, 2025
Page 6

But Mr. Zhu's own involvement – while admittedly culpable, and for which he accepts full responsibility – was substantially less than that both of his coconspirators and the average person to whom the stalking Guideline is applied. A role reduction is warranted.

## II.    Mr. Zhu's Personal History

### A.    Mr. Zhu's childhood was defined by the Cultural Revolution.

Zhu Yong was 10 years old when Chairman Mao launched the Great Proletarian Cultural Revolution – a disaster that lasted the entire decade until Mr. Zhu turned 20. China in that period was a chaotic and dangerous place – children told to turn away from classical poetry to study political slogans, adults attacked by teenagers, and daily life marked by instability and even mayhem.

Mr. Zhu was always poor – a level of poverty more severe than what that term means in the contexts to which we are accustomed. He grew up without indoor plumbing, electricity, access to medicine, and, at times, sufficient food. It was not until Mr. Zhu was in his mid-20s, around 1980, that he was able to enjoy indoor plumbing at home in urban Wuhan. PSR ¶¶ 178-179. Winters were wet cold, and without indoor warmth. In the summer, Wuhan is one of China's "three furnaces" – known for scorching and debilitating heat without respite. Teeth rotted in Mr. Zhu's mouth because dental care generally did not exist. He was beaten in the streets by youths with arm bands and at home by an alcoholic uncle. PSR ¶ 181.

In his early teens, during the latter half of the Cultural Revolution, Mr. Zhu was assigned heavy farmwork. Starting in 1966, high schools were shuttered, and college entrance exams suspended. Elementary schools were staging grounds for political rallies. Students tortured teachers and sometimes killed them. Mr. Zhu was tasked with clearing the dead bodies of "intellectuals." PSR ¶ 180. To end the chaos, in 1968, when Mr. Zhu was 12 years old, Chairman Mao launched the "Up to the Mountains and Down to the Countryside Movement."[2] This meant children like Mr. Zhu went to Hubei's rural areas to pick rice and cotton – the region's staple crops – and to eat grasshoppers for protein. Rice is a labor-intensive crop to plant and pick, with multiple harvests each year amidst flooded paddies. Harvesting rice breaks one's back, and then the rest of the body.

This Cultural Revolution-era China in which Mr. Zhu grew up is not famous for its poetry like the prosperous Tang and Song Dynasties of the seventh and twelfth centuries. It instead produced a brand of nonfiction called "scar literature" – memoirs about the violence and disorder, and how it traumatized an entire generation – the

---

[2] Kathrin Hille, "China's 'sent-down' youth," Financial Times (Aug. 23, 2022), *available at* https://www.ft.com/content/3d2ba75c-1fdf-11e3-8861-00144feab7de.

Honorable Pamela K. Chen
January 3, 2025
Page 7

generation of Mr. Zhu and other teenagers who were knocked around by the whirlwind of the Red Guards before acclimating to life as agricultural workers.[3]

The term "scar literature" is apt – Mr. Zhu remains scarred by what happened. He grew up in a period he describes as *luan* – chaotic, frightening, a world that felt dangerously out of control. Those formative years contribute to his depression today. The lingering trauma disrupts his sleep and causes anxiety decades later. For Mr. Zhu, ▮

### B.    Mr. Zhu struggled as an adult and immigrated to the United States.

When he was in his mid-30s, Mr. Zhu attended Wuhan University, but was unable to complete his degree after he became stricken with hepatitis. PSR ¶ 202. Notably, and due to very bad luck, this short period when he was able to enjoy higher education not only corresponded with his illness but also straddled another year of turbulence when universities across China were shuttered and students sent home for reasons related to politics.

Mr. Zhu, who has struggled with depression and gambling, an acknowledged vice that provides solace and distraction from his mental pain, was introduced to heroin initially to numb stomach pain. He became addicted but he no longer uses drugs. PSR ¶ 199. He has not tested positive for drugs during the past four years on pretrial release. PSR ¶ 201.

He moved to the United States in 2001 when he was 45 years old. Middle age is a difficult time to start a new life. The brain is no longer as adaptable to foreign languages. The physical strain is more taxing on bodies that have lost their youthful vigor. Mr. Zhu had to work more than half of an adult life to get his family to New York, and he seized the opportunity for his son.

### C.    Mr. Zhu is proud of his American family.

Mr. Zhu's brothers all recall how he bragged about his son the U.S. Navy sailor when he returned to China to visit after years away. *See* Ex. D. His son, Zhu Yin, served for six years and was deployed to Afghanistan and Iraq. Ex. B. He is now married and raising a family in Elmhurst, while supporting and housing his father since his arrest over four years ago.

---

[3] Sabina Knight, "Scar Literature," ScholwWorks (January 2021), *available at* https://scholarworks.smith.edu/opencoursematerials/41/.

Honorable Pamela K. Chen
January 3, 2025
Page 8

Mr. Zhu's daughter-in-law, Maggie Wang, describes how Mr. Zhu dotes on his grandson – helicopter grandparenting to always make sure that the child his safe. Ex. C. Mr. Zhu, who grew up in a society where most people do not learn how to swim, grows particularly concerned near the water and follows behind the child closely, imploring as much as possible to return to the safety of the shore. *Id.*

He worked incredibly hard so that he could watch his son's family live as American cruise goers, servicemembers, and homeowners. His son remembers how late Mr. Zhu used to work when they first came here, coming home exhausted to help cook and watch children. Ex. B. While Mr. Zhu toiled in a foreign land, feeling at times isolated and demeaned, at home he pushed his son to "focus on studying and becoming a contributing member of society." *Id.* His son recalls learning from watching his father's resilience as an immigrant parent. *Id.*

### D.    Mr. Zhu's health worsens by the year.

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████ Ex. D. He has grown depressed and afraid for what comes next. He knows that he will lose his social security payments and Medicare after he is deported, and he will not be able to rely on those earned benefits, one that he has paid into for over two decades, to support him after he is sent back to China.

████████████████████████████████████████ He was struck by a car last year and hobbled for months, necessitating surgery. PSR ¶ 193.

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████ He is aging, declining in cognitive function, and physically ailing. Just when he most needs his family, social security payments, and Medicare, he will lose it all. It is in many ways the realization of his lifelong fear about returning to a chaotic and unpredictable life like the one that defined his childhood during the Cultural Revolution. Everything he has worked to build will slip away – and he will FaceTime with his family from the other side of the world without any idea now who will help care for him as he further deteriorates. He knows that he has only himself to blame.

Honorable Pamela K. Chen
January 3, 2025
Page 9

### E. Mr. Zhu was brought into a scheme from which he gained no benefit. He confessed immediately and would have pled guilty if he had been competently represented.

