

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:MAA/IC/CB
F. #2017R00906

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 15, 2025

By ECF

The Honorable Pamela K. Chen
United States District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Congying Zheng
                  Criminal Docket No. 21-265 (S-1) (PKC)

Dear Judge Chen:

        The government respectfully submits this letter in advance of the defendant's sentencing, which is scheduled for January 22, 2025, and in response to the defendant's sentencing memorandum, which was filed on January 8, 2025 (ECF No. 329). On June 16, 2023, following a 13-day trial, the defendant was convicted of two counts of a superseding indictment charging him with conspiracy to engage in interstate stalking, in violation of 18 U.S.C. § 371 (Count Three), and interstate stalking, in violation of 18 U.S.C. § 2261A(1)(B) (Count Four). For the reasons below, the government respectfully submits that a sentence of 33 months' imprisonment, within the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range, would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case. Such a sentence would constitute just punishment, reflect the severity of the defendant's offenses, promote respect for the law, and provide the specific and general deterrent effect called for by the defendant's offenses.

I.      Factual Background[1]

        The defendant participated in an international campaign to threaten, harass, surveil, and intimidate Xu Jin, Liu Fang, and their adult daughter, Xu Xinzi (also known as "Sabrina Xu"),

---

[1] The information below is taken from the Court's March 1, 2024 memorandum and order denying the defendant's motion to vacate the guilty verdicts rendered against him and for a new trial, pursuant to Federal Rules of Criminal Procedure 29 and 33, respectively (ECF No. 294); the Presentence Investigation Report ("PSR") provided to the parties by the United States Probation Department ("Probation") on October 11, 2024; the documentary and testimonial evidence admitted at the defendant's trial; and other evidence gathered as part of the investigation and prosecution of the defendant.

with the goal of forcing Xu Jin and Liu Fang to return from the United States to the PRC, as part of transnational repression programs known as "Operation Fox Hunt" and "Operation Sky Net."[2] The defendant's own conduct traumatized Xu Jin and Liu Fang and caused them to fear for their, and their family members', safety.

A.   Operations Fox Hunt and Sky Net

Operation Fox Hunt was an effort by the government of the People's Republic of Chine ("PRC") designed to repatriate individuals who moved overseas who the PRC government alleged to have committed criminal offenses; Sky Net was an expansion of that program. (PSR ¶¶ 9-10.) The PRC government carried out these programs through, among other things, pressuring and harassing the wanted individual to return to the PRC, pressuring and harassing family members to coerce the individual to return to the PRC, and instilling fear that the individual's failure to return would place the individual's family in danger. (*Id*. ¶ 12.) Several of the defendant's co-conspirators were PRC government officials who worked for the entities responsible for Fox Hunt and Sky Net actions, such as the Ministry of Public Security ("MPS"), a rough equivalent to the Federal Bureau of Investigation in the United States. (*Id*. ¶ 11.) For example, co-defendant Hu Ji was a policeman with the Wuhan Public Security Bureau under the MPS and co-defendant Tu Lan was a prosecutor in a local procuratorate. (*Id*. ¶¶ 18-19.)

Two of the victims in this case, Xu Jin and Liu Fang, were targeted for repatriation as part of these PRC government programs. (*Id*. ¶¶ 6, 13, 32.) Xu Jin and Liu Fang, as well as their adult daughter Xinzi Xu and other family members, were pursued by the PRC government in an effort to intimidate Xu and Liu into returning to the PRC to face alleged crimes committed there. (*Id*. ¶ 32.)

B.   Zhu Hired McMahon to Locate and Target the Victims for the PRC Government

The evidence at trial established that co-defendant Zhu Yong worked for the PRC government to locate Xu Jin and Liu Fang so that they could be forced to return to the PRC. (PSR ¶ 34.) In August 2016, after returning to the United States from a trip to the PRC, Zhu Yong contacted an attorney in New York in order to identify a New Jersey private investigator who could locate the victims; the attorney, in turn, recommended co-defendant Michael McMahon. (*Id.*) The attorney provided a draft retainer agreement, which Zhu Yong forwarded to an email account belonging to Sun Hui, a "political commissar" at the Wuhan Public Security Bureau, a police

