## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                Plaintiff,

     v.

MICHAEL MCMAHON,
ZHENG CONGYING and
ZHU YONG,
         also known as "Jason Zhu,"

                Defendants.

Case No. 1:21-cr-00265 (PKC) (S-1)

*Filed electronically*

---

### SENTENCING MEMORANDUM OF DEFENDANT MICHAEL MCMAHON

---

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

*On the memorandum:*
Lawrence S. Lustberg, Esq.
Genna A. Conti, Esq.

1

# TABLE OF CONTENTS

**Page**

APPENDIX OF LETTERS.................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................... 2

I.    PROCEDURAL HISTORY........................................................................................ 2

    A.    Charges and Jury Verdict................................................................................ 2

    B.    The Presentence Investigation Report ("PSR") ............................................. 4

II.   THE OFFENSE CONDUCT ..................................................................................... 5

LEGAL ARGUMENT ......................................................................................................... 13

I.    THE APPLICABLE LEGAL STANDARD.............................................................. 13

II.   STEP ONE: ADVISORY GUIDELINES CALCULATION ................................... 14

    A.    The Presentence Investigation Report Miscalculates the Advisory
    Guidelines Calculation................................................................................. 14

        1.    The Presentence Investigation Report Fails To Apply A
        Sufficiently Analogous Guideline............................................... 15

        2.    The Presentence Investigation Report Improperly Calculates Count
        Three As Three Separate Offenses. ........................................... 17

        3.    The Specific Offense Characteristic of Participating in a "Pattern
        of Activity" Does Not Apply. .................................................... 20

        4.    The Vulnerable Victim Enhancement Does Not Apply. ......................... 22

        5.    The Special Skill Enhancement Does Not Apply. .................................. 24

        6.    The Reduction For Acceptance Of Responsibility Should Apply. ........... 26

        7.    The Reduction For Minimal or Minor Participant Should Apply............. 29

    B.    A Downward Departure Is Warranted Because Of The Atypical Nature Of
    This Case...................................................................................................... 34

III.  STEP TWO: SECTION 3553(a) FACTORS............................................................ 38

    A.    Application Of The § 3553(a)(1) Factors Warrant A Lenient Sentence.............. 39

Table of Contents (continued)

Page

1.   The Nature And Circumstances Of The Offense ....................................... 39

2.   The History And Characteristics Of The Defendant ................................. 45

    a.   Personal Background ........................................................ 46

    b.   A Heroic New York City Police Officer ........................................ 51

    c.   9/11 Service and Health Impacts ............................................. 57

    d.   A Reliable and Ethical Private Investigator ................................... 60

    e.   Good Samaritan ............................................................. 65

    f.   Championing Charitable Causes ............................................. 69

    g.   Family Life ................................................................. 71

B.   Application of The § 3553(a)(2) Factors Also Warrant A Lenient Sentence. ........................................................................ 77

1.   Seriousness of the Offense ................................................... 78

2.   Promotion of Respect for the Law ............................................ 78

3.   Just Punishment ........................................................... 80

    a.   Mr. McMahon Has Already Been Punished ................................ 80

    b.   There Will Be A Profound Harm to Mr. McMahon's Family, and in Particular, His Wife and Three Children. ............. 85

4.   Deterrence ................................................................. 96

    a.   Specific Deterrence ......................................................... 96

    b.   General Deterrence ......................................................... 99

5.   Rehabilitation .............................................................. 101

C.   The Court Should Avoid Unwarranted Sentence Disparities In Accordance with § 3553(a)(6). ........................................................... 105

CONCLUSION .................................................................... 110

# APPENDIX OF LETTERS

Brickfield, Paul (attorney)............................................................................................1

Burke, Michael (friend and colleague)…………..………....................................2

Byrne, Brendan (brother-in-law)…………………..………………………...…..3

Byrne, Caroline (niece)…………………………………………………………...4

Byrne, Mary (mother-in-law)……………………………………………………..5

Callanan, Michael (cousin)………………………..…...........................................6

Campo, Frances (friend)…………………………..……………………………....7

Cavegn, Elieen and Alex (friends)………………………………………………..8

Conti, Matthew (foot and ankle orthopaedic surgeon)………………………..…..9

Hayden, Joseph (attorney)………………………………………………………..10

Henning, Rachel (niece)…………………………………………………………..11

Hutton, Theresa (friend)……………………………………………………….....12

Iloreta, Alfred (co-director endoscopic skull base surgery Mount Sinai Health System)………..13

Laddy, Jennifer and Stephen (friends)………………………………………........14

Lawler, Michael and Sessions, Pete (Congressmen)……………………………...15

Lonzar, Robert (friend)……………………………………………………………16

Magri, Scott (friend)………………………………………………………….…..17

Martin, Lauralee (friend)………………………………………………………….18

McCarthy, Christine (cousin)……………………………………………………..19

McCarthy, Robert (attorney and cousin's spouse)………………………………..20

McCullagh, Raymond (cousin)……………………………………………………21

McCullagh, Teresa (friend and cousin's spouse)…………………………………22

McLachlan, Dave (friend)………………………………………………………...23

McMahon, Ann Marie (daughter)………………………………………………...24

McMahon, Eileen, Kevin, Brian, Vincent, Patricia, Kathleen and Stephen (siblings)……………25

McMahon, Martha (wife)………………………………………………………….26

McMahon, Maxwell (son)………………………………………………………...27

McMahon, Michael (son)………………………………………………………….28

McNicholas, Fran (cousin)………………………………………………………..29

McNicholas, Stephen (nephew)…………………………………………………...30

Mills, John (friend)……………………………………………………………….31

Orlando, Jason (attorney and friend)……………………………………………..32

Roalsvig, Alexandra (friend)……………………………………………………..33

Rosenblatt, Raphael (attorney)……………………………………………....…...34

Ross, Lisa (friend)………………………………………………………………...35

Roth, Chrissy (friend)……………………………………………………………..36

Roth, JD (friend)………………………………………………………………….37

Strauss, Cynthia (friend)………………………………………………………….38

Weisberg, Herman (colleague)…………………………………………………….39

## PRELIMINARY STATEMENT

Defendant Michael McMahon stands convicted of three of four counts against him and faces a recommended sentence of 84 months in prison.  Such a sentence would, however, be profoundly unjust, not only because the Sentencing Guidelines calculation upon which it is based is terribly flawed, for a number of reasons, but mainly because neither the nature and circumstances of the offense nor Mr. McMahon's history and characteristics over a lifetime of heroic acts as a police officer, loving loyalty to his family, and unceasing generosity to all with whom he came into contact, can be squared with such a sentence.  Indeed, when one considers whether any sentence of imprisonment at all is "necessary" to fulfill the goals of sentencing, as the law requires, the answer must be that it is not, particularly given that the true culprits in this case have never been prosecuted and those that have, who are themselves more culpable than Mr. McMahon, have received far lesser sentences.

In so arguing, Mr. McMahon does not disparage the Government's efforts to redress China's actions in improperly seeking to repatriate—and in some cases kidnap—political enemies from the United States to China.  These are and were evil acts, even if, under new Department of Justice Guidelines, they would not be prosecuted today, since they are not traditional "espionage." But Mr. McMahon, even if he should have known that those who were directing his private investigative activities were agents of China (though they told him otherwise)—and he certainly wishes he would have seen those "red flags," in which case he would certainly not have taken the steps he did—should not bear such great responsibility for the Chinese campaign of transnational repression which was the subject of this prosecution, but not at all his purpose in acting as he did.

For the reasons set forth at length below, Michael McMahon—really a good and honorable man—has been punished sufficiently already; indeed, his life has been financially, personally and psychologically devastated by this prosecution.  Consideration of all of the facts of this case and

of the entirety of his life, when viewed through the prism of what is really just and what is really necessary to vindicate the purposes of sentencing, requires that he receive a non-custodial sentence, or, at worst, one less than that of his co-defendants and far less than that recommended by Probation.

## BACKGROUND

### I.     PROCEDURAL HISTORY

#### A.     Charges and Jury Verdict

On October 28, 2020, Mr. McMahon was suddenly arrested and charged in a two-count criminal complaint with Conspiracy to Act as an Agent of a Foreign Government Without Prior Notification to the Attorney General and Conspiracy to Engage in Interstate Stalking, both in violation of 18 U.S.C. § 371.  *See* ECF No. 1.  On May 15, 2021, a Grand Jury sitting in the Eastern District of New York returned an indictment charging defendants Hu Ji, Li Minjun, Zhu Feng (also known as "Johnny Zhu"), Mr. McMahon, Zheng Congying, and Zhu Yong (also known as "Jason Zhu") with Conspiracy to Act as an Agent of a Foreign Government Without Prior Notification to the Attorney General in violation of 18 U.S.C. § 371 and 18 U.S.C. § 3551 (Count I) and with Conspiracy to Engage in Interstate Stalking in violation of 18 U.S.C. § 371 and 18 U.S.C. § 3551 (Count II).  *See* ECF No. 54.  Thereafter, on July 21, 2021, the Grand Jury returned a Superseding Indictment adding substantive counts for Acting as an Agent of a Foreign Government Without Prior Notification to the Attorney General in violation of 18 U.S.C. § 951(a), 18 U.S.C. § 2, and 18 U.S.C. § 3551 (Count II), and Stalking in violation of 18 U.S.C. § 2261A(1)(B), 18 U.S.C. § 2, and 18 U.S.C. § 3551 (Count IV).  *See* ECF No. 77.[1]

---

[1] The Superseding Indictment also charged defendants Tu Lan and Zhu Feng (also known as "Johnny Zhu") with Obstruction of Justice in violation of 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 2,

Prior to trial, Mr. McMahon moved to dismiss the Indictment. *See* ECF Nos. 114 through 114-3 and 121. Specifically, Mr. McMahon argued that (1) the Superseding Indictment did not allege that Mr. McMahon: (a) traveled interstate or foreign commerce or that Mr. McMahon engaged in conduct that caused, attempted to cause and would be reasonably expected to cause John Doe #1 and Jane Doe #1 substantial emotional distress, as necessary to establish a violation of 18 U.S.C. § 2261(A)(B); (b) agreed to operate within the United States subject to the direction or control of a foreign government or official, as necessary to establish a violation of 18 U.S.C. § 951(a); or (c) knowingly and willfully entered into an agreement with another to commit an offense against the United States, as necessary to establish a violation of 18 U.S.C. § 371. He also contended that the Superseding Indictment failed to establish venue as to Counts II and IV of the Superseding Indictment, as Mr. McMahon never left the State of New Jersey in conducting his investigative services in connection with the events alleged in the Superseding Indictment. The Court denied Mr. McMahon's Motion to Dismiss. *See* ECF No. 123. Mr. McMahon also filed a Motion for Discovery and an Evidentiary Hearing Regarding Prosecutorial Misconduct, *see* ECF Nos. 146 through 146-11 and 147, which argued that Mr. McMahon was entitled to discovery and an evidentiary hearing as to whether the Government engaged in prosecutorial misconduct in its decision to prosecute Mr. McMahon due to Mr. McMahon's lawful investigative activities performed on behalf of another, high-profile client, whose name had come up at the time of Mr. McMahon's arrest. This motion was also denied. *See* ECF No. 163.

Trial in this matter commenced on May 31, 2023 and continued until June 20, 2023, when the jury found Mr. McMahon not guilty of Conspiracy to Act as an Agent of a Foreign Government

---

and 18 U.S.C. § 3551 (Count V) and Conspiracy to Obstruct Justice in violation of 18 U.S.C. § 1512(k) and 18 U.S.C. § 3551 (Count VI).

Without Notification to the Attorney General (Count I), but guilty of Acting as an Agent of a Foreign Government Without Notification to the Attorney General (Count II), Conspiracy to Engage in Interstate Stalking (Count III), and Interstate Stalking (Count IV). *See* ECF No. 257. The specifics of these charges and the evidence underlying them are further summarized *infra*.

Mr. McMahon filed post-trial motions pursuant to Federal Rules of Criminal Procedure 29 and 33, arguing that: (1) the evidence on all Counts was insufficient as a matter of law; (2) Mr. McMahon's conviction on Count II was fatally inconsistent with his acquittal on Count I; (3) the Government's tandem reading of text messages improperly dramatized the evidence and usurped the jury's role in interpreting their meaning; (4) the Government's rebuttal was improper, as it made new arguments and false or unsupported statements that Mr. McMahon could not correct; (5) the Government relied on evidence that should not have been admitted under Rule 801(d)(2); and (6) the Government made false representations regarding Mr. McMahon's alleged wrongful access to Government databases and regarding Mr. McMahon's purported failure to report certain income on his taxes. *See* ECF Nos. 279 through 279-3 and 291. These motions were also denied. *See* ECF No. 294.

### B.    The Presentence Investigation Report ("PSR")

On October 17, 2024, the United States Probation Office provided Mr. McMahon with its Draft PSR and sentence recommendation, to which Mr. McMahon objected by way of letter response on November 14, 2024 and supplemental letter response on March 3, 2025. Specifically, Mr. McMahon asserted numerous objections to which Mr. McMahon still adheres and does not hereby waive; some of those objections are discussed or referenced herein. Mr. McMahon also provided a narrative version of the offense in addition to specific objections to each paragraph to the Draft PSR pertaining to offense conduct, which was incorporated into Paragraph 135 of the Final PSR.

The Final PSR calculates a base offense level of 18 for Conspiracy to Engage in Interstate Stalking as to John Doe One, Jane Doe One and Jane Doe Two, as well as the substantive offense of Interstate Stalking.  The Final PSR then adds a two-point enhancement because the offense purportedly "involved an aggravating factor, specifically, a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim," *id.* at ¶ 141, a two-point enhancement because Mr. McMahon allegedly "knew or should have known a victim of the offense was a vulnerable victim," *id.* at ¶ 142, and a two-point enhancement because Mr. McMahon purportedly "used a special skill in a manner that significantly facilitated the commission or concealment of the offense," *id.* at ¶ 143.  The Final PSR also adds a three-point enhancement under the multiple count adjustment.  *Id.* at ¶¶ 158, 159.  Therefore, the Final PSR calculates a total offense level of 27, *id.* at ¶ 164; based on that offense level and a criminal history category of I, the recommended Guideline imprisonment range is 70 to 87 months, *id.* at ¶ 210.  The Report recommends a total sentence of 78 months incarceration (30 months on Count 2, to run consecutive to Counts 3 and 4, and 48 months on Counts 3 and 4, to run concurrent with each other), as well as 2 years of supervised release, and a $300 Special Assessment Fee.  *See* Sentence Recommendation.

For the reasons provided herein, Mr. McMahon objects to both the Guideline calculation and Probation's recommended sentence and seeks a far more lenient—indeed, a non-custodial—sentence.

## II.    THE OFFENSE CONDUCT

Michael McMahon is a highly decorated retired New York City Police Department ("NYPD") Officer, who, during his time in the NYPD, served as, among other positions, a detective in the Bronx Narcotics Division, and a Sergeant at the 43rd Precinct in the Bronx.  PSR, ¶¶ 28, 135.  In that capacity, Mr. McMahon conducted or participated in hundreds of investigations, in such areas as drugs, money laundering, insurance fraud, homicide, burglary,

narcotics, and weapons possession, *id.* at ¶ 28, and was awarded 75 medals, including The Police Combat Cross, the second highest departmental award given to officers who "successfully and intelligently perform an act of extraordinary heroism while engaged in personal combat with an armed adversary under circumstances of imminent personal hazard to life," this as a result of his heroic conduct on New Year's Eve in 1995 (entering 1996), when he responded to an armed robbery in progress in Times Square, *id.* at ¶ 198.  However, in 2001, Mr. McMahon suffered a debilitating, career-ending injury during a high-speed car chase, which ultimately forced Mr. McMahon to retire from the NYPD, *id.* at ¶ 135.  While Mr. McMahon was recovering from his injury, he was placed on desk duty, but "following the September 11, 2001 terrorist attacks in New York City," Mr. McMahon "assisted in cleaning up the pile of debris at Ground Zero and was 'exposed to significant amounts of dust,' ███████████████████████████████ ██████████████████████████████████ *id.* at ¶ 185.

After Mr. McMahon's retirement from the NYPD, he began working as a private investigator.  From 2003 to 2012, Mr. McMahon "performed contract investigations for the Law Offices of Brian Neary in Hackensack, New Jersey and Plymouth Rock Insurance in New York, New York."  *Id.* at ¶ 197.  In 2012, Mr. McMahon opened the McMahon Investigative Group, LLC; Mr. McMahon "was the sole proprietor" of McMahon Investigative Group, LLC and "primarily performed investigations via contract work related to civil litigation, corporate theft, workers compensation, employee pre-screening, and criminal defense, utilizing surveillance and various other investigative methods."  *Id.* at ¶ 195.  Mr. McMahon was, at times, "compensated by the federal government for work he did on behalf of the Criminal Justice Act (CJA) attorneys."  *Id.*

Mr. McMahon was first contacted via phone to perform investigative services with regard to John Doe One on September 24, 2016 by a Queens-based translator (whom Mr. McMahon knew as "Emily Hsu") working for TransPerfect Language Services, *see* Ex. 1022. It was Mr. McMahon's understanding, clearly communicated to him in emails and conversations with Ms. Hsu, that Yong Zhu (whom Mr. McMahon knew as "Jason Zhu"), sought to hire a private investigator to assist him in collecting a debt on behalf of a private Chinese company from a person who had embezzled from that company. Accordingly, Jason Zhu went to a Chinese-speaking attorney, Liping Shi, looking to find a private investigator who was licensed in New Jersey, *see* Tr. at 1744:1-17; Liping Shi, in turn, contacted an attorney she knew from the Kings County courthouse, where she did some criminal work, *see* Tr. at 1744:18-1745:3, and that attorney then contacted Paul Brickfield, a former Assistant U.S. Attorney and criminal defense lawyer in New Jersey, to ask for a referral for a private investigator who could do some work in the area of Short Hills, New Jersey, *see* Tr. at 1768:22-1769:14. Mr. Brickfield recommended Mr. McMahon, as Mr. McMahon had previously done work for Mr. Brickfield as a private investigator in New Jersey. *See* Tr. at 1768:14-1768:21; Tr. at 1769:13-17. Once Jason Zhu obtained Mr. McMahon's name, he retained Emily Hsu who then contacted and retained Mr. McMahon on Jason Zhu's behalf.

Mr. McMahon had Jason Zhu, through Emily Hsu, execute his standard, written retainer agreement, *see* Ex. 3009, and provide Mr. McMahon with his standard $5,000 retainer, which was paid via a TransPerfect Language Services check, and deposited into his McMahon Investigative Group bank account, *see* Ex. 403B, 403E. After Mr. McMahon was retained, Emily Hsu provided Mr. McMahon with background information about John Doe One, *see* Ex. 1025, informed Mr. McMahon by email that John Doe One owed money to Jason Zhu, and told him that Jason Zhu was looking for information on where John Doe One lived, along with other information that could

7

be used to recover the embezzled funds.  *See* Ex. 1022 (email stating that John Doe One "is a gentleman who owned [sic] a lot of money from Mr. Jason Zhu. Instead of repaying the money he owned, [sic] [John Doe One] chose to run away, and that's why Mr. Zhu needs to find where does [John Doe One] live and other relate [sic] information.").

During the course of his investigation, Mr. McMahon reported to Jason Zhu, Johnny Zhu and Eric Yan—all of whom claimed to be employees of a Chinese construction company. However, there was no evidence introduced, at any point, that Mr. McMahon was told—by e-mail, text, over the phone, in person, or otherwise—that he was working for the Chinese government or that the goal of the operation was to repatriate John Doe One back to China.  Instead, Mr. McMahon was repeatedly told that these individuals were employees of a Chinese construction company looking to recover the money that John Doe One, a former employee, stole from them, that they were reporting Mr. McMahon's findings to the boss of the company, and, at one point, that Mr. McMahon was being paid by their financial manager.  *See* Ex. 805B at 13 ("Ok mc I spoke *with the company* last nite they want u to monitor on Monday but with one person.  I haven't get reply from invoice yet.  I think they are okay with it.  Can you start on Monday first and I will come to ur office by Tuesday."); *id.* at 15 ("*The company* wants the property list which be long j lifetime can u do that?"); *id.* at 19 ("Standby I will inform your suggestion *to the company* tonight. . . ."); *id.* at 21 ("I will stay here as long as *the company* require."); *id.* at 26 ("I will speak with *the company* tonight."); *id.* at 28 ("Mc I will deposit 1k to ur account tmr morning.  *Company want* to switch to lightweight surveillance with one person tmr until further notice.  They are discussing how we gonna handle this this week.  We will send one agent until they tell us what to do"); Ex. 3047 ("I have already back to China and reported all we found *to my boss of the company*. . . .  So we are willing to commission you to start the off shore property investigation and also the

investigation of these 8 account."); Ex. 3056 ("Hi mike: *our finance manager* wire you the money this morning.  It will take 3 to 5 working days to get to your account."); Ex. 4016 at 2 ("sorry for misunderstanding of off shore, *From the financial record of our company*, Xu transferred the money to those 8 account, so we need to check these accounts first.  Several accounts are from united states.").  It is clear, then, from the record, that Mr. McMahon believed that he was performing his investigative services on behalf of a private Chinese construction company, as he referenced the company in multiple communications.  *See* Ex. 805B at 14 ("So *your company* only wants one investigator for Monday?"); *id.* at 24 ("How did *the company in China* find you and Eric to work in this case??").  Nor did any of these individuals reveal their true identity to Mr. McMahon; for example, it was never until the charges were brought against Mr. McMahon that he learned that Eric Yan was actually Hu Ji, a Chinese official.  Notably, Mr. McMahon communicated with these individuals largely via e-mail and text message (none of which Mr. McMahon deleted, which is itself evidence that goes to his culpability), and the in-person meetings occurred at highly public places:  twice at a Panera Bread in Paramus, New Jersey and once at a law office in Hackensack, New Jersey.  Mr. McMahon also generated formal, written reports regarding his investigative activities, *see, e.g.,* Exs. 3034, 3028, as is standard for Mr. McMahon.

Indeed, the investigative services that Mr. McMahon performed in this matter were typical of his usual services performed as a private investigator.  Mr. McMahon performed surveillance over the course of five days at two different time periods, over six months apart.  During each date of surveillance, Mr. McMahon called the local police to inform them of his surveillance activities, *see* Exs. 314, 407, AAA, as is also Mr. McMahon's standard practice.  Mr. McMahon also subcontracted with two other private investigators, Michael Kelly and Eric Gallowitz, both of whom are also former NYPD Officers, to assist with the surveillance.

The details of Mr. McMahon's investigative services are as follows: the first day that Mr. McMahon conducted surveillance was on October 5, 2016, at John Doe One's sister-in-law's home in Short Hills, New Jersey, *see* Ex. 3034; the purpose of the surveillance, as Mr. McMahon understood it, was to locate John Doe so that he could then conduct further surveillance thereafter. While Mr. McMahon was performing surveillance, he conducted a Google search on his phone of John Doe One, and came across a public news article from a Chinese news publication called The China Daily, which indicated that John Doe One was wanted in China for embezzlement. *See* Ex. 434. But parallel civil and criminal proceedings are quite common, and thus, although Mr. McMahon understood that John Doe One was under criminal investigation in China, his reasonable belief was that this was for the same or similar offense as to which he had been retained to investigate on behalf of the victim on his offenses: the private Chinese construction company. *See* Tr. at 414. And in fact, a parallel civil litigation actually ensued: though this was not admitted into evidence at trial, Tr. at 12:7-15, it is relevant at least for sentencing purposes that about one year after Mr. McMahon completed his investigative services in this matter, a civil lawsuit was filed in the Superior Court of New Jersey by a Chinese construction company against John Doe One. Nor did the mention of Operation Skynet in the sub-headline of The China Daily news article raise Mr. McMahon's awareness about the true purpose of his investigative services, as it was not really described and Mr. McMahon did not know what it meant. *See* Ex. 434.