In 2016, Mr. Zhu returned to China for an all-expense-paid convention sponsored by the Chinese Overseas Affairs Office. For a man of retirement age, the opportunity to stay in a hotel for free for several days, with high quality meals provided, just to attend a convention, was a terrific opportunity. Mr. Zhu was able to combine the trip with visits to his brothers and spend time with family. Wuhan today hardly resembles the city that Mr. Zhu left 25 years ago. Lacking a single subway line until 2004, Wuhan now has over 300 miles of track and a dozen lines. The downtown abounds with neon. The river that Chairman Mao famously swam across to mark his return as the helmsman when he initiated the Cultural Revolution is now spanned by three bridges with more construction on the way.

At the convention, Mr. Zhu was approached by a man known to the government as *Hu Ji* but who identified himself to Mr. Zhu as *Hu Yi*. Mr. Hu provided a business card describing himself as working for a "Decoration Design Company." Ex. E. Mr. Zhu would later learn that Hu Yi worked for a Public Security Bureau. But it is notable that at the time that he was recruited, Mr. Zhu was not told who Mr. Hu worked for or why he was trying to bring someone back to China. Mr. Hu instead provided Mr. Zhu with a fake business card. *Id.* Mr. Hu said that the man who he wanted to locate owed money. The point of raising this fact is not to suggest that Mr. Zhu never, in the end, knew what was really happening, or even to argue that his initial actions lacked an element of recklessness. But it notable that he was not recruited with a clear or even accurate explanation about what the project would entail or why the person was sought. This speaks to Mr. Zhu's reduced role – the fact that he was a disposable recruit, someone who was not privy to the full scope of what was happening, much less organizing or strategizing.

By the time he found himself driving around New Jersey with Mr. Hu, Mr. Zhu knew that Mr. Hu was from the Chinese government. About one year later he took a photograph, and hoped to make money for his work if he ran into Mr. Hu again when he next returned to China; but he never sent it to anyone and had no more actual involvement in the conspiracy.

His conduct was wrong, and he is ashamed. But it is also true that **Mr. Zhu was not present for and was not involved in the ugliest parts of the conspiracy.** When he spoke freely in response to FBI agents' questions, he assessed that the CCP was not taking the matter seriously, noting that either Hi Ji or Zhu Feng had told him on their trip to New Jersey that they were just enjoying the chance to travel and, in essence, that it was a junket. Mr. Zhu's assessment of the PRC's objectives in this case may have been mistaken, but that only underscores his subordinate position and reduced knowledge of

Honorable Pamela K. Chen
January 3, 2025
Page 10

what was going on. When Mr. Zhu left China one quarter century ago, the PRC government would not have been serious about tracking down dissidents in the United States; and Mr. Zhu had not updated his understanding with the changed times. He believed he was making some money – first by accompanying businessmen enforcing a debt and later, he realized, apparatchiks who flew to the United States for a junket and, as he put (via a translator), merely "going through the motions."

Since my first conversation with Mr. Zhu shortly after his trial conviction, he expressed to me his remorse and profound regret for what he involved himself in, and that he wanted to plead guilty and accept responsibility before the trial. He even authorized counsel to put just that in writing when filing his post-trial motion. Dkt. 277 at 1. Just as he confessed promptly following his arrest, he also answered questions posed by Probation about his conduct. PSR ¶ 139.

It has been apparent to me since I first met Mr. Zhu that he wanted to plead guilty and would have if he had been better represented. We acknowledge precedents advising that 2255 matters should not be litigated at sentencing. But what transpired in Mr. Zhu's representation does reflect on his actual acceptance of responsibility – and the correspondingly reduced need for specific deterrence.

### III.    The 3553(a) factors weigh against a lengthy prison sentence.

#### A.    Mr. Zhu is a kind person and a good citizen and his conduct in this case does not represent how he has lived his life.

Mr. Zhu's family is shaken and saddened by his arrest. They know him as an honest citizen and doting parent and grandparent – a person whose life has not been marked by crime and deceit but rather by hard work and integrity. His son remembers that, even as his father worked grueling hours when they first came here, Mr. Zhu would not allow his son to work a summer job to contribute money to the family because he wanted his son to spend his time studying. Ex. B. His brother remembers Mr. Zhu dropping everything to help a woman in delivery get to the hospital in China after her car broke down. Ex. D. His daughter in law remembers him finding and returning lost money – cash that many might have pocketed. Ex. C. Mr. Zhu has been a solid citizen and a terrific father and grandfather.

In one striking story recalled by Mr. Zhu's three brothers, on a family outing they heard shouting that someone had fallen into the water. Ex. D. Reflecting Mencius' parable about a child who falls into a well, Mr. Zhu jumped into the water himself to chase after the child. Even though "his own swimming skills were not very good" and "he barely knew how to swim," he was part of the chain of hands that reached out and rescued the person, bring them back to the shore. *Id.*

Honorable Pamela K. Chen
January 3, 2025
Page 11

He would later become a doting helicopter grandparent, trying to keep his own grandson out of the water. Ex. C. He helped keep children's focus on studies by working tirelessly to provide economic support himself. Ex. B. He remained focused by his childhood hunger, imploring his family that "wasting food is shameful," and buying the least expensive possible food at the supermarket when shopping for himself so that there would be more money for others. Ex. D.

Mr. Zhu grew up during the Cultural Revolution, when political leaders led teenagers and young adults to behave violently towards others in society because, the youthful Red Guards believed, they were acting patriotically to improve China. He left that behind to raise his family in stability and prosperity, and his life here was known to those closest to him as marked by kindness and honesty.

The point of all this is to say that Mr. Zhu is a good, if broken, man. He managed for much of the past decades to cabin his depression and anxiety – and the outlets of gambling and other vices – to focus on earning for his family. People remember him fondly. His son and grandson never felt his stress; he never took it out on his family; he protected what was most important to him.

When he partook in this offense, he was not motivated by malice or obsession, like many convicted of stalking offenses. He was recruited, told only a portion of the story, and involved in only a slice of the conspiracy. He hoped to earn a very modest sum. He was wrong, and he knows he must be punished. But this is not someone who has spent his life cheating or hurting other people. Nor is it someone who organized or orchestrated the scheme, or even knew its full scope. When Zhu Yong was younger, he was victimized, like his entire generation, by the politics in China during that time. When he wanted to go to college – which in 1989 was a rare and difficult achievement in China – he was stricken by illness, and politics again led to school closures. And when he had built a stable American life – a successful one in which he was about to retire – he was recruited, initially under dishonest pretenses, as part of another round of political machinations. His life has been upended time and again by PRC politics. He bears responsibility for his recent actions, to be sure. But he did not create or incite the forces at work here.