---

[2]   The National Security Division of the U.S. Department of Justice has explained that transnational repression "refers to a range of tactics that foreign governments employ to reach beyond their borders to harm, intimidate, threaten, harass, or coerce individuals." *See* National Security Division, U.S. Dep't of Justice, "Transnational Repression (TNR)," https://www.justice.gov/nsd/transnational-repression-tnr (last visited Jan. 10, 2025). As the National Security Division has highlighted, "[t]ransnational repression represents a threat not only to those who seek to exercise their basic rights and freedoms in the United States and abroad, but also to United States' sovereignty and democracy." *Id.*

agency under the Ministry of Public Security – the same entity where co-defendant police officer Hu was employed. (*Id.* ¶ 34.)

Zhu Yong subsequently traveled back to the PRC in September 2016. (*Id.* ¶ 35.) While there, Zhu Yong reached out to a Queens-based translator, whom he used to contact and hire McMahon. (*Id.*) Zhu Yong requested that McMahon be hired "as soon as possible."[3] (*Id.*) Zhu Yong eventually received a contract and request for a $5,000 deposit to hire McMahon, as well as wire transfer information to send the deposit to McMahon. (*Id.*) On September 29, 2016, Zhu Yong signed the contract; he identified "Xu, Jin" as the target of the work for which he was retaining McMahon, and provided a social security number, green card number, New Jersey driver's license number, and date of birth for Xu Jin. (*Id.*)

      C.    Zhu Yong Provided Direction to McMahon and Met with McMahon and PRC Police Officer Hu

After hiring McMahon, Zhu Yong provided additional sensitive information about the victims to be shared with McMahon and directed McMahon to gather intelligence on Xu Jin and his family. (PSR ¶ 42.) For example, Zhu Yong again passed along purported driver's license and social security numbers for Xu Jin, as well as for Liu Fang and Xinzi Xu, and address information for their relatives, Liu Yan and her husband. (*Id.* ¶ 35.) Zhu Yong directed the translator to tell McMahon that "what we need is to locate the person" and to "look into more details, where do they work, which company, living conditions, etc." (*Id.* ¶ 42.) Zhu Yong received intelligence and surveillance reports and photographs from McMahon and provided feedback in response. (*Id.*)

Zhu Yong next set up multiple in-person meetings between himself, McMahon, and PRC police officer Hu to further the operation. (*Id.* ¶ 44.) McMahon proposed that they meet at a Panera Bread restaurant in New Jersey, and that same day Zhu Yong, McMahon, and Hu met at Panera Bread, as documented in a photograph found in Zhu Yong's Apple iCloud account. (*Id.*) Additionally, phone records establish that Zhu Yong was in contact with both Hu and McMahon shortly before and after this meeting. (GX 316 at 2-3.) A few days later, Zhu Yong requested another meeting with McMahon, which occurred on November 1, 2016, at an office in Hackensack, New Jersey; Hu attended this meeting, as well. (PSR ¶ 45.) At the same time, Zhu Yong confirmed he was coming with others, advising that "we want to discuss the next step plan.with you." (*Id.*) Border records establish that Hu was in the United States, where he remained until November 5, 2016. (*Id.*)

After meeting with McMahon and PRC police officer Hu, Zhu Yong contacted McMahon directly to advise McMahon of a transition in McMahon's handler from Zhu Yong to another individual. (*Id.* ¶ 46.) On November 8, 2016, Zhu Yong told McMahon that Zhu Yong had "given the person who's looking for Jin Xu-our subject your email address" and directed that any future correspondence continue to be routed through the translator. (*Id.*)

---

[3]     Unless otherwise indicated, all spelling and grammar in quoted materials is as it appears in the original document.