Thereafter, Mr. McMahon conducted four additional dates of surveillance on April 5, 6, 10, and 11 in 2017. Once again, Mr. McMahon was under the belief that the purpose of this surveillance was to locate John Doe One for purposes of further surveillance thereafter. The surveillance conducted on April 5, 6, and 10 in 2017 occurred at John Doe One's sister-in-law's home in Short Hills, New Jersey, and the surveillance on April 11, 2017, was conducted at John

Doe One's home in Warren, New Jersey. There was no evidence that Mr. McMahon was ever seen by John Doe One or his family, nor was Michael Kelly or Eric Gallowitz; instead, Mr. McMahon's surveillance activities remained completely covert during his work on this matter. *See* Tr. at 1410:20-1411:7 (testimony of John Doe One) (testifying that he did not know who followed him on April 7, 2017, but it could not have been Mr. McMahon, as it is undisputed that he did not conduct surveillance on April 7, 2017, *see, e.g.,* Exhibit 2011); Tr. at 786:9-15 (testimony of Jane Doe One) ("Q. Have you ever met Mr. McMahon before? A. No. Q. Have you ever seen him before? A. No."); Exhibit 713 at 25:13-21 (testimony of Jane Doe Two) ("Maybe just to make it clear, Mr. McMahon, can you put up your hand. . . . Q. Do you see the person who just put up his hand? A. Yes. Now I see him, yes. Q. Thank you very much. Have you ever seen him before today? A. No."). This remained true even after Eric Gallowitz proposed that he and Mr. McMahon use overt surveillance tactics as they had done on a previous matter in Little Ferry, *see* Ex. 4019B, which Mr. McMahon in turn proposed to Johnny Zhu; however, Johnny Zhu vetoed the idea, and it was never done, *see* Ex. 805B. Mr. McMahon's work on this case stopped a few minutes after the rejected proposal, and Mr. McMahon never knew what happened thereafter.

In addition to conducting five days of surveillance, Mr. McMahon obtained records regarding John Doe One and his family, particularly focused on understanding John Doe One and his family's assets, *see* Ex. 805B, consistent with Mr. McMahon's belief that he was working on a private civil matter to collect a debt. For example, Mr. McMahon lawfully searched for John Doe One's and his wife's, Jane Doe One, banking information, *see, e.g.*, Ex. 2029. Mr. McMahon also used a New Jersey Motor Vehicle Commission ("NJMVC") database, NJ CAIR, to which he lawfully had access in his capacity as a private investigator, *see* Exs. 408D, 408C, to determine

whether John Doe One's vehicles were leased or owned, *see* Ex. 805B, once again consistent with the goal of asset recovery. In connection with obtaining information, Mr. McMahon also contacted a friend, Greg Finning, an Assistant Special Agent in charge of the New York Drug Enforcement Agency ("DEA") Office, and discussed his investigation in this matter, as he often did. At the time, Agent Finning was working on Chinese money laundering cases; since this was an embezzlement case arising in China, Mr. McMahon thought that this case night be of particular interest to him, though it turned out it was not. However, Agent Finning did provide Mr. McMahon with travel information related to John Doe One and his family, which was apparently, unbeknownst to Mr. McMahon, in violation of DEA policies. *See* Ex. 429. Thereafter, Mr. McMahon shared the travel information obtained from Agent Finning (which turned out to be inaccurate) with his clients. Mr. McMahon also discussed his investigation with Brian O'Rourke, a federal agent and acquaintance from the gym. Of course, these interactions with law enforcement were inconsistent with the notion that Mr. McMahon understood that he was doing anything wrong, let alone that he had criminal intent.

Mr. McMahon was paid for his investigative services related to John Doe One by various methods, including by check, *see* Exs. 403B, 403E, wire transfer to his joint checking account with his wife, *see* Exs. 403A, 403K, 403L, wire transfer to his son's student checking account, *see* Exs. 403G, 403H, 403I, and cash, *see* Ex. 3072-73 (paid in the middle of the day in a highly public restaurant, Panera Bread, and listed on a McMahon Investigative Services Invoice). Being paid by cash is extremely common in the private investigative profession. *See* Tr. at 1803:20-24; *see also* PSR ¶ 41. Moreover, it is not uncommon for Mr. McMahon to put the money from his investigative services into his joint banking account with his wife, as he was the sole proprietor of McMahon Investigative Services, and the money put into his McMahon Investigative Services

account would, in any event,  eventually be transferred to their joint account.  In total, Mr. Mahon

profited only $11,144.73 in this matter after expenses (including the costs of retaining Eric

Gallowitz and Michael Kelly).  *See* PSR ¶ 38.

After Mr. McMahon was arrested, Mr. McMahon attempted to assist law enforcement:  he

waived his right to an attorney during his post-arrest interview, and freely spoke with law

enforcement for nearly two hours.  *See* Tr. at 1491:11-25; Tr. at 1494:7-8; *see also* PSR ¶ 133.

During this post-arrest interview, Mr. McMahon confirmed his belief that he thought that he was

working for a Chinese construction company on a civil embezzlement case, and that the individuals

he was working for were trying to civilly prosecute John Doe One.  *See* Ex. 701A.[2]  Even after

Mr. McMahon retained counsel, Mr. McMahon provided the Government with his entire file

related to John Doe One, including phone calls, emails, text messages, and searches – none of

which he destroyed – despite the fact that four years had passed since Mr. McMahon performed

investigative services in connection with the matter.

## LEGAL ARGUMENT

### I.    THE APPLICABLE LEGAL STANDARD

Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the

United States Sentencing Guidelines are merely advisory, freeing courts to "tailor the appropriate

punishment to each offense in light of other concerns."  *United States v. Cavera*, 550 F.3d 180,

---

[2] Mr. McMahon was precluded at trial from admitting the exculpatory portions of his post-arrest interview on hearsay grounds, *see* ECF No. 232; Tr. at 887:4-893:5, which were excerpted by the Government in a way that, he contended, and still believes, unfairly incriminated him.  The timing of his challenge to that ruling was unfortunate:  though he adheres to his argument at trial, *see* Tr. at 880:17-883:15, and in his post-trial motions, *see* ECF No. 279-1 at 18-20, today Federal Rule of Evidence 106 has been changed and now allows an adverse party to "require the introduction, at any time, of any other part – or any other statement – that in fairness ought to be considered at the same time" even "*over a hearsay objection*."

187 (2d Cir. 2008) (en banc).  Although the Court must make a finding regarding the correct Guidelines range, "[a] district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *Id.* at 189.  Accordingly, district courts in the Second Circuit "'begin all sentencing proceedings by correctly calculating the applicable Guidelines range,' and then consider the factors listed in 18 U.S.C. § 3553(a)." *United States v. Preacely*, 628 F.3d 72, 79 (2d Cir. 2010) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)); *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005) ("Once an applicable Guidelines range has been determined, the sentencing judge will have the duty, imposed by subsection 3553(a)(4), to 'consider' it, along with all of the factors listed in section 3553(a).").  As is discussed further below, at the end of the day the Court must impose a sentence "sufficient, but not greater than necessary" to fulfill the purposes of sentencing, 18 U.S.C. § 3553(a)(2), and must exercise its great power guided by the fundamental principle that it should "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

As demonstrated below, a Guidelines sentence would not be reasonable in this case.

## II.    STEP ONE: ADVISORY GUIDELINES CALCULATION

### A.    The Presentence Investigation Report Miscalculates the Advisory Guidelines Calculation.

As noted, the first step in the sentencing process is the calculation of the applicable Guidelines range.  Notwithstanding that the Guidelines are advisory, that calculation must be correct:  if it is not, the sentence may not stand. *United States v. Paul*, 904 F.3d 200, 202 (2d Cir. 2018) (citing *Gall*, 552 U.S. at 49).  Here, the Final PSR calculates an advisory guidelines sentence

of 70 to 87 months, *id.* at ¶ 210, based upon a total offense level of 27, *id.* at ¶ 164. However, as is discussed below, the Final PSR miscalculates the advisory Guidelines calculation, as it fails to apply a sufficiently analogous guideline to Count Two, incorrectly calculates Count Three as three separate offenses, improperly applies a specific offense characteristic, wrongly applies the vulnerable victim enhancement, inappropriately applies a special skill enhancement, fails to apply an appropriate reduction for acceptance of responsibility, and denies Mr. McMahon the reduction for minimal or minor participant that he deserved.

### 1. The Presentence Investigation Report Fails To Apply A Sufficiently Analogous Guideline.

Mr. McMahon was convicted, on Count Two, with Acting as an Agent of a Foreign Government Without Prior Notification to the Attorney General pursuant to 18 U.S.C. § 951(a). Mr. McMahon agrees, of course, that this is a "felony for which no guideline expressly has been promulgated." But he disagrees that "there is not a sufficiently analogous guideline" such that "the provisions of 18 U.S.C. § 3553 shall control," as the PSR states. *See* PSR, ¶¶ 106, 137. It is well established that "[i]f the offense is a felony for which no guideline expressly has been promulgated" the Court must "apply the most analogous offense guideline." 18 U.S.C. § 2X5.1. And it is only when "there is not a sufficiently analogous guideline, [that] the provisions of 18 U.S.C. § 3553 shall control . . . ." 18 U.S.C. § 2X5.1. In "selecting the most analogous guideline in compliance with U.S.S.G. § 2X5.1, the courts have traditionally looked at definitions of the offenses, made factual findings concerning the defendant's conduct, and decided which guideline is most applicable to those facts." *Minicone v. United States*, 353 F. Supp. 2d 316, 318 (N.D.N.Y. 2005) (citing *United States v. Rahman*, 189 F.3d 88, 150 (2d Cir. 1999)).

Here, the most analogous sentencing guideline to be applied to Count Two is certainly USSG § 2A6.2, Stalking or Domestic Violence. The Indictment alleges that the defendants

"participated in an international campaign to threaten, harass, *surveil* and intimidate John Doe #1, Jane Doe #1, and their adult daughter, Jane Doe #2" (emphasis added)  and that "[t]he goal of th[e] campaign was to force John Doe #1 to return from the United States to the PRC against John Doe #1's will." *See* ECF No. 77, ¶ 13.  The Indictment further alleges that "the defendants sought to achieve this objective by pressuring John Doe #1 and his family members by imprisoning and threatening to imprison John Doe #1's family members in the PRC, transporting John Doe #1's elderly father to the United States to convey threats to John Doe #1 and *surveilling* and harassing John Doe #1 and his family members, including his adult daughter, Jane Doe #2." *See* ECF No. 77, ¶ 17 (emphasis added).  With regard to Count Two, as well as  Counts Three and Four, Mr. McMahon's actions were, as alleged, the same: he surveilled the John Doe One and his family members.  Although Mr. McMahon does not believe that his actions in that regard, or in locating John Doe One, amounted to "Stalking or Domestic Violence," they are, at worst, analogous as they were alleged and found by the jury.  *See United States v. Versaglio*, 96 F.3d 637, 638 (2d Cir. 1996) (determination of most analogous offense guideline is "predominantly an application of a guideline to the facts"); *United States v. Brennan*, 395 F.3d 59, 72 (2d Cir. 2005) (affirming the sentencing court's analogous guideline determination, as "[t]he court applied the larceny Guideline because it found that appellant's contumacious conduct amounted to stealing money from the Palm Beach Princess that should have gone to his victims or creditors.").  Accordingly, USSG § 2A6.2, Stalking or Domestic Violence, is the Guideline most closely analogous to Count Two, and should be applied here.

Mr. McMahon recognizes, however, that the Court disagrees with this position, as it has with respect to other defendants.  *See* Zhu Yong Sentencing Tr. at 10:11-13:6.   Assuming that it adheres to that position, even with regard to the unique facts of Mr. McMahon's case, it should

16

then utilize another guideline that will address the additional harm caused by Mr. McMahon's failure to register with the Attorney General under 18 U.S.C. § 951(a), the subject of Count Two. In this regard, there are a number of Guidelines that address similar failures to disclose, including USSG § 2T1.1 (Tax Evasion); USSG § 2M4.1 (Failure to Register and Evasion of Military Service); and USSG § 2E5.3 (False Statements and Concealment of Facts in Relation to Documents Required by the Employee Retirement Income Security Act). These Guidelines thus address the Court's concern, expressed during Defendant Zhu Yong's sentencing that, "while it's true that the physical stalking on the one hand, and being an unregistered foreign agent on the other, is largely the same[, t]here are obviously some differences like not registering and knowingly working for the Chinese Government . . . ." Zhu Yong Sentencing Tr. at 11:12-19. In this respect, these other Guidelines, addressing similar failures to register or provide information to the Government, are most closely analogous to Count Two, and should be applied here. Each carries a base offense level of 6.

Thus calculated, Count Two should then be grouped with Counts Three and Four pursuant to USSG § 3D1.2(b). That is, as described above, Count Two "involve[s] the same victims and two or more acts or transactions connected by a common criminal objective or constituting part of common scheme or plan" as are present in Counts Three and Four; the result is that one additional unit would be added to the Guidelines calculation pursuant to USSG § 3D1.4. The Guidelines failure to engage in this grouping analysis, *see* PSR, ¶ 108, is also incorrect, leading to the wrong initial Guideline, which this Court should address and remedy.

### 2. The Presentence Investigation Report Improperly Calculates Count Three As Three Separate Offenses.

The Final PSR improperly regards the conspiracy set forth in Count Three, of which Mr. McMahon was convicted, as more than one offense, resulting in an improper two-point increase

in the advisory Guidelines calculation. *See* PSR, ¶¶ 107, 138, and 158-60. Although Count Three charges a conspiracy to commit "the interstate stalking of one or more persons, namely John Doe One, Jane Doe One, and Jane Doe Two," PSR, ¶ 107, the goal of the interstate stalking conspiracy, as alleged by the Government in the Indictment, was to "plan[] a specific rendition operation to stalk and repatriate Joe Doe One," PSR, ¶ 50. Thus, even accepting the jury's verdict that Mr. McMahon engaged in the interstate stalking of Jane Doe One and Jane Doe Two (though Mr. McMahon maintains his contention that the evidence of that was insufficient as a matter of law), that conduct was undisputedly part of the overarching scheme to locate John Doe One, and thus, cannot be charged as "a conspiracy to commit more than one offense" as alleged in the PSR. That is, although the Indictment specifically alleged that Mr. McMahon and others "participated in *an* international campaign to threaten, harass, surveil and intimidate John Doe #1, Jane Doe #1 and their adult daughter, Jane Doe #2," (emphasis added, showing it was a single "campaign"), it also made absolutely clear that "[t]he goal of th[e] campaign was to force John Doe #1 to return from the United States to the PRC against John Doe #1's will." ECF No. 77, ¶ 13. The remainder of the Indictment only serves to reinforce this fact, *i.e.*, that the only purpose of the surveillance of Jane Doe One and Jane Doe Two, as alleged in the Indictment, was to locate John Doe One. *See, e.g., id.*, ¶ 40 ("The campaign against John Doe #1 at the behest of the PRC government included coordinated operations targeting John Doe #1's adult daughter, Jane Doe #2. . . . The operations against Jane Doe #2 began shortly after the conclusion of the April 2017 failed attempt to render John Doe #1."). Accordingly, Count Three cannot be charged as "a conspiracy to commit more than one offense" under USSG § 1B1.2(d) and the offense cannot "be treated as if McMahon had been convicted on a separate count of conspiracy for each offense that McMahon conspired to commit."

In any event, even if Count Three could be charged as "a conspiracy to commit more than one offense" under USSG § 1B1.2(d), the draconian sentencing enhancement proposed in the PSR cannot be applied here. Although USSG § 1B1.2(d) states that "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit," "[p]articular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy" and that "subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as trier of fact, would convict the defendant of conspiring to commit that object offense." *United States v. Marte Robles*, 562 F.3d 451, 455 (2d Cir. 2009) (citing USSG § 1B1.2(d), Application Note 4). Accordingly, a sentencing enhancement based upon multiple objects of a conspiracy can be applied only if "(1) if the jury renders a general verdict that does not establish which offense was the object of a multiple-object conspiracy; (2) the sentencing court determines that defendant's conduct was proven beyond a reasonable doubt; and (3) the sentence imposed does not exceed the statutory maximum for the count on which the defendant was convicted." *Id.* at 455-57.

Mr. McMahon does not dispute that the jury rendered a general verdict that did not establish whether he joined in a conspiracy to interstate stalk each of John Doe One, Jane Doe One or Jane Doe Two. However, Mr. McMahon's criminal conduct with respect to each of John Doe One, Jane Doe One, and Jane Doe Two certainly cannot be and definitely was not established beyond a reasonable doubt. Thus, leaving aside Mr. McMahon's argument (which he here simply preserves) that his conduct does not apply to John Doe One, there was absolutely no evidence presented at trial that Mr. McMahon actually stalked Jane Doe One or Jane Doe Two, as both Jane Doe One

19

and Jane Doe Two specifically testified at trial that they had never seen or met Mr. McMahon. *See* Tr. at 786:9-15 (testimony of Jane Doe One) ("Q. Have you ever met Mr. McMahon before? A. No. Q. Have you ever seen him before? A. No."); Exhibit 713 at 25:13-21 (testimony of Jane Doe Two) ("Maybe just to make it clear, Mr. McMahon, can you put up your hand. . . . Q. Do you see the person who just put up his hand? A. Yes. Now I see him, yes. Q. Thank you very much. Have you ever seen him before today? A. No.").[3] Nor did the evidence otherwise demonstrate that Mr. McMahon conspired to stalk either of them. For this reason, Count Three cannot be charged as "a conspiracy to commit more than one offense" under USSG § 1B1.2(d) and the offense should not "be treated as if McMahon had been convicted on a separate count of conspiracy" with regard to each of them, in an apparent effort to dramatically increase Mr. McMahon's already extremely harsh punishment. *Cf. United States v. Jett*, 982 F.3d 1072, 1078 (7th Cir. 2020) (affirming the sentencing court's application of USSG § 1B1.2(d) where the court "explicitly" found "'evidence beyond a reasonable doubt . . . of [defendant's] participation in . . . all of these acts in the conspiracy,' . . . under § 1B1.2(d))" and "the court said it was '100 percent certain that [defendant] conspired with [two co-conspirators] and participated in these acts, these crimes.'").

### 3. The Specific Offense Characteristic of Participating in a "Pattern of Activity" Does Not Apply.

Probation also improperly adds two levels to the base offense level pursuant to USSG § 2A6.2(b)(1)(E), as the PSR fails to specify what conduct Mr. McMahon engaged in that purportedly constituted a "pattern of activity involving stalking, threatening, harassing, or

---

[3] Of course, the same is, in reality, true with regard to John Doe One who testified that although he believed he was being followed on April 7, 2017, he did not know who followed him, *see* Tr. at 1410:20-1411:7 (testimony of John Doe One), and it could not have been Mr. McMahon, as it is undisputed that he did not conduct surveillance on April 7, 2017, *see, e.g.,* Exhibit 2011.

assaulting" pursuant to USSG § 2A6.2(b)(1)(E). In fact, even assuming it constituted stalking at all (a characterization that Mr. McMahon continues to dispute), Mr. McMahon's surveillance in this case, over a total of only five days on October 5, 2016, and April 5, 6, 10, and 11, 2017, was all conducted in furtherance of the exact same objective: to locate John Doe One; thus, Mr. McMahon's surveillance activities in this matter do not constitute the *separate* instances of stalking, threatening, harassing, or assaulting required by USSG § 2A6.2(b)(1)(E). *See* USSG § 2A6.2(b)(1)(E), Application Note 1 ("'Pattern of activity involving stalking, threatening, harassing, or assaulting the same victim' means any combination of two or more *separate instances* of stalking, threatening, harassing, or assaulting the same victim, whether or not such conduct resulted in a conviction.") (emphasis added). Indeed, the PSR's position that there was more than one victim, even if it were accepted (which it should not be) would undermine the application of this specific offense characteristic, which only applies to a "separate instances of staking . . . *the same victim*." *Id.* (emphasis added); *see also United States v. Bracken*, No. 2:24-CR-132-TS, 2025 U.S. Dist. LEXIS 7085, at *6 (D. Utah Jan. 13, 2025) ("the notes to the guideline make clear that the 'pattern of activity' enhancement must be supported by a 'separate instance' of stalking behavior for the enhancement to apply."); *cf. United States v. Lloyd*, 809 F. App'x 750, 756 (11th Cir. 2020) (finding the application of USSG § 2A6.2(b)(1)(E) warranted in that case where the record reflected that "on two separate occasions, [defendant] threatened to ruin his victim's 'good girl reputation' by sharing photos that he had received with her friends and parents, unless he received topless pictures of the victim"); *United States v. Robinson*, 433 F.3d 31, 34 (1st Cir. 2005) (affirming sentencing court's application of USSG § 2A6.2(b)(1) where "[t]he judge noted three past incidents in which it was demonstrated by a preponderance of the evidence that [defendant] had harassed, threatened, or assaulted [same victim]"). In sum, there is no basis to

apply this additional enhancement to increase, still further, the offense level applicable to Mr. McMahon's investigative activities on a few days eight years ago.

### 4.    The Vulnerable Victim Enhancement Does Not Apply.

The Final PSR likewise improperly applies the vulnerable victim adjustment pursuant to USSG § 3A1.1(b)(1), as USSG § 3A1.1(b)(1) only applies "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim[.]"  Leaving aside that John Doe Two is not, even in the PSR, which so consistently seeks to maximize the punishment of Mr. McMahon, regarded as a victim, the record at trial is completely devoid of any evidence that Mr. McMahon knew, or should have known, that John Doe Two "was unusually vulnerable because, at the time of the instant offense, he was over eighty years old and in poor health" or that John Doe Two "was sent to the United States alongside Minjun, a physician."  That is, there was absolutely no evidence presented at trial that Mr. McMahon was ever told John Doe Two's age by any of his alleged co-conspirators.  Moreover, even if it was evident that John Doe Two was elderly, that alone, is insufficient to apply the vulnerable victim enhancement.  *See United States v. Fosher*, 124 F.3d 52, 56 (1st Cir. 1997) (rejecting district court's assumption that 62-year-old woman was unusually vulnerable due to age); *United States v. Tissnolthtos*, 115 F.3d 759, 761-62 (10th Cir. 1997) (unwilling to find 71-year-old victim particularly vulnerable due to age alone, noting that "a victim's elderly status, without more, is insufficient to justify a vulnerable victim enhancement").  And, of course, the trial record is completely lacking in any evidence that Mr. McMahon was involved in the decision to bring John Doe Two from China, or that Mr. McMahon was told at any time that John Doe Two was in poor health, including that John Doe Two traveled to the United States with a physician: it simply cannot be said that he "knew or should have known" that John Doe Two was vulnerable.

22

In this regard, Mr. McMahon respectfully requests only that the Court determine this issue as it did with regard to Defendant Yong Zhu, as to whom it declined to apply any vulnerable victim adjustment.  As the Court said at that time:

> All right.  So this is a close call, I would say, certainly, as to this defendant.  Because, again, I'm focusing on what the requirement is under 3A1.1(b) and it does require that the defendant knew or at least should have known that the victim was vulnerable.  Obviously, the definition of vulnerable is a bit illusive.  There are very healthy 79-year-old(s) and then there are very infirmed 79-year-old(s).  Age is obviously not the only consideration.  But I think here as to this defendant, at least, I'm not going to apply the vulnerable victim enhancement.  I just don't find that there's really enough to show that this defendant knew or should have known that the victim was infirmed and here, of course, we're talking about John Doe 2.  I appreciate the Government's arguments and they certainly have some common sense appeal.  But I just think it's really increasing the guidelines by quite a bit, two levels, based on an extremely thin record as to this defendant and what he knew, when.  There's obviously no evidence and it's clear that he wasn't involved in the decision to bring the father back the second time or I should say bring the father in April of 2017 to try to coerce the son into going back to China.  So I just think it would be inappropriate to apply that enhancement to this defendant based on these facts.  So I'm not going to apply the two-level enhancement . . . .

Zhu Yong Sentencing Tr. at 32:12-33:10.  Here, too,  a two-point increase under USSG § 3A1.1(b)(1) should not be applied to Mr. McMahon.  *See, e.g., United States v. Nicholson*, 739 F. App'x  696, 699 (2d Cir. 2018) (finding that the vulnerable victim enhancement was not warranted where the evidence provided by the Government did "not make clear whether [the defendant] knew that [the victim] was elderly during the offense, which [was] unlikely in the absence of any contact between them, or learned that fact only later when he met with the investigating officers"); *United States v. Myers*, 481 F.3d 1107 (8th Cir. 2007) (holding the district court did not abuse its discretion by failing to apply an enhancement where the PSR and record were devoid of evidence that the

defendant knew or had reason to know that the victim was vulnerable because she suffered from ADHD).