Mr. Zhu's role in the scheme was wrong, he acknowledges it was wrong, and he would have pled guilty before trial if he had been better represented. But he certainly was not motivated by politics or a desire to help the CCP or to stanch dissent; when he confessed upon his arrest, he provided his honest, if flawed, assessment that the whole ordeal was just "going through the motions" by party officials looking for a free trip to New York that would lead nowhere. It was a kind of CCP action he had seen his entire life. Even at such great distances – where the moon hangs here while the sun shines in China – the world is flatter than before and the old adage that "the sky is high and the emperor far" no longer holds, or at least it does not apply to the government's reach as it may have in another time. Mr. Zhu navigated this new reality poorly, and he will pay for

Honorable Pamela K. Chen
January 3, 2025
Page 12

that with his freedom, his green card, and his ability to live with loved ones and be properly cared for as he ages. But at base he is a good if broken eldering man who has been treated by the Chinese government as disposable his entire life, including when he was brought into the conspiracy here.

### B. Deportation will impose substantial punishment on Mr. Zhu.

It is all but certain that Mr. Zhu will be deported from the United States and barred from reentering after this case is over – banished from the country where he is spent over two decades and raised his family – where he presently lives with his son and grandson who will seldom be able to see in the future. Given the substantial hardship that deportation will entail, a lengthy prison term will be greater than necessary to punish and deter. The Supreme Court has long recognized that deportation is punishing. *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948) ("Deportation is a drastic measure and at times the equivalent of banishment or exile. It is the forfeiture for misconduct of a residence in this country. Such forfeiture is a penalty.") (internal citations omitted); *see also Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) ("We have long recognized that deportation is a particularly severe 'penalty'" in criminal cases); *Fong v. United States*, 149 U.S. 698, 740 (1893) ("But it needs no citation of authorities to support the proposition that deportation is punishment. Everyone knows that to be forcibly taken away from home and family and friends and business and property, and sent across the ocean to a distant land, is punishment, and that oftentimes most severe and cruel.") (Brewer, J. dissenting). The Second Circuit recognizes that district courts may consider the consequences of deportation as a 3553(a) factor. *United States v. Thavaraja*, 740 F.3d 253, 264 (2d Cir. 2014) ("[A] district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family.").

The Court should consider the punishing new reality that Mr. Zhu will face after he is deported and banished from the United States. He will not be able to see, much less dote on, his grandson everyday – he will watch his family from a distance. He will no longer receive his social security payments – losing what he has worked to invest in that earned benefit. He will lose his Medicare and have trouble affording treatment and care as he ages. The consequences of Mr. Zhu's anticipated deportation will be enormous – personally, emotionally, and physically. The pain inflicted by deportation means that a prison sentence does not need to be so high to punish and deter.

Honorable Pamela K. Chen
January 3, 2025
Page 13

> **C.    Mr. Zhu's immigration status will increase the amount of time that he serves in prison.**

If Mr. Zhu is sentenced to spend time in prison before he is deported, he will serve more time than a U.S. citizen facing the same sentence. Because he is subject to an immigration detainer, Mr. Zhu will be ineligible for the significant reductions his codefendants may receive for participating in evidence-based recidivism reduction programming authorized under the First Step Act. 18 U.S.C. § 3632(d)(4)(E)(i). He will also be ineligible for sentence reductions related to educational and other rehabilitative programs offered by the Bureau of Prisons. *See United States v. Chin Chong*, 2014 WL 4773978, at *9 (E.D.N.Y. 7 Sept. 2014) ("Although the government argues otherwise, the Bureau of Prisons has effectively endorsed this position, opting to exclude from rehabilitative programs (*e.g.*, drug treatment, job training) many prisoners subject to Immigration and Customs Enforcement detainers."). Nor will he receive 6-12 months placed in a halfway house instead of a prison. And even though he would almost certainly be otherwise eligible to be placed in a low-security prison camp, his immigration status precludes that, and he will be housed in a harsher facility.

As a result, a like sentence for Mr. Zhu and a coconspirator will not provide like or proportional punishment because Mr. Zhu will spend longer in jail for each month to which he is sentenced, and under more arduous conditions. We respectfully ask the Court to consider this disparity when fixing a sentence. Mr. Zhu's *actual anticipated time in jail* – as reflected in his sentence – should be in proportion to the time that codefendants are expected to spend in prison, including ones with more culpability.

> **D.    Supervision is punishment.**

Mr. Zhu has been subject to pretrial supervision for over four years without any serious hiccups. For over 15 months, he was subject to home confinement – apparently longer than any other defendant in this case. *See* ECF No. 133. And even now, he has a curfew with strict restrictions. The Supreme Court's reasons for describing probation as punishment apply equally to this length of pretrial supervision, which "substantially restrict[ed]" Mr. Zhu's "liberty." *Gall v. United States*, 552 U.S. 38, 48 (2007). And this matter also weighs on proportional sentences – Mr. Zhu has already been confined more than others in this case, at least one of whom appears never to have been subject to home confinement at all. Mr. Zhu's immigration status may have warranted tighter pretrial deprivations of his liberty, but we respectfully submit that those should be considered when fixing a total amount of punishment to be imposed proportionate to that of other individuals.

Honorable Pamela K. Chen
January 3, 2025
Page 14

In short, even without further incarceration, Mr. Zhu will be seriously punished in ways that will impact him for the rest of his life. He will always be aware of the ongoing price that he will pay for his mistakes.

### E.    Mr. Zhu's medical conditions will make lengthy incarceration challenging.

Mr. Zhu has medical conditions commensurate with his age and mental health challenges arising form his life history. *See* Section II.D above; PSR ¶¶ 195-198. He presently walks with a cane, and life in prison for eldering people with mobility issues can be significantly more challenging. Incarceration is far more difficult for an older person in failing health than for a younger person.[4] Even minor issues like a bunkmate who refuses to move to the top bunk can become a nightmare with someone in Mr. Zhu's physical shape. Older prisoners are also much more expensive for BOP to maintain because of health and mobility issues. Inmates over the age of 50 cost approximately three times more to incarcerate than an average adult inmate.[5] These are among the reasons why courts have long considered age and poor health as important factors when formulating a sentence.[6]

Given Mr. Zhu's age, his conditions will likely worsen while in prison and his "need for ongoing medical monitoring and treatment" will make any period of incarceration challenging. 18 U.S.C. § 3553(a)(2) (courts must consider the need for the sentenced imposed to provide the defendant with needed "medical care . . . in the most effective manner."); *see also United States v. Carmona-Rodriguez*, 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (non-guidelines sentence warranted in part due to defendant's "need for ongoing medical monitoring and treatment" for high blood

---

[4] *See* U.S. Dep't of Justice Nat'l Inst. Of Corrs., *Correctional Health Care, Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, pp. 9-10 (2004) (reporting intensified management problems with elderly inmates in the prison setting, including vulnerability to abuse and predation and need for special physical accommodations in a relatively inflexible physical setting."), *available at* https://info.nicic.gov/nicrp/system/files/018735.pdf.