  D. McMahon Engaged in the Scheme to Use Xu Jin's Elderly Father to Locate and Harass Xu Jin

  Several months later, in March 2017, Hu Ji (the PRC police officer, who also went by "Eric Yan") contacted McMahon directly and requested that McMahon participate in a scheme involving the victim's elderly father. (PSR ¶ 49.) On March 27, 2017, Hu Ji told McMahon that Xu Jin's father would visit him from the PRC that Saturday, and that they wanted McMahon to "trace" him to find Xu Jin's address. (*Id*.) McMahon agreed to partake and began coordinating the planned surveillance with others. On April 3, 2017, in a hotel in New Jersey, PRC prosecutor Tu Lan and two other conspirators, Zhu Feng and Hongru Jin, discussed, among other things, that after Xu Jin's father arrived accompanied by a doctor, they would bring the father to Liu Yan's home, where Hongru Jin and the private investigator would conduct surveillance in the hopes of locating Xu Jin's residence. (*See id.* ¶ 52.) The next day, April 4, 2017, Zhu Feng and Hongru Jin met for just under an hour with McMahon at the same Panera Bread where McMahon previously met with Zhu Yong and Hu Ji. (*Id*. ¶ 53.)

  On April 5, 2017, Xu Jin's elderly father and the PRC doctor arrived at Newark International Airport on a flight from the PRC. (*Id*. ¶ 54.) Zhu Feng then texted McMahon that Zhu "just got the package," an apparent reference to Xu Jin's father, and that their "eta" was "7:40pm." (*Id*.) McMahon conducted surveillance for the scheme on April 5, 2017, and observed Xu Jin's father arrive at Liu Yan's home that evening. (*Id*. ¶ 56.)

  On the morning of April 6, 2017, Liu Yan drove her father-in-law to Livingston Mall to meet Xu Jin; during that trip, Liu Yan noticed someone who she thought might be following her. (*Id*. ¶ 57.) During the meeting at the mall, Xu Jin's father told Xu Jin that he was forced to come to the United States to convince Xu to return to the PRC, explaining that PRC officials told the father that if he refused, they would put his daughter (Xu Jin's sister) in jail. (*See id*. ¶ 58.) Later that same day, McMahon finally located Xu Jin and Liu Fang's home in New Jersey and passed the address along to Zhu Feng. (*Id*. ¶ 61.) As discussed below, the address obtained by McMahon was relied upon later in the broader harassment scheme: the defendant and his conspirator, Kuang Zebin, conveyed a threatening message to Xu Jin at that very address the following year.

  E. The Defendant Delivered a Threatening Note to Xu Jin and Liu Fang at Their Home

  On September 4, 2018, the defendant and Kuang Zebin continued the conspiracy to harass and stalk Xu Jin and Liu Fang at the couple's home in New Jersey, which – through McMahon's efforts – had finally been discovered by the PRC government. The two men acted at the direction of a friend, Chen Chaohong, who directed Kuang Zebin to accompany the defendant to a location in New Jersey and bring three pieces of paper with messages written on them. (PSR ¶ 85.) Chen Chaohong directed Kuang Zebin to write the threatening messages, which said "if you are willing to go back to China to serve a ten years prison . . . sentence, you wife and your children will be okay. That's the end of the matter." (*Id*.)

  By the time the defendant arrived at Kuang Zebin's home to pick up Kuang, Chen Chaohong had already spoken to the defendant about the plans, as the defendant knew the address

4

to travel to in New Jersey. (PSR ¶ 86.) The defendant and Kuang Zebin were instructed to look for people at the location and, if they found them, to hand them the notes or tape the notes to the door with a tape dispenser the defendant brought. (*Id*.) The defendant drove himself and Kuang Zebin to the victims' New Jersey home, and during the ride, the two men talked about what they were supposed to do that day. (*Id*.) The defendant then walked to the front door of the house, knocked on the door, rang the doorbell, and tried to turn the door handle. (*Id*.) As captured on surveillance footage, the defendant used a tape gun to post three notes on the door. (*Id*.)

Then, the defendant and Kuang Zebin went around to the back of the house, walked onto the deck, and looked into the house through the back glass doors. (*Id*.) The men observed a lot of dust in the house, giving the impression that no one had occupied the home in some time. (*Id*.) After looking into the home, the defendant and Kuang Zebin returned to the front of the house, and the defendant ripped down two of the three posted notes because Chen Chaohong believed it would draw too much attention to the house to have all three notes taped to the door. (*Id*.) The defendant threw the two notes he tore down into the bushes in Xu Jin's and Liu Fang's front yard. (*Id*. ¶ 86.) As is visible on the surveillance footage that captured much of these events, the defendant was the first to reach the front door, the person to physically tape the threatening notes to the door, the first to walk into the family's backyard and patio to peer inside the home, and the first to return to the front door to tear off two of the notes before throwing them haphazardly into the bushes. (GX 709B-L.)