### 5.    The Special Skill Enhancement Does Not Apply.

The PSR also improperly imposes "a two-level increase in the form of an adjustment under USSG § 3B1.3 for using a special skill in a manner that significantly facilitated the commission or concealment of the offense" with respect to John Doe One and Jane Doe One.  In doing so, the PSR cites to the fact that Mr. McMahon, an "investigator," accessed the NJ MVC and TLO databases "to gather personal information" about John Doe One and Jane Doe One, and that Mr. McMahon "made calls to local law enforcement informing them of his surveillance in the towns of Short Hills and Warren to conceal the real nature of his activities."  PSR, ¶ 111.  Leaving aside that the PSR declines to apply the two-level increase under USSG § 3B1.3 for using a special skill with respect to Jane Doe Two, about whom Mr. McMahon also gathered personal information, thus correctly acknowledging that gathering information as a private investigator is insufficient to qualify as a special skill, the conduct cited by the PSR in Paragraphs 111, 113, 143 and 149, *i.e.*, gathering personal information (such as information related to whether John Doe One's car was owned or leased, and John Doe One's address, all of which is publicly available information that could be accessed by any lay person, *see* PSR, ¶ 15) and calling law enforcement (which again, any lay person could do) cannot and do not reflect the use of  a special skill.  *See* USSG § 3B1.3, cmt. 4 ("'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts.").  Of course, Mr. McMahon does not possess the special skill of a pilot, doctor, lawyer, accountant, chemist or demolition expert.  That is, obtaining publicly available information, and calling local law enforcement just does not amount to the use of a special skill, as interpreted by the caselaw.  Indeed, in *United States v. Holt*,

24

170 F.3d 698, 703 (7th Cir. 1999), the Court specifically found that, although the defendant's "position as a police officer enabled him to run the license plate," running the license plate did not "significantly facilitate[]the commission or concealment of the offense" and, thus, did not warrant a two-level enhancement under USSG § 3B1.3. But, more generally, the caselaw is clear: what is a special skill and what amounts to it being used to facilitate the commission or concealment of the offense concealment requires much, much more. *See, e.g., United States v. Sampson*, 898 F.3d 287, 313 (2d Cir. 2018) (affirming the district court's ruling that the defendant "relied on his skills as an attorney in his endeavors to obstruct justice, including: (1) his knowledge of how criminal cases developed, and at what point in the investigatory process witnesses would be identified; (2) his knowledge of how the USAO worked, so that he could give specific directions to [a supervisory paralegal at the USAO]; (3) his knowledge of the criminal justice system so that he could instruct [a private investigator] accordingly in terms of acquiring information; and (4) his knowledge and relationships developed as an attorney in criminal cases in determining which attorneys to hire for [his client's] co-defendants" (cleaned up)); *United States v. Calabrese*, 660 F. App'x 97, 100 (2d Cir. 2016) (applying the special skills enhancement because defendant possessed special skill as his "knowledge of the approval processes for various loan products, as well as his ability to calculate the minimum income necessary for clients to obtain desired loans exceed[ed] the knowledge of the average person and was acquired through years of on-the-job experience"); *United States v. Reich*, 479 F.3d 179, 191-92 (2d Cir. 2007) (affirming upward adjustment under USSG § 3B1.3 where the defendant "used his special skills as a lawyer to create the forged Order" in furtherance of "knowingly, intentionally and corruptly obstruct[ing], influenc[ing] and imped[ing] an official proceeding"); *United States v. Fritzson*, 979 F.2d 21, 22-23 (2d Cir. 1992) (affirming upward adjustment to defendant's sentence in connection with his plea of guilty to mail

25

fraud and making a false claim to the IRS, where defendant's special skills as an accountant with "knowledge of the withholding process, including the roles of the claim and transmittal documents, and how and when to file them, exceed[ed] the knowledge of the average person").

But even assuming that somehow, Mr. McMahon possessed some kind of special skill as a private investigator, Mr. McMahon did not use that "special skill in a manner that significantly facilitated the commission or concealment of the offense" sufficient to warrant a two-level increase in the form of an adjustment under USSG § 3B1.3. To reiterate, Mr. McMahon's involvement in this case as a private investigator included conducting asset searches to obtain bank information (here, Mr. McMahon used data brokers, which any individual could have done in order to obtain banking information), information regarding whether John Doe One owned or leased his car (again, this information was available through the use of publicly available, and unmonitored, databases), and to locate John Doe One's address (which, there was no dispute, was publicly available, *see* PSR, ¶ 15). In addition, Mr. McMahon conducted surveillance related to John Doe One in Short Hills, New Jersey and Warren, New Jersey, which occurred on public streets, and, was therefore, legal for any individual of the public to do. In sum, the Government did not show that Mr. McMahon used any special skill to further the offense sufficient to warrant a two-level increase under USSG § 3B1.3.

### 6.    The Reduction For Acceptance Of Responsibility Should Apply.

The Final PSR also improperly fails to include "a reduction for acceptance of responsibility." Application Note 2 to USSG § 3E1.1 expressly recognizes that "[c]onviction by trial . . . does not automatically preclude a defendant from consideration for" the acceptance of responsibility reduction; rather, in certain "situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial." A defendant's eligibility for a reduction for acceptance of responsibility in such

instances "will be based primarily upon pre-trial statements and conduct." USSG § 3E1.1, Application Note 2.     Here, Mr. McMahon is eligible for a two point reduction for acceptance of responsibility, despite the fact that he exercised his constitutional right to proceed to trial.  Thus, as the Government contended in introducing his statement into evidence, Mr. McMahon "truthfully admitt[ed] the conduct comprising the offense(s) of the conviction."  USSG § 3E1.1, Application Note 1(A).  Indeed, Mr. McMahon never, ever denied the fact that he conducted private investigative services in connection with this matter, including by performing bank and asset searches regarding John Doe One and his family through various databases and conducting surveillance of John Doe One on five separate dates (on each of which he called the local police to notify them of his surveillance activities), and likewise did not dispute the amounts and manners by which he was paid for the performance of these private investigative services.  Thus, the only dispute at trial with respect to Mr. McMahon was whether Mr. McMahon knew, or consciously avoided learning, that he was working at the direction of agents of the Chinese government and whether Mr. McMahon knew that his investigative and surveillance work contributed to the harassment of John Doe One and his family.  He denies that he possessed that knowledge or was willfully blind, but again, he does not now, and never has, denied the underlying facts which he believes are consistent with innocence, rather than guilt.

Moreover, Mr. McMahon provided "voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense."  USSG § 3E1.1, Application Note 1(E).  Indeed, as soon as Mr. McMahon was arrested, Mr. McMahon sought to assist law enforcement's investigation of this matter by giving a lengthy post-arrest statement.  *See* Ex. 701; *see also* PSR ¶ 133.  And he voluntarily provided all of documents relevant to the case voluntarily—indeed, his entire file, which was completely intact—early in the Government's investigation. Under the

27

prevailing legal standards, then, Mr. McMahon is entitled to the two-point reduction for acceptance of responsibility under USSG § 3E1.1(a).

Nor even is it appropriate to deny Mr. McMahon the additional one-point offense-level reduction under USSG § 3E1.1(b) simply because the Government did not make move for one. As Judge Rakoff recently held in a published opinion in *United States v. Tavberidze*, __ F. Supp. 3d __, 2025 U.S. Dist. LEXIS 43082, at *4 (S.D.N.Y. Mar. 10, 2025), "section 3E1.1 in its entirety effectively penalizes a defendant who, whether innocent or guilty, proceeds to trial based on his decision to exercise his Sixth Amendment right to trial[.]" *Id.* at *9-10. That is, while "section 3E1.1(a) at least arguably justifies this imposition as a reward for a defendant's demonstrating genuine remorse,[4] the only ground given for imposing the additional penalty under 3E1.1(b) is that the defendant failed to save the Government from having to prepare for trial." *Id.* In sum, Judge Rakoff held USSG § 3E1.1(b) unconstitutional on Sixth Amendment grounds as it "subject[s] a defendant to a heightened Guidelines range based solely on his decision to proceed to trial – or even just for considering for too long . . . his constitutional right to go to trial," *id.* at *11, and additionally because "it conditions the application of the one-level reduction on a motion by the Government . . . amplif[ying] the pressure exerted on a defendant to plead guilty, rather than proceed to trial," *id.* at *14. This Court should do the same here.

---

[4] While Judge Rakoff acknowledged that the additional two-point reduction authorized under USSG § 3E1.1(a) may also be "an unconstitutional penalty imposed for [a defendant's] exercise of their constitutional right to trial," it was an issue he did not reach in that case, as, for "discretionary and policy reasons . . . [the Court] [] in any case treat[ed] [the defendant] as having the equivalent of a Guidelines range three points less than what the formal Guidelines calculation would otherwise mandate." *Tavberidze*, 2025 U.S. Dist. LEXIS 43082, at *15-16.

### 7.    The Reduction For Minimal or Minor Participant Should Apply.

Finally, the Final PSR fails to apply a four-point reduction to the Guidelines calculation to account for the fact that Mr. McMahon was a "minimal participant" under USSG § 3B1.2(a) or, at minimum, a two-point reduction to account for the fact that Mr. McMahon was a "minor participant" under USSG § 3B1.2(b).  It is well established that "[a] defendant who is 'plainly among the least culpable of those involved in the conduct'" is entitled to a "four-level reduction in the otherwise applicable offense level." *United States v. Hued*, 338 F. Supp. 2d 453, 455 (S.D.N.Y. 2004) (quoting USSG § 3B1.2(a) & cmt. n.4).  Moreover, "[a] defendant who 'is less culpable than most other participants, but whose role could not be described as minimal is a 'minor participant' and awarded a two-level reduction." *Id.* (quoting USSG § 3B1.2(b) & cmt. n.5).  And, "[d]efendants whose participation falls between 'minor' and 'minimal' may be awarded a three-level reduction." *Id.* (quoting USSG § 3B1.2).  Courts have held that "[i]n determining whether a defendant qualifies for one of these adjustments, the Court must evaluate 'the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise.'" *Id.* (quoting *United States v. Garcia*, 920 F.2d 153, 155 (2d Cir. 1990)); *see also United States v. Alston*, 899 F.3d 135, 149 (2d Cir. 2018) (finding that eligibility for a such an adjustment depends on "the defendant's relative culpability [with] reference to his or her co-participants in the case at hand") (quotation marks and emphasis omitted); *United States v. Rosario*, 54 F. App'x 570, 571 (3d Cir. 2002) (affirming sentencing court's application of a "minor" role adjustment where defendant "understood less of the scheme than [conspirator]," even where evidence supported defendant's "physical participation" by way of "[a]ccompanying a significant player on a 'counter-surveillance' operation"); *United States v. Adames*, 901 F.2d 11, 13 (2d Cir. 1990) (lack of knowledge or understanding of scope and structure of enterprise is

indicative of minor or minimal role). "The Guidelines also provide that even 'a defendant [who] performs an essential or indispensable role in the criminal activity . . . may receive a[] [mitigating role] adjustment.'" *United States v. Wynn*, 37 F.4th 63, 68 (2d Cir. 2022) (quoting USSG § 3B1.2 application note 3(C)).

"The guidelines . . . explain that assessing whether a defendant was a minimal or minor participant involves the consideration of five factors," including (1) "the degree to which the defendant understood the scope and structure of the criminal activity;" (2) "the degree to which the defendant participated in planning or organizing the criminal activity;" (3) "the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;" (4) "the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;" and (5) "the degree to which the defendant stood to benefit from the criminal activity." *United States v. Rainford*, 110 F.4th 455, 481 & n.8 (2d Cir. 2024) (quoting USSG § 3B1.2 application note 3(C)). Here, it is clear that, based on an analysis of these five factors, Mr. McMahon was "plainly among the least culpable of those involved in the conduct of a group" and clearly lacked "knowledge or understanding of the scope and structure of the enterprise of others," USSG § 3B1.2(a), cmt. 4, warranting a four-point reduction. *See United States v. Alba*, 933 F.2d 1117, 1121-22 (2d Cir. 1991) (affirming district court's application of a USSG § 3B1.2 downward departure where defendant had no "knowledge of" or "stake" in the offense); *United States v. Haut*, 107 F.3d 213, 217 (3d Cir. 1997) (affirming sentencing court's classification of defendants as "minimal participants" under § 3B1.2 as, in comparison with two other conspirators, they were "among the least culpable if those involved in the conduct of [the]

group," and "had no [financial] interest" and "did not benefit in any manner" from the conspiracy's goal).

*First*, even entirely crediting the Government's proofs, there is no evidence that Mr. McMahon understood "the scope and structure of the criminal activity." USSG § 3B1.2 application note 3(C)(i). Of course, Mr. McMahon's position is that he neither understood the purpose of his investigative services, nor who he was performing investigative services for. *See United States v. Paulino*, 147 F. App'x 858, 860 (11th Cir. 2005) ("[t]he defendant's lack of knowledge or understanding of the scope and structure of the enterprise and the activities of others is indicative of a minimal role"). Specifically, Mr. McMahon did not know or take any direction from, any known Chinese government official involved in the scheme; rather, Mr. McMahon corresponded with Jason Zhu, Johnny Zhu, and Eric Yan, all of whom used aliases when communicating with Mr. McMahon and continually deceived Mr. McMahon into believing that he was working on behalf of a private Chinese company to recover a private debt. But even beyond that, and beyond the fact that Mr. McMahon obviously played no role in the broader repatriation program in which his coconspirators were involved, there was absolutely no evidence that Mr. McMahon was involved in or even aware of the conduct of others involved in the scheme, including the surveillance operation conducted against Jane Doe Two from approximately May 2017 to July 2017, the purported online harassment campaign against John Doe Two from approximately April 2018 to July 2018, or the threatening note that was left on John Doe One's front door on September 4, 2018.

*Second*, Mr. McMahon certainly did not "participate[] in planning or organizing the criminal activity," or otherwise "exercise[] decision-making authority or influence[] the exercise of decision-making authority." USSG § 3B1.2 application note 3(C)(ii)-(iii). Nor could he have

given that he did not really understand the purpose of his investigative services or who he was performing the investigative services for, and thus, could not have assisted in planning or organizing the criminal activity.  But much more to the point, the evidence was undisputed that Mr. McMahon "did not have any leadership position over another participant in the instant offense," PSR, ¶ 115, but rather, took direction from Jason Zhu, Johnny Zhu and Eric Yan in doing all of what he did, including when and where to conduct surveillance, and what asset searches to perform.  Indeed, Mr. McMahon was undisputedly absent from key meetings planning Mr. McMahon's activities, such as the meeting at the Embassy Suites Hotel in Elizabeth, New Jersey. Further, when Mr. McMahon did make a suggestion to those with "decision-making authority" (*i.e.*, on April 11, 2017 when Mr. McMahon texted Johnny Zhu to propose Eric Gallowitz's idea (*see* Ex. 4019B at 66) to conduct overt surveillance, *see* Ex. 805B at 32), his idea was rejected, *see* Ex. 805B at 32, demonstrating that he truly lacked decision-making authority.

*Third*, the Court must consider "the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts."  USSG § 3B1.2 application note 3(C)(iv).  With regard to this factor, Mr. McMahon's only involvement during the timeframe of the entire conspiracy in this matter was conducting asset searches and performing five days of surveillance over the course of six months.  Notably, in performing his investigative activities, Mr. McMahon did not make any contact with John Doe One and his family, did not perform overt surveillance of John Doe One and his family, and was never known or seen by John Doe One, Jane Doe One and Jane Doe Two.  And, Mr. McMahon's investigative services were not crucial to the success of the venture.  Although Mr. McMahon was retained to locate John Doe One's address, evidence at trial established that John Doe One's address was publicly available

32

information, *see* PSR, ¶ 15, and, in any event, that other individuals, including Hongru Jin, were independently conducting surveillance of John Doe One, and it is therefore entirely speculative to conclude that Mr. McMahon located John Doe One's address.  Moreover, Mr. McMahon's only connection to Jane Doe Two was that he conducted computer searches related to her address and assets; however, the address that Mr. McMahon provided to Johnny Zhu for Jane Doe Two was incorrect, and, in any event, the information that Mr. McMahon provided had nothing to do with the Facebook accounts that were used to harass Jane Doe Two.

*Fourth*, and finally, Mr. McMahon did not stand "to benefit from the criminal activity," USSG § 3B1.2 application note 3(C)(v), as Mr. McMahon did not stand to reap a financial or other personal benefit based upon the success of the venture.  *See Haut*, 107 F.3d at 217-18 (finding codefendants who were present during discussions of substantive offense but did not play active role or benefit financially from it were "minimal participants").  Indeed, Mr. McMahon made only $11,144.73 for his work on this matter after expenses (including the costs of retaining Eric Gallowitz and Michael Kelly, *see* PSR, ¶ 38), an amount that constitutes the kind of benefit consistent with a minimal role.

Under these circumstances, any objective view of the facts of this case lead the conclusion that Mr. McMahon was "plainly among the least culpable of those involved in the conduct" and is therefore entitled to a "four-level reduction in the otherwise applicable offense level" under USSG § 3B1.2(a), or at the very least was "less culpable than most other participants" and should therefore be described as a minor participant and awarded a two-level reduction.  USSG § 3B1.2(b) & cmt. n.5.  *See Wynn*, 37 F.4th at 69 (vacating defendant's sentence where the District Court "implicitly observed that the evidence suggested that Wynn 'understood the scope and structure of the criminal activity' to a significant 'degree[,]'" but the record otherwise failed to indicate that

defendant "'participated in planning or organizing the [gang's] criminal activity,' or 'exercised decision-making authority or influenced the exercise of decision-making authority' for the gang[,] [] [a]nd most crucially, 'the nature and extent of [defendant's] participation in the commission of the [gang's] criminal activity' appear[ed] to pale in comparison to that of his fellow gang members." (quoting USSG § 3B1.2 application note 3(C))).

### B.    A Downward Departure Is Warranted Because Of The Atypical Nature Of This Case.

Probation's calculation of the total offense level of 27, if accepted, risks imposition of an excessive sentence because it fails to take into account the atypical nature of Mr. McMahon's role in this case and his lack of knowledge and intent regarding his participation in the scheme. Of course, this fact will be fully discussed and explicated below, with regard to Mr. McMahon's request for a variance. But the Sentencing Guidelines continue to recognize that "[a] departure may be warranted in the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." 18 U.S.C. § 5K2.0. That is, it remains appropriate to impose a sentence outside of the Guideline range under § 5K2.0 where, as here, "certain aspects of the case [are] found unusual enough for it to fall outside the heartland of cases" within that Guideline. *United States v. Thorn*, 446 F.3d 378, 391 (2d Cir. 2006); *see also United States v. Arevalo-Contreras*, 601 F. Supp. 3d 974, 995 (D.N.M. 2022) (A departure is warranted if the case is "unusual enough for it to fall outside the heartland of cases in the Guideline."). For example, "[t]he Second Circuit has recognized that a district court can consider a defendant's initial lack of intent in granting a downward departure under § 5K2.0." *United States v. Nachamie*, 121 F. Supp. 2d 285, 297 (S.D.N.Y. 2000). Here, there can be no dispute that Mr. McMahon's intent with respect to the nature and purpose of the private investigative services conducted in this matter falls far outside

the realm of a typical case charging the failure to register as an agent of a foreign government or interstate stalking, thus warranting a sentence outside of the Guidelines range.[5]

Although, again, this argument is at least as, and maybe more, appropriate in connection with the discussion below addressed to downward variances, the extraordinary nature of the facts here, and the caselaw in this Circuit demands that it be discussed in the context of a downward departure as well.  For example, the decision of the United States District Court for the Southern District of New York in *Nachamie* addresses just this kind of situation, involving such unusual cases as this one certainly is.  Thus, in *Nachamie*, the Court recognized that none of the doctor-defendants entered into the Medicare fraud scheme with criminal intent.  121 F. Supp. 2d at 296. Instead, the Court found that the doctors believed that they had been hired for legitimate positions and were consistently lied to by the masterminds of the scheme in a deliberate attempt to prevent the doctors from learning about the fraudulent Medicare operation—placing them in the highly unusual category of an "accidental criminal."  *Id.*  Although at some point the doctors must have suspected the fraudulent nature of their work, the Court recognized that they acted with "diminished" intent, and concluded: "The fact that defendants did not join [the] scheme with criminal intent—and then operated for an additional period of time with 'diminished' intent— makes this an 'atypical' case that 'significantly differs from the norm[.]"  *Id.*; *see also United States v. Redemann*, 295 F. Supp. 2d 887, 899 (E.D. Wis. 2003) (downward departure warranted in fraud scheme where defendant's involvement was a byproduct of legitimate construction work he was performing).

---

[5] Notwithstanding the Court's decision whether to apply the minor or minimal role adjustment— though it should—the Court may still "depart[] downward on the analytically distinct basis that the defendants lacked initial intent and operated for a period under diminished intent."  *Nachamie*, 121 F. Supp. 2d at 297 n.11.

The circumstances surrounding Mr. McMahon's agreement to perform investigative services in this matter are just as anomalous.  Notwithstanding the jury's verdict in this matter, the evidence at trial established that, at the outset of Mr. McMahon's retention, Mr. McMahon did not have either the knowledge that he was being retained on behalf of the Chinese government, or otherwise have the criminal intent necessary to stalk John Doe One.  Indeed, Mr. McMahon was a licensed private investigator, and was retained to perform his services in his usual fashion, through the execution of his standard, written retainer agreement, *see* Ex. 3009.  He was paid his standard $5,000 retainer, which was paid via a TransPerfect Language Services check and deposited into his McMahon Investigative Group bank account, *see* Exs. 403B, 403E, and was otherwise asked to perform usual investigative services, *i.e.* to conduct surveillance over the course of five days.  On each of these days, Mr. McMahon, per his standard practice, called the local police to inform them of his surveillance activities, *see* Exs. 314, 407, AAA, and subcontracted with other private investigators, also former NYPD Officers, to assist with surveillance, and to obtain records regarding John Doe One and his family, particularly focused on understanding John Doe One and his family's assets, *see, e.g.,* Ex. 805B, *i.e.* through conducting searches for banking information, *see* Ex. 2029, and whether John Doe One's vehicles were leased or owned, *see* Ex. 805B.  Throughout, there is no question but that Mr. McMahon was purposely misled and deliberately lied to during the course of his investigation; indeed, Jason Zhu, Johnny Zhu and Eric Yan—the individuals that Mr. McMahon reported to—all used aliases and consistently claimed to be employees of a private Chinese construction company seeking to recover money that John Doe One embezzled from the company.  *See, e.g.,* Exs. 805B at 13, 15, 19, 21, 28; 3047; 3056; 4016 at 2.

Further, there is no evidence that Mr. McMahon took any action with the intent to harm John Doe One or his family and certainly never was seen by or actually caused fear to John Doe One or his family. *See* Tr. at 1410:20-1411:7 (testimony of John Doe One) (testifying that he did not know who followed him on April 7, 2017, but it could not have been Mr. McMahon, as it is undisputed that he did not conduct surveillance on April 7, 2017, *see, e.g.,* Exhibit 2011); Tr. at 786:9-15 (testimony of Jane Doe One) ("Q. Have you ever met Mr. McMahon before? A. No. Q. Have you ever seen him before? A. No."); Exhibit 713 at 25:13-21 (testimony of Jane Doe Two) ("Maybe just to make it clear, Mr. McMahon, can you put up your hand. . . . Q. Do you see the person who just put up his hand? A. Yes. Now I see him, yes. Q. Thank you very much. Have you ever seen him before today? A. No."). As the Court recognized during Zhu's sentencing, "stalking is typically a crime where the persons involved in the stalking, even if they're just conspirators, have some desire to visit harassment and harm on people." Zhu Yong Sentencing Tr. at 83:16-19. Indeed, the Court recognized that even Zhu, who was aware that he was acting as a "middleman" for the Chinse government, had "become a conspirator in some very bad conduct without a full appreciation of how harmful it was." Zhu Yong Sentencing Tr. at 83:16-19. Likewise, Mr. McMahon, taking directions from Zhu, could not have appreciated that the goal of his investigative services was to cause harm to John Doe and his family.