[5] *See* Heather Habes, *Paying for the Graying*, 20 S. Cal. Interdisc. L.J. 395, 399 (Winter 2011).

[6] *See, e.g.*, *United States v. Barbato*, 2002 WL 31556376, at *4-5 (S.D.N.Y. Nov. 15, 2002); *United States v. Kloda*, 133 F. Supp. 2d 345, 349 (S.D.N.Y. 2001); *United States v. Gigante*, 989 F. Supp. 435, 443 (E.D.N.Y. 1997).

Honorable Pamela K. Chen
January 3, 2025
Page 15

pressure, diabetes, anxiety, and depression); Sarah Rakes et al., *Recidivism Among Older Adults: Correlates of Prison Re-entry*, 15 Justice Pol'y J. 1 (2018) ("Few prisons are able to accommodate age-related changes such as functional decline, mobility, and chronic medical conditions . . . .").

Even before *Booker*, the Guidelines always considered physical condition as a basis for a departure. U.S.S.G. § 5H1.4; *see also id* § 5H1.1 (departure based on age). In an era where BOP's ability to provide routine medical care is sometimes called into question, the DOJ Inspector General recognizes that it is unable to care for older inmates:

> [L]imited institution staff and inadequate staff training affect the BOP's ability to address the needs of aging inmates. The physical infrastructure of BOP institutions also limits the availability of appropriate housing for aging inmates. Further, the BOP does not provide programming opportunities designed specifically to meet the needs of aging inmates. We also determined that aging inmates engage in fewer misconduct incidents while incarcerated and have a lower rate of re-arrest once released; however, BOP policies limit the number of aging inmates who can be considered for early release and, as a result, few are actually released early.

Office of the Inspector General, U.S. Dep't of Justice, "The Impact of an Aging Inmate Population on the Federal Bureau of Prisons," (Feb. 2016).[7]

In short, Mr. Zhu's age and health will also make his time in prison more difficult, and we respectfully urge the Court to take that into consideration. The Court should, on this basis, either vary or depart under U.S.S.G. §§ 5H1.1, 5H1.4.

---

[7] *Available at* https://oig.justice.gov/reports/2015/e1505.pdf.

Honorable Pamela K. Chen
January 3, 2025
Page 16

**F.    A lengthy prison sentence will create unwarranted sentencing disparities.**

When imposing sentence, the Court must consider "the need to avoid unwarranted sentencing disparities." 18 U.S.C. § 3553(a)(6). In the past month, several people convicted of serious offenses had their sentences commuted so that they could be returned to China in a prisoner exchange deal. This is significant for two reasons. First, it demonstrates Mr. Zhu's minor role in the offense: if he was important at all to the Chinese government, he would have been included in that deal. He was not: he was a pawn, disposable and disposed of. This goes to his role and his level of responsibility. As part of this prisoner deal, the executive branch granted clemency to the following three individuals:

- Xu Wanjun, who was sentenced to 240 months in prison in the Southern District of Ohio on November 16, 2022.[8]

- Ju Chaoqun, who was sentenced to 96 months in prison in the Northern District of Illinois on January 25, 2023.[9]

- Jin Shanlin, who was sentenced to 97 months in prison in the Eastern District of Texas on July 14, 2022.[10]

Presumably these are three individuals who were actually important to the Chinese government. Mr. Zhu by contrast is a nobody, an old man who they took advantage of and then left to his fate. Mr. Zhu will serve his sentence, lose his life here, and be deported. But he was not important enough to be part of a bargain that was just recently transacted to spare him time in prison.

In addition, the executive branch's grants of clemency will lead to unwarranted sentencing disparities if a cog like Mr. Zhu spends substantially more time in jail than hardcore spies. That these other men were more senior and important to the Chinese government and therefore warranted a place in a prisoner exchange does not in turn warrant a dramatic disparity in prison time between them and Mr. Zhu, who was used like a pawn to create some kind of an initial screen between the retained U.S. investigator and the PRC police officer. Quite the opposite. And it also underscores how little the masterminds of this scheme will be deterred by imposing a harsh prison sentence on Zhu Yong – it will mean nothing to them. They will recruit another stooge next time to serve

---

[8] *United States v. Yanjun Xu*, 18 Cr. 43 (S.D. Oh.). Executive Grant of Clemency *available at*, https://www.justice.gov/d9/2024-11/xu_signed_warrant.pdf.

[9] *United States v. Ji Chaoqun*, 18 Cr. 611 (N.D. Ill.). Executive Grant of Clemency *available at* https://www.justice.gov/d9/2024-11/choaqun_signed_warrant.pdf.

[10] *United States v. Shanlin Jin*, 21 Cr. 48 (E.D. Tex.). Executive Grant of Clemency *available at* https://www.justice.gov/d9/2024-11/jin_signed_warrant.pdf.

Honorable Pamela K. Chen
January 3, 2025
Page 17

the same role, and similarly discard that person to their fate the same way that those who recruit and dispatch drug mules discard their marks.

Other cases from around the country also provide relevant sentences with which Probation's recommendation would be completely out of sync. We do not have the same comprehensive data about comparable offenses from other parts of the country that the government has, and the ECF systems' mechanisms for searching cases by offense type generally are not effective. But in many cases that we located, defendants received probationary or brief prison sentences, and only received more than that where they directly threatened U.S. military, technology, and security interests:

- In *United States v. Lin*, 15-CR-601 (E.D.N.Y.), a defendant received a probationary sentence for helping the People's Liberation Army smuggle items through JFK airport. According to the government's sentencing submission in that case, the defendant "act[ed] under the direction and control of PRC military officers and other PRC government officials" to help smuggle items in and out of the United States, and she made so much money for her work that she engaged in a structured finance scheme to avoid triggering reporting requirements.[11] After her arrest, the defendant attempted to obstruct justice.[12] Judge Donnelly imposed a non-incarceratory sentence of five years' probation.