Though the defendant did not know it, Xu Jin and Liu Fang were inside their home when they heard the defendant banging on their front door and trying to enter their home. (PSR ¶ 88.) They were frightened, did not answer the door, called the FBI and watched their home security camera system. (*Id*.) They saw that the two men had arrived in a car and approached their front door. (*Id*.) The men were smoking cigarettes and using a cell phone. (*Id*. ¶¶ 88-89.) They also saw one of the men carrying a tape dispenser and saw both linger at their front door. (*Id*.) Xu Jin and Liu Fang watched as the men entered their backyard, walked onto their deck, and peered through the back glass door into their home. (ECF No. 294 at 7.) After the two men left, Xu Jin and Liu Fang went outside and discovered a note affixed to their front door, which threatened that, if Xu Jin returned to China and spent 10 years in jail, his family would be safe and "that will be the end of it." (PSR ¶ 88.)

The following day, the defendant returned to Xu Jin's home, and Xu Jin observed him walking to the front door before leaving. (*Id*. ¶ 89.) Video surveillance footage and the defendant's DNA found on a discarded cigarette butt corroborated Xu Jin's observations. (*Id*.)

As a result of the note delivered by the defendant, Xu Jin explained that he felt that for the first time, the threats made to him by the PRC government were no longer "mental" but "physical," and he became "very worried about [the] safety" of his wife and daughter. (*Id*. ¶ 88.) After these two episodes, Xu Jin "reinforced the lock" for every door at his home and also purchased a baseball bat. (*Id*. ¶ 90.)

### F. The Harassment and Intimidation of the Victims Continued

In mid-2018, Xinzi Xu discovered that her friends were receiving harassing messages about her family on Facebook that detailed the PRC government's messaging about her parents being wanted fugitives. (PSR ¶ 81.) The victims were also sent mailings from the PRC, which were designed to further harass Xu Jin and coerce him to return to the PRC. In 2019, Liu Yan began to receive numerous letters and packages from the PRC. (*Id*. ¶ 92.) The mailings were ostensibly coming from Xu Jin's sister, Xu Qin, though Xu Jin testified that, based on the tone and tenor of the messages, he understood that she had been compelled to write them. (*Id*. ¶ 94.) One letter mailing described Xu Jin's parents as in ailing health, explaining that they were in the hospital and hoping Xu would "suddenly appear in front of them." (*Id*.) Another of the mailings contained a CD with a video titled "A Family Letter to Brother – Xu Qin." (*Id*. ¶ 93.) The video contained subtitles, which at one point stated, "When parents are alive, you can still call someplace a home; when parents are gone, you can only prepare for your own tomb." (*Id*.) The video ends with the subtitles exhorting Xu Jin to return to the PRC: "Come home, brother!" (*Id*.)

### G. The Defendant Admitted Certain Facts Following His Arrest

Following his October 28, 2020 arrest, the defendant made statements in which he admitted to being involved in the scheme to deliver the threatening notes. (*Id*. ¶ 102.) The defendant admitted to knowing Chen Chaohong, picking up Kuang Zebin in New York and driving him to New Jersey, and being aware that Kuang Zebin had brought notes that were supposed to be left for the victim. (*Id*.) The defendant falsely claimed that only Kuang Zebin posted the notes, but he admitted that he had the tape dispenser that was used to affix the notes. (*Id*.) The defendant also admitted to ringing the doorbell, as well as to returning the following day. (*Id*.) At the end of his post-arrest interview, the defendant claimed that he was the victim in in this case because he did not know what was happening. (*Id*.)

## II. Applicable Law

The Supreme Court has explained that the sentencing court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Supreme Court further has explained that "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Id.* The sentencing court "should then consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party." *Id.* at 49-50. In doing so, the court "may not presume that the Guidelines range is reasonable," but "must make an individualized assessment based on the facts presented." *Id.* at 50 (internal citation omitted).