Of course, the Court has upheld Mr. McMahon's conviction notwithstanding these facts, holding that Mr. McMahon eventually suspected that he was engaging in illegal conduct or otherwise consciously avoided learning that he was engaging in illegal conduct. ECF No. 294 at 21. But it remains the case that there was no evidence that he was ever made aware of the true purpose behind his engagement: to repatriate John Doe One back to China. Under that circumstance, Mr. McMahon certainly would have been operating thereafter with, at most, the

37

kind of "diminished intent" that, under this caselaw, justifies a downward departure, because this is simply not the "typical" case involving the failure to register as an agent of a foreign government, as he was lied to about who hired him and the purpose of the investigation, or interstate stalking, as Mr. McMahon did not intend to harm John Doe One or his family. *See* Zhu Yong Sentencing Tr. at 83:16-19 ("[S]talking is typically a crime where the persons involved in the stalking, even if they're just conspirators, have some desire to visit harassment and harm on people."). Before even addressing the application of the section 3553(a) factors, Mr. McMahon's motion for a downward departure should be granted, in order to reach the appropriate starting point for that discussion.

## III.    STEP TWO: SECTION 3553(A) FACTORS

Although calculating the applicable Guidelines range is the required first step in the sentencing process, following *Booker* the Guidelines are advisory only and district judges are directed to "craft an appropriate sentence taking full account of 'the history and characteristics of the defendants.'"    *Preacely*, 628 F.3d at 84 (Lynch, J., concurring) (quoting 18 U.S.C. § 3553(a)(1)); *see also Nelson v. United States*, 555 U.S. 350, 352 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable. . . . The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable."); *Gall*, 552 U.S. at 49-50 ("[T]he district judge . . . may not presume that the Guidelines range is reasonable."). In exercising this discretion, judges are guided by 18 U.S.C. § 3553(a), which instructs sentencing courts to take a holistic approach to sentencing, requiring the court to consider "the nature and circumstances of the offense," as well as "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The statute thus mandates that courts impose a sentence "sufficient, but not greater than necessary" to, among other considerations, "reflect the seriousness of the offense, . . . promote respect for the law, and provide just punishment

38

for the offense," and to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2); *see also United States v. Chong*, No. 13-cr-570, 2014 U.S. Dist. LEXIS 135664, at *9 (E.D.N.Y. Sep. 22, 2014) ("Discretion remains an indispensable mitigating safety valve for the law's sometimes destructive and illogical effects."). Section 3553 also directs courts regarding "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). At the end of the day, courts must make "an individualized assessment" of all of the facts and circumstances. *United States v. Johnson*, 567 F.3d 40, 51 (2d Cir. 2009) (internal quotation marks omitted); *Gall*, 552 U.S. at 50 ("[The sentencing judge] must make an individualized assessment based on the facts presented."). And in doing so, the Court must abide by the guiding principle dictated by the Supreme Court: it must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper*, 562 U.S. at 487 (quoting *Koon*, 518 U.S. at 113).

Here, application of the § 3553(a) factors warrant a non-custodial sentence and certainly, a sentence far below the Guideline range prescribed by the PSR, or otherwise.

### A.    Application Of The § 3553(a)(1) Factors Warrant A Lenient Sentence.

#### 1.    The Nature And Circumstances Of The Offense

First, of course, the Court must consider the nature and circumstances of the offense. Having presided over the trial, and as they are set forth above, these are well known to the Court and are, as previously discussed, largely undisputed; as the Court recognized, the primary issue at trial was Mr. McMahon's *mens rea*. And while the Court has held that the evidence was sufficient, as a matter of law, to find that Mr. McMahon knew or was willfully blind to the fact that he was working with the Chinese Government, at sentencing the Court should consider all of the facts that it has heard, including the circumstances surrounding Mr. McMahon's retention and his overall

39

role in the conspiracy, including the continuous deception to which Mr. McMahon was subject in his communications with his purported co-conspirators. *See United States v. Robinson*, 634 F. App'x 47, 50 (2d Cir. 2016) ("a defendant's role in the conspiracy may be a germane factor under § 3553(a), and the facts regarding his role are relevant to sentencing"); *United States v. Smalling*, No. 12-cr-61, 2014 U.S. Dist. LEXIS 44889, at *4 (E.D.N.Y. Mar. 14, 2014) (in considering the nature and circumstances of the offense, the court noted that the defendant "played a minor role in creating and distributing fraudulent credit cards. Her participation in the instant access device fraud operation was largely dictated by co-defendant Miller, with whom she had a romantic relationship."); *United States v. Maynard*, 596 F. App'x 56, 60-61 (3d Cir. 2015) ("[T]he District Court properly weighed [co-conspirator's] relative culpability and the other § 3553(a) factors.").

That is, at this stage of the proceedings, and notwithstanding that the Court, employing the deferential standard with which it examines jury verdicts, denied Mr. McMahon's post-trial motions, *see* ECF No. 294 at 18-19, 44-45, the Court should also at least consider the facts that showed that Mr. McMahon did not have either the knowledge that he was being retained on behalf of the Chinese government, or the criminal intent necessary to stalk John Doe One. As the Court knows, Mr. McMahon was a licensed private investigator, who was retained to perform his services through the execution of his standard, written retainer agreement, *see* Ex. 3009, and paid his standard $5,000 retainer, which was paid via a TransPerfect Language Services check and deposited into his McMahon Investigative Group bank account, *see* Exs. 403B, 403E; he was then asked to perform typical investigative services, *i.e.* to conduct surveillance over the course of five days, (on each of which Mr. McMahon—as is his standard practice—called the local police to inform them of his surveillance activities, *see* Exs. 314, 407, AAA), subcontracted with other private investigators, also former NYPD Officers, to assist with the surveillance. He was also

asked to obtain records regarding John Doe One and his family, particularly focused on their assets which, he understood, he was working to recover, *see, e.g.,* Ex. 805B, *i.e.* through conducting searches for banking information, *see* Ex. 2029, and determining whether John Doe One's vehicles were leased or owned, *see* Ex. 805B.  Most significantly, throughout the course of these activities, it is also undisputed that Mr. McMahon was told by those for whom he was working—Jason Zhu, Johnny Zhu and Eric Yan—that they were employees of a private Chinese construction company seeking to recover money that John Doe One embezzled from the company.  *See, e.g.,* Exs. 805B at 13, 15, 19, 21, 28; 3047; 3056; 4016 at 2.  There was literally no direct evidence in this case, as the Court itself has noted, *see* ECF No. 294 at 21-24 ("The focus of McMahon's Rule 29 motion with respect to his conviction under Count Two is the mens rea element—whether the evidence was sufficient for the jury to find that McMahon *knew* he was working for the Chinese government. . . . The jury was also instructed more generally that evidence of a criminal defendant's knowledge is almost always premised on circumstantial evidence and that it is rare that a defendant's state of mind can be proved directly. . . . The Court finds that the jury did not engage in improper speculation and instead chose among competing inferences, as they were entitled to do, in reaching their verdict."), that Mr. McMahon was ever informed that these individuals, who were using aliases throughout, were Chinese Government officials, as the Government showed at trial that they were.  However, sufficient the inferences that the Government urged and the jury and later the Court accepted, for sentencing purposes, these facts, and the others to which Mr. McMahon pointed at trial and has only briefly summarized herein, still  matter for sentencing.  *Booker*, 543 U.S. at 249-50 (stating that, in the context of 18 USC § 3553(a), "the words 'the court' mean 'the judge without the jury,' not 'the judge working together with the jury.' A further statutory provision, by removing typical 'jury trial' evidentiary limitations, makes this clear."); *United*

41

*States v. Davis*, No. 0:04-898-JFA, 2025 U.S. Dist. LEXIS 51532, at *20-21 (D.S.C. Mar. 20,

2025) (affirming the sentencing court's reduction of defendant's sentence as it "carefully

considered all of the statutory factors under § 3553(a), including the defendant's post-sentencing

conduct and efforts at rehabilitation," "despite the fact that the defendant was determined by a jury

to be guilty of very serious offenses" and despite the court not being "obliged to grant relief").

Likewise, though again the Court has rejected Mr. McMahon's legal position with regard

to the conviction itself under the principles of vicarious liability upon which the Court relied in

denying Mr. McMahon's post-trial motions, *see* ECF No. 294 at 30-35, it remains highly

relevant—as among the nature and circumstances of the offense under 18 U.S.C. § 3553(a)—that

Mr. McMahon never himself took steps, and was not shown to have actually known about steps

that his coconspirators took to harm John Doe One or his family; indeed, as Mr. McMahon has

shown, he was himself never seen by and thus did not himself cause fear to John Doe One or his

family. *See* Tr. at 1410:20-1411:7 (testimony of John Doe One) (testifying that he did not know

who followed him on April 7, 2017, but it could not have been Mr. McMahon, as it is undisputed

that he did not conduct surveillance on April 7, 2017, *see, e.g.,* Exhibit 2011); Tr. at 786:9-15

(testimony of Jane Doe One) ("Q. Have you ever met Mr. McMahon before?  A.  No.  Q.  Have

you ever seen him before?  A.  No."); Exhibit 713 at 25:13-21 (testimony of Jane Doe Two)

("Maybe just to make it clear, Mr. McMahon, can you put up your hand. . . . Q.  Do you see the

person who just put up his hand?  A.  Yes.  Now I see him, yes.  Q.  Thank you very much.  Have

you ever seen him before today?  A.  No.").  As the Court recognized during Zhu's sentencing,

"stalking is typically a crime where the persons involved in the stalking, even if they're just

conspirators, have some desire to visit harassment and harm on people."  Zhu Yong Sentencing

Tr. at 83:16-19.  This Court has recognized the significance of such facts with regard to defendant

42

Zhu, who was aware that he was acting as a "middleman" for the Chinse government, but, the Court had noted, had "become a conspirator in some very bad conduct without a full appreciation of how harmful it was." *Id.* at 83:16-19. Likewise, Mr. McMahon, taking directions from Zhu, never appreciated—and never himself intended, even if the intent of his alleged coconspirators can be legally deemed his—that the goal of his investigative services was to cause harm to John Doe and his family. At the very least, as set forth above, *supra*, section I.B., Mr. McMahon certainly would have been operating thereafter with, at most, "diminished" intent.

In this regard, the Court should also consider Mr. McMahon's actual role in the conspiracy, particularly in comparison to those of his co-conspirators, not only with regard to the role adjustment discussed above, but also in evaluating the nature and circumstances of the offense under the sentencing statute. As the Second Circuit recognizes, "a defendant's role in the conspiracy may be a germane factor under § 3553(a), and the facts regarding his role are relevant to sentencing." *Robinson*, 634 F. App'x at 50; *see also Maynard*, 596 F. App'x at 60-61 ("[T]he District Court properly weighed [co-conspirator's] relative culpability and the other § 3553(a) factors."); *United States v. Osanyinbi*, No. 1:15-CR-00172-AA-4, 2019 WL 993617, at *5 (D. Or. Feb. 28, 2019) ("Relative culpability among co-defendants in the same case is more properly considered as part of the 'nature and circumstances of the offense and the history and characteristics of the defendant,' under § 3553(a)(1)."); *United States v. Monnier*, 718 F. Supp. 2d 1040, 1056 (D. Neb. 2010) ("In considering the nature and circumstances of the offense, the court must consider [the defendant's] culpability relative to the others whose conduct also contributed to the" offense.); *United States v. Wyatt*, 442 F. Supp. 2d 298, 301 (W.D. Va. 2006) ("The sentence also reflects the nature and circumstances of the offenses and the history and characteristics of the defendant, in particular her youth, mental impairment, family support, history of substance abuse,

43

and relative culpability."); *Smalling*, 2014 U.S. Dist. LEXIS 44889, at *4 ("The court considered the 'nature and circumstances of the offense and the history and characteristics of the defendant.' *See* 18 U.S.C. § 3553(a)(1). [Defendant] played a minor role in creating and distributing fraudulent credit cards. Her participation in the instant access device fraud operation was largely dictated by co-defendant Miller, with whom she had a romantic relationship.").

In this regard, regardless of whether Mr. McMahon was aware of the fact that they were working for the Chinese government—and, of course, Mr. McMahon's position is that he did not, and never would have done what he did if he was aware—there was no dispute but that Mr. McMahon was directed in his activities by Jason Zhu, Johnny Zhu, and Eric Yan (as he knew them—these were, as we now know, aliases used in communicating with Mr. McMahon). Moreover, there is no dispute that Mr. McMahon "did not have any leadership position over another participant in the instant offense." PSR, ¶ 115. Likewise, in assessing his role, it remains undisputed that Mr. McMahon did not make any contact with John Doe One and his family, did not perform overt surveillance of John Doe One and his family, and was never known or seen by John Doe One, Jane Doe One and Jane Doe Two, as others in the scheme did. Moreover, it is also undisputed that Mr. McMahon was not aware of the conduct of others involved in the scheme, including the surveillance operation conducted against Jane Doe Two from approximately May 2017 to July 2017, the purported online harassment campaign against John Doe Two from approximately April 2018 to July 2018, or the threatening note that was left on John Doe One's front door on September 4, 2018. Finally, even with regard to what he did to, in assessing his role in the offense, it is important to consider that Mr. McMahon's investigative services were not crucial to the success of the venture: although Mr. McMahon was retained to locate John Doe One's address, evidence at trial established that John Doe One's address was publicly available

44

information, *see* PSR, ¶ 15, and, in any event, that other individuals, including Hongru Jin, were independently conducting surveillance of John Doe One, so that it is unclear, and entirely speculative, that Mr. McMahon was the one who located John Doe One's address. Moreover, Mr. McMahon's only connection to Jane Doe Two was that he conducted computer searches related to her address and assets; however, the address that Mr. McMahon provided to Johnny Zhu for Jane Doe Two was incorrect, and, in any event, the information that Mr. McMahon provided had nothing to do with the Facebook accounts that were used to harass Jane Doe Two. While these facts were not, in the Court's view, sufficient to warrant post-trial relief, they are very significant in assessing Mr. McMahon's role for purposes of sentencing. *See Robinson*, 634 F. App'x at 50.

## 2.    The History And Characteristics Of The Defendant

In fashioning Mr. McMahon's sentence, the Court must consider, in addition to the nature and circumstances of the offense, Mr. McMahon's "history and characteristics." 18 U.S.C. § 3553(a)(1); *Gall*, 552 U.S. at 49 n.6. That history, and those characteristics, as set forth both in the PSR and in the numerous letters written to the Court on Mr. McMahon's behalf, portray a heroic, upstanding man who comes from a humble Irish Catholic background, and who, having been influenced by his hardworking, respectable family, spent his entire life giving back to the community and supporting his family and friends.[6] Here, beyond the lack of any criminal record, dozens of friends, family members, and colleagues have submitted letters of support on behalf of Mr. McMahon, each of which describe a compassionate, generous, hard-working, religious, and dedicated family man who has "a genuine love of life, and an inherent desire to help." Ex. 23 (McLachlan, Dave). Mr. McMahon's heroism and relentless drive and commitment to protect this

---

[6] The letters in support of Mr. McMahon are attached to this memorandum and designated as Exhibits A-1 to A-39.

country and its citizens, is noted by all who have had the privilege of getting to know him.  As such, and for the reasons set forth below, this factor strongly supports imposition of the probationary sentence that Mr. McMahon seeks.  *See, e.g.*, *United States v. Gupta,* 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012) (imposing below-Guidelines sentence in light of defendant's "extraordinary devotion, not only to humanity [at] large, but also to individual human beings in their times of need").

This memorandum focuses on three key features of who Mr. McMahon is that demonstrate his true character and are most significant for purposes of sentencing: (1) Mr. McMahon's illustrious, honorable NYPD career and subsequent upstanding work as a private investigator; (2) his service to his community, including his many charitable acts; and (3) his dedication to his family, most especially to his wife, Mary Martha McMahon, and their three children Michael "Mikey" McMahon, Maxwell "Max" McMahon, and Ann Marie McMahon.  As his cousin, Robert McCarthy, so correctly summarized it, Mr. McMahon "is an individual that is steadfast in his beliefs and is a person that loves his family, community, and country. His moral compass is always due North."  Ex. 20 (McCarthy, Robert).

### a.    Personal Background

Michael McMahon is the sixth child of nine, born to first-generation Irish Americans, as Mr. McMahon's grandparents immigrated from Ireland to the United States in the 1920s.  Ex. 25 (McMahon, Eileen, Kevin, Brian, Vincent, Patricia, Kathleen and Stephen).  Mr. McMahon's grandparents worked hard to make their way in America and become pillars of their community. A longtime Bronx resident, Mr. McMahon's paternal grandfather was employed as a store manager for a local A&P Supermarket for his entire life.  *Id.*  Mr. McMahon's maternal grandfather, a

United States Veteran, served in World War I, and, after the war, joined the New York Fire Department ("FDNY") in 1927.[7]  *Id.*

Mr. McMahon's parents, Vincent and Patricia, remained in the Bronx, where they raised their family; Mr. McMahon, his mother, father, and eight siblings all lived together in a small, two bedroom apartment in the Bronx.  *Id.*  In 1975, his parents, through hard work and perseverance, moved the family to Rockland County, New York, in order to provide their children a better life and, they hoped, more plentiful opportunities.  *Id.*  But no matter where the family was, they were always together, "happy, protected and secure laughing those days away;" indeed, "Sundays were spent with having all of [the] extended family come for dinner" and "[t]he guest of honor was always [their] grandmothers, one of who[m] lived to be 99."  *Id.*; *see* Ex. 12 (Hutton, Theresa) ("The McMahon family was, and still is, a close knit family through good times and bad times, with the foundation of their Catholic Faith.").

As a child, Mr. McMahon was always watching over the other kids in the neighborhood. Mr. McMahon's cousin, Michael Callanan, details how, although "Michael was only a year older" he "considered him an older brother," and how "Michael and his family were always there for [him] and his family."  Ex. 6 (Callanan, Michael).   Michael recalls how Mr. McMahon "was the one who organized [the] neighborhood games and sports" and that, "[w]hether it was tag, kickball

---

[7] Mr. McMahon's grandfather was the first in a long line of public servants.  *See* Ex. 26 (McMahon, Martha) ("Many of his relatives, including three siblings, were cops or firemen.  It was clearly a multi-generational family of service.").  Mr. McMahon's uncle followed in his father's footsteps and also joined the New York Fire Department—together, they became the first father-son pair to work in the same firehouse.  Ex. 25 (McMahon, Eileen, Kevin, Brian, Vincent, Patricia, Kathleen and Stephen).  Three more of Mr. McMahon's uncles, like Mr. McMahon, joined the NYPD.  And, Mr. McMahon's oldest son, Mikey, and his nephew are currently employed as police officers.  *Id.* This backdrop is important to understanding Mr. McMahon's dedication to service, as is discussed *infra*.

or hanging out after school, Michael kept a watchful eye over all of [the] kids and made sure everyone got home safe and sound." *Id.* Frances Campo, Mr. McMahon's childhood "friend, classmate, and neighbor of over forty-five years" details how "Michael always lead a life reflecting his family's deep-rooted belief in being kind and generous to all around him." Ex. 7 (Campo, Frances).

In high school, Mr. McMahon "was on the varsity lacrosse team and taught [his cousin, Michael Callanan,] and many others the game of lacrosse." Ex. 6 (Callanan, Michael). Although Mr. McMahon's cousin "couldn't get the hang of the game and [] didn't make the team [his] first year," he recalls how "Michael was always there with encouraging and motivating words and a chin-up mentality that [he] needed at the time," which taught him "the ethic of hard work, teamwork and 'Never Give Up' attitude that [he] took away from so many years ago and still ha[s] today." *Id.* Mr. McMahon also "played football" and "was a sociable presence in [the] class, yet never sought to be the center of attention;" "was never a troublemaker at school, at off-campus school functions, or anywhere in [the] close-knit community." Ex. 7 (Campo, Frances). Indeed, Mr. McMahon "was always responsible, even as a teenager, and his sense of responsibility to his family and community was quiet evident." *Id.*

This remained true when, tragedy struck the McMahon family. In 1992, just three years after Mr. McMahon joined the NYPD, Mr. McMahon's sister, Ann Marie, and father, Vincent, were both diagnosed with cancer. Ex. 25 (McMahon, Eileen, Kevin, Brian, Vincent, Patricia, Kathleen and Stephen). During this time, Mr. McMahon was the backbone of the family; his siblings describe how he:

> would come home from work at the NYPD and help get [their] father out of bed, into the shower and help get him dressed so that [their] mother could take care of him at home. This cut into any social time that [Michael] would have had and something that he

48

> never complained about doing. For over a year, Michael's daily routine was just work and taking care of [their] father. [Ann Marie] was born almost a year to the day before Michael was born. They were best friends and the closest out of all of the children, so with her also going through Chemo and Radiation during the same timeframe, it was a stressful and sad time for Michael. [Michael's] father and sister ended up passing away 3 weeks apart from each other and [the family's] world, and especially [their] mom, was never the same.  Ann Marie was only 26 years old.

*Id.*; *see also* Ex. 26 (McMahon, Martha) ("His father had spent months in the hospital prior to his death from leukemia.  Mike was working midnights on the NYPD during their illnesses which spanned over just one year, 1992.  He would drive straight to the hospital to bathe and shave his father then head home to his bed-ridden sister Ann Marie who had fatal Neuroendocrine cancer. His siblings shared stories of Mike's empathy at a time when others (he is one of nine children) were paralyzed in disbelief.  They were about to lose two members of their family within weeks of each other.  Mike stepped up and put his own pain aside to give his father and sister dignity and reassurance, whatever they needed to give them peace."); Ex. 12 (Hutton, Theresa) ("Michael was one of nine children.  Being one of nine children has to teach you kindness and patience.  Michael is the embodiment of kindness and patience.  This was particularly evident during a terrible time for his family.  Michael's father was battling cancer and at the same time Michael's sister, Ann Marie, age twenty-five, was diagnosed with an aggressive cancer.  Michael was the quiet angel of his namesake, Michael the Archangel.  I still am overcome when I think of him during that time. Michael was his father's right hand.  He would literally pick his father up and carry him from one place to another.  Michael never seemed to say anything or draw any attention to himself.  He was the quiet sentinel standing guard over his family.  We were all heartbroken when Ann Marie passed.  I remember Michael wheeling his father into the luncheon after the funeral; ever by his father's side.  As we all know, losing a child is the worst thing that can happen to any parent.  It

was too much for his father to bear.  Tragically, Michael's father passed away about three weeks

after his sister.  Faced with the terrible tragedy of losing a sister, father and then a few months later

a grandmother, the McMahon family did what Irish Catholic families do.  They all leaned on their

faith.  Faith once again the anchor of the family.").  After his sister's and father's passing "Michael

was committed to the care of his mother and became a supporting figure to his siblings," all while,

as is discussed below, continuing his remarkable service with the NYPD.  Ex. 19 (McCarthy,

Christine).  As was always the case for Mr. McMahon's family, their "love and support for each

other and [their] mother is what helped [them] get through this devastating time."  Ex. 25

(McMahon, Eileen, Kevin, Brian, Vincent, Patricia, Kathleen and Stephen).

     Throughout, a major tenet upon which Mr. McMahon's dedication to protecting and

serving others, whether family members or otherwise, is based is his Irish Catholic faith.  Mr.

McMahon "comes from a wonderfully loving and caring Irish Catholic family upbringing. He was

taught that God and family are the most important things in life and he has shown us that attribute

over and over again."  Ex. 8 (Cavegn, Elieen and Alex); *see also* Ex. 12 (Hutton, Theresa)

("Michael McMahon has been formed form his childhood to live his life by his Catholic Faith.

Throughout his life he has been a shining example of that faith in whatever role he was in; son,

brother, husband, father, friend and police officer.").    Accordingly, "Michael and Martha have

lovingly raised three children based on the tenets of their Catholic Faith; love God above all else

and love your neighbor as yourself."  Ex. 12 (Hutton, Theresa).

     And, Mr. McMahon, a pious man, has throughout his life, leaned on that faith, especially

when faced with such tragedies as the death of  his sister, Ann Marie, and father, Vincent, died

from cancer within weeks of one another.  *See*  Ex. 12 (Hutton, Theresa) ("Faced with the terrible

tragedy of losing a sister, father and then a few months later a grandmother, the McMahon family

did what Irish Catholic families do. They all leaned on their faith. Faith once again the anchor of the family."). That religiosity is, of course, a mitigating factor that the Court should consider, along with the other family circumstances discussed here, at sentencing. *See Alba*, 933 F.2d at 1122 (holding that the sentencing court's "determination to depart downwardly relying on [the defendant's] family circumstances [was] not an abuse of its discretion" where "incarceration in accordance within the Guidelines might well result in the destruction of an otherwise strong family unit"); *United States v. Howe*, 543 F.3d 128, 130, 137 (3d Cir. 2008) (affirming a probationary sentence despite eighteen to twenty-four month Guideline range where defendant had no prior criminal history and "led an honorable and lawful life until this point"; including that he was a well-regarded member of his community who regularly attended church and "made but an 'isolated mistake' in committing his crime").