- Several defendants in other districts similarly received probationary sentences for FARA convictions. *United States v. Patten*, 18-CR-260 (D.D.C. May 6, 2019), Dkt. 47, (Judgment sentencing defendant to 36 months' probation for steering $50,000 from a Ukrainian politician to the president's inaugural committee); *United States v. Chaudry*, 18-CR-226 (D. Md. May 7, 2018), Dkt. 14 (prosecutors recommend five years' probation for defendant engaged in political activities as an agent of Pakistan for six years, including obtaining in-depth information about U.S. policies towards Pakistan); *United States v. Islamic American Relief Agency*, 07-CR-87, Dkt. Nos. 645, 647 (Judgments for former congressman Mark Sijander, sentenced to one year in prison, and fundraiser Abdel Azim El-Zaddig, sentenced to two years' probation, for work on behalf of Islamic American Relief Agency, which secretly funneled money to Iraq in violation of sanctions; Siljander concealed his work and repeatedly lied about his ties and purpose of payments).

- In *United States v. Chun*, No. 16-CR-518 (S.D.N.Y.), the defendant was an FBI employee with a Top Secret security clearance who sold sensitive FBI

---

[11] *United States v. Lin*, 16 Cr. 601 (AMD) (E.D.N.Y. Nov. 15, 2019), Dkt. 172.
[12] *Id.*

Honorable Pamela K. Chen
January 3, 2025
Page 18

documents and technology to Chinese officials over a period of years. In a submission requesting a 27-month sentence, AUSA Emil Bove wrote that "[t]he defendant engaged in a deep betrayal of the FBI and the United States that lasted for nearly a decade . . . ."[13] Judge Marrero ultimately sentenced the defendant to 24 months in prison for conduct that much more directly and permanently imperiled U.S. security than what Mr. Zhu did or even could do.

- In *United States v. Soueid*, 11-CR-494 (E.D. Va.), a defendant received 18 months in prison for operating covertly on behalf of the Syrian government.

- In *United States v. Peng*, No. 19-Cr-589 (N.D. Cal.), a defendant received 48 months in prison for far more serious conduct than Mr. Zhu's: bribing U.S. officials to obtain classified information and then smuggling classified documents to China.

- In *United States v. Dumeisi*, No. 03-CR-664 (N.D. Ill.), a defendant was sentenced to 46 months in prison following a trial conviction for travelling to Iraq to train with Saddam Hussein's intelligence service and then operating in the United States on its behalf.[14]

Here, although Mr. Zhu did not plead guilty and was convicted at trial, he accepts responsibility and would have pled guilty if he had been represented by effective counsel. A sentence like the one recommended by Probation would be out of sync with these other offenders – who in many cases much more directly and brazenly imperiled United States security on behalf of some of its most hostile adversaries, including by betraying positions of trust and confidence. None of this is to minimize the seriousness of Mr. Zhu's conduct – conduct he acknowledges and admits was harmful and wrong. But these cases involved similarly wrong and harmful conduct – and conduct that was much more dangerous to national security, as they pertained to military intelligence and secrets. Mr. Zhu's sentence belongs at the lower end of these sentences.

### G.    A lengthy sentence is unnecessary for deterrence.

Mr. Zhu will be deported and there is no question that he has been shaken and specifically deterred. Because he has no criminal history and is a true first-time offender, Mr. Zhu is substantially unlikely to recidivate. U.S. Sentencing Comm'n, *Recidivism*

---

[13] *United States v. Chun*, No. 16-CR-518 (VM) (S.D.N.Y. Jan. 6, 2017), Dkt. 13 at 18.

[14] Judge Komitee discussed additional cases cited by the government in a bail opinion *United States v. Angwang*, 2020 WL 5947187, at *1 (E.D.N.Y. Oct. 7, 2020). The government's letter is at docket entry number 11 in 20-MJ-837.

Honorable Pamela K. Chen
January 3, 2025
Page 19

*Among Federal Offenders: A Comprehensive Overview* 5 (Mar. 2016) ("A federal offender's criminal history [is] closely correlated with recidivism rates . . . . Each additional criminal history point [is] generally associated with a greater likelihood of recidivism."); *United States v. Cosimi*, 368 F. Supp. 2d 345, 349 (S.D.N.Y. 2005) (noting that defendant's "lack of criminal history," among other things, "indicate[d] that he presents a low danger of recidivism"); *see also United States v. Smith*, 321 F. Supp. 3d 405, 409 (E.D.N.Y. 2018). Notably, the Guidelines calculated by Probation do **not** consider Mr. Zhu's absence of criminal history.

As to general deterrence, the architects of what happened here, and the midlevel people like Hu Ji who recruited and took advantage of Mr. Zhu, will not be deterred from future actions no matter how long Zhu Yong languishes in a U.S. jail. A lengthy prison sentence imposed on Zhu Yong will no more deter PRC officers than drug mules' sentences impact decisions by the people who dispatch them to fly into JFK. Further, evidence-based studies support that the certainty of apprehension rather than the severity of the ensuing legal punishment is more effective to deter crimes. *E.g.*, Nat'l Institute of Justice, *Five Things About Deterrence* (May 2016). Here, Zhu Yong was apprehended, convicted, spent 51 months under restrictive conditions of supervision, including over 15 months subject to home confinement, and he almost certainly will be deported without ever being permitted to return from prison to reunite with loved ones. These punishments all serve as powerful deterrents. General deterrence will not be incrementally increased by a greater number of months in prison.

## IV.    Conclusion

For the foregoing reasons, we respectfully urge the Court to impose a sentence of not more than 18 months in prison.

Respectfully submitted,

/s/ Benjamin Silverman
Benjamin Silverman
*Attorney for Zhu Yong (aka Yong Zhu)*

Attachments

cc: AUSAs Meredith Arfa, Irisa Chen, and Christine Bonomo (by email and ECF)

## Index of Exhibits

**Exhibit A:** Letter by Zhu Yong[1]

**Exhibit B:** Letter by Mr. Zhu's son, Zhu Yin

**Exhibit C**: Letter by Mr. Zhu's daughter-in-law, Maggie Wang

**Exhibit D**: Letter by Mr. Zhu's brothers in Hubei

**Exhibit E**: Business card for "Hu Yi"

---

[1] Letters contain English translations placed in front of the Chinese originals.

# Exhibit A

**TRANSLATION:**

Honorable Judge Chen,

I take this opportunity to pray for your good health and to wish you all the best. I am Yong Zhu, male, 68 years old. I was recently found guilty in a trial. I am responsible. I am willing to plead guilty. Since I do not understand English, I have no knowledge of American law at all.  I was used by others to do something that was not good for the US government. In addition, I was misled by my lawyer (K Wentang), who always said that my case was a very minor crime and told me not to plead guilty, which led to my current situation. Now, after the explanation of the lawyer appointed by the government, I realized the seriousness of the problem. I regret not listening to the government to plead guilty earlier to seek leniency from the government.