Title 18, United States Code, Section 3553(a) provides, in part, that in imposing a sentence, the court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed--

6

  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

  (B) to afford adequate deterrence to criminal conduct;

  (C) to protect the public from further crimes of the defendant; [and]

  (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

  At sentencing, "the court is virtually unfettered with respect to the information it may consider." *United States v. Alexander*, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

III. Guidelines Calculation

 A. Applicable Guidelines

  As set forth below, the applicable Guidelines calculate a total offense level to be 20. (*See* PSR ¶¶ 133-54.) With the exception of the applicability of the Zero-Point Offender two-level reduction, the government agrees with the Guidelines calculation as set forth in the PSR.

Count Three and Four – Xu Jin

| | | |
|---|---|---:|
| Base Offense Level (§ 2A6.2(a)) | | 18 |
| Plus: | Pattern of Stalking Same Victim (§ 2A6.2(b)(1)(E)) | +2 |
| Less: | Minor Participant (§ 2A6.2(b)(1)(E)) | -2 |
| Total: | | <u>18</u> |

Count Three and Four – Liu Fang

| | | |
|---|---|---:|
| Base Offense Level (§ 2A6.2(a)) | | 18 |
| Plus: | Pattern of Stalking Same Victim (§ 2A6.2(b)(1)(E)) | +2 |
| Less: | Minor Participant (§ 2A6.2(b)(1)(E)) | -2 |

| | | | |
|---|---|---|---|
| Total: | | | <u>18</u> |

Multiple Count Analysis

Highest Adjusted Offense Level     18

| Group/Count | Level | Units | |
|---|---|---|---|
| Count 3 (Xu Jin) and 4 | 18 | 1 | |
| Count 3 (Liu Fang) and 4 | 18 | 1 | |

Total Units:     <u>2</u>

Plus:    Grouping Two Units (§ 3D1.4)     +2

Total:     <u>20</u>

Excluding the two-level Zero-Point Offender reduction, assuming a Criminal History Category of I, a total adjusted offense level of 20 yields an applicable Guidelines advisory range of 33 to 41 months' imprisonment.

    B.    A Two-Level Reduction for Zero-Point Offender Status Is Not Appropriate Under U.S.S.G. § 4C1.1

The government respectfully submits that the Zero-Point Offender reduction, as applied in the PSR and advocated for by the defendant, does not apply to the defendant. The defendant is not a Zero-Point Offender pursuant to U.S.S.G. § 4C1.1 because he used credible threats of violence in connection with his offenses. *See* U.S.S.G. § 4C1.1(3). Under Section 4C1.1, a defendant must have no criminal history and satisfy various other criteria to qualify for the reduction, including that he "did not use violence or credible threats of violence in connection with the offense." *Id.*; *see also United States v. Celso*, 22-CR-194 (EK), 2024 WL 2319679, at *1 (E.D.N.Y. May 22, 2024).

Here, the defendant drove from New York to the home of Xu Jin and Liu Fang in New Jersey, pounded on their front door, tried to open the door, entered their backyard, peered into their windows, and taped a threatening note to the door that stated: "If you are willing to go back to the mainland and spend ten years in prison, your wife and children will be safe and sound. That's the end of this matter!" The note communicated – and obviously was intended to communicate – a clear threat of violence to Liu Fang (a victim identified in Counts Three and Four) and Xinzi Xu (a victim identified in Count Three) if Xu Jin did not return to the PRC. The note relayed by the defendant plainly threatens that Liu and Xinzi Xu would *not* "be safe" if Xu Jin did not return to the PRC.

This threat is only exacerbated when contextualized by the defendant's conduct in banging on and trying to open the door to Xu Jin and Liu Fang's home and traveling to their backyard to peer through the windows. *See Celso*, 2024 WL 2319679, at *3 ("A credible threat need not be explicit. A sentencing court may infer a threat from the defendant's conduct and the

surrounding circumstances.") (internal quotation marks omitted) (citing *United States v. Kirk Tang Yuk*, 885 F.3d 57, 83 (2d Cir. 2018) and *United States v. Johnson*, 64 F.4th 1348, 1352 (D.C. Cir. 2023)). Moreover, given the conduct of the PRC government and the defendant's co-conspirators – including forcing Xu Jin's elderly and ill father to travel from the PRC to New Jersey and imprisoning Xu Jin's sister in China in an attempt to coerce him to return to the PRC – there can be no serious dispute that the threats of violence were credible.