### b.      A Heroic New York City Police Officer

As a child, Mr. McMahon was known for being the neighborhood protector, keeping a "watchful eye over all of [the] kids and ma[king] sure everyone got home safe and sound." Ex. 6 (Callanan, Michael); Ex. 7 (Campo, Frances) ("Michael has always been a good and caring family man with high moral character from the time we were children."). This drive to protect ultimately led Mr. McMahon to become a police officer, a career upon which he commenced just a few weeks after graduating from high school: Mr. McMahon entered the police academy at the young age of nineteen. Ex. 16 (Lonzar, Robert). After completing the police academy, Mr. McMahon joined the NYPD in 1989 as a Transit Police officer and then a patrol officer in Manhattan and the South Bronx. *See* Ex. 20 (McCarthy, Robert). Indeed, "Michael never had to return to the Bronx, but he made the choice to when he became a New York City Police Officer. He could have easily have stayed in the comfort of suburbia, but chose to give back to the next wave of American dreamers living in the Bronx." Ex. 21 (McCullagh, Raymond).

Based upon his stellar performance as a street patrol officer, in 1993, Mr. McMahon was selected to serve in the Street Crime Unit, an elite team of officers who were tasked with addressing the then-rising rate of violent crime in the area. Ex. 20 (McCarthy, Robert); *see also* Ex. 26 (McMahon, Martha) ("When we met in 1993, Mike was serving on the Street Crime Unit of the NYPD."). Mr. McMahon's unit "was deployed in decoy operations, stakeouts, and investigations involving homicides, shootings, burglary and robberies." Ex. 20 (McCarthy, Robert). While in the Street Crime Unit, Mr. McMahon often "faced gunfire and other life-threatening situations to protect the citizens of the city," but with his help and, due his team's heroism, "the level of violent crimes in the targeted areas reduced dramatically." *Id.* Mr. McMahon "was in constant combat on the job including a shootout in Times Square on New Year's Eve with thieves armed with AK47s holding workers hostage." Ex. 25 (McMahon, Eileen, Kevin, Brian, Vincent, Patricia, Kathleen and Stephen). However, "[d]ue to Mike's courage and heroism, and that of his fellow cops, no attendees were harmed and the ball dropped right on time. Mike had saved countless lives and no one popping champagne was the wiser." *Id.*

After Mr. McMahon's time in the Street Crime Unit, Mr. McMahon was promoted to Detective for the Bronx Narcotics Division, "work[ing] closely with community leaders and precinct commanders to develop strategies to reduce drug related crime and violence in their neighborhoods." Ex. 20 (McCarthy, Robert). He also conducted narcotic trafficking investigations, money laundering and surveillance. *Id.*

Subsequently, in recognition of his excellence and dedication to protecting and serving the community, Mr. McMahon "was promoted several times and eventually served as school safety sergeant for approximately 40 public and private schools in the Bronx." Ex. 26 (McMahon, Martha). As school safety sergeant, Mr. McMahon "trained and managed seventy-five police

officers and detectives," and also "managed security and investigations for thirty-nine schools in the 43rd Precinct." Ex. 20 (McCarthy, Robert). Mr. McMahon was also "in charge of protecting children from drug dealers, gang recruitment and more. He would often be the only voice for children victimized in the schools and protector for many who otherwise would be forgotten." Ex. 26 (McMahon, Martha). In this capacity Mr. McMahon "hosted a camp for underprivileged kids sponsored by the SDNY and several U.S. Attorneys spent time at the camp with Mike and his children." *Id.* As Mr. McMahon's wife, Martha, recognizes, "[h]e helped so many kids during his time on the job" and she "was always so proud of him." *Id.*

Despite the dangers of his job, "[b]eing a Police Officer was all that Michael loved and wanted to do." Ex. 25 (McMahon, Eileen, Kevin, Brian, Vincent, Patricia, Kathleen and Stephen); *see also* Ex. 26 (McMahon, Martha) ("His heroism was a constant occurrence. He viewed it as part of his job and he loved every second of it."). Mr. McMahon's cousin, Michael Callanan, who also joined the NYPD, recalls how Mr. McMahon taught him "how to be a good officer," including "the core values of being one of the NYPD 'Finest'" through "courtesy, professional and respect to all." Ex. 6 (Callanan, Michael).[8]

---

[8] It is in this context that one must view the seven New York City Civilian Complaint Review Board (CCRB) complaints filed against Mr. McMahon during his fourteen year career as a NYPD Officer, containing 19 allegations of misconduct (of which four—stemming from only one complaint—were substantiated, though they "resulted in no penalties against the defendant"). *See* PSR, ¶ 198. According to the Government, with regard to the substantiated allegations, "on April 11, 2000, [Mr. McMahon] confronted a minor male, grabbed the minor male, repeatedly called him 'stupid,' placed him in a NYPD radio motor patrol vehicle, searched the minor male and his backpack, and ordered a NYPD officer to issue a summons against the minor male." *Id.* This is hardly egregious behavior, especially given that CCRB complaints are extremely common against police offers, and it is extraordinary that the only substantiated conduct, over a fourteen year career, was that Mr. McMahon called a suspect "stupid." *See also* Ex. 26 (McMahon, Martha) ("At trial I had to listen to the brutal personal and professional attacks on Mike. It was so painful for me and my sons who attended to hear. One day NYPD CCRB complaints against Mike from 1995 were submitted as proof of some character flaw. What the jury didn't hear were the details of those complaints. They involved a known gang member Mike had removed from school grounds who

Tragically, Mr. McMahon's impressive career with the NYPD was prematurely cut short after he sustained career-ending injuries on February 13, 2001 doing what he loved most: "protecting and serving the good people of New York City, specifically the Bronx."    Ex. 22 (McCullagh, Teresa).    Thus, Mr. McMahon was engaged in a high-speed car chase on the Cross-Bronx Expressway:

> … a man with nineteen prior arrests  was stalking his girlfriend and threatening the victim again.  He had broken both of the woman's eye sockets and claimed he was going to kill a cop.  Mike got the call and immediately located the perp driving by the victim's home . . . The chase was televised on ABC news.  I watched in real time the end of my husband's career when the perp ran Mike's police car off the road, hitting a telephone pole at 50 miles an hour.  The car looked like an accordion.  Mike was removed from the car with the jaws of life and [was] permanently disabled.  He suffered a broken hip and a fractured bone in his neck.

Ex. 26 (McMahon, Martha); *see also* Ex. 20 (McCarthy, Robert) ("Unfortunately, Michael's police career ended by a high-speed car chase which resulted in substantial injuries. These injuries required Michael to retire from the New York City Police Department in 2003."); Ex. 7 (Campo, Frances) ("After being injured in a high-speed chase. Michael suffered permanent physical injuries that required him to retire from the force."); Ex. 23 (McLachlan, Dave) ("His success at the NYPD, right up to the time he was severely injured in the Police chase that ended his career, was a journey for all his friends.").

This injury ended an extraordinary career, in which Mr. McMahon "racked up medal after medal building his stellar reputation." Ex. 26 (McMahon, Martha).  Specifically, Mr. McMahon

---

was trying to recruit kids.  The other was from the mother of the same gang member who Mike had stopped and vouchered $1400 cash.  Mike told the boy if he could prove where the money came from it would be returned.  The mother of the boy entered the precinct screaming about Mike and wanted the money back.  Mike was not disciplined for these complaints and did not lose any vacation days.").

received 75 medals of commendation over the course of his career, including the Combat Cross, the second highest departmental award which is awarded to police offers who perform an act of extraordinary heroism while engaged in personal combat with an armed adversary under circumstances of imminent personal hazard to life, *see* Ex. 15 (Lawler, Michael and Sessions, Pete), "as a result of his conduct on New Year's Eve in 1995 (entering 1996) in which he responded to an armed robbery in progress near Times Square in New York, New York, PSR, ¶ 198, truly "speak[ing] volumes of the difference he made while on duty in the Bronx." Ex. 22 (McCullagh, Teresa). *See also* Ex. 2 (Burke, Michael) ("His seventy-five medals represent his ability to bring down dangerous individuals and keep innocent people safe."); Ex. 27 (McMahon, Maxwell) ("The acts of heroism and countless good deeds he's performed alone can attest to the person he is, but it does not stop there. As if anyone needed proof, he has over a seventy-five medals and recognitions from his time on the force. He is someone who takes pride in his work and is honored to have dedicated himself to the good of his community at work and at home."); Ex. 19 (McCarthy, Christine) ("Even in this difficult job he was known to show honesty, fairness, compassion, and kindness. Which is evidenced by him receiving over 75 medals of commendation including the Combat Cross."); Ex. 20 (McCarthy, Robert) ("Michael was awarded seventy-five medals from the New York City Police Department, including The Combat Cross, one of the most distinguished awards bestowed upon a police officer. The seventy-five medals speak for themselves. But, more importantly are the less prestigious accolades known as "Exceptional Police Duty" awards that Michael received during his career. These awards speak to his character and are given to officers who just do the right things for the right reasons."); Ex. 22 (McCullagh, Teresa) ("Please consider all the wonderful things Mike has done for others in his family, his community and in the City of New York. 75 meritorious medals speaks volumes of the difference he made while on duty in the

Bronx. I would also please ask that you consider all his years on the NYPD. All those shifts spent away from his family - nights, weekends and holidays, please let them all count for something."). As Lisa Ross, a family friend, expressed, "[Michael's] life reflects the vow he made to serve and protect with his spotless and decorated career in law enforcement. Mike's awards and record of service speaks for itself."   Ex. 35 (Ross, Lisa).

Certainly, Mr. McMahon's heroic acts and service during his time in the NYPD, although his law enforcement experience has been held against him in this matter, *see* Tr. at 2139:17-24 ("Now, the evidence shows that McMahon knew what he was doing, regardless of his background. But to the extent that you need to consider whether McMahon consciously avoided knowing what was going on, consider this fact:  If anyone should have known what he was doing was wrong, that there were major red flags that he should have looked into, that he was obviously participating in criminal activity, it was a former member of law enforcement."); ECF No. 294 at 10 ("Though the circumstances of his retention on the Xu Jin investigation are murky, the government's evidence showed that McMahon—someone with experience and savvy in the investigation field—did not probe into the origin of this investigative work or the people for whom he was working); PSR, ¶¶ 111 113, 143, and 149 (providing for a two-level increase in the form of an adjustment under USSG § 3B1.3 for using a special skill), warrant a downward variance. In hindsight, of course, Mr. McMahon agrees—and wishes he had seen the "red flags" that were at the core of the Government's case and the Court's post-trial opinion.  *See* PSR, ¶ 135 ("I want it to be clear that there is no way that I would have performed investigative services in this matter, had I known that the individuals who hired me were actually Chinese government officials involved in a repatriation scheme.  During my trial, the Government attempted to show that I should have known it, and in retrospect, I wish I had.").  But Mr. McMahon's acknowledged failures in this regard should not

be permitted to negate or overshadow his long and honorable career, as the caselaw shows. *See, e.g., United States v. Canova*, 412 F.3d 331 (2d Cir. 2005) (affirming downward departure for ex-Marine who, as a volunteer firefighter, sustain[ed] injuries in the line of duty three times," and rescued a 3 year old from a burning building, delivered 3 babies, and administered CPR to persons in distress); *United States v. Patterson*, No. 1:08-CR-383, 2019 U.S. Dist. LEXIS 222167, at *8 (M.D. Pa. Dec. 30, 2019) (reducing based, in part, on "a special award for what the BOP called an 'act of heroism'"); *United States v. Acosta*, 846 F. Supp. 278, 280 (S.D.N.Y. 1994) ("Acosta's life-saving, heroic act itself justifies such a departure.").

### c.    9/11 Service and Health Impacts

When the horrific terrorist attack took place on September 11, 2001, Mr. McMahon was on modified desk duty, attempting to recover from his injuries. *See* Ex. 26 (McMahon, Martha) ("On September 9th 2001 after a few months of daily rehabilitation, he returned to modified duty with physical restrictions. Two days later we all know what happened."). But Mr. McMahon's extensive injuries "did not stop him from doing his part to help his city"; Mr. McMahon refused to "simply sit at a desk" and instead immediately "stepped up and volunteered to travel to Ground Zero with his fellow officers" and assisted with "transport[ing] NYPD personnel. . . to and from the chemically toxic site." Ex. 7 (Campo, Frances). Mr. McMahon and his fellow first responders were consistently exposed to the highly toxic residue from what was known as "the pile." Ex. 5 (Byrne, Mary); *see also* Ex. 13 (Iloreta, Alfred) (█████████████████████████████████ █████████████████████████████████████████); Ex. 37 (Roth, JD) ("During 9/11, he selflessly went down to the devastation to help and support, despite the risks involved. █████████████████████████████████████ Yet, not once has Mike ever complained about the sacrifices he made."). As a result of the events of

September 11, 2001, Mr. McMahon "lost several members of his precinct" and "[c]ountless funerals became regular events."  Ex. 26 (McMahon, Martha).

Shortly after the events of 9/11, Mr. McMahon "got the news he was to retire on the disability from the accident" which "devastated him." *Id.*  As Mr. McMahon's wife details:

> I've only seen him cry a few times in our thirty years together. When he got word he was out of the police department was one of them.  He never returned to the precinct to retrieve his badge and gun.  His brother Brian, also NYPD, worked in the same precinct, took the items home.  He began to recover physically but mentally he was defeated.  I know how much his work meant to him.  Truly a loss not just for him but the entire city of NY.

*Id.  See Koon*, 518 U.S. at 89-90, 95 (affirming downward departure for police officers, in part because they also faced job-termination proceedings, after which they would lose their positions as police officers" and suffer "anguish and disgrace").

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████



"he would do it all over again."

Chrissy Roth Letter.  There can be no question that Mr. McMahon "has placed his life on the line

repeatedly, whether it was in the aftermath of the 9/11 attacks ████████████████████

████████████ or on the streets of New York, as an officer, detective and sergeant."  Ex. 15

(Lawler, Michael and Sessions, Pete).  These facts are, certainly, significant considerations as the

Court, in sentencing Mr. McMahon, evaluates his "history and characteristics" and, as discussed

above, "consider[s] every convicted person as an individual and every case as a unique study in

the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to

ensue."  *Pepper*, 562 U.S. at 487 (citation omitted).

### d.    A Reliable and Ethical Private Investigator

██████████████████████████████████ Mr. McMahon tried to move on with

his life, by establishing a career, as a private investigator.  Unsurprisingly, "[t]ransitioning into

private investigation, [Mr. McMahon's] ethical practices and relentless pursuit of justice continued

to shine."  Ex. 37 (Roth, JD).  Indeed, just two years after retiring from the NYPD, and for twelve

years thereafter, Mr. McMahon "performed contract investigations for the Law Office of Brian

Neary, in Hackensack, New Jersey, and Plymouth Rock Insurance, in New York, New York."

PSR, ¶ 196; Ex. 26 (McMahon, Martha) ("Mike was the go-to PI for top defense attorneys in the

tri-state rea.  He worked for billionaires, cases with the DOJ, FBI and other law enforcement

agencies.").  And, in 2012, Mr. McMahon formed McMahon Investigative Group, LLC, where he

was "the sole proprietor."  PSR, ¶ 195.  Here, Mr. McMahon "primarily performed investigations

via contract work related to civil litigation, corporate theft, workers compensation, employee pre-screening, and criminal defense, utilizing surveillance and various other investigative methods." *Id.* Mr. McMahon's clients included "the Vatican, the FBI as well as owners of well-known businesses and insurance companies." Ex. 25 (McMahon, Eileen, Kevin, Brian, Vincent, Patricia, Kathleen and Stephen). Mr. McMahon also performed worked for Criminal Justice Act (CJA) attorneys, and, in such cases, was compensated by the federal government. PSR, ¶ 196.

Mr. McMahon was "a sought-after private investigator" due to "his knowledge, responsiveness, and integrity," Ex. 32 (Orlando, Jason), and his "work with McMahon Investigative Group showcased his dedication to helping others within the bounds of the law," Ex. 37 (Roth, JD); *see also* Ex. 33 (Roalsvig, Alexandra) ("I have always known Michael to be an ethical, honest person and he always showed the highest standards in work and family. He always took great pride in his work and providing for his family. He was growing his business, and so proud to grow his client base, which expanded because he was highly sought after, and capable and highly respected."); Ex. 31 (Mills, John) (detailing how Mr. McMahon is known for operating "honorably and heroically," "both in uniform and also as an ethical and law-abiding private investigator"). Despite Mr. McMahon being so highly regarded as a private investigator, "[h]is career had nothing to do with financial gain and everything to do with right versus wrong;" instead, "[t]he idea of any innocent person going to jail drove Mike on many cases." Ex. 26 (McMahon, Martha).

Indeed, the praise by those who had the privilege to work with Mr. McMahon is effusive. Jason Orlando, "an attorney, practicing primarily in New Jersey," who has "known Mike since he was referred to [him] as an investigator in 2016," describes Mr. McMahon as a "revelation" as he was "[s]mart, responsive, and diligent" and "added value and insight into each matter he worked

on . . . largely consist[ing] of representing criminal defendants who qualified to have an attorney appointed pursuant to the Criminal Justice Act."   Ex. 32 (Orlando, Jason).  Mr. Orlando details how Mr. McMahon "quickly became [his] 'go-to' investigator and remained so until he stopped working because of this matter."  *Id.*

Raphael M. Rosenblatt, "an attorney at law admitted to practice in the States of New York and New Jersey," who has "known Mr. McMahon for approximately ten (10) years," hired Mr. McMahon "each time [he] had such a need" for a private investigator.    Ex. 34 (Rosenblatt, Raphael).  Mr. Rosenblatt "always found [Mr. McMahon] to be professional, trustworthy, honest, and competent," conducting work "in a most ethical and responsible manner," detailing how Mr. McMahon:

> always diligently documented his efforts and charged a reasonable fee for his work. His work was always highly competent, and his calm demeanor and unflappability defused situations that could easily have gotten out of hand. [Mr. Rosenblatt] never witnessed him do anything outside the bounds of the highest ethics in doing his job. [Mr. Rosenblatt] saw the same work ethic and high moral code in the work he performed for colleagues – to the extent that [he] witnessed his efforts in that regard.

*Id.*

Likewise, Paul Brickfield, "an attorney-at-law of the States of New York and New Jersey," who has "known Mr. McMahon for well over 15 years . . . retained him to assist in a large number of matters of the years," including "civil and criminal cases" by "perform[ing] private investigative type duties, including interviewing witnesses and obtaining records."   Ex. 1 (Brickfield, Paul). Mr. Brickfield, too, recognizes "Mr. McMahon's work ethic and professionalism was excellent and above reproach" and "never had any reason to believe that [Mr. McMahon] did anything inappropriate for [Mr. Brickfield] or [his] clients."   *Id.*

Further, Joseph Hayden, Jr., "a practicing trial lawyer in New Jersey since 1969," past President of our Federal Bar, of our Criminal Defense Association," and "a member of the American College of Trial Lawyers since 1989," retained Mr. McMahon to "work as an investigator for [him] in connection with a number of civil cases." Ex. 10 (Hayden, Joseph). Mr. Hayden, one of the most respected attorneys in New Jersey, and nationally, details how:

> About five years ago, I was asked to represent a number of catholic priests in a series of civil cases where there were allegations of sexual abuse 40 or 50 years in the past. I needed an investigator in the area of my office and the recommendations were almost unanimous that Mike was the hardest-working, fairest and most professional investigation I could find. I worked closely with Mike on three or four cases for over a year and I was struck by [Mike's] diligence, professionalism and the ability to interview and interact with people in a respectful way. (I had previously been advised of Mike's record and heroic activities as a New York City Police Officer and the high regard he was held by other police officers.)
>
> I will not infringe on the Court's time with the details of the cases involved, but the thing which impressed me the most about Mike was his almost utter discard of money or billing. All he really cared about, as far as I could see, is doing a good job and being respectful to our clients and the people he had to interview. I had to hound him to get his bills in so that I could be sure he would be paid. At no time, when I was working closely with Mike, did I observe any tendency to break the rules or engage in any unprofessional or illegal activity.

*Id.*

And, Herman Weisberg, a fellow retired NYPD Detective, and Managing Director of Sage Intelligence Group, expressed that working with McMahon "turned out to be an excellent decision" because "Mr. McMahon was impartial," "respected [their] clients' confidentiality," and "demonstrated sound judgment and the utmost respect for the law." Ex. 39 (Weisberg, Herman). This is why, for example, Mr. Weisberg "assigned Mr. McMahon to protect the children who witnessed the Parkland Shooting" by accompanying them "as they made public appearances

throughout the country" where "[g]un rights activists carrying AK47s often greeted the bus carrying the children." *Id.* Although "[t]he children were always at risk on this tour," Mr. Weisberg "was reassured that Mr. McMahon headed the team assigned to protect them" and "[i]t also gave the parents peace of mind." *Id.*

However, "[t]here was one type of case [Mr. McMahon] said he would never take, any involving someone harming a child" and "[i]f he found the accused to be guilty, that was where [his services] ended." Ex. 26 (McMahon, Martha). Martha recalls one instance where Mr. McMahon came "home and t[old her] he returned a check for $1200 to a client after one meeting" because "[t]he man had been accused of sexual assault on a child." *Id.* Mr. McMahon "knew he was guilty and pushed the check back to the man across the table and promptly left the meeting." *Id.*

It is clear that Mr. McMahon "loved his work as a PI and often worked pro-bono when people were in need." Ex. 26 (McMahon, Martha). Martha details one of the pro-bono cases which:

> involved a young man who had been falsely arrested for murder. Mike met with the young man and his family and knew just by speaking to the family, he was innocent. When the parents struggled to pay, Mike offered to work for free. Something he did more often than not. The case of this young man being falsely accused kept Mike up at night. He did a boots on the ground investigation, placing posters on trees where the shooting took place with his personal cell number. Sure enough it worked. Mike's work led to the young man being fully exonerated when he uncovered the real killers. If not for Mike there is NO DOUBT that young man would be rotting in jail right now. I was with Mike when he got a call from this nineteen-year old, thanking him profusely.

*Id.*

There can be no doubt: Mr. McMahon is "a man of honor and integrity who would never put anyone in harm's way," Ex. 35 (Ross, Lisa); *see also* Ex. 8 (Cavegn, Alex and Eileen) ("In all

the years we have known Mike, we have never questioned his morals or ethics as a person or a private investigator."), and Mr. McMahon's "professional colleagues" and "the clients he worked so hard for—many of whom, such as the CJA defendants, are often from hard-luck circumstances and have not been afforded the opportunities to be represented by dedicated and committed professionals such as Mike," have suffered from the prosecution of Mr. McMahon.  Ex. 32 (Orlando, Jason).  This exemplary work record is, of course, a significant aspect of the history and characteristics of Mr. McMahon, part of the "unique study" of the whole person whom this Court will be sentencing.  In this case, it is powerful mitigation, which militates against a custodial sentence.  *See, e.g., United States v. Ramirez-Cortez*, 581 F. App'x 165, 167 (4th Cir. 2014) (recognizing that the sentencing court properly considered defendant's employment history); *United States v. Allen*, 551 F. App'x 491, 494 (11th Cir. 2013) (finding that a defendant's "employment record is part of his history and characteristics" under § 3553(a)); *United States v. Henson*, 500 F. App'x 211, 214 (4th Cir. 2012) (discerning no error with district court's assessment of defendant's "history as a good a student and her regular employment"); *United States v. Jackson*, 390 F. App'x 130, 134 (3d Cir. 2010) (finding district court reasonably applied § 3553(a) factors, including by taking into account defendant's "positive characteristics, including his excellent employment history and the dedicated support of his family"); *United States v. Taylor*, 280 F. App'x 397, 399 (5th Cir. 2008) (affirming downward variance based in part on defendant's "impressive employment history").