I have been in the United States for 22 years. I have lived honestly in the United States based on the principles of being friendly to people, working hard, abiding by the law, respecting the elderly and loving the young, and silently working hard to make my own contribution to the prosperity of American society.

When I was young, I dreamed of America because it is a country of democracy and freedom, where everyone is equal and respected. After more than 20 years in the United States, I have experienced and witnessed that the United States is a beacon of democracy and freedom, a harmonious multi-ethnic society, and at the same time I feel the greatness of the United States and am full of enthusiasm and love for it.

In order to cultivate the next generation's love for America, I was proud to see my only child to the U.S. Navy to train and fight on the front lines. It was to defend this beautiful land and homeland of America.

Because I am in my old age and have entered the retirement age, I suffer from multiple illnesses, also suffer from depression, and I hope Your Honor will give me a chance to reform and start a new life. I was being taken advantage of. I regret it deeply.

Your Honor: I have been under supervision for more than three years. During these three years, I have honestly reflected on my mistakes, learned the lessons and reformed myself. I will do my best to use my limited life to serve the American people. I thank the American government for giving me its meticulous care and warmth.

I am already an old man. The stress of this case has aged me. I hope that Your Honor will give me a chance to reform myself. Although I know it is very unlikely, my dream is to be able to spend a happy and peaceful old age with my family, children, and grandchildren before I leave this world. Once again, I express my sincere gratitude to Your Honor!

Sincerely,

Yong Zhu

尊敬的陈(Chen)法官大人：

**我借此机会祈祷您的身体健康 万事如意、本人朱勇、男、今年 69、本 人最近在一次**审判中获的有罪指空·**我是有**责任的。我愿意认罪。由于 **本人不懂英文，所以对美国的法律知识 一巧不通，就被人利用 去做了一些**对不起美国政府的事情。**加上 被我的律师(K 文堂)的**误导·他总是说我的案例是一个很轻的罪名、让 **我不要认罪，才造成我今天的**结果。现在经过政府指派律师的解释，**我才意**识到问题的严重性。我现在很后悔没有听政府的话、早一点认罪争取政府的宽大处理。

本人来美国已经二十二年了，是本着对人友善、勤奋工作、遵纪守法、尊老 爱幼的原则老老实实的在美国生活，为 美国社全的繁荣昌盛而努力默默的 在作出自己的贡献。

我年轻的时候就憧憬着美国，因为美国是一个民主自由、人人平等、人人得到尊重的国家。来美二十多年，也体会和见证了美国是一个民主自由的灯塔，是一个多民族的和谐社会，同时感受到美国的伟大并对美国充满着热枕和热爱

我为了培养下一代热爱美国将身边唯一的一个孩子骄傲得送到美国海军部队去锻炼，送到前线部队去打仗。就是为了去保卫美国这个美丽的国土和家园

由于本人年事已高，已经进入了老年退休的年龄，加上本人身体患有多种疾病。精神也患有忧郁症。这次我被人利用。我很后悔。我希望法官大人给我一次改过自新，重新做人的机会。

尊敬的法官大人：我受管制至今，已经三年多了，在这三年中我是在老老实实的在反省自己的过错，好好吸取教训好好的改造自己，用自己有限的生命为美国人民去服务尽最后一份力量，感谢美国政府给我的无微不至的关怀和温暖。

我已经老了。这个案件的压力把我崔老了。希望法官大人给我一次改过自新的机会。虽然我知道可能性很低，但我的梦想是在我离开人世之前和家人和孩子，孙子们一起度过一个幸福祥和的晚年。再次表示我对法官大人由衷的谢意！

此致，

朱勇敬上

# Exhibit B

**TRANSLATION:**

Honorable Judge,

I am writing to provide some information about my father, Yong Zhu, so that you can better understand his character and intrinsic qualities. My name is Yin Zhu, and I am a military veteran. During my six years of service in the US Navy, I was deployed to Afghanistan and Iraq. After my discharge, I began my current career as an import specialist for the Customs and Border Protection agency, serving my country. My father has always been my role model, a dedicated, hardworking, kind, and honest person. His selfless dedication to our family and contributions to the community make me proud.

My father came to the United States to provide a better life for us. Despite not knowing English, he was willing to put in extra effort, working over 10 hours a day. Even when working late, he would come home to cook and take care of us. He never complained and always told me that he didn't feel tired. When I suggested working part-time during the summer to ease the family burden, he firmly refused, and encouraged me to focus on studying and becoming a contributing member of society. It was his resilience and the values he instilled in me that inspired me to join the Navy, with a sincere desire to defend our country and honor.

My father is not only a hardworking provider but also an upright man. Once, when we were shopping at a supermarket, the customer in front accidentally left his phone at the checkout and walked away. My father immediately noticed the situation. When another customer behind tried to take the phone, he acted quickly. Despite the language barrier, with my assistance in interpretation, he found the supermarket staff and informed them about the phone situation. Eventually, the phone was returned to its owner, and as my father left the supermarket with a polite demeanor, the owner expressed deep gratitude to him. This story demonstrates his integrity and kindness, showing his instinctive response to stop misconduct.

Honorable Judge, I believe my father's qualities and actions have made significant contributions to society. He is not only an excellent father but also a person with a positive impact on the community. He actively participates in community activities and helps those in need. I implore you to consider his character and his positive influence on society when deciding on sentencing, hoping to mitigate any potential punishment he may face. Once again, thank you for taking the precious time to read this letter.

Best wishes for your health,

Yin Zhu

2023 年 10 月 10 日

尊敬的法官：

我写信是为了提供一些关于我的父亲，Yong Zhu 的信息，以便您更好地了解他的性格和品质。

我叫 Yin Zhu，我是一名军事退伍军人，在六年的美国海军服役中，我曾被派往阿富汗和伊拉克。退伍后，我开始了我目前的职业生涯，成为了海关和边境保护局的进口专家，一直在为国家效力。我的父亲一直是我的楷模，一个敬业、勤劳、善良和正直的人。他对家庭的无私奉献和对社区的贡献让我深感自豪。

父亲为了给我们提供更好的生活来到美国，尽管他不懂英语，但他愿意额外付出努力，每天工作超过 10 个小时。即使工作到很晚，他还会回家做饭，照顾我们。他从不抱怨，总是积极地告诉我，他并不觉得累。当我提出要在暑期打工来减轻家庭负担时，他坚决拒绝，鼓励我专心学习，成为对社会有贡献的人。正是他的坚韧和他灌输给我的价值观激励我加入了海军，怀着真诚的愿望来捍卫国家和荣誉。