Although the defendant argues that he had "no relationship" with the victims "where the victims may have knowledge that [the defendant] was a violent person" (ECF No. 329 at 8), what the victims knew about the defendant – *i.e.* the threatening behavior they observed from him – reasonably led them to view the threatening note he posted as a credible threat of violence. From their observations, the defendant was a criminal who trespassed on their property, invaded their backyard, and peered into their home without permission; notably, it was the defendant who led the charge, leading Kuang Zebin to the front door of the home and then into the backyard. The victims also heard the defendant as he pounded on the front door and tried to open the door handle of the front door. Those observations, coupled with the note threatening the safety of Xu Jin's wife and daughter, provided ample reason to believe that the threat would be carried out. Xu Jin confirmed as much when he testified that he understood the threat as a shift from "mental" to "physical" and he became "very worried about [the] safety" of his wife and daughter. (PSR ¶ 88.) In response to the fear of the physical safety of his family, Xu Jin "reinforced the lock" for every door at his home and bought a baseball bat. (*Id.* ¶ 90.)

Accordingly, in light of the defendant's use of a credible threat of violence, a two-level reduction pursuant to U.S.S.G. § 4C1.1 is not appropriate. *See Celso*, 2024 WL 2319679, at *3 (holding that statements of the defendant, a Genovese crime family associate, that if the victim did not withdraw his police complaint, "things would ugly" was a credible threat of violence, rendering U.S.S.G. § 4C1.1 inapplicable) (internal quotation marks omitted); *see also Yuk*, 885 F.3d at 82-83 (rejecting defendant's challenge to the district court's application of U.S.S.G. § 2D1.1(b)(2)'s two-point enhancement for making a credible threat to use violence where defendant referenced driving to the victim and "predicted [the victims'] impending deaths").

IV.  <u>Argument</u>

For the reasons below, the government respectfully submits that a sentence of 33 months' imprisonment, at the bottom of the applicable Guidelines range, would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case. 18 U.S.C. § 3553(a) requires courts to consider a number of factors in imposing a sentence, including the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to serve as a deterrent. For the reasons below, analysis of these factors supports imposing a sentence of 33 months' imprisonment. The government does not object to Probation's recommendation that no fine be imposed, and there is no forfeiture or requested restitution in this case.

9

A. The Nature and Circumstances of the Offense

The nature and circumstances of the defendant's offenses are serious. As detailed above, because of the conduct of the defendant and his co-conspirators, the lives of Xu Jin and his family have been upended.

Liu Fang testified at trial, for example, that her "life was turned upside down" because of the actions taken against "all the family members and the extended family." (Tr. 732:16-18.) She explained that, because she did not "want to be harmed" she "chose to be away from [her family]" and "cut off all communications." (Tr. 732:20-25.) As a result of "seal[ing] myself up," Liu Fang testified she "lost my friends and all the connection with my relatives and friends in China." (Tr. 733:2-3.) She also testified that she feared for her daughter's safety. (Tr. 730:17-18.) Liu Yan corroborated this testimony, herself testifying that her sister, Liu Fang, had been "on the verge of collapsing" as a result of the illegal repatriation scheme, and had distanced herself from family and friends. (Tr. 126:14-19.) She stated that she had "no proper words to describe the mental pain we have suffered." (Tr. 126:11-12.) In addition, Xu Jin testified that he feared for his personal safety, as well as the safety of his family members – both in the PRC and in the United States. (Tr. 1400:19-1401:03.)

The profound effects of the defendant's conduct are further detailed in the victim impact statements. The victims uniformly describe feeling unsafe and worrying about the safety of themselves and their family members. (PSR ¶¶ 99-101.) One victim, for example, describes spending "countless days crying, worrying about my family's safety, and my own." (*Id.* ¶ 100.) The victims also describe significant health issues, including depression, insomnia, excessive stress, anxiety, and heart disease. (*Id.* ¶ 99.) In addition, the victims describe the significant disruption to their daily lives, including that, "in order to minimize harm to others, [the victims] have almost entirely severed ties" with friends and business partners. (*Id.*) Those victims "dare not venture out casually, and only leave the house to buy essential supplies." (*Id.*) In addition, the victims describe harm to family members in the PRC, including medical issues, interrogations by the PRC government, and lost jobs. (*Id.* ¶¶ 99-101.)