### e.    Good Samaritan

Mr. McMahon did not just serve the community in his professional life; he was also known as a hero in his personal life, as evidenced as by the number and substance of the personal accounts provided by friends and family.  *See, e.g.,* Ex. 26 (McMahon, Martha) ("There are countless incidents of Mike doing good for others and expecting nothing in return."); Ex. 17 (Magri, Scott)

("Mike has so much to give his family, community, and the society he worked to uphold and
protect his entire career."); Ex. 4 (Byrne, Caroline) ("He is one of the best people I know, and I
promise you that society is a better place with him in it."); Ex. 36 (Roth, Chrissy) ("I am a physical
therapist, and the world I am surrounded in is one of caregivers. Selfless people. Mike is one of
these types. He wants to make the world a better place and spent his life doing that."); Ex. 7
(Frances, Campo) ("Throughout our school-age years, I watched Michael always lead a life
reflecting his family's deep-rooted belief in being kind and generous to all around him. Michael
played football with my brother and he was a sociable presence in our class, yet never sought to
be the center of attention. He was never a troublemaker at school, at off-campus school functions,
or anywhere in our close-knit community. He was always responsible. even as a teenager, and his
sense of responsibility to his family and community was quite evident."); Ex. 12 (Hutton, Theresa)
("Throughout their married life together, Michael and Martha have been quietly helping anyone
who needed it, family, friend or stranger.").

Indeed, Mr. McMahon has truly been a "guardian angel for so many." Ex. 35 (Ross, Lisa);
*see also* Ex. 29 (McNicholas, Fran) ("Thank God for [Michael]."). For example, when his
neighbor, Lisa Ross, was rendered unconscious in a medical emergency, Mr. McMahon was the
first person her husband called, even before calling the police. Ex. 35 (Ross, Lisa). Lisa recounts
that her husband,

> Dan was screaming for Mike to come over and to hurry! Mike didn't
> think twice and ran in the snow across the street to help. When Mike
> arrived he saw me on the floor and immediately began CPR. Dan
> was in shock and pacing the floor and unable to continue to assist
> Mike. Dan left the room and began vomiting. Mike continued to do
> chest compressions as my daughter wailed in fear. Mike called 911
> when Dan was incapacitated and continued CPR. He conducted
> chest compressions and mouth to mouth for almost thirty minutes.
> When the police arrived they shocked my chest three separate times
> until they finally felt a faint pulse. Mike had saved my life but was

I out of the woods? Did I suffer severe brain damage? Would I be in a vegetative state for the rest of my life? Until I was out of the coma no one would know. Two weeks later I woke up with a permanent heart monitor which would shock my heart if I experienced another similar cardiac event. My doctors informed me ninety-nine percent of people who experience this type of cardiac event die. It cannot be detected during a routine check up. Due to Mike doing CPR which kept blood flowing to my brain I was sparred any brain damage. I have never had any health issues in the past twenty years since this event.

*Id.*; *see also* Ex. 2 (Burke, Michael) ("If anyone in my family became the victim of a crime and had to dial 911 for assistance, I pray someone of Mike's character and professionalism would respond. I would trust him with my family's life in his hands."). Likewise, Mr. McMahon came to the aid of a friend whose home was flooded during Hurricane Sandy, helping clean up the catastrophic damage. Ex. 8 (Cavegn, Alex and Eileen). Indeed, "[n]o one asked him, he just did it. That's what he does. He's the type of person who has a natural instinct to help people." *Id.*

Aside from emergencies, in which Mr. McMahon's truly heroic nature emerges, he has also served as an important mentor and father figure to children who do not have the privilege of having a father like Mr. McMahon in their lives. As his daughter Ann Marie has noted, Mr. McMahon took a neighborhood child under his wing, making him feel like a part of the McMahon family, creating a safe space in which the child could flourish and feel accepted. Ex. 24 (McMahon, Ann Marie) ("After school and on weekends he would ring our doorbell wanting to play. At school he was always getting in trouble, so I wasn't too happy with him visiting to be honest. My mom and dad always welcomed Ian and made him feel at home. He would come in our house and run right to our pantry and grab snacks. Eventually he would just walk in the house unannounced and share details of his personal life. We learned everything about Ian, everything. He had a lot of energy and never stopped talking. My parents would invite him to swim and let his mom know he could come over any time. Ian's mom was happy he had us as she was having a

tough time. . . . Looking back I understand what my dad was doing for Ian. We gave him a safe place to let off some steam which he really needed. He was never mean to me, he just wanted to be heard. My dad always listened. Ian moved away before high school but stayed in the same town. Over the last ten years we've been in the same schools. It hasn't been easy for him, but he's graduating with me in June. I can't help but think my dad's presence in his life was a positive.").

And again, when family friend Alexandra Roalsvig was the first to receive the tragic news that their "friend and actor, Benjamin Hendrickson, died from an apparent suicide," her "first instinct was to reach out to Michael" because she "trusted him and knew he had the experience and knowledge from his experience as a NYPD Detective and private investigator to confirm if th[e] terrible news was true." Ex. 33 (Roalsvig, Alexandra). Mr. McMahon just has that kind of generous, supportive nature, and those around him rely upon him whenever they need help—and he is there.

Nor did this change after Mr. McMahon's arrest in 2020. In 2022, Mr. McMahon "stopped the robbery of a woman at [his] local bank." Ex. 26 (McMahon, Martha). Mr. McMahon "was driving out of the parking lot and saw a suspicious man lurking by the door to the bank" and, "[d]espite being unarmed due to this case, he turned his car around and confronted the man who was robbing the 90 year old woman in her car." *Id.* "It turned out there was a pattern of these 'lookout' robberies in NJ and Mike had prevented at the very least a robbery; possibly more." *Id.* Moreover, "[s]oon after the event at the bank he intervened on an assault of a woman in Grand Central Station." *Id.* Mr. McMahon "could have kept walking and let someone else intervene but he turned around and went back to help." *Id.*

Finally, Mr. McMahon's eighty-six year old mother-in-law "was recently targeted in a 'grandma scam'" as she received "a landline call from a scammer claiming her grandson was in

jail and she needed to pay three thousand dollars to get him out." *Id.* Mr. McMahon "instructed her what to do" and "[s]ure enough an Uber car showed up . . . just as the local police arrived" and Mr. McMahon and the "local police spoke to the driver and quickly determined he was being used as a courier for a criminal organization." *Id.* "Within a few minutes [the Uber driver] was cleared of any wrongdoing and on his way." *Id.* In sum, Mr. McMahon remains a person who, albeit in his private capacity, spends him time and energy enforcing the law through help to others and to law enforcement. This, too, is a relevant factor, as part of the constellation of facts, that go to his history and characteristics and bear upon the appropriateness of the non-custodial sentence that he seeks. *See Canova*, 412 F.3d at 359 (considering defendant's "Good Samaritan" acts at sentencing).

### f. Championing Charitable Causes

Beyond Mr. McMahon's dedication to the community through his career, Mr. McMahon is also committed to important philanthropic efforts with his wife, Martha. *See United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) ("[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance."); *United States v. Collins*, No. 18-cr-1170 (LAP) (S.D.N.Y. Oct. 17, 2023), ECF No. 244, Sent'g Tr. at 20:23-21:1 (holding that the defendant's "lifelong good works and charity" "work[ing] for his church, his family, his schools, and numerous other deserving organizations that work to better individuals' lives," combined with collateral factors such as reputational damage, supported a below-Guidelines sentence); *Gupta*, 904 F. Supp. 2d at 354 (imposing below-Guidelines sentence in light of defendant's extensive charitable works, which evidenced "an extraordinary devotion, not only to humanity [at] large, but also to individual human beings in their times of need."); *United States v. Cooper*, 394 F.3d 172, 177-78 (3d Cir. 2005) (affirming a below-Guidelines

sentence for a defendant who created a youth athletic organization in his community and paid for the high-school tuition of several boys he mentored). Specifically, Mr. McMahon and Martha act as ambassadors for St. Jude Children's Research Hospital. *See* Ex. 26 (McMahon, Martha) ("We have both given of ourselves through philanthropy and volunteering for countless causes. I served on the professional advisory board for St. Jude Children's Research Hospital and all of my children have participated in fundraising for the cause. Mike and his retired police officers volunteered for security for my St. Jude events in NJ and NY. We have tried to instill the importance of giving back to all our children.").

In that capacity, Mr. McMahon and his wife have planned numerous galas and fundraisers, and "[t]heir steadfast commitment and resolve to this organization over the past 30 years has resulted in raising a staggering 15 million dollars for pediatric cancer" which is, of course, no small feat and can only be obtained through sincere dedication and unwavering belief in this renowned organization." Ex. 19 (McCarthy, Christine). As one letter writer states:

> Michael has always dedicated himself to serving his community and those less fortunate. This dedication to others is a family mantra for the McMahon family. Michael and his wife Martha are ambassadors for St. Jude's Children's Research Hospital. The hospital is the pioneer in childhood cancer research, and no one is ever turned away for their inability to pay. The hospital is run one hundred percent on donations. Through Michael and Martha's noble efforts they held annual black-tie fundraisers and other events starting in 1994 in New York City and New Jersey to support St. Jude's. The time and effort involved in the planning and execution of these events was more than time consuming. Each event had hundreds, sometimes thousands, of attendees. Michael was able to marshal his fellow police officers to generously donate their time to work as security for the events. Martha, who is an actor, was able to have her co-workers provide the entertainment for the events which continue to date. Due to the tireless efforts of Michael and Martha and their vast network of friends and family they were able to raise over 15 million dollars for St. Jude's Children's Research Hospital.

70

Ex. 20 (McCarthy, Robert); Ex. 25 (McMahon, Eileen, Kevin, Brian, Vincent, Patricia, Kathleen

and Stephen) ("Since he was retired, he was now able to be the . . . supportive husband for many

St. Jude fundraisers that Martha was the Chairperson for . . . .").  Though this is but one charitable

endeavor, it bears significantly on an understanding of who Mike McMahon really is; it is thus an

important aspect of his "history and characteristics" under § 3553(a).

g.    **Family Life**

As is evidenced in nearly every letter written on behalf of Mr. McMahon, there also can be

no question but that Mr. McMahon is a dedicated family man who loves and supports his wife and

children above all else; indeed, he is truly the "epicenter" of his entire family.  Ex. 19 (McCarthy,

Christine); *see also* Ex. 20 (McCarthy, Robert) ("With all of the good Michael has done for his

community, his true love is his family. I would be remiss not to comment on Michael's family and

his deep love for his wife and children. He has been a great father and role model for" Michael,

Max and Ann Marie.); Ex. 15 (Lawler, Michael and Sessions, Pete) ("In addition to his long and

respectable career as an NYPD Police Detective, Michael is a dedicated husband and father to his

three children."); Ex. 36 (Roth, Chrissy)  ("I want to say a few words about Mike because I have

always found him to be above and beyond caring about others and such an incredible family man.

When we have had dinner over the years he always talked about his kids and Martha with such

pride and heart."); Ex. 37 (Roth, JD) ("Mike's devotion to his family, community, and faith is

exemplary. His loving relationship with his wife Martha, his children, and extended family, along

with his charitable endeavors and dedication to his Catholic faith, speak volumes about his

character.");  Ex. 35 (Ross, Lisa) ("Mike is always there for his extended family and the first one

everyone would call in a time of need. I trust the McMahons with my life and the lives of my

children. Their home was always open and the epicenter for every family gathering."); Ex. 33

(Roalsvig, Alexandra) ("I have seen Michael raise his children. Michael has always been a devoted

71

father, husband, son-in-law, brother, cousin, and he has always put his family first. He has and

continues to be someone I can lean on, and I am honored to call him a friend.").

Mr. McMahon and his wife, Martha, met on February 6th, 1993. Ex. 26 (McMahon,

Martha). Martha recalls:

> I had just moved back to NJ from California and met some friends
> on my first weekend home. When Mike walked in that night, I
> couldn't take my eyes off of him. He had the most beautiful blue
> eyes and the "map of Ireland" on his face as they say. I was not one
> to be shy, so I immediately went up to him and struck up a
> conversation. I was twenty-three years old, Mike twenty-five. We
> were young but both had already experienced quite complex lives.
> Mike as a police officer on the NYPD, me as a professional actress
> since age ten. We talked for hours the night we met. After more
> than thirty years and three wonderful children, we haven't stopped
> talking.

*Id.* Mr. McMahon has three children: twenty-six (26) year old Michael ("Mikey"), twenty-two

(22) year old Maxwell ("Max"), and eighteen (18) year old Ann Marie. PSR, ¶ 179.

Mr. McMahon's oldest son, Mikey, decided to "follow[] in his father's foot steps" and

become a police officer; he "graduated the Passaic NJ Police Academy in September to join the

Hawthorne NJPD." Ex. 26 (McMahon, Martha); *see also* PSR, ¶ 179. Mr. McMahon was even

"asked to present Mikey with his badge on stage in front of hundreds of people," which "was quite

a proud moment for . . . his parents." Ex. 26 (McMahon, Martha). Mr. McMahon's middle child,

Max, "works in the automotive industry and [is] looking to buy his first home." Ex. 26 (McMahon,

Martha); *see also* PSR, ¶ 179. Ann Marie, Mr. McMahon's youngest daughter, "has started

community college working towards a degree in early childhood education while holding three

jobs." *Id.* Ann Marie "works as a teacher's aide, for the state of NJ assisting a special needs young

woman maintain independent living," as well as works "at a local coffee shop." Ex. 26 (McMahon,

Martha); *see also* PSR, ¶ 179.

Mr. McMahon has always been an central figure in his children's lives. Indeed, Mr. McMahon's mother-in-law recalls how that, when Mikey, "Michael and Martha's first born" was born, "[f]atherhood came naturally to [Michael]" and that "Michael was a great 'hands on' father." Ex. 5 (Byrne, Mary). And, "[t]he shining light of [Mr. McMahon's] retirement [from the NYPD] was being able to be with [his] sons every day while [Martha] went to work." Ex. 26 (McMahon, Martha). Mr. McMahon "embraced this time with the boys" and "went above and beyond in participating in every aspect of their lives." *Id.* Mike "volunteered to coach every sport [his] boys were involved in, baseball, basketball, soccer, lacrosse, track, anything where the boys showed interest." *Id.*; *see* Ex. 25 (McMahon, Eileen, Kevin, Brian, Vincent, Patricia, Kathleen and Stephen) ("Since he was retired, he was now able to be the lacrosse coach, the softball coach, the football coach, the basketball coach, [and] the stay at home dad."). After Ann Marie "came along in 2006 he became the best 'girl dad'." Ex. 26 (McMahon, Martha). Ann Marie, "named after [Mr. McMahon's] sister who had passed, *see* Ex. 5 (Byrne, Mary), was born one month early and "on life support for over a week as her lungs were not developed and she could not breathe on her own," Mr. McMahon would "sit[] with her in the rocking chair for hours with tubes weighing her down as she slowly recovered." *Id.* When Ann Marie was older "[a]gain Mike volunteered to coach her soccer team, lacrosse and was often the only dad in the mix." *Id.* Ann Marie was "blessed . . . to have this time with him and to this day they are inseparable. *Id.* Martha recognizes that "[t]he bond [Mr. McMahon] shares with all of his children is precious" and that "not a day goes by that [she] do[esn't] recognize the role he plays in their life is immeasurable." *Id.*

Even beyond his own children, Mr. McMahon acted as a father figure to his nephew while his brother-in-law was deployed in Afghanistan, including by making sure he was able to try out and join the travelling soccer team. *See* Ex. 29 (McNicholas, Fran) ("I knew when he was in

charge, my boys were safe and in good hands. These stories are from years ago, but his kindness and willingness to step up and lend a hand continues to this day. My mother lives with my sister and Mike, and he's there for her for whatever she needs.").

In addition, when Mr. McMahon's father-in-law, Terry, died in 2013 after fighting with Parkinson's disease and dementia (the care of which "exhausted most of [their] assets"), "Michael offered to convert part of the[] garage into a 'Granny Pod'" for his mother-in-law, Mary, in which Mary has lived for almost ten years. Ex. 5 (Byrne, Mary). And, a few years ago, Mary "was hit was a 'double whammy diagnosis' of kidney cancer and a defective aortic valve," both of which required surgery. *Id.* Although Mary's "valve replacement was not debilitating," the "major kidney surgery left [her] in need of support." *Id.* After Mary returned from the hospital, Mr. McMahon and Martha "were there every day to help." *Id.* Mr. McMahon continue to care for Mary, who "will need surgery again soon as [her valve] is leaking and needs to be replaced again." Ex. 26 (McMahon, Martha).

It is clear that beyond being a dedicated husband and father, Mr. McMahon is the glue that holds his family together and that his absence, should he be incarcerated, will be truly devastating. Ex. 33 (Roalsvig, Alexandra) ("They are a tight family unit which I have been fortunate to enjoy, staying with them at their home many times. They always opened their doors and were generous and kind. I cannot imagine the pain his family will endure, and the worry they will carry if he is absent from their daily lives. The impact will resonate forever."); Ex. 18 (Martin, Lauralee) ("As their friend I'm gravely concerned if Mike is taken away from the family, Martha and the children will be lost without him. I've seen the emotional and financial toll it has taken on Martha and Mike. I cannot imagine Martha having to manage her family alone. As a mother of a daughter just out of her teens, I know Ann Marie, their [nineteen] year old child, is particularly fragile. Martha has

carried the family through this but I worry about her every day. I know how much she and Mike rely on each other's presence to literally survive."); *see also* Ex. 8 (Cavegn, Alex and Eileen) (Mr. McMahon is "the quintessential husband and father, who has and would do anything for them," which is why Mr. McMahon "would NEVER put them in any kind of jeopardy or risk doing anything that would take him away from them.").

A non-custodial sentence, then, is not only the best—but the only—way that the Court has available to it to consider this factor and limit the deleterious effects of Mr. McMahon's sentence. *See, e.g.*, *Alba*, 933 F.2d at 1122 (holding that the sentencing court's "determination to depart downwardly relying on [the defendant's] family circumstances [was] not an abuse of its discretion" where "incarceration in accordance within the Guidelines might well result in the destruction of an otherwise strong family unit"); *United States v. R.V.*, 157 F. Supp. 3d 207, 255 (E.D.N.Y. 2016) (finding, under § 3553(a), the fact that "defendant belongs to a strong family unit and his children would suffer from his absence" warranted non-custodial sentence); *United States v. Baker*, 502 F.3d 465, 467-68 (6th Cir. 2007) (affirming district court's sentence of probation, which was based on "the effect incarceration would have on defendant's older son"); *United States v. Trapero-Cortez*, 501 F. App'x 800, 801 (10th Cir. 2012) (district court granted defendant's request for a downward variance, citing his "commitment to his family").

Mr. McMahon's devotion to his family, as illustrated through many of his friend's and family's letters, is precisely the type of information that the Court should consider in determining Mr. McMahon's sentence under 18 U.S.C. § 3353(a)(1). *See United States v. Isola*, 548 F. App'x 723, 725 (2d Cir. 2013) (identifying "[defendant's] family circumstances and the effects of his incarceration on his daughter" as one of the factors to be considered under 18 U.S.C. § 3553(a)); *United States v. Bills*, 401 F. App'x 622, 624 (2d Cir. 2010) (holding that "the likely effects of

[defendant's] incarceration on her daughter" were one of the "mitigating factors" that was appropriately considered under 18 U.S.C. § 3553(a)); *United States v. Thomas*, 181 F. App'x 188, 190 (3d Cir. 2006) ("[U]nder Section 3553, the history and characteristics of the defendant, including her family ties, are pertinent to crafting an appropriate sentence."); *see also United States v. Golino*, 956 F. Supp. 359, 363 (E.D.N.Y. 1997) ("The sentencing court must guard against the possibility of wreaking undue depredations upon the defendant's innocent family.").

This Court should, accordingly, consider a lenient, non-custodial, sentence in this case: as other courts have recognized, there are times when this is the only way to achieve a just punishment. Indeed, as discussed at much greater length below, sentencing Mr. McMahon to any—let alone such a substantial term of incarceration would serve only to exacerbate the pain of his innocent family members who do not deserve to suffer any longer. *See United States v. E.L.*, 188 F. Supp. 3d 152, 156 (E.D.N.Y. 2016) (imposing below-Guidelines sentence upon finding "[a]n incarceratory Guidelines sentence . . . [would] deprive [the defendant's] family of vital financial and emotional support while doing little to further protect the public"); *United States v. Ranum*, 353 F. Supp. 2d 984, 990-91 (E.D. Wis. 2005) (finding that defendant's "history and characteristics" warranted a downward departure where defendant "is fifty years old, had no prior record, a solid employment history, [] [was] a devoted family man," and "provide[d] care and support for his elderly parents" and two daughters, concluding that "defendant's absence would have a profoundly adverse impact on both his children and his parents"); *see also United States v. Johnson*, 964 F.2d 124, 128-29 (2d Cir. 1992) (extraordinary family circumstances are a valid reason for a downward departure; "we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing"); *Gall*, 552 U.S. at 59 (observing

that probation could be appropriate if family members would be "very badly hurt" by defendant's incarceration).

In sum, there really can be no question: Mr. McMahon has been an extraordinary father, husband, servant of the community, and philanthropist:  this that describes who Mr. McMahon really is, not the crimes for which he was been found guilty.  It, then, is the history and characteristics of the person which this Court must consider, in again, viewing "every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue," *Pepper*, 562 U.S. at 487 (quoting *Koon*, 518 U.S. at 113).  In this case, that analysis, means that any period of incarceration would not serve the statute with which this Court must comply: "a sentence sufficient, but not greater than necessary" to achieve the goals of sentencing, 18 U.S.C. § 3553(a), would not be one that sends Mr. McMahon to prison.   Those goals are discussed now.

### B.    Application of The § 3553(a)(2) Factors Also Warrant A Lenient Sentence.

Under § 3553(a)(2), the Court must consider "the need for the sentence imposed," which must "reflect the seriousness of the offense," "promote respect for the law," "provide just punishment," "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with [rehabilitation, *i.e.*] needed educational or vocational training, medical care, or other correctional treatment."  18 U.S.C. § 3553(a)(2)(A)-(D).  Always, the Court must consider Congress's fundamental command, embodied in the first few words of the sentencing statute, that it "impose a sentence sufficient, but not greater than necessary," to serve these sentencing purposes.  *See Dean v. United States*, 581 U.S. 62, 67 (2017) (Section 3553(a) provides a "broad command that instructs courts to 'impose a sentence sufficient, but not greater than necessary, to comply with' the four identified purposes of sentencing[.]"); *United States v. Katsman*, 905 F.3d 672, 675 (2d Cir. 2018) ("Section 3553(a) requires that courts

'impose a sentence sufficient, but not greater than necessary[.]").  These factors, discussed in turn below, all disfavor the imposition of the lengthy custodial sentence recommended by Probation.

### 1.    Seriousness of the Offense

Mr. McMahon does not dispute that acting as an agent of a foreign government and interstate stalking are both serious offenses, a factor which the Court must and certainly will consider.  *See United States v. Fitzpatrick*, No. 23-cr-6722, 2024 U.S. App. LEXIS 29600, at *3 (2d Cir. Nov. 21, 2024) (noting that the court must weigh the "need to 'reflect the seriousness of the offense'").  But the complete nature and circumstances of the offense, as set forth above— including those factors that diminish Mr. McMahon's culpability, including the fact that he was deceived and his overall role in the offense and "did not have any leadership position over another participant in the instant offense," PSR, ¶ 115—also bear on  a full consideration of their seriousness.  Thus, although Mr. McMahon adheres to the legal positions set forth in his post-trial motions, which this Court has rejected, it nonetheless has the obligation, which we know it will fulfill, to full consider all of the nature and circumstances of the offense in making a careful, even-handed and, we hope, humane and merciful assessment of the seriousness of his offense.  That is all that Mr. McMahon requests with regard to this factor.

### 2.    Promotion of Respect for the Law

Courts often look to the promotion of respect for the law" factor of 18 U.S.C. § 3553(a)(2)(A) as a basis for imposing harsh sentences.  But the law, as the Supreme Court has discussed it, is clear: at times, "a sentence of imprisonment may work to promote not respect, but derision, of  the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54; *see also United States v. Schmoll*, No. 07-cr-762, 2008 U.S. Dist. LEXIS 83605, at *5 (E.D.N.Y. Sep. 8, 2008) (imposing a sentence of probation after concluding that a sentence of

imprisonment "may work to promote . . . derision[] of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." (quoting *Gall*, 522 U.S. at 54)).  For the reasons set forth above, such circumstances are present here, as Mr. McMahon has argued above, given the particular facts of the case, including that, as even the Presentence Report recognizes, Mr. McMahon was neither the organizer nor leader of the charged schemes, as recognized by the PSR, *see* PSR, ¶ 115 (recognizing that Mr. McMahon "did not have any leadership position over another participant in the instant offense"), and was not involved in much of the conduct that occurred, including the surveillance of and alleged Facebook harassment of Jane Doe Two, or the threatening note that was left on John Doe One's residence in September of 2017, and, at the end of the day, the fact that the most culpable members of the conspiracy have not been prosecuted at all.  *See United States v. Acosta*, No. 06-cr-172, 2008 U.S. Dist. LEXIS 91200, at *4 (E.D.N.Y. Sep. 8, 2008) ("A sentence of imprisonment in light of the fact that individuals and entities more culpable than this defendant were not prosecuted 'may work to promote . . . derision[] of the law if the law'" (quoting *Gall*, 552 U.S. at 54)).