父亲不仅是一个勤劳的提供者，还是一个正直的人。有一次，我们一起去超市购物，前面的顾客结账时不慎将手机落在收银台上然后离开了。父亲立刻注意到了这种情况，当后面的一位顾客试图拿走手机时，他迅速行动，尽管存在语言障碍，他需要我协助翻译，但他还是找到了超市工作人员并告知他们手机的情况。最终，手机被归还给了失主，而父亲离开超市时保持着礼貌的态度，失主对父亲表达了深深的感谢。这个故事展示了他的正直和善良，展现了他制止不正当行为的本能反应。

尊敬的法官，我相信我的父亲的品质和行为对社会做出了重要贡献。他不仅是一位出色的父亲，还是社区中一名有着积极影响的人。他积极参与社区活动且帮助有需要的人。我恳请您在决定判刑时考虑他的品格和他对社会的积极影响，希望能减轻他可能面临的处罚。再次感谢您抽出宝贵的时间来阅读这封信。

顺祝安康，

Yin Zhu

# Exhibit C

**TRANSLATION:**

Dear judge,

Thank you for taking your time to read this letter. My name is Maggie Wang. I work at the Social Security Administration as a welfare authorizer. I am Yong Zhu's daughter-in-law. My husband and I registered our marriage in the United States on May 16, 2011.

In the 12 years that I have spent time with my father-in-law Zhu Yong, I think he is a person who is willing to help others. I remember one time when the family took a walk, two people were fighting on the street. My father-in-law's first reaction was to run over and pull them apart. Even though he could not speak or understand English, he was the first to rush over and pull the two apart when he saw someone fighting. It wasn't until the police arrived and the two people that were fighting were separated that we saw he was accidentally injured in the process of the mediation. But he still smiled and said that he couldn't just sit back and watch. At that moment, I felt in my heart that my father-in-law was really a person full of positive energy.

In July 2017, our family went on a cruise. When we arrived in Bermuda, we were all excited to go to the beach. Because my eldest son was only 4 years old at the time, my father-in-law kept following behind him in fear that he would get hurt. In fact, every time the family went on a trip, my father-in-law would take meticulous care of the children. Later, the wind and the waves at the beach became stronger and stronger, so he reminded us to go ashore as soon as possible. We walked to the shore with the children in our arms. Then there was an old couple on the beach. The grandfather was sitting in a wheelchair and the old woman had difficulty moving. Seeing this, my father-in-law immediately went over to help the old woman up and then wheeled the grandfather to the shore. At that time, I told my four-year-old son that he should grow up to be a sunny and loving person like his grandfather.

My father-in-law is a very frugal person. He always goes to the supermarket to buy $1.00 food. He said that $100 is enough for one-month of living expenses. We always laugh at him and tell him to be nice to himself, that these foods are not healthy. He said that life is very long and should not be wasteful. Wasting food is most shameful. We saw that he was not in good health and suggested that he saw a doctor. He always comforted us and said that he was fine. But when we saw the medicine he took, we knew that Dad's heath was a concern. He has high blood pressure, high blood sugar, heart disease, and has hearing loss in one ear. My father-in-law is over 67 years old and now has issues with his mental health. He talks nonsense from time to time. He has forgotten to turn off the gas and water faucet at home many times. Family members would take turns to accompany him. I really can't imagine what would happen to him if he is alone.

Once when he was playing in a casino, he went into the bathroom and found a handbag opened, but it was forgotten on the toilet. There was a lot of cash in it. He immediately took it to the casino service staff. It was finally returned to the owner.

That is the kind of person he is.  He is unwilling to bring trouble to others and does his best to help those in need. He is full of positive energy, life-affirming, and brings warmth and sunshine to people. We hope that my father-in-law can be with us and my two children, who also love their grandfather. They don't want to part from him. My second child was born on October 16, 2019. Because of the epidemic, his grandfather has been with him at home watching him grow up.  The child is now 4 years old. Every day, he asks his grandfather to tell stories before going to bed, and he looks for his grandfather everywhere in the morning. Sometimes when I tell him that he may not see his grandfather for a while, he would cry and say that he does not want toys but rather his grandpa.

I hope Your Honor can reduce the sentence and let our family reunite as soon as possible. Thank you very much.

尊敬的法官您好，

感谢你的时间来阅读读这封信。我叫 Maggie Wang，就职于 Social Security Administration as a benefit authorizor. 我是朱勇的媳妇，我与老公于 5 月 16 日 2011 年在美国注册结婚。

在我与公公朱勇相处的这 12 年里，我认为他是一个乐于助人的人。记得有次家里人一起逛街，街上有两个人在打架。我公公第一反应就是跑过去拉开他们，即使他不会说也听不懂英文但是当他看到有人打架时他还是第一时间冲过去拉开两人。等到警察来到打架的两人被分开时我们才看到再劝架的过程中他被误伤到。可是他还是满脸笑意对我们说过他不能做到坐视不理。当时我的心里觉得我的公公真的是一个充满正能量的人。

2017 年 7 月份我们一家人去游轮旅行。到了百慕大的时候我们都很兴奋的去海边玩。因为当时我的大儿子只有 4 岁。我公公就一直跟在他后面怕他受伤。其实每次一家人出去旅游，我公公都是细心照顾小孩。后来海边风浪越来愈大，他就提醒我们尽快上岸。我们抱着小孩往岸上走。然后沙滩上有一对老夫妻，老爷爷坐在轮椅上，老婆婆行动也比较困难，公公见状马上过去搀扶起老太太然后推着老爷爷去岸边。当时我就对着我四岁的儿子说过，长大也要像爷爷一样做个阳光有爱心的人。

我公公生活方面是一个非常勤俭的人。他总是会去超市买$1.00。他说他一个月大生活费 $100.00 就够了。我们总是笑话他，对自己好点，这些食物都不健康，他说人生很长，不能浪费。浪费食物是最可耻的。我们看到他身体不是很好，建议他看医生，他也总是安慰我们说他没事。但是当我们看到他服用的药物时我们才知道爸爸身体状况堪忧。高血压，高血糖，心脏病，并且有一只耳朵出现失聪现象。公公已经过了 67 岁，现在精神方面也出现了问题。时不时胡言乱语。在家已经多次忘记关煤气和水管。家里人都会轮流陪着他。真的无法想象他一个人会发生什么事。

有次他在赌场玩，进去厕所发现有个手提包打开了，可是遗忘在了马桶上，里面■很多现金，他马上拿去给到赌场的服务人员。最后归还给了失主。

他就是这样一个人。不愿意给别人带去麻烦，尽自己最大的能力去帮助有需要的人。充满正能量，积极向上，给人带去温暖阳光的人。我们希望公公能够陪着我们，我的两个小孩也很爱他们的爷爷。不愿意离开他。我的第二个小孩出生在 10 月 16 日 2019 年，因为疫情在家一只都是爷爷在陪伴他的成长，小孩现在已经 4 岁了，每天都要爷爷睡前讲故事，早上起来到处找爷爷。有时候跟他说可能会有段时间看不到爷爷，他都会哭着说不要玩具要爷爷。

希望法官大人能过减轻判决，让我们早日一家团聚。不尽感谢。

# Exhibit D

**TRANSLATIONS:**


Honorable Judge Chen,

Greetings!