The defendant's attempts to minimize his conduct, going so far as to claim that he was "merely used as a pawn" (ECF No. 329 at 2), are unavailing.[4] The actions he took knowingly and intentionally were severe, and shattered any sense of safety the victims held in their own home. The defendant, having been provided the victims' home address, drove himself and Kuang Zebin to the victims' home to look for the victims and threaten them by delivering a note communicating that Xu Jin's daughter and wife would be harmed unless he returned to the PRC. (PSR ¶ 86.) Upon arriving at their home, the defendant knocked on the front door, rang the doorbell, and tried to get into the home by turning the door handle. (*Id.*) The defendant used the tape gun he brought

---

[4] The defendant also argues that his "involvement in conspiracy is limited in scope and duration" thus warranting a below-Guidelines, non-incarceratory sentence (ECF No. 329 at 4), but the defendant's role in the conspiracy is already accounted for by the minor participant reduction in the applicable Guidelines range. (PSR ¶¶ 139, 145). The defendant fails to address how a further variance is warranted given the two-point Guidelines level reduction already applied.

10

to tape three threatening notes to the home's front door. The defendant and Kuang Zebin then further invaded the victims' privacy by going to the back of the house and walking through the backyard and onto the patio, where they peered into the victims' home through the patio windows. (PSR ¶ 86.) The defendant subsequently returned to the front of the home to tear two of the notes off the door and throw them on the ground in the front yard in order to avoid his crime being detected by individuals other than the intended victims.[5] (PSR ¶ 86.) Each of the brazen criminal acts taken by the defendant furthered the conspiracy to stalk the victims and to ensure they were continually harassed and intimidated.

Moreover, although the defendant continues to argue that he returned to remove the note threatening Liu Fang and Xinzi Xu's safety (ECF No. 329 at 5), he already argued such a withdrawal from the conspiracy to the jury, which the jury was permitted to – and did – reject by finding the defendant guilty of conspiring to, and committing, interstate stalking. (Tr. 54-56 (arguing in opening statement that "[the defendant] went back and took the note down . . . He did it on his own. He decided not to commit the crime."); 2059-61 (arguing in summation that "he's trying to do the right thing. He does not want to commit a crime. He wants to withdraw from this so-called conspiracy"); 2185-87 (jury charge on affirmative defense of withdrawal from a conspiracy).

The serious nature of the crimes committed by the defendant, and the real, damaging and lasting harm caused by the defendant and his co-conspirators warrants the recommended Guidelines sentence of 33 months' imprisonment.

B. The History and Characteristics of the Defendant

The defendant does not have any criminal history, and the government does not contest the assertions of those who have written letters concerning the defendant's personal history and family relationships. The government respectfully submits, however, that the defendant's arguments with respect to his "truthful" post-arrest statements to law enforcement are unsupported by the evidence and should not weigh in favor of a lenient sentence.

Though the defendant claims that "[u]pon [his] arrest, he provided truthful information to law enforcement" (ECF No. 329 at 10), this assertion is not supported by the record. At the outset, rather than take responsibility for posting the threatening notes on Xu Jin and Liu Fang's door, the defendant falsely blamed co-defendant Kuang Zebin for the act. (PSR ¶ 102.) Further, throughout the post-arrest interview, the defendant repeatedly minimized his role in the criminal conspiracy, first stating that "[a]ll [he] did" was give Kuang Zebin a ride to Xu Jin and Liu Fang's home. (Exhibit A, Oct. 28, 2020 Post-Arrest Interview Video Recording at 0:36:10; Exhibit B, Oct. 28, 2020 Post-Arrest Interview Transcript at 15.) The defendant further claimed

---

[5] The defendant's speculation as to what more he could have, but did not, engage in to further the criminal conspiracy (*see* ECF No. 329 at 5 ("Perhaps the theory also could be that he would attempt to contact the victims a second time to achieve the goals of SKYNET.")) is misplaced. Such considerations are not properly before the Court as either Section 3553 factors or the conduct underlying his criminal convictions.