The sentence recommended by the PSR—78 months in prison—is stunningly, horrifyingly harsh.  It would also,  given both the nature and circumstances of the offense and the history and characteristics of Mr. McMahon, serve not to promote respect but instead derision for a system of justice that is already being attacked from so many quarters.  This is particularly so given that the Department of Justice now seems to be re-prioritizing, such that cases like this one may not be brought at all, *see* OAG Memoranda, "General Policy Regarding Charging, Plea Negotiations, and Sentencing (Feb. 5, 2025), raising issues of arbitrariness as well, *i.e.*, that Mr. McMahon stands convicted of a crime that might not be prosecuted today raises questions regarding whether he is

just a victim of timing. *See also supra* at n.2. Under all of the circumstances of this case, but primarily based upon the natures and circumstances of the offense and Mr. McMahon's history and characteristics, tempered by a real sense of what justice requires for what he did and who he is, a non-custodial sentence—or at least one far beneath the PSR's recommendation—should be imposed.

### 3.    Just Punishment

In assessing Mr. McMahon's forthcoming punishment, he most respectfully requests that the Court consider both the punishment that has already been visited upon him as a result of his investigation, prosecution and conviction, and the further punishment that will be imposed not only upon him but also upon innocent others as a result of the sentence that this Court will mete out for this offense.

### a.    Mr. McMahon Has Already Been Punished

To say that Mr. McMahon has already been punished as a result of this criminal investigation, prosecution, trial and conviction would be a terrible understatement. His life and career are in tatters: his private investigative business—which he founded—and his heroic reputation, which is at the core of Mr. McMahon's identity, reflecting as it does, all of his life's work, have been destroyed not only by his conviction itself but as a result of the fact that it came about as a result of such a highly publicized case. Thus, Mr. McMahon respectfully submits that further punishment would not be "just", as contemplated 18 U.S.C. § 3553(a)(2)(A), and would not necessary to fulfill this purpose of sentencing, among the others set forth in the statute.

Specifically, as the Court likely knows, from the very outset,[9] and certainly since the time of Mr. McMahon's conviction, this prosecution has generated a huge amount of publicity. *See,*

---

[9] Indeed, Martha McMahon recalls how on:

*e.g.,* Hannah Rabinowitz and Emma Tucker, *Former NYC police officer, 2 others convicted of stalking New Jersey family on behalf of Chinese government*, CNN (June 20, 2023), https://www.cnn.com/2023/06/20/us/operation-fox-hunt-men-convicted-new-york/index.html;

Priscilla DeGregory, *Ex-NYPD cop convicted for acting as Chinese agent in 'Operation Fox Hunt'*, NEW YORK POST (June 20, 2023), https://nypost.com/2023/06/20/ex-nypd-cop-convicted-for-acting-as-chinese-agent/, *Ex-NYPD Sgt., others accused of harassing and intimidating Chinese dissidents in US*, EYEWITNESS NEWS ABC7 (June 1, 2023), https://abc7ny.com/nypd-china-harassment-intimidation/13323856/. Obviously, this publicity has caused Mr. McMahon tremendous shame and embarrassment: though he spent his entire life serving the community as an NYPD officer, putting his life on the line for others, and continuing to do so in his private life, Mr. McMahon is now viewed as a criminal who betrayed the country he loves so much and spent his life protecting. More concretely, Mr. McMahon, his licenses having expired and not believing

---

> [t]he afternoon of Mike's arrest in 2020 several photos of us were published in the NY Post online. Within an hour, the press was parked outside our home. . . The photographers parked outside for days. When my children, Mike or I would walk to our cars, they would run towards us and take our picture. One day my son Max was photographed as he was leaving. He rolled down his window and told them to please leave, they didn't. My car was followed. The press wasn't breaking any law but it was surreal. . . . Sometimes the photographers would just stand in the middle of the public street and photograph our home. They finally left after three days.

Ex. 26 (McMahon, Martha). *See also* Rosenberg, Rebecca, McCarthy, Craig and Golding, Bruce, *Private eye busted in Chinese government plot is an ex-NYPD sergeant*, https://nypost.com/2020/10/28/private-eye-busted-in-chinese-government-plot-is-ex-nypd-sergeant/, NEW YORK POST (Oct. 28, 2020); Schmidt, Michael S., *U.S. Charges 8 in Plot to Harass Chinese Dissidents*, THE NEW YORK TIMES (Oct. 28, 2020) *Eight Individuals Charged with Conspiring to Act as Illegal Agents of the People's Republic of China*, United States Attorney's Office Eastern District of New York (Oct. 28, 2020).

that they would be renewed, has had to closed his private investigative business, which he spent over a decade building.

Taking all of these facts together, there really can be no question:  Michael McMahon has been severely punished already, a fact that must, under the law, be taken into account at the sentencing phase.  *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (approving a downward variance because defendant's conviction made it doubtful that he could pursue his career, and, therefore, "the need for further deterrence and protection of the public is lessened because the conviction itself 'already visits substantial punishment on the defendant'" and stating "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence"); *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (affirming below-Guidelines range sentence for defendant convicted of insider trading and money laundering where district court "specifically addressed other ways in which the defendant had suffered atypical punishment such as the loss of his reputation and his company"); *United States v. Mateo*, 299 F. Supp. 2d 201, 209-10 (S.D.N.Y. 2004) ("[B]eyond the offender's actual deprivation of liberty when incarcerated, a host of other penalties and burdens always attend criminal conviction, to name a few: losses of family life, of socioeconomic status, of employment and career opportunities; diminution of certain civil rights and entitlements; and countless humiliations and indignities commonly associated with living in confinement."); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding downward variance warranted, in part, because defendant lost his position and "suffered incalculable damage to his personal and professional reputation as a result of tremendous media coverage of his case"); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (upholding downward variance from Guidelines range in part because defendant posed little risk of recidivism and "already suffered substantially due to

82

the criminal investigation"). And this does not even come close to describing the true psychic damage to Mr. McMahon, who is, for those who know him, truly a shell of his former self: he is, in a word, already devastated by what has occurred, and no further punishment is, genuinely, necessary for the criminal justice system to fulfill its goals. *See* Ex. 26 (McMahon, Martha) ("Mike has been punished since October 28th, 2020. For four and a half years he has suffered tremendous physical and emotional deterioration. . . . I worry about his mental and physical health every minute of the day. He has become forgetful and withdrawn at times, which is frightening and completely out of character from the man I know. He will never be the same. . . . Heading into trial took our anxiety and stress to another level. Mike wasn't doing well. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

    In sum, the effects of the prosecution of this Mr. McMahon are evident to all who know him. Martha states that Mr. McMahon "has lost his business, his reputation, his health, his financial stability for the future, friends in law enforcement who are afraid to speak to him, his freedom to live his life as he wishes, [his] privacy decimated." Ex. 26 (McMahon, Martha). As Mr. McMahon's siblings summarize:

>Since that day in 2020, October 28, which also happened to be the 28th anniversary of our sister Ann Marie's death, Michael has been in his own Prison. His livelihood has been taken away, his freedom has been taken away, his financial resources have been depleted, his integrity has been compromised, his reputation has been damaged and so called friends have long since disappeared. The happy go lucky, always with a smile on his face brother that we knew has been taken away from us and replaced with someone that now has extreme stress and anxiety.

Ex. 25 (McMahon, Eileen, Kevin, Brian, Vincent, Patricia, Kathleen and Stephen); *see also* Ex. 5 (Byrne, Mary) ("For more than three years I have observed the impact the arrest has had on Michael. The emotional impact has been devastating. . . . The emotional and physical toll is recognizable. The accumulation of insurmountable legal debt is overwhelming. More importantly, Michael is not well. I personally see the progressive physical change in him. ███ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████); Ex. 23 (McLachlan, Dave) ("Since the accusation and trial that followed, the same Mike McMahon who was the heart of our lifelong group of friends is no longer here; it's been pure devastation for our friends and, more importantly, his family. Mike's punishment ALREADY far exceeds the allegations against him that I refuse to believe. . . . I have a six-year-old son named Hart. Mike and I were playing the pool with Hart this past summer. I could see the pain in my friend's face and feel it within him as he did his best to make my son smile while playing Marco Polo. At that moment, Mike was still sacrificing for me and my son to make him happy amid the mental imprisonment he's faced."); Ex. 19 (McCarthy, Christine) ("When this nightmare began almost four years ago their idyllic life crumbled. Michael has barely left his house; he hasn't been able to work, and he has depleted his life savings to refuse these charges. . . ."); Ex. 16 (Lonzar, Robert) ("This wrongful conviction has devastated Mike and his family financially and emotionally. I went out to finder with him recently

and he shared . . . his feeling of how distraught and broken he was . . . ."); Ex. 30 (McNicholas,

Stephen) ("Since Mike's arrest the laughter has become duller, the conversation quieter, and the

faith in justice has been brought into question.  The impact of this is not just exclusively on him,

but all those surrounding him as well.  You can always tell when this situation becomes the topic

of conversation heads start to hang, eyes meet the floor, the sane phrases of sorrow and defeat are

spoken.").

> **b.    There Will Be A Profound Harm to Mr. McMahon's Family,
> and in Particular, His Wife and Three Children.**

In imposing a sentence, and again, cognizant that any term of imprisonment will not only

punish Mr. McMahon, but also those around him, the Court, most respectfully, should consider

the impact of its sentence on the defendant's family.  *See, e.g., Isola*, 548 F. App'x at 725

(considering "[defendant's] family circumstances and the effects of his incarceration on his

daughter" under 18 U.S.C. § 3553(a)); *Bills*, 401 F. App'x at 624 (considering the effects that

defendant's incarceration would have on her daughter under 18 U.S.C. § 3553(a)); *United States

v. Tavarez*, No. 08-cr-242, 2024 U.S. Dist. LEXIS 159043, at *4 (E.D.N.Y. Sep. 4, 2024) ("In its

current guidelines, the U.S. Sentencing Commission has identified several categories of

extraordinary and compelling reasons—such as medical circumstances, age, family circumstances,

or abuse—that may warrant a sentence reduction."); *see also United States v. Dominguez*, 296 F.3d

192, 198 (3d Cir. 2002) ("It is appropriate—indeed, essential—that the District Court consider the

impact of a defendant's family circumstances on the purposes underlying sentencing.").

As described above, it is clear that Mr. McMahon's wife, three children—Mikey, Max and

Ann Marie—as well as Mr. McMahon's extremely close-knit extended family, have already

suffered tremendously as a result of the prosecution in this matter, and will suffer even more

profoundly from his absence from their lives during any period of incarceration, but especially a

substantial one.   For example, Mr. McMahon's wife, Martha, details how she "miss[es] the man he was before this happened" and that she "do[esn't] sleep and when [she] do[es she] ha[s] nightmares of losing him" because "[t]he mere thought of what could happen brings an overwhelming sadness and distress."   Ex. 26 (McMahon, Martha).   She notes that "[w]hen the world thinks your husband is a traitor working for the CCP your family instantly has millions of enemies" and recognizes "[t]his label . . . will never be removed.   It will follow [them] wherever [they] go" and that, although "[t]he case may be nearing an end for many . . . the threat of retaliation from unknown enemies will be with [their] family forever."   *Id.* █████████████████████

████████████████████████████████████████████████████████████

████████████████   *Id.*   Martha also describes the terrible effect this prosecution has had on her children:

> There is no doubt the level of stress put upon them, most children will thankfully never experience.  From day one this happened we continued to fight as a team.  I reiterated to Mike and the children that we would fight this until he was fully  exonerated.  This hasn't been easy for any of us,  It was uncharted territory and it got worse as the months, then years, went by.  My children have been living with this stigma for over four years and it will now be a part of their forever. . . .  My daughter told me a few months after the arrest, the day the FBI came to our home, she went to school and cried alone in the bathroom, trying to process what happened.  I had no idea.  I still don't know how she's processing this nightmare.  She was only fourteen when it happened. . . . My children need their father home to maintain our family unit which has been unbroken and our lifeline for survival.  I don't know what I would do without him.  I suffer separation anxiety anytime I am away from him for more than a few hours. . . We need to start a new chapter for our family. . . There is constant concern for the mental health of my children, who could lose their father at a time they need him the most.

*Id.*

86

Perhaps most affected by this prosecution is Mr. McMahon's youngest child, Ann Marie McMahon. Ann Marie's high school years already suffered a terrible impact: having, as a result of the COVID-19 pandemic, which caused her to be remote for most of her freshman year, she then went on to suffer the terrible upset and stress of her father's arrest and prosecution. Now, instead of being able to go away for college as she would have originally liked, Ann Marie is attending community college to be with her father, as well as due to both the expenses and the loss of income that have directly resulted from this matter, and the need to aggressively defend against it. Ann Marie writes:

> I was excited to start high school in fall of 2019, then everything fell apart. In the last four years, I faced a lot of challenges, stating with Covid-19 shutting down my school for months. . . . After finishing my freshman year, I was hoping my sophomore year would be better. When my father was arrested in October of 2020, it was a setback I wasn't prepared for. I'm not sure how anyone could be. . . . I went to school every day, including the day of my dad's arrest, always wondering who knew about what happened to my dad. The only place I felt safe was at home with my parents, who made the tough times a lot easier. I knew my dad would never hurt anyone, but it didn't stop people from parking outside my window for days after his arrest. It was scary and waking up every day wondering if the press would still be there was horrible. My family has been through so much. I hope when I start college in the fall, it will be a fresh start for everyone in my family, especially my dad. . . . Most of my friends are going away to college in the fall. I didn't want to live away from home, I knew that. Over the last four years my family has been all together under one roof, including my grandma. I'm not ready to go yet. If I left it would be the first time since I was born I would be without one or both of my parents. A lot of kids can't wait to leave, I'm not one of them. My relationship with my dad is special. I want him there to share in everything new that is to come in my life. To tell him about my day over a pizza in the kitchen. I can't wait for that. . . . This has been hard on all of us and I hope we are finally at the end of it. I try not to think about where I would be if I didn't have my dad in my life, even for one day.

Ex. 24 (McMahon, Ann Marie). And Mr. McMahon's wife, Ann Marie's mother, writes:

> My poor children. I have done everything I can to help them but I'm sure I missed signs which will one day manifest. My daughter's entire four years of high school have had this cloud of uncertainty following her every day. She started community college this past fall to stay close to us. With the sentencing coming, even though I have tried to lessen the reality of what may happen, she has struggled. She's expressed her concern about her dad, as have all of my three children. I'm angry about the time stolen which should have been focused on their future. Believe me, they would be upset at me for even feeling that way because they love their father so much. As their mother, I have greater understanding of what they truly missed. We will never get these years back. I'll never forgive the people who deliberately instilled trauma on innocent children. I can't imagine what they have gone through over the last four years but we have manager because we love each other. . . . Especially my daughter who relies on her father as protector and confidant. She trusts him on a level I have never seen with other teenagers and a parent. I am so grateful they have each other. Please don't take him away from her, from any of us. We need him.

Ex. 26 (McMahon, Martha); *see also* Ex. 33 (Roalsvig, Alexandra) ("The biggest concern is for his youngest daughter, Ann Marie, who has been living with uncertainty for over three and a half years during her vulnerable, formative, developing teen age years. The stressors for a child, will be felt forever. The fear of losing your dad is painful, I know as I lost my father when I was only 20 years old and it's a pain I still feel to this day. I can only imagine the stress this has caused Ann Marie as she watches her parents navigate the great unknown."); Ex. 16 (Lonzar, Robert) ("I went out to dinner with him recently and he shared how he would not be able to send one of his children to college and she would have to stay home and work.").

Mr. McMahon's middle child, Maxwell, has also suffered severe punishment of his own; instead of going to college as he would have liked, he stayed home to work and support his family during the pendency of this matter. Max writes:

> After graduation from high school, I had the choice to go to college like everyone I knew or stay home and work. It was a difficult choice. Prior to the events of October 2020 my decision was clear I

88

wanted to head off to school and secure a higher education in engineering and experience college, which so many describe as some of the best years of their lives. Due to the financial burden of fighting in court, hiring lawyers, etc. I wanted to lessen the burden on my parents and find another path to be successful. College is often one of the biggest expenses a family will need to save for, especially with three children. Even with going to a local college, I was afraid that additional expenses would put unneeded stress on my parents, so I decided to stay home and work. Primarily to be with my parents as we all endure this terrible time and save every penny possible. During the college application process, because I was not sure which direction I wanted to go, I was offered a full-time job, as my current position as service advisor at Subaru, in my hometown of Mahwah, NJ. I weighed my options and decided it would be better to work and help at home. Without this life upending event I believe I would have gone to college and received an experience like my peers. More recently, I decided to try my luck with another endeavor on top of my full-time job and get my real estate license. It was a difficult process, but I was willing to do whatever I needed to make ends meet and help my family. . . . Please do not take a loving father away from our amazing family or from his loving friends. It would mean more than anything to be able to have him around so I can try to continue to make him proud of me, so he can meet his baby great-nephew in a few months, so he can finally enjoy his life again after the years of stress he has been put through.

Ex. 27 (McMahon, Maxwell). And, Mikey McMahon, Mr. McMahon's oldest son, whose name came up at trial, though affected himself, worries for his siblings should his father be incarcerated.

*See* Ex. 28 (McMahon, Michael) ("Judge Chen, I know you must consider what the next and final phase will be for my dad. He is the reason we were able to face these last few years together. To say he is a role model for us kids is not enough. He is one of the good guys who's shadow I am happy to walk in. I don't know what my mother, my grandmother, me, Max and Ann Marie will do if we are without our father. I ask you to consider the last three and a half years as punishment enough. . . . Please give him the chance to . . . watch Ann Marie start college and allow Max to be free to make life choices with the help of his father. So many new beginnings for all of us. Please

consider my letter and the others written to you about my incredible father, to find it in your heart to let him stay home.").

Further, Mr. McMahon has been acting as a caretaker for his brother, Vincent McMahon Jr. since July 2024. *See* PSR, ¶ 174. ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████  As a caretaker for his brother, Mr. McMahon accompanies Vincent to doctor's appointments, grocery shopping, and assists with basic care needs.  PSR, ¶ 174.  Vincent, would certainly be unfairly punished should Mr. McMahon should he be incarcerated, ████████████████████████████████████████  Likewise, Mr. McMahon and his wife "care for [Martha's] 86 year old mother, who had two medical procedures during the time of this case," including "the removal of a cancerous kidney and a heart [valve] replacement." Ex. 26 (McMahon, Martha).   Indeed, Mary "will need surgery against soon as the [valve] is leaking and needs to be replaced again."  *Id.*  Mary too, would be punished by being deprived of the caretaking she receives by Mr. McMahon, as would Martha and the rest of the family who will be deprived of Mike's extraordinary assistance and unparalleled motion support during this time of need.

As well, the financial burden placed upon the McMahon family has been devastating. "While maintaining his innocence, his family has been doing everything possible to defend his integrity and to pay the legal fees and associated costs of his criminal defense."  Ex. 15 (Lawler, Michael and Sessions, Pete).   Indeed, "[a]t a time of widespread unaffordability, these fees are overwhelming and the McMahon family has not been able to keep up with the costs. This financial burden, especially when added to the stress of being accused of crimes against the country he loves

so much, have devastated Michael and his family." *Id*.; *see also* Ex. 17 (Magri, Scott) ("Since his arrest Mike's life has been turned upside down, his hard-earned reputation has been decimated and the financial impacts have been crippling, forcing him to deplete his life savings on legal fees. His wife and children have endured immense stress and anguish and the prospect of him being imprisoned is unbearable. Mike has already been severely punished and his life's work and legacy undermined. Additional incarceration would be an excessive and unnecessary cruelty."); Ex. 22 (McCullagh, Teresa) ("I cannot begin to tell you how difficult things have been for Mike and his family, both personally and financially, since that fateful day the FBI raided their family home in the early hours of the morning; frightening the children … taking away his source of income for the last 3 years. I am sure you can appreciate how devastating this has been financially."); Ex. 16 (Lonzar, Robert) ("This wrongful conviction has devastated Mike and his family financially and emotionally. I went out to dinner with him recently and he shared how he would not be able to send one of his children to college and she would have to stay home and work. He shared his feelings of how distraught and broken he was but emphasized how the strength of his wife Martha has kept the family intact. . . . Mike and his family have already suffered enough, financial devastation, emotional and psychological trauma from this wrongful prosecution. Any further punishment would serve no purpose. If Mike is incarcerated, it would only add to more financial destruction and potentially the destruction of his family."),

Indeed, the effect of this prosecution to the McMahon family has been noticed by nearly all who know them. As Mr. McMahon's mother-in-law, Mary Byrne, writes:

> The kids were traumatized the day of his arrest. The ensuing weeks, months and years have been a difficult period of adjustment for them. They, as all who know Mike, are steadfast in their belief and defense of his innocence. Those sentiments are all 'well and good' but the reality is that the suffering of their family is incomprehensible. The emotional and physical toll is recognizable.

. . . Thanks to their continuing efforts they try to maintain a sense of normalcy and protect the lives of their children. Mikey and Max have made mature choices for their futures. Ann Marie will remain home and enter a comprehensive nursing program at Bergen Community College in September. Her goal is to become a pediatric nurse. Ann Marie is at a crossroads in her life. She is quiet and sensitive young girl of [nineteen] whose high school years were comprised by the isolation of the Covid-19 lockdown, the emotional distress brought on by the arrest of her father and his recent conviction. She is at an extremely vulnerable age and needs her father in her life. The next four years are crucial to her transition into adulthood. Michael and she are very close. They go to the gym together, have lunch, travel to visit her cousins and attend their soccer games. . . . I fear what the repercussions of a possible separation from her father will be. . . . The last three years have been a punishment in and of itself. I doubt that he will ever recuperate from those years. There is no remedy to undo the unfortunate emotional and financial damage that has been done. Right now his family needs him and he needs his family. Ann Marie specifically needs her father for the support she will need in the coming years.