We are several close brothers from Zhu Yong's family. We were informed that our third brother in the United States has committed some actions that violate US laws and has been prosecuted by the US government. The four of us brothers were very surprised and saddened. (Over the past three years, our parents have passed away one after another. Zhu Yong, in order to comply with the regulations of the court, was unable to return to China to see our parents for the last time.)

Today, the four of us brothers are writing this letter to Judge Chen, specifically as a plea letter. First of all, we express our respect to Judge Chen for your hard work. Zhu Yong has caused trouble for you in the United States, and we sincerely apologize for his wrongdoing under US law.

Zhu Yong ranks as the third child in our family. He has always been a gentle and low-key person since childhood. When he was young, our parents hoped that he would succeed, be more considerate of others, do more good things and good deeds for others, and also be a law-abiding and qualified citizen in the United States.

As Zhu Yong grew up, he became very family oriented. He is also a person who values warmth and peace. He is always willing to help others and act heroically in a just cause. For example, more than twenty years ago, during a summer outing with our family by the Yangtze River, we suddenly heard someone shouting that someone had fallen into the water. Without hesitation, Zhu Yong rushed down and saved the drowning person. (His own swimming skills were not very good. He barely knew how to swim.) Fortunately, there were many people on the shore who also reached out their hands to help and brought the person who fell into the water to the shore! The drowning person was rescued and survived thanks to the CPR that was performed! This instance shows that Zhu Yong sacrificed himself to save others at a critical moment and was considerate of the lives of others. He was always considerate of others at critical moments.

There was another incident many years ago, Zhu Yong and our two brothers were driving on the road when a taxi in front suddenly stopped. The driver walked to the front of Zhu Yong's car and urgently explained that his car had broken down, and there

was a pregnant woman in the car who needed to go to the hospital urgently and hoped to ride Zhu Yong's car to the hospital. Without hesitation, Zhu Yong immediately got out of the car, helped lift the pregnant woman into the car, and rushed to the hospital. He assisted the medical staff in carrying her into the emergency room, and waited until the doctor came out to say that both mother and child were safe. Zhu Yong did not leave his name and quietly left the hospital. After returning home, he told our brothers at home about this incident and we all praised him for doing the right thing. The brothers all said that just a simple help was able to save two lives, which is commendable.

Zhu Yong suffered a lot when he was young. He contracted jaundice hepatitis. As he grew up, he worked hard to become an outstanding person who could contribute to others and serve the community. His dream is to live in the United States, become a legal American citizen, and serve the American community by making contributions. He raised his son to join the US military to defend American freedom and democracy, educating his son to be a good soldier who obeys his superiors. Therefore, his son has always performed exceptionally well in the United States. Our whole family is proud of Zhu Yong's son.

Zhu Yong has violated some laws in the United States, and our entire family feels deeply distressed. We sincerely request, Your Honor, that you give Zhu Yong a chance to reform. We are extremely grateful for Your Honor's forgiveness!!!

Yours sincerely,

Zhu Yong's Brothers: Zhu Wu, Zhu Wen, and Zhu Quan (who suffered from an illness in his childhood and has difficulty walking and has been paralyzed at home for many years).

The Zhu Brothers

October 10, 2023

尊敬的陈（ ）法官：

您好！

　　我们是朱勇家里的几个亲兄弟，得知我们家第三兄弟在美国做了一些违背美国法律的事情。被美国政府进行了起诉，我们四个兄弟非常吃惊，难过。（这三年多，我们的父亲母亲相继去世。朱勇为了遵守法院的法规都没有能够赶回国内见上父母最后一面）

　　今天我们兄弟四人特地写给陈法官一封信，准确的说是一封恳求信。首先向辛苦工作的陈法官表示我们兄弟四人的敬意，朱勇在美国给您增添的麻烦了，并为他在美国违背了法律的过错，表示诚挚的歉意。

　　朱勇在我们家排行老三，其性情从小温和，为人低调，小时候父母期望他有出息，多为他人着想，为他人多做好事，善事，在美国也要遵纪守法，做合格的公民。

　　朱勇长大后，非常注重家庭，他也是注重温馨和安宁之人，平时乐于助人，见义勇为，比如在二十多年前的一个夏天，全家人在长江边游玩，突然听到有人呼喊，有人落水了，朱永毫无犹豫的的冲了下去（他自己游泳技术并不是很好，仅仅会游泳）。一把拉住溺水的人，幸亏岸边还有很多人纷纷伸出了援手。将那个落水的人救上岸来！做的人工施救此人才得以生还！这个实例说明朱永关键时刻舍己救人考虑别人的生命。关键时刻总是在为他人着想。

　　还有一次，也是多年前，朱勇和我们两兄弟在路上开着车，前面的一个出租车突然停下来，司机走到后面朱勇车前，恳求的说道，他的车子出了故障，车内有孕妇待产着急上医院，希望搭乘朱永的车子上医院。朱勇一听，二话没说，立即下车帮忙抬起孕妇到车里，一路赶到医院，帮忙医务人员一起送进抢救室，一直等候医生出来说，母子平安朱勇也没有留下姓名，就悄悄地离开了医院，回家后和家里的兄弟说起了这件事都称赞他做的对，兄弟们都说一个简单的帮助，可以救下两条人命，值得点赞。

　　朱勇小时候吃过很多苦，小时候得了黄疸性肝炎，长大后，努力想成为优秀的人，能为他人作贡献，为社区服务，他的梦想是去美国生活做一个合法的美国公民，为美国社区服务而作出贡献。他培养自己的儿子去美国当兵，捍卫美国的自由，民主服务，教育儿子，当好兵听从长官的教诲，所以儿子一直在美国表现非常优秀。我们全家都为朱勇的儿子感到骄傲。

　　朱勇如今在美国犯了一些法规，我们全家也深感痛苦。现请求法官大人，能给朱勇一个改过自新的机会，万分感谢法官大人的宽恕！！！

此致

朱勇几兄弟：朱武，朱文（小时候得病，两腿行动不便，朱泉在家中瘫痪多年）

　　　　　　　　　　　　　朱家兄弟敬上

# Exhibit E