11

he "didn't know what [Kuang Zebin] was writing about" in the notes (Ex. A at 3:19:29; Ex. B at 72), but as was clear from the surveillance footage, it was the defendant who posted the notes, which were plainly in front of the defendant while the defendant taped the notes to the door. In addition, trial testimony shows that the defendant and Kuang Zebin discussed the plan to deliver the threatening notes in the car ride from New York to Xu Jin's and Liu Fang's home in New Jersey. (ECF No. 294 at 38.)

The defendant's "truthful" account of the events in September 2018 also wholly omitted the defendant's trespassing into Xu Jin and Liu Fang's backyard, that he and Kuang Zebin walked up to the home's deck and looked inside the back patio windows, that the defendant originally taped three threatening notes on the victims' door before removing two notes at Chen Chaohong's direction because they were too conspicuous, and that it was the defendant who ripped down the two notes and threw them into the front yard of the home to avoid detection. The defendant also lied to law enforcement agents when he claimed that he returned the next day and removed the final threatening note from Xu Jin and Liu Fang's door. (Ex. A at 0:36:34; Ex. B at 16-17.) Surveillance footage clearly demonstrates that never happened. Indeed, though the defendant now claims Kuang Zebin made "every effort to lie to divert responsibility away from himself" (ECF No. 329 at 10), it was the defendant who lied to law enforcement and decided not to take responsibility for the crimes he committed.[6]

### C. Respect for the Law, Just Punishment, and the Need for Deterrence

With respect to the other Section 3553 factors, a sentence of 33 months' imprisonment will promote respect for the law, provide just punishment and provide adequate deterrence. *See* 18 U.S.C. § 3553(a)(2). As discussed above, the seriousness of the defendant's crime was demonstrated at trial by testimony of the victims who each explained the substantial harm and distress they suffered due to the harassment scheme. The defendant's delivery of the threatening note was a critical component to their mental anguish, including leading Xu Jin to believe for the first time that the PRC government's threats were no longer "mental" but "physical." (PSR ¶ 88.) The defendant's actions also caused Xu Jin reasonably to fear for the safety of his wife and daughter. (*Id*. ¶ 89.)

The government's requested sentence will also make clear to the defendant's associates and to anyone who considers engaging in similar conduct that serious penalties will

---

[6] The defendant also argues that his sentence should be "less severe" than that of co-conspirator Kuang Zebin in particular. (ECF No. 329 at 9-10.) As this Court is aware, defendant Kuang has not yet been sentenced. In any event, the defendant and Kuang are not similarly situated: Kuang pleaded guilty, accepted responsibility for his role in the crimes, and cooperated with the government, including by testifying truthfully at trial. The defendant, in contrast, decided to proceed to trial and not to cooperate with the government, as was his right and choice. Notably, however, compared with the co-defendants who also proceeded to trial, the defendant's applicable Guidelines range and recommended sentence by Probation is "less severe." The government similarly is recommending a "less severe" sentence for the defendant than for co-defendant Zhu; the government has not yet made a sentencing recommendation for co-defendant McMahon.

result from any participation in such schemes to harass and intimidate individuals like the victims. For these reasons too, a sentence of 33 months' imprisonment will serve the Section 3553(a) factors. *See United States v. Siegel*, 271 F. App'x 115, 118 (2d Cir. 2008) (upholding 37-month term of imprisonment imposed for interstate stalking convictions, where the district court found the sentence necessary, in part, to serve the "purposes of punishment and deterrence").

V.      Conclusion

For the forgoing reasons, given the serious nature of the criminal conspiracy and the defendant's role in that conspiracy – including the terror caused to the victims because of the conduct of the defendant and his co-conspirators – the government respectfully submits that a sentence of 33 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

Respectfully submitted,

CAROLYN POKORNY
Acting United States Attorney
Eastern District of New York

By:     /s/
Meredith A. Arfa
Irisa Chen
Assistant U.S. Attorneys
(718) 254-7000

MATTHEW G. OLSEN
Assistant Attorney General
Department of Justice
National Security Division

By:     /s/
Christine Bonomo
Trial Attorney

Cc:     Clerk of the Court (by ECF and Email)
        Counsel of Record (by ECF)