Ex. 5 (Byrne, Mary); *see also* Ex. 3 (Byrne, Brendan) ("I fear if Mike is taken away from Martha, the children and my mother, they will be losing not just a person they love but their fierce protector. I worry about my sister and the emotional toll this has already taken on her. Losing her partner Mike for any reason would be a travesty for the entire family. . . . Over the last almost four years, I have witnessed the emotional and physical damage this has done to Mike. When Mike suffers, his entire immediate and extended family suffers with him."); Ex. 4 (Byrne, Caroline) ("The truth is, this case has had an insidious effect on our entire family. There's a heaviness in the air now during birthdays and holidays. I've watched my father, grandmother, aunts, uncles, and cousins slowly become disillusioned by what we thought the justice system was—thinking at each step of the way that *this* is when the truth comes to light."); Ex. 2 (Burke, Michael) ("The terrible repercussions of the last four years have already wreaked havoc upon his family both mentally and financially."); Ex. 7 (Campo, Frances) ("Finally, Michael's most important role in his life is that

of being a loving and devoted husband to his wonderful and supportive wife, Martha, and a father to three children. Michael is completely immersed in all of their lives in his usual selfless way. Michael's family has endured several years of deep and sustained suffering. They need him now more than ever."); Ex. 8 (Cavegn, Alex and Eileen) ("Mike, Martha, and their children Michael, Max, and AnnMarie have been living this nightmare for far too long. The constant stress and fear of what's going to happen to him is unbearable. They have suffered so much."); Ex. 14 (Laddy, Jennifer and Stephen) ("The hardships endured by Mike and Martha's family are beyond comprehension. Yet, they have emerged stronger, with children who embody the values of education, respect, and compassion instilled by their loving parents. Witnessing their unity amid adversity has been profoundly inspiring."); Ex. 18 (Martin, Lauralee) ("As their friend I'm gravely concerned if Mike is taken away from the family, Martha and the children will be lost without him. I've seen the emotional and financial toll it has taken on Martha and Mike. I cannot imagine Martha having to manage her family alone. As a mother of a daughter just out of her teens, I know Ann Marie, their [nineteen] year old child, is particularly fragile. Martha has carried the family through this but I worry about her every day. I know how much she and Mike rely on each other's presence to literally survive. The McMahon family has been punished enough Judge Chen. Please let them put this behind them and give the family a fresh start. It wasn't just Mike on trial for the last three years, it was the entire family."); Ex. 17 (Magri, Scott) ("His wife and children have endured immense stress and anguish and the prospect of him being imprisoned is unbearable."); Ex. 25 (McMahon, Eileen, Kevin, Brian, Vincent, Patricia, Kathleen and Stephen) ("What is happening to Michael is affecting all of us."); Ex. 20 (McCarthy, Robert) ("The pain this experience has caused his entire family for over three years is enough punishment for Michael."); Ex. 22 (McCullagh, Teresa) ("I cannot begin to tell you how difficult things have been for Mike

and his family, both personally and financially, since that fateful day the FBI raided their family home in the early hours of the morning frightening the children, freezing their assets, freezing his income and taking away his source of income for the last 3 years."); Ex. 21 (McCullagh, Raymond) ("This legal ordeal that Michael has been through has brought great pain and suffering to Michael and those who know and love him.").  And as, Alexandra Roalsvig, a close personal friend of Mr. McMahon's, writes:

> This criminal prosecution has been devastating to his family and his wife Martha and his children Mikey, Max and Ann Marie.  Michael has been a constant presence in his children's lives.  Working out of the home operating his private investigation business, was a gift.  He always had the flexibility to be there for his kids.  He's been there for all their games, special events, concerts, proms, holidays.  They are a tight family unit which I have been fortunate to enjoy, staying with them at their home many times.  They always opened their doors and were generous and kind.  I cannot imagine the pain his family will endure, and the worry they will carry if he is absent from their daily lives.  The impact will resonate forever.  The biggest concern is for his youngest daughter, Ann Marie, who has been living with uncertainty for over three and a half years during her vulnerable, formative, developing teen age years.  The stressors for a child, will be felt forever.  The fear of losing your dad is painful . . . . I can only imagine the stress this has caused Ann Marie as she watches her parents navigate the great unknown.  Michael and Martha are best friends and work as a cohesive unit and have since the day they met.  They make each other stronger and better.  Martha's world will be shattered if Michael isn't home. ████████████████████████████████████████████ Who will be the families strength if Michael isn't able to be present?  It's heart-wrenching to imagine this tight-knit family being broken apart."

Ex. 33 (Roalsvig, Alexandra).  To reduce the collateral damage to Martha, Mikey, Max, Ann Marie, and the rest of Mr. McMahon's family, who do not deserve to suffer any more pain, this

Court should consider a non-custodial sentence; as other courts have recognized, there are times, such as here, when this is the only way to achieve a just punishment. Indeed, sentencing Mr. McMahon to any term of incarceration would serve only to exacerbate the pain of his innocent family members who have suffered so much and do not deserve to suffer any longer. *See Gall*, 552 U.S. at 59 (observing that probation could be appropriate if family members would be "very badly hurt" by defendant's incarceration); *United States v. Pellegrini*, No. 08-210 (GEB), 2008 U.S. Dist. LEXIS 97474, at *5-6 (D.N.J. Nov. 25, 2008) (permitting non-custodial sentence below Guidelines where, inter alia, the defendant's family relied on him for financial support and the defendant attended to the health needs of his sister-in-law); *United States v. Castanon*, 476 F. App'x 503, 507 (3d Cir. 2012) (discussing the adequacy of a sentencing court's consideration of the defendant's "family obligations"); *Baker*, 502 F.3d at 467-68 (affirming district court's sentence of probation, which was based on "the effect incarceration would have on defendant's older son"); *United States v. Baez-Arrogo*, 553 F. App'x 922, 923 (11th Cir. 2014) (affirming a sentence in which the district court granted a defendant "a nine-month downward variance because of his family circumstances"); *Trapero-Cortez*, 501 F. App'x at 801 (district court granted defendant's request for a downward variance, citing his "commitment to his family"); *E.L.*, 188 F. Supp. 3d at 156 (imposing below-Guidelines sentence upon finding "[a]n incarceratory Guidelines sentence . . . [would] deprive [the defendant's] family of vital financial and emotional support while doing little to further protect the public"); *United States v. Bortnick*, No. 03-CR-0414, 2006 WL 680544, at *5 (E.D. Pa. Mar. 15, 2006) ("In the instant matter, this Court does not believe that taking defendant out of his family environment for a protracted period of time will serve a useful social or penal purpose."); *R.V.*, 157 F. Supp. 3d at 255 (finding, under § 3553(a), that negative effect of separating defendant from his children warranted non-custodial sentence). *Cf.,*

*e.g.*, *Trapero-Cortez*, 501 F. App'x at 801 (district court granted defendant's request for a downward variance, citing his "commitment to his family").  There is no question but that the mitigating nature of this sentencing factor is, tragically, established here; it should, in the interests of humanity and mercy, guide the Court's sentencing.

For all of these reasons, a custodial sentence in this case, far from being a just punishment and promoting respect for the law, would do a real disservice to our system of justice by allowing to pile on to an already devastatingly punished defendant, harming his family, who so rely upon him, in the process, all long after the actions at issue.  Indeed, such a heartless would undermine rather than promote respect for the law.  Accordingly, Defendant McMahon's request for a non-custodial sentence should be granted.

### 4.    Deterrence

As the Court is well aware, it is required to consider both specific and general deterrence and, as explained, fashion a sentence that is sufficient but not greater than necessary to "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B) and (C).  Here, a non-custodial sentence, rather than that dictated by the Guidelines and recommended by Probation, would certainly accomplish those objectives.

### a.    Specific Deterrence

With respect to specific deterrence, it is obvious that the conduct that led to Mr. McMahon's conviction will not reoccur for several reasons.  *First*, the circumstances of this offense are simply no longer present. *See United States v. Wells*, No. 08-cr-806, 2010 U.S. Dist. LEXIS 29990, at *5-6 (E.D.N.Y. Feb. 24, 2010) (specific deterrence satisfied in light of defendant's "good work history, his supportive family, and the fact that it is unlikely he will again be in a position to commit a similar offense").  Here, that is because Mr. McMahon is no longer

operating a private investigative business so as not to compromise any ongoing cases and his New York and New Jersey private investigator licenses have expired. Nor, having been through this would he ever again miss the red flags that he now sees that missed here. *See* PSR, ¶ 135 ("I want it to be clear that there is no way that I would have performed investigative services in this matter, had I known that the individuals who hired me were actually Chinese government officials involved in a repatriation scheme. During my trial, the Government attempted to show that I should have known it, and in retrospect, I wish I had.").

*Second*, that Mr. McMahon is not in need of specific deterrence is demonstrated by his exemplary compliance with the conditions of his pre-and-post trial release. Mr. McMahon has, as the PSR makes clear, *see* PSR, ¶ 7, fully complied with those conditions, and completely fulfilled the terms of his release, including, of course, appearing in Court whenever required. This compliance is, obviously, highly relevant to the sentence to be imposed, as it bears upon the extent to which he is not a danger to recidivate, but rather to comply with legal requirements imposed upon him, no matter how difficult or uncomfortable. *See, e.g., United States v. Muzio*, 966 F.3d 61, 66 (2d Cir. 2020) (acknowledging that the district court reasonably considered defendants "good behavior while on pretrial release" at sentencing); *United States v. Childress*, 788 F. App'x 27, 30 (2d Cir. 2019) (upholding defendant's sentence where the district court properly "considered [defendant's] conduct on pretrial release and cited his compliance as one of its reasons for departing downward from the Guidelines range"); *United States v. Celado*, No. 08-cr-1114, 2011 U.S. Dist. LEXIS 110975, at *15 (S.D.N.Y. Sep. 25, 2011) (citing defendant's "dedicat[ion] to his rehabilitation, and [the fact that] his behavior on pretrial release has been commendable" to justify the court's sentence beneath the Guidelines range).

*Third*, as explained, should Mr. McMahon ever consider violating the law again, he will certainly be deterred from doing so by the punishment already visited upon him, discussed above—including the devastation of his career and the damage to a reputation as a heroic cop and private investigator, which, prior to this prosecution, was the essence of Mr. McMahon's identity.  Indeed, as numerous courts hold, the punishment that Mr. McMahon has already experienced achieves precisely the specific deterrence that Congress intends sentencing to achieve.  *See, e.g., Gupta*, 904 F. Supp. 2d at 355 ("no further punishment" was needed for the purposes of specific deterrence where the defendant suffered a "blow to his reputation" making him "unlikely to repeat his transgressions"); *Adelson*, 441 F. Supp. 2d at 514 (stating that neither "rehabilitation" nor "specific deterrence" had "any relevance" to defendant, as "[w]ith his reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct. Just to be sure, however, the Court, as part of the sentence here imposed, barred Adelson from ever again serving as an officer or director of a public company."); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) ("Elimination of the defendant's ability to engage in similar or related activities—or indeed any major business activity—for some time, and the substantial loss of assets and income . . .constitutes a source of both individual and general deterrence."), *aff'd*, 31 F.3d 73 (2d Cir. 1994); *see also United States v. Chartock*, No. 05-614-02, 2013 WL 3009719, *3 (E.D. Pa. June 18, 2013) (concluding that the defendant was "at very low risk to re-offend and he poses no threat to society"), *aff'd*, 556 F. App'x 158 (3d Cir. 2014); *United States v. Merced*, 603 F.3d 203, 209, 226-27 (3d Cir. 2010) (affirming a sentence based on the sentencing court's finding that the defendant was a "changed man" who would "not re-offend," and noting that such determinations are part of the sentencing court's assessment of the defendant's individual circumstances); *United States v. Rhodes*, 410 F. App'x 856, 864 (6th Cir. 2010) (affirming sentence based on "district

court's conclusion that defendant presented low risk to reoffend"); *United States v. Smith*, No. 1:06-CR-00394, 2009 U.S. Dist. LEXIS 7462, at *10-11 (N.D. Ohio Feb. 2, 2009) ("The court has no doubt that the lengthy and costly ordeal of a trial and the stress of a conviction have deterred [defendant] from future crime, and instilled a respect for the law. . . . it is not always necessary to incarcerate a defendant to promote such respect and demonstrate the seriousness of the crime"). Shame associated with felony convictions satisfies the objections of specific deterrence. *United States v. Alatsas*, No. 06-cr-473, 2008 U.S. Dist. LEXIS 6446, at *4 (E.D.N.Y. Jan. 16, 2008). Such deterrence does not make a custodial sentence necessary here, as the statute requires.

### b.    General Deterrence

Nor is incarceration necessary to advance § 3553(a)(2)'s general deterrence objective in this case, as it sometimes is not in others. *See United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010) ("Section § 3553(a) . . . does not require the goal of general deterrence be met through a period of incarceration." Indeed, "it may very often be that the release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose." (quoting S. Rep. No. 98-225 at 92)); *see also Gall*, 552 U.S. at 48, 59 (recognizing that in determining an appropriate sentence, "[s]ection 3553(a)(3) directs the judge to consider sentences other than imprisonment" and further recognizing that probation is a weighty sanction that imposes on an offender "several standard conditions that substantially restrict their liberty").

As some courts have observed, a criminal prosecution itself serves as significant deterrence to the general public. *United States v. Stern*, 590 F. Supp. 2d 945, 958 (N.D. Ohio 2008) ("The mere fact of [the defendant's] prosecution deters others from engaging in this sort of conduct . . . ." (quoting *United States v. Baird*, 580 F. Supp. 2d 889, 895 (D. Neb. 2008))); *United States v. Repp*, No. 06-CR-178, 2006 U.S. Dist. LEXIS 100742, at *6 (E.D. Wis. Dec. 8, 2006) ("the specter

of federal prosecution and the consequences that flowed therefrom in the present case – a federal felony conviction, electronic monitoring, a stiff fine and years of supervision on stringent conditions – would be sufficient to create a real deterrent").  But beyond the mere fact of prosecution, anyone looking at this case would understand not only that they risk losing their freedom for years, but also that, like Mr. McMahon, they could face substantial penalties, such as loss of their career, and devastating effects on their physical and emotional health, as well as the financial security and health of their loved ones.  *See United States v. Davis*, No. 08-CR-332, 2010 U.S. Dist. LEXIS 147825, at *5 (E.D.N.Y. Mar. 17, 2010) (imposing a substantially below-guideline sentence because it would not undermine specific and general deterrence); *United States v. Dauria*, No. 08-cr-76, 2008 U.S. Dist. LEXIS 106306, at *4 (E.D.N.Y. Nov. 24, 2008) (three year probationary sentence satisfies general deterrence "because the sentence sends a clear message that illegal mafia-related activity will not be tolerated by the law"); *Schmoll*, 2008 U.S. Dist. LEXIS 83605, at *5 (imposing five year probationary sentence and finding general deterrence satisfied where the sentence would "send a clear message that any minimal involvement" in the crime at issue "will result in a criminal prosecution"). In this case, these lessons apply with particular force: anyone who would consider committing offenses like that at issue here, who understood the punishment that Mr. McMahon has already suffered, from the loss of his private investigative business that he founded and built himself over a decade ago, to the loss of his heroic reputation, to the costly attorneys' fees which he has had to pay, to the loss of his liberty through the imposition of his arrest would certainly be deterred from committing such an offense.  Specific and general deterrence, then, though powerful and important sentencing factors under § 3553(a)(2)(B) and (C), are of somewhat diminished weight here, and thus mitigate in favor of a

far less severe sentence than that prescribed by the Sentencing Guidelines and that recommended by Probation.

### 5. Rehabilitation

Finally, there is no evidence or indication that Mr. McMahon requires "educational or vocational training, medical care, or other correctional treatment." 18 U.S.C. § 3553(a)(2)(A)-(D). *First*, there is no evidence that Mr. McMahon suffers from substance abuse or addiction. PSR, ¶ 190. *Second*, Mr. McMahon has already received educational training (he attended Rockland County Community College in Suffern, New York, between September 1, 1986 and June 1, 1989, where he graduated with an associate degree), PSR, ¶ 193. And, of course, Mr. McMahon has an established employment record, including by serving as a NYPD Officer from 1990 until 2003, and working as a private investigator from 2003 until his arrest in this matter, including starting his own business, McMahon Investigative Services in 2012. PSR, ¶ 195. *Third*, there is no suggestion in the PSR that Mr. McMahon would require any "other correctional treatment." Indeed, the caselaw suggests that Mr. McMahon's lengthy period on restrictive conditions has already served the purposes of rehabilitation. *See Muhammad v. Jenkins*, No. 12-cv-8525, 2014 U.S. Dist. LEXIS 158481, at *18 (S.D.N.Y. Nov. 4, 2014) (noting that, generally, conditions of release serve "the public-interest purpose of rehabilitation and deterrence").

*Finally*, and perhaps most significantly, any incarceration will service only to interrupt Mr. McMahon's psychological and physical well-being, both of which have been exacerbated since his arrest in this matter. With regard to Mr. McMahon's psychological well-being, ████

████████████████████████████████████████████

████████████ PSR, ¶ 187; *see also* Ex. 26 (McMahon, Martha) ("Mike has been punished since October 28th, 2020. For four and a half years he has suffered tremendous physical and emotional deterioration. . . . I worry about his mental and physical health every minute of the day.

He has become forgetful and withdrawn at times, which is frightening and completely out of character from the man I know.  He will never be the same. . . . Heading into trial took our anxiety and stress to another level. ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████).  █████████████████████████████████████████████████████████

██████████████████████████████    ███████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████    ███████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████    These rehabilitative steps would be hindered, rather than promoted, by Mr. McMahon's incarceration.

Likewise, with respect to Mr. McMahon's physical well-being, as described above, ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

Indeed, Mr. McMahon's metal and physical health issues are reason enough to impose a non-custodial sentence. *See United States v. Hammond*, 37 F. Supp. 2d 204, 207-08 (E.D.N.Y. 1999) ("An important factor in determining the adequacy of a sentence is [a defendant's] health."); *Edwards*, 595 F.3d at 1011 ("imprisoning [defendant] would simply pass the cost of medical care on to taxpayers"); *United States v. Lara-Castillo*, 310 F. App'x 909, 911 (7th Cir. 2009) (affirming sentence and finding district court considered all § 3553(a) factors, including "the cost to taxpayers associated with housing [defendant]" with health problems); *see, e.g., United States v. Riccardi*, 98 Cr. 0242 (RWS), 1998 U.S. Dist. LEXIS 14467, at *3 (S.D.N.Y. Sep. 14, 1998) (finding that the defendant's family ties and responsibilities, along with his "myriad of health problems," warranted a downward departure'"). Put simply, a custodial sentence would frustrate, not serve, the rehabilitative purpose of providing Mr. McMahon with the care he needs in the "most effective manner." 18 U.S.C. § 3553(a)(2)(D). As well, Mr. McMahon has also struggled emotionally throughout this prosecution, a circumstance that will only be exacerbated by his imprisonment. In this regard, Mr. McMahon will realize instant rehabilitation if he avoids a sentence of incarceration; if he is imprisoned, he will rapidly deteriorate, deprived of the presence of those who love and care for him, as he does them, and of the physical treatment that he so obviously needs. Certainly, this is a factor that does not favor a custodial sentence.

### C.    The Court Should Avoid Unwarranted Sentence Disparities In Accordance with § 3553(a)(6).

Section 3553(a)(6) directs sentencing courts to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The "primary purpose" is "to reduce unwarranted sentence disparities nationwide," *United States v. Johnson*, 505 F.3d 120, 123 (2d Cir. 2007), but

the Court must also consider "similarities and differences among co-defendants when imposing a sentence," *United States v. Esso*, 486 F. App'x 200, 202 (2d Cir. 2012).

Here, a non-custodial sentence is the right resolution because it would avoid an unwanted disparity between Mr. McMahon and other individuals involved with this case. That is, the most culpable co-defendants, *i.e.*, Hu Ji, Li Minjun, Tu Lan and Zhu Feng ("Johnny Zhu"), have fled the United States, unlikely to ever return, and thus, have not been prosecuted—and, therefore, not sentenced—in this matter. It would, then, cause a sentencing disparity for Mr. McMahon, who was a minimal participant in this matter, *see supra* Section II(A)(7), to be sentenced to imprisonment for actually facing the charges that were brought against him. Moreover, a non-custodial sentence would also be the only just resolution given the sentences of co-defendants Yong Zhu and Congying Zheng. Specifically, Yong Zhu "played a pivotal role in both conspiracies, the stalking and the 951," by acting as "the connection between the Chinese Government, the Chinese agents, and the U.S. co-conspirators like Mr. McMahon," Zhu Yong Sentencing Tr. at 42:1-4, and, thus, was "more aware of the tactics used by the Chinese Government than others," *id.* at 34:25-35:2, "knew or foresaw that there was going to be some strong armed tactics used by the Chinese Government to . . . coerce Mr. John Doe 1 to go back and face some kind of negative consequences meted out by the Chinese Government," *id.* at 35:18-22, and whose "role might have been more important and indispensable or irreplaceable [that Mr. McMahon's] because he was the Chinese speaker, the Chinese citizen who . . . could travel easily back and forth to meet with the Chinse agents," *id.* at 44:13-19. But he was sentenced to only 24 months in custody. *Id.* at 88:23-25. And, Congying Zheng, who posted the threatening note that was left on John Doe One's front door on September 4, 2018, and thus was the only defendant at trial who actually caused fear to Joh Doe One and his family, *see* Congying Zheng Sentencing Tr.

at 9:6-12:11, was sentenced to just 16 months incarceration on Counts 3 and 4 each, to run concurrently, to be followed by one year of supervised release on each count, to run concurrently as well. *Id.* at 46:8-11. Specifically, on September 4, 2017, Congying Zheng and Kuang Zebin "a co-conspirator . . . went to the victims' home for the specific purpose of taping a threatening note on the victims' front door[; t]he note, which was written in Chinese" said: "if you are willing to go back to the mainland and spend ten years in prison, your wife and children will be safe and sound[.] That's the end of this matter[!]" *Id.* at 10:2-11. And, Congying Zheng posted the message after he "and Kuang Zebin had trespassed onto the victims' property" and "pounded on the front door to the victims' home and tried to turn the handle to the front door of their home, certainly giving the impression he was trying to enter it, and then, . . . went around to the back of the victims' home and peered into the home itself to see if the victims were inside," *id.* at 10:20-11:2, all of which caused the victims fear of "physical harm," *id.* at 11:16-18. Of course, Mr. McMahon did no such thing and, indeed, took no steps to cause distress to the victims of this offense. For these reasons, Yong Zhu and Congying Zheng were unquestionably more culpable than Mr. McMahon in this matter, and Mr. McMahon should accordingly receive a lesser sentence.

For all of the reasons stated above, a sentence significantly below the Sentencing Guidelines and, certainly far less than the 78 months proposed in the PSR, is warranted. As noted above, however, this is particularly true today given that we are apparently at the onset of an era when others will likely not be prosecuted for these actions at all: given the Attorney General's February 5, 2025 Memorandum for all Department Employees ("USAG Memo"), it appears that criminal charges would not even be brought against Mr. McMahon under 18 U.S.C. § 951 today. Specifically, per the USAG Memo, in light of "historic threats" from "terrorism, hostile nation states, and other sources," USAG Memo at 3, the "Department's priorities and guidance" support,

*inter alia*, disbanding the Foreign Influence Task Force; "[r]ecourse to criminal charges under the Foreign Agents Registration Act (FARA) and 18 U.S.C. § 951 shall be limited to instances of alleged conduct similar to more traditional espionage by foreign government actors"; and, "[w]ith respect to FARA and § 951, the Counterintelligence and Export Control Section, including the FARA Unit, shall focus on civil enforcement, regulatory initiatives, and public guidance." *Id.* at 4. It would thus fly grossly in the face of justice to sentence Mr. McMahon to the PSR's recommended term of imprisonment when either he or a similarly positioned person would—were all facts equal today—be subject to civil enforcement, at worst.[10] The fact Mr. McMahon was also separately convicted of interstate stalking and a conspiracy to engage in same does not negate this fact; as described *supra*, Section II(A)1-2, the factual underpinnings of Counts II, III, and IV are

---

[10] Indeed, the USAG Memo's current "Investigative and Charging Priorities" also severely undercut the significance of either specific or general deterrence here, where § 951 and FARA offenses such as the one Mr. McMahon was convicted of will ostensibly cease to be prosecuted criminally. *See United States v. Hawkins*, 380 F. Supp. 2d 143, 149 (E.D.N.Y. 2005) ("deterrence prevents crime by scaring the offender away from future crime (specific deterrence) or by making an example of the offender to others, thus scaring them away from crime (general deterrence)").

It also bears emphasizing that an October 24, 2024 report prepared by the House Committee on Oversight and Accountability Majority Staff, titled *CCP Political Warfare: Federal Agencies Urgently Need a Government-Wide Strategy* at 205-06, in fact cast doubt over whether charging Mr. McMahon with FARA-related offenses was at all warranted, or in line with the DOJ's directives and FARA's fundamental purposes:

> [I]t has come to the Committee's attention that serious concerns have been raised about DOJ's exercise of prosecutorial discretion in *United States v. Michael McMahon*. The Committee's March 13, 2024 letter to DOJ referenced the conviction of Michael McMahon, who was prosecuted under FARA for activity DOJ considered part of Operation Fox Hunt. Recent public reporting raises a number of questions as to DOJ's enforcement of FARA against an individual who reportedly was unaware that his client for private investigation services, a translation company in New York, was involved with the Chinese government—calling into question whether the individual should have been prosecuted as an agent for an undisclosed foreign principal.

largely intertwined; there is no meaningful distinction between the evidentiary record relevant to Mr. McMahon's convictions for acting as a foreign agent in violation of § 951, and of interstate stalking.

## **CONCLUSION**

For the reasons set forth above, and those to be further elucidated at the sentencing proceeding before the Court, the Court should impose a non-custodial sentence on defendant Michael McMahon.

Dated: March 27, 2025                Respectfully submitted,

*s/ Lawrence S. Lustberg*
Lawrence S. Lustberg
Genna A. Conti
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
llustberg@gibbonslaw.com
gconti@gibbonslaw.com

110