

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AFM:MAA/IC/CB                           *271 Cadman Plaza East*
F. #2017R00906                          *Brooklyn, New York 11201*

April 3, 2025

<u>By ECF</u>

The Honorable Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

     Re:  United States v. Michael McMahon
        <u>Criminal Docket No. 21-265 (S-1) (PKC)</u>

Dear Judge Chen:

     The government respectfully submits this letter in advance of the defendant's sentencing, which is scheduled for April 10, 2025.  On June 16, 2023, following a 13-day trial, the defendant was convicted on three counts of a superseding indictment charging him with acting as an agent of the government of the People's Republic of China (the "PRC" or "China") without prior notification to the Attorney General, in violation of 18 U.S.C. § 951 (Count Two), conspiracy to engage in interstate stalking, in violation of 18 U.S.C. § 371 (Count Three), and interstate stalking, in violation of 18 U.S.C. § 2261A(1)(B) (Count Four).  For the reasons below, the government respectfully submits that a sentence of 87 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

I.   <u>Factual Background</u>[1]

     The defendant – a seasoned private investigator and former New York City Police Department ("NYPD") officer who attained the rank of sergeant – participated in an international campaign to threaten, harass, surveil, and intimidate Xu Jin, Liu Fang, and their adult daughter, Xu Xinzi (also known as "Sabrina Xu").  The goal was to coerce Xu Jin and Liu Fang to return

---

     [1]   The information below is taken from the Court's March 1, 2024 memorandum and order denying the defendant's motion to vacate the guilty verdicts rendered against him and for a new trial, pursuant to Federal Rules of Criminal Procedure 29 and 33, respectively (ECF No. 294); the Presentence Investigation Report dated October 16, 2024 and provided to the parties by the United States Probation Department ("Probation") on October 17, 2024 (the "PSR"); the Addendum to the PSR ("PSR Addendum") provided to the parties by Probation on March 25, 2025; the documentary and testimonial evidence admitted at the defendant's trial; and other evidence gathered as part of the investigation and prosecution of the defendant.

from the United States to the PRC, as part of transnational repression programs known as "Operation Fox Hunt" and "Operation Sky Net."[2]  The defendant understood that his participation in this illegal repatriation scheme was directed by the PRC government, and he played a critical role in the scheme to locate Xu Jin and harass him and his family members.  (ECF No. 294 at 10.)

    A.   The Victims Were Targeted as Part of Operations Fox Hunt and Sky Net

Operation Fox Hunt was an effort by the PRC government to repatriate individuals who had moved overseas and whom the PRC government alleged to have committed criminal offenses; Sky Net was an expansion of that program.  (PSR ¶¶ 11-12.)  The PRC government carried out these programs through, among other things, pressuring and harassing the wanted individual to return to the PRC, pressuring and harassing family members to coerce the individual to return to the PRC, and instilling fear that the individual's failure to return would place the individual's family in danger.  (*Id.* ¶ 14.)  Several of the defendant's co-conspirators were PRC government officials who worked for the entities responsible for Fox Hunt and Sky Net actions, such as the Ministry of Public Security ("MPS").  (*Id.* ¶¶ 13, 20-21.)  For example, co-defendant Hu Ji was a policeman with the Wuhan Public Security Bureau under the MPS and co-defendant Tu Lan was a prosecutor in a local procuratorate.  (*Id.* ¶¶ 20-21.)

Two of the victims in this case, Xu Jin and Liu Fang, were targeted for repatriation as part of these PRC government programs, beginning in 2012 when the PRC government caused the International Criminal Police Organization ("Interpol") to issue red notices for them.  (*Id.* ¶¶ 8, 10, 15, 34.)  Xu Jin and Liu Fang, as well as their family members, were pursued by the PRC government to intimidate Xu Jin and Liu Fang into returning to the PRC to face prosecution for alleged crimes committed there.  (*Id.* ¶ 34.)

    B.   The Defendant Was Hired to Locate and Target the Victims for the PRC Government Under Suspicious Circumstances

Beginning in 2016, the defendant, along with his co-conspirators, knowingly acted for and with PRC government officials and others to harass and intimidate Xu Jin and Liu Fang into repatriation.  (PSR ¶ 34.)  In September 2016, the defendant, then working as a private investigator, was contacted by a translator to perform work on behalf of a client who did not speak English.  (GX 3008.)  The translator provided vague, suspicious, and changing information about who the client was, and did not answer the defendant's questions about the nature of the investigation.  For example, the translator initially described the client only as female (referring to her as "female client," "lady," and "she"), and did not answer the defendant's question about "what

---

[2]    The National Security Division of the U.S. Department of Justice has explained that transnational repression "refers to a range of tactics that foreign governments employ to reach beyond their borders to harm, intimidate, threaten, harass, or coerce individuals."  *See* National Security Division, U.S. Dep't of Justice, "Transnational Repression (TNR)," https://www.justice.gov/nsd/transnational-repression-tnr (last visited Apr. 3, 2025).  As the National Security Division has highlighted, "[t]ransnational repression represents a threat not only to those who seek to exercise their basic rights and freedoms in the United States and abroad, but also to United States' sovereignty and democracy."  *Id.*

the client hopes to accomplish." (*Id.*) Notwithstanding the lack of information, the defendant provided the translator with a blank retainer agreement and a demand for a $5,000 retainer to begin work, noting that he "still do[es]n't know what the case is about." (*Id.*) Two days later, the defendant received a completed retainer agreement signed not by a female client, but by co-defendant Zhu Yong (using his alias "Jason Zhu"). (*Id.*; GX 3009.) The translator advised that "Mr. Jason Zhu has signed the retainer agreement" and would wire the retainer fee; the defendant did not ask about the abrupt switch away from a supposed female client. (GX 3008.)

In early October 2016, the defendant was provided sensitive and personal information about Xu Jin, Liu Fang, and their family, including purported U.S. driver's license numbers, social security numbers, green card numbers, dates of birth, PRC government identification information, exit-entry permit information, and address information for their relatives, Liu Yan (Liu Fang's sister) and her husband – at least some of which was information that could only have been provided by the PRC government. (PSR ¶ 44; GX 3013.) The defendant was directed to gather additional information about them, and on October 5, 2016, directed to "track the person who accompanies Jin Xu's parents" (who were visiting for Xu Xinzi's graduation) to the airport. (GX 3011-13.) The defendant agreed to begin immediately and requested more information about Xu Jin. (GX 3011; GX 4004 at 775.)

The defendant again asked for "the reason [the client] needs information," as well as whether "there [was] a lawyer involved." (GX 3011.) The defendant was told that Xu Jin "ow[]ed a lot of money [to] Mr. Jason Zhu" and that "Mr. Zhu needs to find where [] Jin Xu live[s] and other relate[d] information." (*Id.*) The defendant also was told that there were "no attorneys involved" (*id.*), establishing that the defendant's work was unrelated to any civil litigation. The defendant ignored this red flag.

The defendant eventually asked how Zhu Yong knew the information about Xu Jin and his family, to which the translator responded that she had not asked Zhu Yong but that she "guess[ed] they used to do business together" and so had "mutual friends" who provided the sensitive information. (GX 4004 at 777-78.) The defendant did not inquire how "mutual friends" would have the victims' PRC passport numbers or the exit-entry permit information for travel to and from Hong Kong and Macau that Zhu Yong provided. (GX 3013.)

C.    The Defendant Knew That the Victims Were Wanted by the PRC Government but Continued with the Engagement Anyway

Less than a week after being retained, and before he conducted any surveillance, the defendant learned that the targets of his investigation were wanted by the PRC government. On October 5, 2016, the defendant obtained a "Comprehensive Report" from a database called TLO that identified Xu Jin as "INTERPOL MOST WANTED." (PSR ¶ 45.) The defendant sent an email to Eric Gallowitz, a private investigator the defendant asked to assist with the surveillance, stating "tlo says he wanted by INTERPOL wow!!" and advising Gallowitz to "bring your gun" to the surveillance. (ECF No. 294 at 12.)

The defendant also learned that the arrest warrant for Xu Jin came from the PRC government. On October 5, the defendant sent an article from *China Daily* titled "Interpol Launches Global Dragnet for 100 Chinese Fugitives" to Gallowitz. (GX 4019B at 121-22; GX

3

434.)  The article explained that under the PRC's "Operation Sky Net," "arrest warrants were issued by Interpol China for former State employees and others suspected of a wide range of corrupt practices."  (GX 434.)  The article noted that the publication "was authorized by the Chinese justice authorities" to publish information about the alleged fugitives.  The article contained names and photographs, as well as biographical and charging information about Xu Jin and Liu Fang.  (*Id.*)

At trial, Gallowitz testified that he remembered the defendant telling him that the person to be surveilled was wanted on an "Interpol warrant" and showing him a "wanted poster" for that person.  (Tr. 1776-79.[3])  Gallowitz described the nature of the engagement as "atypical."  (ECF No. 294 at 12.)  Gallowitz also confirmed that he understood he was working on a criminal matter because of the "Interpol warrant" and the fact that "the person we were looking for" was "wanted."  (Tr. 1801-02; ECF No. 294 at 12.)

The same day the defendant found the *China Daily* article, he sent it to the translator working for Zhu Yong, texting her: "I just [*sic*] some checks on him.  Looks like he's wanted in China for corruption."  (GX 4004 at 781-82.)  When the translator asked the defendant whether she should share the information with Zhu Yong, the defendant responded, "I'm sure he knows this but he didn't tell us" and "I think he should have."  (*Id.* at 782.)  The defendant even noted that one of the photographs of Xu Jin sent to the defendant was the same as the one provided by the PRC government and published in the article:



---

4

(*Id.*) The translator then responded: "I see. I think now I know what is going on with JIN XU's case." (*Id.* at 783.) The defendant did not ask "what [was] going on."

Despite learning that the victims were wanted by the PRC government, the defendant, along with Gallowitz, conducted surveillance, and provided photographs and other information about the victims to the translator, who advised that she was providing them to Zhu Yong. (GX 1031-39; GX 3020.) Prior to conducting surveillance, the defendant notified the local police department that he and his team were present in the area, but confided to Gallowitz that he did not tell the police why they were conducting surveillance. (GX EG-3.) At trial, Gallowitz testified that the reason for notifying the local police regarding the surveillance was, in part, because "if [the police] get a call for a suspicious vehicle, they're less likely to show up." (PSR ¶ 58; Tr. 1831.)

The defendant also was asked to provide information about Xu Jin's daughter, including her whereabouts and college major. The defendant, in turn, provided information about her graduate studies, her graduate residence (including a description), and her prior addresses, but stated he had been unable to confirm her major. (ECF No. 294 at 13.) Most, if not all, of that information had no legitimate relevance to a purported financial dispute concerning Xu Jin. Again, however, the defendant did not question the request or refuse to provide the requested information.

Subsequently, on October 27, 2016, and November 1, 2016, the defendant met in person with Zhu Yong and PRC police officer Hu Ji, who was introduced to the defendant as "Eric Yan." (PSR ¶¶ 46-48; *see also* GX 902D-E; GX 201 ¶ 20; GX 4008 at 841-43.) Shortly after these meetings, Zhu Yong – who had acted as a go-between for the defendant and Hu – advised the defendant that he should communicate with "the person who's looking for Jin Xu." (*Id.* ¶ 48.) On November 13, 2016, Hu (using the name "Eric Yan") told the defendant that he had returned to the PRC and "reported all we found to my boss of the company"; despite several references to a "company," no company was ever identified. (GX 3047.) Hu directed the defendant to perform several additional investigative tasks and advised that Hu's "uncle" would transfer money for the work. (*Id.*) Notwithstanding that the person who wanted information on the victims had changed yet again – from a "female" client, to Zhu Yong, to Eric Yan, to Eric Yan's "boss" or "uncle" – the defendant did not challenge the story or stop performing work.

D.    The Defendant Acquired Sensitive U.S. Government Records and Passed the Information to PRC Government Officials

The defendant did not use his law enforcement contacts to report the suspicious nature of the work he was hired to perform. Instead, he improperly exploited his law enforcement contacts to obtain sensitive information from federal government databases, which he then provided to his PRC co-conspirators.

On October 6, 2016, a day after learning that the victims were wanted by the PRC government, the defendant contacted his close friend, then-Drug Enforcement Administration ("DEA") Assistant Special Agent-in-Charge Greg Finning. (GX 4006B at 817-18.) On October 20, 2016, following a phone call, the defendant texted to Finning the victims' names, social

security numbers, dates of birth, and driver's license information. (GX 316; GX 306A; GX 4006B at 819.) On October 28 – the day after the defendant met with Zhu Yong and PRC police officer Hu (GX 902D-E; GX 201 ¶ 20) – the defendant requested status updates on his request for information. (GX 4006B at 823-24.) Three days later, the defendant again requested an update, explaining that he needed the information because "[m]y clients flew in from China and I'm meeting them this eve." (*Id.* at 824.) Finning responded that he did not yet have the information because his "HSI guy" – a reference to an agent with Homeland Security Investigations ("HSI"), a federal agency that is part of the Department of Homeland Security ("DHS") – was not at work. (*Id.*; Tr. 1452.) The following day, November 1, the defendant met with Zhu Yong and Hu a second time. That same day, an HSI special agent requested information from DHS databases related to Liu Fang and Xu Jin. (GX 424-25; GX 429.) The defendant and Finning spoke by phone several times before and after those queries were conducted. (GX 316.)

On November 17, 2016, Hu (as "Eric Yan") emailed the defendant and requested exit information for Liu Fang. (GX 3050.) That same day, the defendant and Finning spoke for 20 minutes. (GX 316.) The following day, the defendant sent an email to Hu with the subject line "FANG LIU EXIT INFORMATION" and provided travel information, noting that his "contact could not obtain her Passport number." (GX 3051.) The information the defendant shared with Hu was materially identical to the information from one of the database checks run by the HSI special agent on November 1. The information from the DHS database, however, was not permitted to be shared with individuals outside of law enforcement. (Tr. 1451-52.)

E.    The Defendant Played a Critical Role in the Scheme to Use Xu Jin's Elderly Father to Locate and Harass Xu Jin[4]

Several months later, in March 2017, Hu (as "Eric Yan") contacted the defendant and requested that he participate in a scheme involving Xu Jin's elderly father. (PSR ¶ 51.) On March 27, 2017, Hu told the defendant that Xu Jin's father would "visit him from China this Saturday," they wanted the defendant to "trace him [*i.e.*, Xu Jin's father] to find Xujin's address," and Hu's friend (later identified as Zhu Feng) would provide the defendant with payment in cash and the time of the father's arrival at the house. (*Id.*; GX 3067.) The defendant agreed to take part in the operation. (PSR ¶ 51.)

The defendant's co-conspirators, in turn, prepared to bring Xu Jin's elderly father from the PRC to the United States against his will. (*Id.* ¶¶ 52-54.) For example, on April 3, 2017, PRC prosecutor Tu Lan, Zhu Feng, and Hongru Jin met to discuss the plan to use Xu Jin's elderly father to locate and coerce Xu Jin. (*Id.* ¶ 54; Tr. 1000-01.) They discussed that, after the father arrived accompanied by a doctor, they would bring the father to Liu Yan's home, where Hongru Jin and the private investigator, *i.e.*, the defendant, would conduct surveillance in the hopes of locating Xu Jin's residence. (Tr. 1001.) At trial, Hongru Jin testified that prosecutor Tu Lan referred to locating Xu Jin's home as the "backup plan" because the hope was that the father would convince Xu Jin to return to the PRC, but that if he did not, "I will stalk the person and get his

---

[4]    In his sentencing memorandum, the defendant's description of the offense conduct entirely omits his participation in the scheme to force Xu Jin's father to travel to the United States to coerce Xu Jin's return to the PRC. (ECF No. 358 at 5-13.)

license plate number, et cetera." (*Id.* at 1018.) Hongru Jin understood that "the private detective," *i.e.*, the defendant, was also part of the "backup plan" to stalk the victim if using the father to coerce Xu Jin's repatriation failed. (*Id.*) Tu Lan and Zhu Feng discussed the defendant in some detail during this meeting, and Tu Lan ultimately directed Zhu Feng to "tell him clearly about everything." (ECF No. 294 at 14.)

The next day, April 4, 2017, the defendant met with Zhu Feng and Hongru Jin for almost an hour. (PSR ¶ 55.) During the meeting, Zhu Feng paid the defendant $5,000 in cash as documented in an invoice that the defendant sent the next day to "Eric Yan and J. Zhu." (PSR ¶ 41; GX 3072-73.) The invoice was not sent to a company, despite Hu Ji's November 13, 2016 email suggesting that was the client. (GX 3072-73.)

On April 5, 2017, Xu Jin's elderly father, accompanied by a PRC doctor, arrived in the United States from the PRC. (PSR ¶ 56.) That day, the defendant, along with Gallowitz, conducted surveillance of Liu Yan's home in furtherance of the scheme. (*Id.* ¶ 58.) As he had previously, the defendant notified the local police department that they were present in the area, so the police would be less likely to arrive if their presence was reported. (*Id.*; Tr. 1831.) During their surveillance, the defendant observed Xu Jin's father arrive at Liu Yan's home on the evening of April 5. (GX 4010 at 849-50.) As they watched the operation unfold, Gallowitz asked the defendant "you trust them?" The defendant responded: "No." (ECF No. 294 at 12.) At trial, Gallowitz testified that, of the dozens of surveillance operations he had conducted as a private investigator, none had ever involved a client bringing an elderly man from a foreign country to the United States. (Tr. 1833-34.)

On the morning of April 6, 2017, Liu Yan drove Xu Jin's father to Livingston Mall to meet Xu Jin. (PSR ¶ 59; Tr. 98, 104, 109-10, 133.) During that trip, Liu Yan noticed someone who was not Chinese who she thought might be following her. (PSR ¶ 59; Tr. 99.) As Liu Yan suspected, the defendant, together with another private investigator he hired, was surveilling Liu Yan.[5] (PSR ¶ 59.) The defendant also took photographs of her, and shared those photographs and reports with Zhu Feng. (*Id.*)

At the direction of Zhu Feng, the defendant continued surveillance on April 6 because they still had not located Xu Jin's residence. (*Id.* ¶ 61.) During the surveillance, the defendant again sent himself the *China Daily* article stating that Xu Jin was wanted by the PRC government. (*Id.*) During the operation that day, the defendant conducted a query of New Jersey Motor Vehicle Commission ("NJMVC") records and passed information he learned from those records to Zhu Feng. (*Id.* ¶ 61.) By doing so, the defendant violated the terms of a memorandum

---

[5]      The defendant contends that the meeting at Livingston Mall occurred on April 7, 2017, on which date he was not conducting surveillance. (Def. Supp. PSR Obj. at 1.) At trial, both Liu Yan and Xu Jin testified that the meeting at Livingston Mall occurred on April 6, 2017. (Tr. 98-99 (Liu Yan); Tr. 1389-90, 1392, 1410 (Xu Jin).) The government is not aware of any evidence – at trial or otherwise – that the meeting occurred on April 7. Xu Jin, however, testified that while he was driving with his father on April 7, he observed someone following him (*id.* at 1393, 1410-11); based on its knowledge of events, the government believes Xu Jin in fact was referring to events on April 6 rather than April 7 and was mistaken regarding the date.

7

he had signed with the NJMVC, which "prohibit[ed] using records to conduct surveillance or to investigate or locate an individual for reasons not specifically related to motor vehicle activity." (*Id.*)

Later that same day, the defendant finally located Xu Jin and Liu Fang's home in New Jersey, and provided the address to Zhu Feng. (*Id.* ¶ 63.) That night, the defendant texted with Gallowitz that the day's events went "great," they "got em," and the "client was very happy." (*Id.*) The defendant said he was "waiting for a call" to find out what to do next. Gallowitz responded "Yeah. *From NJ State Police about an abduction*," to which the defendant responded "*Lol*":



(GX 4019B at 244-57 (emphasis added).)

In the ensuing days, as the plan to use the father to coerce Xu Jin's return did not seem to be working, the defendant discussed with Zhu Feng more aggressive ways to harass and coerce the victims. (PSR ¶ 68.) At one point, Zhu Feng told the defendant that "[t]hey already told me *they will try everything they can to get Xu to plead* and return the money." (*Id.* (emphasis added).) The defendant, a private investigator and former police sergeant, did not inquire how a company – as opposed to government actors – could force a person to "plead" to certain conduct. At another point, Zhu Feng advised the defendant that they would "grant u a nice trip *if they can get Xu back to China* haha." (*Id.* ¶ 70 (emphasis added).)) The defendant responded "oh nice" and

then proposed to Zhu Feng a more aggressive method of coercion: "*I think if we harass Xu. Park outside his home and let him know we are there. I did that before on another case*":



(GX 805B at 32 (emphasis added).) Zhu Feng declined, but advised that "they are very happy for what u have done." (*Id.* ¶ 70.)

In addition to the above communications, the defendant participated in a number of telephone calls with Zhu Feng during the operation, and conceded during his post-arrest interview that he discussed the operation's goals during one or more of these calls. (*Id.* ¶ 69; GX 701A; GX 701B at 6.)

F.    The Defendant Engaged in Suspicious Financial Activities to Conceal His Payments from the PRC Government

The defendant was paid more than $19,000 in total for his role in the illegal repatriation scheme. (PSR ¶ 38.) The defendant was paid the initial $5,000 retainer by check from Zhu Yong with the memo line "Retainer fee," which the defendant deposited into his business bank account. (*Id.* ¶ 39.) The defendant subsequently found the *China Daily* article and Interpol information which indicated that the victims were wanted by the PRC government. (*Id.*) He thereafter never deposited payment for work on Xu Jin's case into his business account. (*Id.*) Ultimately, for his work on the case, the defendant received payment from four different people (including two PRC government officials) in three different formats (including cash and a wire transfer from the PRC with a facially false description indicating it was for "Eric Travelling Fee"). (*Id.* ¶¶ 40-42.) The defendant deposited the majority of those payments into three different bank

accounts (including his son's student account[6]), but he did not deposit a $5,000 cash payment into any bank account he controlled. (*Id.* ¶ 41.) Tellingly, the day after he was arrested, the defendant told a friend that this case was the only time he had ever deposited money into his son's account.[7] Moreover, the defendant's 2016 and 2017 tax returns underreported his taxes in a manner consistent with concealing these payments. (*Id.* ¶ 43.) That is, although the defendant's conduct prior to learning that the victims were wanted by the PRC government was consistent with standard business practice, his conduct after learning that information can be explained only by a deliberate effort to conceal the payments and their PRC government sources.

G.    Co-Defendants Zheng and Kuang Subsequently Delivered a Threatening Note to the Victims at Their Home

On September 4, 2018, co-defendants Zheng and Kuang Zebin continued the conspiracy to harass and stalk Xu Jin and Liu Fang at the couple's home in New Jersey, which – through the defendant's efforts – had then been discovered by the PRC government. (PSR ¶ 86.) Zheng and Kuang were provided the address of Xu Jin and Liu Fang's home and directed to post threatening notes there. The notes stated, in substance, "if you are willing to go back to China to serve a ten years prison . . . sentence, you wife and your children will be okay. That's the end of the matter." (*Id.* ¶ 87.)

At the victims' home in New Jersey, Zheng and Kuang engaged in threatening and intrusive behavior, including pounding on the front door and trying to turn the door handle, posting three notes on the front door, walking onto the deck behind the house, looking into the house through the back glass doors, and tearing down two of the three posted notes to avoid being overly conspicuous. (*Id.* ¶ 88.) Unbeknownst to Zheng and Kuang, Xu Jin and Liu Fang were inside their home, watching these events unfold on their home security camera system. (*Id.* ¶ 90.) After the two men left, Xu Jin and Liu Fang discovered the note affixed to their front door, stating that, if Xu Jin returned to the PRC and spent ten years in prison, his family would be safe. (*Id.*) Xu Jin testified that, as a result of the note, he felt that the threats made by the PRC government against him were no longer "mental" but "physical," and he became "very worried about [the] safety" of his wife and daughter. (*Id.*)

---

[6]    The defendant contends that the payments to his son's account were made by wire transfer (ECF No. 358 at 12), but in fact they were cash deposits made from two different branches, outside New Jersey.

[7]    The government did not introduce the defendant's statement at trial, but disclosed the statement to the defendant in advance of trial. The Court may consider this evidence for purposes of sentencing. *See* 18 U.S.C. § 3661 (no limitation may be placed on information the court may receive and consider in imposing an appropriate sentence).

H.    The Victims and Their Families Were Harassed in Additional Ways

As part of the illegal repatriation scheme, the victims and their family members were harassed in a variety of additional ways.  For example, in mid-2018, Xu Xinzi discovered that her friends were receiving harassing messages about her family on Facebook that detailed the PRC government's messaging about her parents being wanted fugitives.  (PSR ¶ 83.)  In addition, the victims were sent mailings from the PRC, which were designed to further harass Xu Jin and coerce him to return to the PRC.  (*Id.* ¶¶ 94-96.)  One of the mailings sent to Liu Yan, purportedly from Xu Jin's sister, contained a DVD with a video titled "A Family Letter to Brother – Xu Qin." (ECF No. 294 at 9.)  The video contained subtitles, which at one point stated, "When parents are alive, you can still call someplace a home; when parents are gone, you can only prepare for your own tomb."  (*Id.* at 9-10.)  The video ended with the subtitles exhorting Xu Jin to return to the PRC: "Come home, brother!"  (GX 506G.)

I.    The Defendant Admitted Knowing the PRC Government Directed the Scheme

During the defendant's post-arrest interview, he admitted knowing that he was participating in a scheme to coerce Xu Jin to return to the PRC to face alleged criminal charges. The defendant conceded that he knew "the goal" of the operation was that "they were trying to get [the victim] back to China . . . so they could *prosecute* him" – a word the defendant, as a former NYPD officer, naturally would have used to refer to government action, rather than to a civil property dispute, as he contended at trial.  (GX 701A; GX 701B at 4 (emphasis added).) Confirming that understanding, the defendant explained that the father was flown from the PRC to the United States to "convince the son" to return "out of honor for the [family] name."  (GX 701A; GX 701B at 4.)  The defendant later reiterated this, stating that the elderly father had come to the United States "to get his son to go back to China."  (GX 701A; GX 701B at 7.)  The defendant understood the purpose was to get Xu Jin to "face the consequences back in China."  (GX 701A; GX 701B at 5.)  The defendant admitted that he discussed the purpose of their operation with "the guy on the text messages," a reference to Zhu Feng, and said that they discussed the plan on the phone.  (GX 701A; GX 701B at 6.)

The defendant was also asked about his involvement in stalking and harassing the victims.  The defendant was confronted with his text message to Zhu Feng in which he proposed to "harass" Xu Jin and "[p]ark outside his home and let him know we are there."  The defendant initially claimed that the message must be a "typo."  (GX 701A; GX 701B at 2.)  The defendant then claimed he was thinking about a prior instance in which he "s[a]t outside a guy's house" to "let him know we were outside."  (GX 701A; GX 701B at 5.)  He stated he suggested doing so with respect to Xu Jin because if the target "knows you're sitting outside" then he would think that "maybe he should turn himself in."  (GX 701A; GX 701B at 5.)

II.    Applicable Law

The Supreme Court has explained that the sentencing court "should begin all sentencing proceedings by correctly calculating the applicable [U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G.")] range.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  The Supreme Court further has explained that "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  *Id.*  The

sentencing court "should then consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party." *Id.* at 49-50. In doing so, the court "may not presume that the Guidelines range is reasonable," but "must make an individualized assessment based on the facts presented." *Id.* at 50 (internal citation omitted).

Title 18, United States Code, Section 3553(a) provides, in part, that in imposing a sentence, the court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed--
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; [and]
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." *United States v. Alexander*, 860 F.2d 508, 512-13 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

III.    Guidelines Calculation

The government agrees with the Guidelines calculation set forth in the PSR. With respect to Count Two, as the PSR notes, no Guideline has been promulgated for 18 U.S.C. § 951, which carries a statutory maximum term of imprisonment of 10 years. (PSR at 3, ¶¶ 110, 141.) The government agrees with Probation that there is no sufficiently analogous Guideline, and further agrees that the provisions of 18 U.S.C. § 3553 control the imposition of an appropriate sentence, pursuant to U.S.S.G. § 2X5.1. (*Id.* ¶¶ 106, 137.) Accordingly, the government respectfully requests that the Court impose a significant, deterrent sentence for the defendant's Section 951 convictions, as described further below. With respect to Counts Three and Four, which are grouped pursuant to U.S.S.G. § 3D1.2(b), the government agrees with Probation that the combined adjusted offense level is 27, and, because the defendant does not have a criminal

history, the applicable Guidelines range is 70-87 months' imprisonment.  (*Id.* ¶¶ 108, 138-71, 210.)
The appropriate calculation of the defendant's adjusted offense level for these counts is:

Counts Three and Four – Xu Jin

|  |  |  |
|---|---|---|
| Base Offense Level (§ 2A6.2(a)) |  | 18 |
| Plus: | Offense involved a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim (§ 2A6.2(b)(1)(E)) | +2 |
| Plus: | Offense involved a vulnerable victim (§ 3A1.1(b)(1)) | +2 |
| Plus: | Offense involved defendant's use of a special skill (§ 3B1.3) | +2 |
| Total: |  | 24 |

Counts Three and Four – Liu Fang

|  |  |  |
|---|---|---|
| Base Offense Level (§ 2A6.2(a)) |  | 18 |
| Plus: | Offense involved a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim (§ 2A6.2(b)(1)(E)) | +2 |
| Plus: | Offense involved defendant's use of a special skill (§ 3B1.3) | +2 |
| Total: |  | 22 |

Count Three – Xu Xinzi

|  |  |  |
|---|---|---|
| Base Offense Level (§ 2A6.2(a)) |  | 18 |
| Plus: | Offense involved a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim (§ 2A6.2(b)(1)(E)) | +2 |
| Total: |  | 20 |

Multiple Count Analysis

Highest Adjusted Offense Level ............ 24

| Group/Count | Level | Units |
|---|---|---|
| Count 3 (Xu Jin) and 4 | 24 | 1 |
| Count 3 (Liu Fang) and 4 | 22 | 1 |
| Count 3 (Xu Xinzi) | 20 | 1 |

13

| | | |
|---|---|---|
| Total Units: | | <u>3</u> |
| Plus: | 3 levels (§ 3D1.4) | +3 |
| Total: | | <u>27</u> |

(PSR ¶¶ 138-64.)  Accordingly, assuming a Criminal History Category of I, a total adjusted offense level of 27 yields a Guidelines range of 70-87 months' imprisonment.  (*Id.* ¶¶ 167, 210.)

The defendant disputes the applicability of the two-level pattern of stalking enhancement (§ 2A6.2(b)(1)(E)), the two-level vulnerable victim enhancement (§ 3A1.1(b)(1)), the two-level special skill enhancement (§ 3B1.3), and the grouping analysis (§ 1B1.2(d)).  The defendant also contends that a minor role reduction (§ 3B1.2) and a three-level acceptance of responsibility reduction (§ 3E1.1) are appropriate.  For the reasons below, Probation correctly applied these enhancements and declined to apply these reductions.

IV.    <u>Argument</u>

For the reasons below, the government respectfully submits that a sentence of 87 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.  Specifically, the government submits that the Court should impose concurrent sentences of 48 months' imprisonment on Count Two and 87 months' imprisonment – the top of the applicable Guidelines range – on Counts Three and Four.  Such a sentence would constitute just punishment, reflect the severity of the defendant's offense, provide the specific and general deterrent effect called for by the defendant's offenses, and promote respect for the law.

In light of the defendant's estimated net worth, the government disagrees with Probation's assessment that the defendant is unable to pay a fine.  (PSR ¶¶ 201-08.)  The government respectfully requests that a $50,000 fine be imposed, and notes that the defendant was paid $19,000 in connection with the offense conduct.  There is no forfeiture or requested restitution in this case.

The government does not object to the special conditions of supervised release recommended by Probation, except that the government respectfully submits that the defendant should be required to cooperate with Probation in the investigation and approval of any employment (paid or unpaid), rather than only self-employment.

The government addresses below the Guidelines calculation, followed by consideration of the Section 3553(a) factors.

A.    <u>Analysis of Guidelines Calculation</u>

The government's Guidelines analysis is set forth below.  The government respectfully submits that, given the defendant's conduct, no downward departure or variance is warranted.

14

1.      There Is No Analogous Guideline for Count Two and Accordingly the
        Provisions of Section 3553 Control

For statutory violations that are not listed in Appendix A to the Guidelines, the Guidelines instruct that the "most analogous offense guideline" is to be used. U.S.S.G. § 2X5.1. Where, however, there is no sufficiently analogous Guideline provision, the court is to sentence the defendant anywhere within the statutory sentencing range based on application of the Section 3553(a) factors. *See id.* As this Court found when sentencing co-defendant Zhu Yong, no sufficiently analogous Guideline provision applies to convictions for violating or conspiring to violate 18 U.S.C. § 951 and accordingly the provisions of Section 3553(a) control. (Zhu Tr. 13.)[8] Here too.

The defendant's contention that the stalking Guidelines are sufficiently analogous (ECF No. 358 at 15-16) is unavailing. This Court already rejected precisely that argument in sentencing co-defendant Zhu, reasoning:

> [A]pplying the stalking guidelines would negate what is the very distinct features and purposes with respect to these two different sets of crimes. Unlike the stalking offense, the critical element of the foreign agent offense is the defendant's knowing involvement with a foreign government to carry out that foreign government's directives with respect to persons and things in this country, all while not alerting the U.S. Government about those activities. It is the intrusion and interference into the affairs of the U.S. citizens and residents and the compromising of U.S. National Security interests that is at the heart of the foreign agent crime, and that doesn't appear, of course, anywhere in terms of the purpose or harms trying to be prevented by the stalking crime.

(*Id.* at 11-12.)

The defendant alternatively cites as sufficiently analogous the Guidelines for failing to report income taxes, U.S.S.G. § 2T1.1, failure to register for military service, U.S.S.G. § 2M4.1, and false statements in relation to documents required by ERISA, U.S.S.G. § 2E5.3. (ECF No. 358 at 17.) This argument also fails. Section 951 criminalizes the *action* of the agent of a foreign government without notification to the Attorney General, not merely the *failure to notify* the

---

[8]     *See also, e.g.*, *United States v. Buryakov*, No. 15-CR-73 (S.D.N.Y.), ECF No. 158 at 6-7, 17 (finding no sufficiently analogous Guideline provision where defendant was convicted of violating § 951 for agreeing to provide information to Russian official); *United States v. Chun*, No. 16-CR-518, ECF No. 17 at 10 (S.D.N.Y.) (parties jointly submitted there was no analogous Guideline and court agreed where defendant was convicted of violating § 951 for providing sensitive information to Chinese officials); *United States v. Butina*, No. 18-CR-218, ECF No. 120 at 11-12 (D.D.C.) (observing "[t]he majority of the courts that have dealt with this issue have determined that § 951 does not have a sufficiently analogous guideline" and similarly finding no sufficiently analogous Guideline provision for conspiracy to violate § 951).

Attorney General.  Indeed, the failure to notify is only one element of the Section 951 offense. Here, the defendant took numerous actions in the United States beyond the failure to notify.  For example, he located and targeted Xu Jin and his family; passed sensitive information about the victims to PRC officials to assist with the surveillance efforts; and surveilled the victims on behalf of the PRC government.  (ECF No. 294 at 10-16, 21-25; GX 408A; GX 408H; GX 805B; GX 3051.)  The Guidelines the defendant cites as analogous do not account for such conduct.

Accordingly, the Court may sentence the defendant up to the statutory maximum of 120 months' imprisonment on Count Two based on application of the Section 3553(a) factors.

2.    Probation's Guidelines Calculation for Counts Three and Four Is Correct

a.    A Two-Level Pattern of Stalking Enhancement Is Appropriate Under U.S.S.G. § 2A6.2(b)(1)(E)

A two-level enhancement for a pattern of stalking pursuant to U.S.S.G. § 2A6.2(b)(1)(E) is appropriate.  Under Section 2A6.2, if a stalking offense involved "a pattern of activity involving stalking, threatening, [or] harassing . . . . the same victim, increase by *2* levels." U.S.S.G. § 2A6.2 (emphasis in original).  A "[p]attern of activity involving stalking, threatening, harassing, or assaulting the same victim means any combination of two or more separate instances of stalking, threatening, [or] harassing . . . the same victim, whether or not such conduct resulted in a conviction."  U.S.S.G. § 2A6.2, Application Note 1 (internal quotation marks omitted).  "For example, a single instance of stalking accompanied by a separate instance of threatening, harassing, or assaulting the same victim constitutes a pattern of activity for purposes of this guideline."  *Id.*[9]  The evidence at trial plainly establishes a pattern of stalking activity by the defendant and his co-conspirators directed at victims Xu Jin, Liu Fang, and Xu Xinzi.

As the Court explained in finding the enhancement applicable with respect to co-defendant Zhu's Guidelines calculation:

> The enhancement doesn't require the defendant himself to have been the one who went to the victim's home and did the physical stalking.  Rather, the stalking offense had to quote, unquote, "involve" such a pattern of activity. . . . [T]he evidence in this case clearly establishes a pattern of stalking activity and, in fact, I just found beyond a reasonable doubt that that is the case.  And that the stalking activity was all directed at [Xu Jin, Liu Fang, and Xu Xinzi] over the course of three years as part of a – and I'm quoting the

---

[9]    "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."  *Stinson v. United States*, 508 U.S. 36, 38 (1993). Although the "continuing vitality of *Stinson* is subject to debate," the Second Circuit continues to "adhere to *Stinson*" and "defer[s] to the application note[s]."  *United States v. Rainford*, 110 F.4th 455, 475 n.5 (2d Cir. 2024).

> Government – "multipronged, multi-phased scheme to locate and
> compel John Doe 1 and Jane Doe 1 to return to the PRC."

(Zhu Tr. 39-40.) So too here. The scheme the Court described included, among other things: efforts to locate Xu Jin, Liu Fang, and Xu Xinzi in October and November 2016 to further the harassment campaign; the April 2017 coercion attempt using Xu Jin's elderly father; and the posting of threatening notes at Xu Jin and Liu Fang's home in September 2018. (ECF No. 294 at 4-17.)

The defendant played an integral role in several aspects of this scheme. As described above, the defendant conducted surveillance on Xu Jin's sister-in-law, Liu Yan, with the goal of obtaining Xu Jin's address. (*Id.* 12-13.) Around the same time, he obtained information about Xu Xinzi, including her graduate residence. (*Id.* at 13.) Several months later, the defendant continued to further the stalking and harassment scheme by conducting surveillance during the April 2017 coercion attempt involving Xu Jin's elderly father. (*Id.* at 13-14.) After surveilling Xu Jin and his family for multiple days, the defendant successfully located Xu Jin's home address. (*Id.*) The defendant then provided the address to his co-conspirators. (*Id.*) That address later was used by co-defendants Zheng and Kuang to post threatening notes on the front door of Xu Jin's home.

The defendant's objection to the pattern-of-stalking enhancement (ECF No. 358 at 20-21) is unpersuasive. The defendant suggests that, because each of his surveillance efforts on multiple days over the course of October 2016 and April 2017 had the same "objective" of locating Xu Jin, they do not constitute "separate" instances of stalking. (*Id.* at 21.) As a preliminary matter, the objective of the conspiracy that the jury convicted the defendant of joining was not merely to locate Xu Jin, as the defendant contends, but to stalk and harass him in order to coerce his return to the PRC. More broadly, the fact that multiple distinct acts of stalking reflect the same goal by the perpetrator cannot, and does not, defeat an argument that they constitute separate instances of stalking. Tellingly, were the Court to conclude as much, the enhancement would almost never apply when the defendant carries out multiple acts of stalking and harassment, because such acts almost always have the same objective given the nature of the crime, *i.e.*, to cause substantial emotional distress to the victim. It is a rare pattern of stalking in which the various constituent acts do *not* reflect the same goal.

Moreover, the defendant's argument ignores the acts of his co-conspirators, which constitute relevant conduct for the offense level calculation because they were "within the scope of the jointly undertaken criminal activity," "in furtherance of that criminal activity," and "reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a). As described above, the defendant admitted in his post-arrest statement he knew that the goal of the scheme was to coerce Xu Jin into returning to the PRC so that he could be prosecuted. (ECF No. 294 at 15-16.) Additional harassment by others to achieve that goal was reasonably foreseeable given the nature of the offense. Such harassment also was reasonably foreseeable to the defendant because the defendant's co-conspirators requested – and the defendant largely provided – information having no conceivable relevance to the purported financial dispute he was hired to investigate (*e.g.*, information about Xu Xinzi's college major), and which only could have been sought to harass the victims.

17

> b.    A Two-Level Vulnerable Victim Enhancement Is Appropriate Under U.S.S.G. § 3A1.1(b)(1)

A two-level enhancement for a vulnerable victim pursuant to U.S.S.G. § 3A1.1(b)(1) is appropriate. As explained above, as part of the illegal repatriation scheme, in April 2017, the defendant's co-conspirators forced Xu Jin's elderly and ill father – the vulnerable victim – to travel from the PRC to the United States, against his will, in order to try to coerce Xu Jin to return to the PRC.

Section 3A1.1(b) provides, in relevant part, that a defendant's offense level should be increased by two levels if he "knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1(b). As the Second Circuit has observed, courts generally require that "the vulnerability of the victim must bear some nexus to the criminal conduct." *United States v. McCall*, 174 F.3d 47, 50 (2d Cir. 1998). Courts generally also require that the vulnerable victim must have been "singled out . . . from a larger class of potential victims." In addition, "broad generalizations about victims based upon their membership in a class are disfavored where a very substantial portion of the class is not in fact particularly vulnerable to the crime in question." *Id.* In such cases, courts have required that the enhancement be based on individualized findings as to the vulnerability of particular victims. *Id.*

The defendant knowingly participated in a stalking and harassment scheme involving a vulnerable victim. PRC police officer Hu Ji requested that the defendant participate in the April 2017 operation, directing that the defendant "trace [Xu Jin's father] to find Xujin's address." (GX 3067.) During a meeting about the April 2017 operation attended by certain of the defendant's co-conspirators (but not the defendant), the co-conspirators discussed that a doctor would be accompanying Xu Jin's elderly father. At the meeting, PRC prosecutor Tu Lan directed Zhu Feng to "tell [the defendant] clearly about everything." (ECF No. 294 at 14.) The next day, Zhu Feng met with the defendant for nearly an hour. It is reasonable to conclude that – just as Tu Lan directed – Zhu Feng told the defendant "everything," including that Xu Jin's father was being escorted by a PRC doctor. And on April 5, 2017, the defendant was surveilling Liu Yan's home when Xu Jin's father was left on her doorstep. (GX 4010 at 849-50.)

Following his arrest, the defendant admitted his knowledge of the scheme, stating that Xu Jin's father was flown from the PRC to the United States to "convince the son," *i.e.*, Xu Jin, to return "out of honor for the [family] name" in order to "face the consequences back in China." (GX 701A; GX 701B.) When the interviewing agent referred to the father as "elderly" and "older," the defendant never questioned the characterization or suggested he had been unaware of the father's age. (*See* ECF No. 228, Ex. 4 at 44, 60, 61.)

As this Court found during defendant Zhu's sentencing, a clear nexus exists between the elderly and ill state of Xu Jin's father and the conspirators' decision to send him to the United States to try to coerce his son into returning to the PRC.[10] (Zhu Tr. 24.) That is, Xu

---

[10]    The government also contends that it stands to reason that it was Xu Jin's father, rather than other family members in the PRC, who was forced to make the trip because he was elderly and ill. Notably, other family members could have been forced to make the trip, including

Jin's father was the one forced to make the trip *because* he was elderly and ill, which itself would be expected to place significant pressure on Xu Jin to return to the PRC. Specifically, Xu Jin would be more likely to return to the PRC upon seeing the threat posed to his vulnerable father than in response to another family member or other individual being forced to travel to the United States. In finding such a nexus, this Court reasoned:

> [I]t's easy . . . to find that some members of the conspiracy, namely the Chinese Government or the officials in China like Ji Hu or whoever else was acting back there . . . did pick the father because he's old and vulnerable, and he is the father, obviously, who could have more moral suasion on his son because the evidence about the father's age . . . and his infirmities would be something known to the other conspirators who did pick him out of all of the millions – billions of people in China, to go to see the son.

(*Id.* at 24.)

And indeed, Xu Jin testified that his reaction to Xu Jin's father being forced to travel to the United States was based on his father's vulnerability:

> My first impression was that I was in shock. And my second feeling was that I was very angry. It was because earlier in that year my father had the surgery done and his health condition has been weakened, and previously he had a brain hemorrhage and started saying that he's getting headaches. My family members were very concerned and worried about his conditions; however, under such condition he was still being forced to come to the U.S. It was very shocking. First of all, it was very shocking for me to see that being done and, secondly, I was very angry because the Wuhan officials and the prosecutor's office did things like this to an 80 some what year old man and he had a bad health condition and he was being forced to come to the U.S. I was very angry about that.

(*Id.* at 1396-97.) Liu Fang and Liu Yan similarly testified that their reactions were based on the vulnerability of Xu Jin's father. Liu Fang testified she felt bad that "[i]n order to serve their purpose, they have forced and threatened an 80-year-old man to come from China to the U.S." (*Id.* at 699.) Liu Yan testified: "I cannot believe that the law enforcement of Chinese government were using an elderly man to meet the – I cannot believe that the law enforcement of China were using an old man to meet their goal." (*Id.* at 96.) Liu Fang likewise testified she felt bad that "[i]n order

---

Xu Jin's younger sister, who PRC officials threatened to imprison if Xu Jin's father did not make the trip (Tr. 1392), thereby making clear she was readily accessible to the PRC government. The government is mindful, however, that during Zhu's sentencing, the Court expressed that it was not persuaded by this argument. (Zhu Tr. 13-14.)

to serve their purpose, they have forced and threatened an 80-year-old man to come from China to the U.S." (*Id.* at 699.)

Tellingly, as part of the illegal repatriation scheme, Xu Jin's sister-in-law received a video in 2019 that underscores that Xu Jin's father was selected to make the trip to the United States because of his vulnerable state. (GX 506G.) The video featured footage of Xu Jin's mother, father, and sister, sitting in a living room with subtitles and a montage of old family photographs. (ECF No. 294 at 9.) The subtitles repeatedly emphasized the vulnerabilities of Xu Jin's parents – with respect to both their age and health – in a transparent effort to manipulate him into returning to the PRC. For example, one of the subtitles stated: "In the last few years, dad and mom changed a lot. They became less active. . . . There are more medications at home. They are more fragile. They can't get a good night's sleep. They lose their appetite. They were stressed when thinking about you. They visited the hospital frequently because of health issues. . . . They kept hoping that you would suddenly appear in front of them when they were sick and stayed at the hospital." (GX 506G.) Another subtitle stated: "When parents are alive, you can still call someplace a home; when parents are gone, you can only prepare for your own tomb." (ECF No. 294 at 9-10.)

Moreover, the defendant was well aware of Xu Jin's father's vulnerabilities. As the defendant's post-arrest statements reflect, he knew the goal of the scheme was to force Xu Jin's father to travel to the United States to try to coerce Xu Jin's return to the PRC. That scheme reflected the continuation of efforts, known to the defendant, to follow Xu Jin's parents over multiple years in order to locate Xu Jin. Indeed, in early October 2016, according to the translator, Zhu Yong advised her that Xu Jin's parents – who were in the United States for Xu Xinzi's graduation – were going to Newark International Airport, and directed that the defendant conduct surveillance because "[m]aybe this a lead to find Mr. Jin Xu."[11] (GX 4004 at 777.) Zhu Yong also provided the translator with a Word document, which was forwarded to the defendant. The document included, among other things, Xu Jin's birthdate and a photograph of Xu Jin's parents. (GX 1020.) Based on Xu Jin's own age (and the fact that he had an adult daughter), the defendant was aware that Xu Jin's father was elderly. That was further evidenced by the photograph Zhu Yong provided; as the Court observed during co-defendant Zhu's sentencing, the father looks "older" in the photograph, even if not "frail." (Zhu Tr. 28-29.) Then, in April 2017, the defendant personally surveilled Xu Jin's father after he arrived in the United States and had the opportunity to observe the father's elderly, ill physical condition. (GX 4010 at 849-50.) That was mere months after the father suffered a brain hemorrhage. Further, it is reasonable to infer that, as Tu Lan directed, Zhu Feng told the defendant "everything," including that Xu Jin's father was being escorted by a PRC doctor – an escort whose presence would only have been necessary if Xu Jin's father suffered from a medical issue or other significant vulnerability. (ECF No. 294 at 23.)

It is of no moment that this Court did not find the vulnerable victim enhancement applicable to co-defendant Zhu (ECF No. 358 at 23), given that the defendant possessed far more

---

[11]    After his October 2016 trip to the United States, Xu Jin's father experienced a brain hemorrhage and needed surgery. (Tr. 1388, 1396.) His medical condition made further travel dangerous.

information regarding the father's vulnerabilities than did Zhu and actively participated in the April 2017 operation.  The trial evidence indicated that Zhu's information was limited to the October 2016 photograph (from prior to the father's brain hemorrhage) and the information provided in the Word document reflecting that the father had an adult son.  In contrast, the defendant possessed not only that information, but also his own personal observations of the father's condition and information from his co-conspirators that the father was escorted by a PRC doctor.  The Court found that it was "a close call" whether the enhancement was applicable to Zhu (Zhu Tr. at 32); it is not a similarly close call with respect to this defendant.

c.    A Two-Level Special Skill Enhancement Is Appropriate Under<br><u>U.S.S.G. § 3B1.3</u>

A two-level enhancement for the defendant's use of a special skill pursuant to U.S.S.G. § 3B1.3 is appropriate.  Under Section 3B1.3, if the defendant "used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by *2* levels."  U.S.S.G. § 3B1.3 (emphasis in original).  The Application Notes to the Guideline explain that a special skill "refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing," and offers as examples, among others, lawyers, doctors, and accountants.  U.S.S.G. § 3B1.3, Application Note 4.  The defendant possessed and used such special skills in furtherance of his crimes.

As this Court has observed, the defendant is a "veteran New York City police officer and private investigator," "a seasoned investigator," and "someone with experience and savvy in the investigation field."  (ECF No. 294 at 10, 23, 25.)  The defendant used his law enforcement background, connections, training, and experience, as well as his private investigator background and license – skills not possessed by members of the general public – to facilitate and conceal his crimes.

Most significantly, the defendant relied on his training and experience to conduct surveillance and to evade detection by local law enforcement while doing so; there can be no serious dispute that the defendant's surveillance significantly facilitated his crimes.  In conducting surveillance, the defendant relied upon special skills he obtained as a police officer and private investigator to inform decisions about surveillance strategy, including what records to obtain to facilitate surveillance efforts, how large of a team would be needed and where to position team members, and how to overcome Xu Jin's evasive maneuvers.  (*See, e.g.*, GX 805B at 13 (defendant's text messages to Zhu Feng: "It will be impossible for one person to watch him.  I was going to recommend 3 investigators." and "He lives on a quite [*sic*] street.  The 2nd investigator would be 1 street away."); *id.* at 26 (Zhu Feng's text message to defendant asking, "As [sic] ur experience do u think he is intentionally hiding?" and defendant's response "Yes 100 percent hiding"); GX 4019B at 249 (defendant's text message with Gallowitz explaining Xu Jin had engaged in [v]ery evasive maneuvers – followed him an hour away and got where he's living.").)

The defendant also relied on his training and experience to evade detection by notifying local law enforcement when he was conducting surveillance of Liu Yan's home.  As Gallowitz testified at trial, and as described above, the reason for making such notification was, at least in part, that "if [the police] get a call for a suspicious vehicle, they're less likely to show up."  (PSR ¶ 58; Tr. 1831.)  That is, by drawing upon his law enforcement and private investigation

background to manipulate the law enforcement system, the defendant ensured that his surveillance activities would not be disrupted and that he would not be caught. In doing so, he also ensured that his targets would not receive local law enforcement assistance if they called for help. The defendant thus used special skills – his non-public knowledge of local law enforcement operations and surveillance techniques – to conceal his offense, such that a two-level enhancement pursuant to Section 3B1.3 is warranted. *See, e.g.*, *United States v. Young*, 213 F.3d 627 (2d Cir. 2000) (upholding § 3B1.3 enhancement where defendant used special skills he obtained during his thirty-one years as a police officer to commit the offense, including using standard police investigative techniques and facilities to track down the victim); *see also United States v. Chinniah*, 173 F.3d 846 (2d Cir. 1999) ("The [§ 3B1.3] enhancement was supported by the showing that the defendant used his knowledge of computers and of his employer's internal computer controls in committing the offense."); *United States v. Alexander*, No. 98-CR-1377, 2000 WL 1721142, at *1 (S.D.N.Y. Nov. 16, 2000) ("Woart had worked in the securities industry and he clearly was using his special skills as someone experienced in the sale of securities to facilitate his commission of a fraud."). In arguing that the defendant made a phone call that "any lay person could do" (ECF No. 358 at 24), the defendant misses the point. It is not that anyone could make the call, but that the defendant only knew to make the call because of the special skills he developed as a law enforcement officer.

### d.    A Minor Role Reduction Is Not Appropriate Under § 3B1.2

The minor role reductions the defendant seeks pursuant to U.S.S.G. § 3B1.2 (ECF No. 358 at 39-45) are not appropriate. Section 3B1.2 provides for a four-level reduction where the defendant was "a minimal participant," a two-level reduction where the defendant was "a minor participant," and a three-level reduction where the defendant's conduct falls somewhere between being a minimal and a minor participant. U.S.S.G. § 3B1.2. These mitigating role reductions are appropriate where the defendant is "substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2, Application Note 3(A). The defendant played a critical role in the criminal scheme – ultimately locating Xu Jin's home address and providing it to his co-conspirator – and was far from a minimal or minor participant.

The jury squarely rejected the defendant's argument that he did not understand the scope of the criminal scheme or that he was working for the PRC government. (ECF No. 358 at 31.) And this Court subsequently found in denying the defendant's motions pursuant to Rules 29 and 33 that there was sufficient evidence presented at trial to support the jury's finding. (*See* ECF No. 294 at 22-25 (detailed discussion of evidence supporting that defendant knew he was working for PRC government); *see also id.* at 10 ("The evidence at trial established that McMahon was hired by Zhu to perform surveillance on Xu Jin and his relatives at the direction of Chinese officials, that McMahon knew . . . that he was working at the direction of agents of the PRC government, and that his investigative and surveillance work contributed to the harassment of Xu Jin and his family."); *id.* at 11 ("The true identities of the people for whom McMahon was working did not remain obscure."); *id.* at 24-25 ("[T]here was evidence that McMahon learned directly, on his own, that the target of his investigation was 'wanted' by the Chinese government and that McMahon was working with and for agents of the PRC."); *id.* at 25 ("McMahon's actual knowledge that the Chinese government was seeking to repatriate Xu Jin to face criminal charges was corroborated by his post-arrest statement that he knew his clients' goal was getting Xu Jin 'back to China . . . [s]o they could prosecute him.'" (quoting GX 701B at 4).)

The defendant's attempts to minimize his role are similarly unavailing.[12]  The defendant's characterization of his conduct as "conducting asset searches and performing five days of surveillance" (ECF No. 358 at 32) understates the role he played in the illegal repatriation scheme.  For example, the defendant ascertained personal information about the victims well beyond asset searches, such as Xu Xinzi's graduate residence.  (ECF No. 294 at 13.)  Most importantly, the defendant agreed to – and did – participate in the April 2017 operation spearheaded by PRC officials to compel Xu Jin's father's travel to New Jersey to coerce Xu Jin to return to the PRC.  (*Id.* at 27, 32.)  In doing so, the defendant located Xu Jin's residence, following years of unsuccessful efforts by the PRC government to find the address, which Xu Jin and Liu Fang had sought to keep private.  (*Id.* at 32.)  After providing the address to Zhu Feng, Zhu told the defendant that they would "grant u a nice trip if they can get Xu back to China haha."  The defendant responded by proposing, "I think if we harass Xu.  Park outside his home and let him know we are there."  (PSR ¶ 70.)  That response demonstrates that he plainly understood the scheme's goal to "harass Xu."  And when asked about next steps given that he had located Xu Jin's residence, the defendant joked with Gallowitz about "waiting for a call" about "an abduction."  (GX 4019B at 255-57; *see also* ECF No. 294 at 35 n.21.)  The defendant's conduct belies his claim that he lacked knowledge regarding the scope and structure of the criminal activity.  (ECF No. 358 at 31.)  Further, his contention that he did not stand to benefit from the criminal activity (*id.* at 33) fails.  The defendant was paid for his services.  And, after being promised an additional benefit if the scheme succeeded – "a nice trip" – the defendant suggested becoming more aggressive and overtly harassing Xu Jin.  That response demonstrates that the defendant not only stood to benefit from the criminal activity, but was motivated by such benefit.  Nor is it of any moment that the defendant did not personally have contact with the victims, as he contends (*id.* at 32).  The victims were harassed and stalked and suffered substantial emotional distress as a direct result of the defendant's conduct.  To the extent the defendant did not personally reveal himself to the victims, that was not a result of his own decisions, but the product of specific direction by his PRC clients that "[w]e can't harass Xu like that," countermanding the defendant's proposed course of action.  (ECF No. 294 at 15.)

The nature and extent of the defendant's participation in the criminal scheme demonstrates that the Court should not apply any reduction under Section 3B1.2 here.  Even to the extent the defendant did not lead the criminal scheme, he is not substantially less culpable than others involved in the scheme, including Zhu Yong, for whom the Court already rejected any mitigating role reduction (*see* Zhu Tr. 43-47).[13]

---

[12]    The government does not herein address each of the defendant's mischaracterizations of the trial evidence, because the evidence is more than sufficient to establish that Section 3B1.2 is not applicable.  By way of example, however, the government notes that the defendant's contention that his "only connection to [Xu Xinzi] was that he conducted computer searches related to her address and assets" (ECF No. 358 at 33) ignores the defendant's efforts to obtain wholly irrelevant information regarding Xu Xinzi, such as her college major and information regarding her purported graduate residence (ECF No. 294 at 13).

[13]    In contrast, co-defendant Zheng in fact was substantially less culpable than his co-conspirators, such that a two-level minor role reduction was warranted, as the parties agreed and

e.    A Two-Level Reduction for Acceptance of Responsibility Is Not
Appropriate Under U.S.S.G. § 3E1.1

The two-level acceptance of responsibility reduction the defendant seeks pursuant
to U.S.S.G. § 3E1.1 is not appropriate.  Under Section 3E1.1, "[i]f the defendant clearly
demonstrates acceptance of responsibility for his offense," the court should "decrease the offense
level by two levels."  U.S.S.G. § 3E1.1.  The Application Notes make clear that "[t]his adjustment
is not intended to apply to a defendant who puts the government to its burden of proof at trial by
denying the essential factual elements of guilt, is convicted, and only then admits guilt and
expresses remorse."  U.S.S.G. § 3E1.1, Application Note 2; *see also United States v. Nouri*, 711
F.3d 129, 146 (2d Cir. 2013) (affirming district court's decision not to apply acceptance of
responsibility adjustment because defendant contested his guilt at trial by arguing in summation
that he lacked criminal intent); *United States v. Kamara*, 85 F. App'x 231, 232-33 (2d Cir. 2003)
(affirming district court's rejection of acceptance of responsibility adjustment because defendant's
expression of remorse for his conduct only occurred "after the jury found him guilty"); *United
States v. Castano*, 999 F.2d 615, 617 (2d Cir. 2003) (per curiam) (holding that defendant was not
entitled to acceptance of responsibility adjustment where "nothing in the record indicates that
[defendant] had any purpose in going to trial other than to deny his factual guilt").  The Application
Notes recognize that conviction by trial "does not automatically preclude a defendant from
consideration for such a reduction," but caution that the court should only apply the adjustment
after conviction by trial in "rare situations," such as "where a defendant goes to trial to assert and
preserve issues that do not relate to factual guilt."  U.S.S.G. § 3E1.1, Application Note 2.  In such
instances, "a determination that a defendant has accepted responsibility will be based primarily
upon pre-trial statements and conduct."  *Id.*  Ultimately, the defendant bears the burden of showing
that the acceptance of responsibility reduction is warranted.  *United States v. Chu*, 714 F.3d 742
(2d Cir. 2013).

The defendant has not satisfied that burden and, indeed, it is hard to fathom a
defendant for whom an acceptance of responsibility reduction would be less appropriate.  The
defendant has never accepted responsibility for his criminal conduct and has contested his factual
guilt at every stage.  This is not the "rare situation" where a reduction is warranted, and it is
appropriate, in this regard, for the Court to consider the defendant's conduct both during and after
trial.

Throughout his trial, the defendant vigorously contested his factual guilt.  (*See, e.g.*,
Tr. 49 (argument in opening statement that "The evidence in this case is going to show that Mike
McMahon is truly innocent and that this prosecution is a true tragedy."); *id.* at 2046-47 ("Today,
only you can prevent the injustice that such a conviction would engender. . . . the conviction of an
innocent man.").  Following trial, the defendant forcefully challenged his convictions in briefs

---

this Court found.  (Zheng Tr. 43.)  Unlike the defendant's, Zheng's involvement in the conspiracy
lasted at most two days, and Zheng was unaware of other participants in the scheme such as Hu Ji,
Zhu Yong and Zhu Feng – individuals central to the illegal repatriation scheme with whom the
defendant frequently communicated in furtherance of the scheme.

totaling almost 180 pages.  (ECF Nos. 279, 291.)  At no point during trial proceedings did the defendant accept responsibility for his offenses.

Following his convictions, the defendant, in at least three interviews, refused to accept responsibility.  Immediately following the guilty verdicts, the defendant spoke outside the courthouse and stated, regarding his offense conduct:  "This case was no different than the hundreds of other cases I worked on.  Nothing stood out to me."[14]  (*See* Ex. A, "Private Investigator Speaks After Being Found Guilty of Spying," *Daily Mail* (June 16, 2023), https://www.dailymail.co.uk/video/news/video-2963637/Private-Investigator-McMahon-speaks-guilty.html (last visited Apr. 3, 2025)).  Rather than accept responsibility for his own conduct and the harm he caused, the defendant cast the prosecution and verdicts as unjust.  (*See* Ex. A ("Why are we here?  Why was I arrested?  Why didn't they protect our family?  This is . . . not America.  This is not our justice system."); *id.* ("Absolute injustice."); *id.* ("This is . . . outrageous, what happened.  Absolutely outrageous.").)  Similarly, in an interview reported by the *New York Post*, the defendant again refused to accept responsibility for his crimes.  (*See* Ex. B, "Former NYC Sergeant Says FBI Scapegoated Him in China Spying Scandal," *N.Y. Post* (June 24, 2023), https://nypost.com/2023/06/24/former-cop-michael-mcmahon-says-fbi-scapgoated-him-in-china-spying-scandal/.)  The defendant contended that "everything [he] did was right," he "didn't harass or stalk anyone," and that "if [he] had suspected that [his] clients worked for the Chinese Communist Party, [he] would have contacted the FBI right away and not proceeded with the job."  (*See id.*)  He further stated that there was "nothing out of the ordinary" about the private investigation job.[15]  (*See id.*)  In addition, in a July 2023 interview, the defendant was asked why he believed he was "wrongly convicted," to which the defendant did not dispute that he held such belief, and instead repeated that he "conducted legal P.I. work."  (*See* Ex. C, CNN Newsroom with Jim Acosta (July 8, 2023), https://www.youtube.com/watch?v=Xgjd7ETVv_g (defendant claiming he was told the father "was coming here to ask the son to return the millions of dollars that he stole from the construction company," which is inconsistent with his post-arrest statements that he knew the father was flown to the United States to convince Xu Jin to return to the PRC).)  The defendant's various interview statements – including his claims that he was wrongly convicted – clearly demonstrate that he has not accepted responsibility.

The defendant's statement to Probation likewise does not demonstrate any acceptance of responsibility.  (PSR ¶ 135.)  Instead, his statement continues to minimize and obfuscate his role in ways that are not credible.  For example, the defendant told Probation that learning from the *China Daily* article that Xu Jin was wanted in the PRC for embezzlement did not strike him as "unusual."  That claim is contradicted by the defendant's text messages to Gallowitz ("tlo says he wanted by INTERPOL wow!!"; "bring your gun") and emails with the translator ("I'm sure he knows this but he didn't tell us"; "I think he should have.").  (ECF No.

---

[14]    Tellingly, that claim was contradicted by Gallowitz, the defendant's friend and surveillance partner.  Gallowitz testified that the type of surveillance work he and the defendant did in this case – surveillance of an individual wanted by Interpol – was "atypical."  (ECF No. 294 at 12.

[15]    This claim too was contradicted by Gallowitz's testimony.  (ECF No. 294 at 12.)

294 at 12; GX 4004 at 781.)  With respect to accepting responsibility, the defendant states only that, "[d]uring [his] trial, the Government attempted to show that [he] should have known it, and in retrospect, [he] wish[es] [he] had."  (PSR ¶ 135.)  That statement falls far short of accepting responsibility for his criminal conduct.

Similarly, the defendant does not accept responsibility for his criminal conduct in his sentencing memorandum.  Notably, he repeatedly highlights letters submitted on his behalf, many of which assert that he is innocent and was wrongfully convicted.  Those letters do not discuss the evidence in the case and offer no basis for the writers' assertions of the defendant's innocence.  They instead make unfounded attacks against the investigation, prosecution, and trial, accusing the government of knowingly conspiring to jail an innocent man.  The defendant does not disavow these attacks.[16]

Despite the defendant's argument (ECF No. 358 at 26-28), nothing about the circumstances of the pre-trial or trial proceedings suggests this is the "rare" case in which a reduction for acceptance of responsibility is warranted after conviction by trial.  The record disproves the defendant's contention that he tried to assist law enforcement's investigation by providing a lengthy post-arrest statement (*id.* at 27).  As a threshold matter, the defendant's admissions in his post-arrest interview to certain facts that helped prove elements of his crimes is not a "rare" circumstance establishing his clear acceptance of responsibility for his criminal conduct prior to trial.  *Cf. Castano*, 999 F.2d at 616-17 (acceptance of responsibility reduction not applicable even where defendant was "truthful" about his criminal conduct at his second proffer session, because he contested his factual guilt at trial).  In any event, during the interview, the defendant repeatedly lied to the interviewing agents and attempted to minimize his role in the scheme.  For example:

- The defendant disclaimed any knowledge that he was working for the PRC government or that the goal was convincing Xu Jin to return to the PRC to face criminal charges, repeatedly claiming he believed he was working on a civil matter, *i.e.*, trying to locate Xu Jin because he had stolen money from a PRC construction company.  (*See, e.g.*, ECF No. 228, Ex. 4 at 10, 62-63.)

---

[16]    The assertions in the letters submitted by the defendant echo those made publicly on the defendant's behalf, which he similarly has not refuted.  For example, a March 2025 social media post by the Pipe Hitter Foundation – which his wife, Martha Byrne, appears to have co-founded and which has raised funds to assist with the defendant's legal fees – contended that the defendant "faces sentencing for a crime he did not commit," "was wrongfully arrested," and "faces an unjust sentence."  *See* Pipe Hitter Foundation (@pipe_hitter_foundation), Instagram (Mar. 13, 2025), https://www.instagram.com/pipe_hitter_foundation/reel/DHI6s6dRluL/; *see also* Martha Byrne (@MarthaByrne10), X (Mar. 1, 2025) ("It's almost too much to see how many people had to coordinate & agree to be willing to send my innocent husband to federal prison when he committed no crime."); Martha Byrne (@MarthaByrne10), X (Oct. 28, 2023) ("[T]he government dragged someone they know is innocent through the mud.").

- When asked about his text message in which he suggested harassing Xu Jin, the defendant initially responded, "I don't know why I would even say something like that. . . Unless it was [a] typo or something." (*Id.* at 56.) The defendant's excuse is not plausible, particularly given the surrounding text conversation about benefits to the defendant if Xu Jin was persuaded to return to the PRC. (*See* GX 805B at 32.)

- When asked about the payment deposited into his son's student account, the defendant responded, "Oh, I don't know why it went to my son's." (ECF No. 228, Ex. 4 at 71.) After the interviewing agent pointed out that the defendant himself provided the account number for purposes of the deposit, the defendant said he might have "been uneasy using [his] account" and that he "didn't want to give out [his] business account information." (*Id.* at 72.) Such explanations clearly were intended to hide the defendant's prior efforts to conceal the source of his payments, and are not credible given that the defendant had already provided his own business account information in connection with obtaining the retainer.

Nor is the defendant entitled to an acceptance of responsibility adjustment simply because he voluntarily provided his case file to investigators. (ECF No. 358 at 27-28.) That does not establish that he has accepted responsibility for his criminal conduct, and his statements before, during, and after trial, outlined above, demonstrate he has not.

Finally, the Court should reject the defendant's argument that U.S.S.G. § 3E1.1(b) unconstitutionally subjects a defendant who proceeds to trial to a heightened Guidelines range. (*Id.*) The government respectfully submits that the decision on which the defendant relies, *United States v. Tavberidze*, No. 23-CR-585 (JSR), 2025 WL 748354 (S.D.N.Y. Mar. 10, 2025), was wrongly decided by Judge Rakoff. In any event, that decision is not binding on this Court.

The defendant has, at every stage and in every respect, refused to accept responsibility for his crimes. The acceptance of responsibility adjustment plainly is not warranted.

f.    The Grouping Analysis Applied to Multiple Stalking Offenses Is Appropriate Under U.S.S.G. § 1B1.2(d)

Probation appropriately applied U.S.S.G. § 1B1.2(d), including the three-level enhancement due to the grouping of the multiple object counts. (PSR ¶ 160.) As Section 1B1.2(d) and its Application Notes instruct, "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit" but only "if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit [each] object offense." U.S.S.G. § 1B1.2(d); U.S.S.G. § 1B1.2(d), Application Note 4; *see also United States v. Robles*, 562 F.3d 451, 455-56 (2d Cir. 2009) (sentencing court finding § 1B1.2(d) applicable must find "beyond a reasonable doubt" that the defendant conspired to commit each object of the conspiracy).

Here, Section 1B1.2(d) applies because the trial evidence proved beyond a reasonable doubt that the defendant was guilty of Count Three's multiple conspiratorial objects – namely, the interstate stalking of each of Xu Jin, Liu Fang, and Xu Xinzi.  (PSR ¶ 107.) Accordingly, the grouping adjustment under Section 1B1.2(d) applied to the multiple-count conspiracy provides for a three-level enhancement.  (*Id.* ¶¶ 138-60.)

The defendant argues that the interstate stalking conspiracy is not a "conspiracy to commit more than one offense" because the ultimate goal of the conspiracy was to harass and coerce Xu Jin alone into returning to the PRC.  (ECF No. 358 at 17-18.)  All this shows is that the defendant stalked three people in support of a larger coercive goal against one person.  That is no defense to the application of Section 1B1.2(d).  That section is inapplicable where, as here, the multiple offenses of the conspiracy "refers to all offenses the defendant conspired to commit that fall within the conspiracy that is alleged in the indictment."  *United States v. Mitchell*, 120 F.4th 1233, 1244 (4th Cir. 2024); *see also Robles*, 562 F.3d at 456 (multiple objects of a conspiracy need not be articulated in an indictment to be considered under Section 1B1.2(d)).  As this Court found during co-defendant Zhu's sentencing, under Section 1B1.2(d), "a conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit," and it is "not necessary for the separate crimes committed as part of the conspiracy to be identified in the indictment."  (Zhu Tr. 37-38 (finding sufficient evidence to apply § 1B1.2(d) and count each of the acts carried out as part of the conspiracy as separate offenses that are grouped together for purposes of the Guidelines calculation).)

The defendant argues that the trial evidence did not prove beyond a reasonable doubt that he conspired to stalk each of Xu Jin, Liu Fang, and Xu Xinzi.  (ECF No. 358 at 19-20.) That argument fails.  As described above, the defendant provided detailed personal information about all three victims, including bank records, housing information, and educational and enrollment data.  (*See, e.g.*, GX 3028; GX 4008.)  He suggested to Zhu Feng that they "harass Xu" and "[p]ark outside his home and let him know we are there."  (GX 805B.)  He joked with Gallowitz about Xu Jin being abducted, while waiting for instructions about further surveillance. (GX 4019B at 244-57.)  And the defendant knowingly participated in the scheme to bring Xu Jin's father to the United States as an intimidation and harassment tactic to force Xu Jin's return to the PRC, admitting during his post-arrest statement that he knew Xu Jin's father was brought to the United States to try to "convince" Xu Jin to return to the PRC.  (GX 701A; GX 701B.)

### 3.    No Downward Departure Is Warranted

Given the defendant's role in and knowledge of the illegal repatriation scheme, detailed above, the Court should reject the defendant's request for a downward departure (ECF No. 358 at 34-38).  The applicable Guidelines range – which necessarily does not account for the defendant's Section 951 conduct – is the appropriate starting point for consideration of the Section 3553(a) factors.

### B.    Analysis of Sentencing Factors Under 18 U.S.C. § 3553(a)

18 U.S.C. § 3553(a) requires courts to consider a number of factors in imposing a sentence, including the nature and circumstances of the offense, the history and characteristics of

the defendant, the need for the sentence to serve as a deterrent, and the need to avoid unwarranted sentencing disparities. For the reasons below, these considerations support imposing a sentence of 87 months' imprisonment; specifically, a sentence of 48 months' imprisonment on Count Two and sentences of 87 months' imprisonment –the top of the applicable Guidelines range – on Counts Three and Four, all to run concurrently to each other.

The defendant – a former law enforcement officer who took an oath to protect the public, and regularly touts his public service (*see, e.g.*, PSR ¶ 135) – knowingly engaged in illegal conduct that caused terror to Xu Jin, his wife, his daughter, and his extended family, shattering their sense of safety and security. The defendant's conduct thus warrants a sentence within the Guidelines range for the interstate stalking offenses. The fact that the defendant engaged in that conduct in furtherance of a foreign government's interests – a significant consideration not otherwise accounted for by the interstate stalking Guidelines – warrants a sentence at the top of that range.

1.    The Nature and Circumstances of the Offenses

The defendant was a critical member of the illegal scheme to forcibly repatriate Xu Jin and Liu Fang and terrorize them and their family, as detailed above. Indeed, as this Court observed, "[i]t was McMahon's uncovering of the home address of Xu Jin, through surveillance and tailing, that enabled the co-conspirators to target these victims for harassment and intimidation." (ECF No. 294 at 33.) The defendant's actions furthered the PRC government's illegal operations on U.S. soil – conduct which, as this Court recognized during co-defendant Zhu's sentencing, posed a serious threat to U.S. national security and sovereignty. (Zhu Tr. 77.) Such conduct is extraordinarily serious and has upended the lives of Xu Jin, Liu Fang, and their family.

a.    The Defendant Knew He Was Working for the PRC Government to Coerce Xu Jin's Repatriation to the PRC to Face Criminal Charges

The defendant harassed the victims, and he did so on behalf of the PRC government in furtherance of a scheme to coerce Xu Jin and Liu Fang's repatriation to the PRC. The defendant's claim that he did not know he was working for the PRC government (ECF No. 358 at 36, 39-41) is flatly contradicted by the evidence. Such evidence includes:

- Contemporaneous emails and text messages demonstrating that, before he conducted any surveillance, the defendant learned that Xu Jin was "wanted" for arrest by the PRC government. The defendant obtained a report that identified Xu Jin as "INTERPOL MOST WANTED" and that he was wanted by PRC authorities. (PSR ¶ 45.) The defendant also sent himself an article titled "Interpol Launches Global Dragnet for 100 Chinese Fugitives," which identified Xu Jin and Liu Fang as individuals for whom Interpol China had issued arrest warrants, and provided their names, photographs, biographical information and charging information. (*Id.* ¶ 61.) The defendant texted Gallowitz, "tlo [database] says he wanted by INTERPOL wow!!" and "bring your gun" to the surveillance. (ECF No. 294 at 12.) At trial, Gallowitz testified that this was an "atypical" private investigator engagement and that Gallowitz believed the defendant understood there was "criminality involved" in tracking

down Xu Jin. (*Id.*) Notably, as a former law enforcement officer, the defendant would have understood that a lawful arrest of a fugitive wanted by Interpol would not be executed by a private investigator.

- Contemporaneous text messages also demonstrated that the defendant knowingly participated in the scheme to coerce Xu Jin's repatriation to the PRC. For example, after the defendant located Xu Jin's residence and provided the address to co-conspirator Zhu Feng, the defendant sent a text message to Gallowitz that the defendant was "waiting for a call" regarding next steps. Gallowitz responded, "Yeah. From NJ State Police about an abduction," to which the defendant responded "Lol." (GX 4019B at 244-57.) The only reasonable reading of this text exchange is that the defendant and Gallowitz understood that, having located Xu Jin, the PRC government now could accomplish its objective of forcing his repatriation by abducting him.

- In separate text messages, Zhu Feng advised the defendant that they would "grant u a nice trip if they can get Xu back to China haha." (PSR ¶ 70.) The defendant then proposed a more aggressive method of coercion: "I think if we harass Xu. Park outside his home and let him know we are there." (*Id.*) That response demonstrates that the defendant understood, and supported, the scheme to harass and intimidate Xu Jin.

- The defendant also admitted in his post-arrest interview that he knew the "goal" of bringing Xu Jin's father from the PRC to the United States was to "get [Xu] back to China . . . so they could prosecute him," and that the father was brought to the United States to "convince" Xu Jin to return "out of honor for the [family] name" so Xu Jin would "face the consequences back in China." (GX 701A; GX 701B at 4.) The defendant's law enforcement background informed his use of the word "prosecute" and undercuts his contention he believed he was involved in a civil dispute.

- The defendant also hid or otherwise obscured payments he received for his work in locating and harassing Xu Jin and his family. The defendant's bank records reflect that he deposited the initial retainer check into his business account prior to learning Xu Jin and Liu Fang were wanted by Interpol. (PSR ¶ 39.) However, after learning that fact, he never again deposited payment for his work on the case into his business account. (*Id.*) Instead, he took thousands of dollars in cash from in-person meetings with his co-conspirators or deposited the payments into various other non-business accounts, such as his son's student account. (*Id.* ¶¶ 40-42.) When questioned during his post-arrest interview as to why he had used his son's student bank account, he offered implausible explanations, such as that he did not know why it went to his son's account – even though he had provided that account information. Tellingly, following his arrest, the defendant admitted to a friend that this case was the only time he ever deposited money into his son's account. That fact further corroborates the defendant's knowledge that his conduct was illegal.

- Despite his investigative background, the defendant did not inquire about his co-conspirators' suspicious conduct, including the circumstances under which he was hired. The defendant repeatedly and purposefully ignored red flags such as an ever-changing story about his client's identity, the purpose of the retention, and the reasons for requests irrelevant to the purported goal of locating Xu Jin. (ECF No. 294 at 10-11.) The defendant also never asked his co-conspirators about the victims being "wanted" by the PRC government.

- Phone records and photographs demonstrated that the defendant met and spoke by phone with co-conspirators, including a PRC police officer, at critical junctures during the conspiracy. (*See, e.g.*, PSR ¶ 69.)

Thus, as this Court observed, and the jury found: "[t]he evidence at trial established that McMahon was hired by Zhu to perform surveillance on Xu Jin and his relatives at the direction of Chinese officials, that McMahon knew – or at least consciously avoided learning – that he was working at the direction of agents of the PRC government, and that his investigative and surveillance work contributed to the harassment of Xu Jin and his family." (ECF No. 294 at 10.) That remains true, notwithstanding the defendant's urging that the Court should reach a different conclusion now that it is not constrained by post-trial review standards. (ECF No. 358 at 40.)

Additionally, the defendant actively encouraged his co-conspirators to engage in harassing and intimidating conduct, including at one point suggesting to Zhu Feng that the co-conspirators make their surveillance and scheme known so they could openly "harass Xu." (PSR ¶ 70.) It cannot be seriously disputed that the defendant's co-conspirator PRC government officials relied on, and were encouraged by, the defendant's active engagement and pursuit of the victims. Indeed, as Zhu Feng told the defendant, "they are very happy for what u have done." (*Id.*)

Further, contrary to his contention (*see, e.g.*, *id.*), the defendant's conduct was not merely standard private investigation. As this Court found:

> This argument requires a revisionist perspective on the evidence presented at trial. As the facts established at trial show, the dubious circumstances under which McMahon was hired, the scope of work he was asked to perform, the scheme's objective, and certain unsettling activity – namely, the use of Xu Jin's elderly father, via a compelled visit to the United States, to repatriate his son – sets the work he performed for the PRC government apart from that of a typical private investigative assignment. The legitimate practice of private investigation is not unfairly impacted, no less "outlawed," by the limits imposed by the interstate stalking statute."

(ECF No. 294 at 27-28.) The Court should again reject this argument.

b.    <u>The Defendant's Conduct Profoundly Harmed His Victims</u>

The victims' testimony and impact statements reflect that their sense of safety and security was shattered by the conduct of the defendant and his co-conspirators. As the victims'

statements reflect, the defendant's conduct not only was intended to, but in fact did, aid a foreign government in stalking and harassing individuals living here in the United States.

Liu Fang testified at trial, for example, that her "life was turned upside down" because of the actions taken against "all the family members and the extended family." (Tr. 732.) She explained that, because she did not "want to be harmed" she "chose to be away from [her family]" and "cut off all communications." (*Id.* at 732.) As a result of "seal[ing] myself up," Liu Fang testified she "lost my friends and all the connection with my relatives and friends in China." (*Id.* at 733.) She also testified that she feared for her daughter's safety. (*Id.* at 730.) Liu Fang's sister corroborated this testimony, herself testifying that Liu Fang, had been "on the verge of collapsing" as a result of the illegal repatriation scheme, and had distanced herself from family and friends. (*Id.* at 126.) She stated that she had "no proper words to describe the mental pain we have suffered." (*Id.*) In addition, Xu Jin testified that he feared for his personal safety, as well as the safety of his family members – both in the PRC and in the United States. (*Id.* at 1400-01.)

The profound effects of the defendant's conduct are further detailed in the victim impact statements. The victims uniformly describe feeling unsafe and worrying about their own safety and that of their family members. (PSR ¶¶ 101-03.) One victim, for example, describes spending "countless days crying, worrying about my family's safety, and my own." (*Id.* ¶ 102.) The victims also describe significant health issues, including depression, insomnia, excessive stress, anxiety, and heart disease. (*Id.* ¶¶ 101, 103.) The victims further describe the significant disruption to their daily lives, including that, "in order to minimize harm to others, [the victims] have almost entirely severed ties" with friends and business partners. (*Id.* ¶ 101.) Those victims "dare not venture out casually, and only leave the house to buy essential supplies." (*Id.*) The victims additionally describe harm to family members in the PRC, including medical issues, interrogations by the PRC government, and lost jobs. (*Id.* ¶¶ 101, 103.)

The defendant's contention that he never personally harmed the victims (*see, e.g.*, ECF No. 358 at 42) is factually and legally incorrect. Liu Yan testified that, while driving Xu Jin's father to Livingston Mall on April 6, 2017, she noticed someone she thought was following her who was not Chinese. (PSR ¶ 59; Tr. 99.) That was the defendant. (PSR ¶ 59.) He, along with another private investigator he hired, was surveilling Liu Yan, took photographs of her, and shared those photographs and reports with Zhu Feng. (*Id.*) The defendant claims that he was never seen by Xu Jin or his family because they did not identify him in court. But Liu Yan's testimony establishes that she observed the defendant following her.[17] And in any event, the defendant's conduct directly facilitated the harassment of Xu Jin and his family. For example, the defendant participated in the scheme to use Xu Jin's elderly and ill father to locate Xu Jin – a scheme that caused evident harm to the victims. (*See, e.g.*, GX 4010 at 849-50; Tr. 1396-97.) And it was because of the defendant's role in that scheme that he was able to locate Xu Jin's home, which enabled the defendant's co-conspirators later to leave the threatening note on the door. (ECF No. 294 at 40.)

---

[17]    As set forth above, the government believes Xu Jin's testimony conflates the events of April 6 and April 7, 2017, such that Xu Jin in fact did observe the defendant on April 6 while the defendant was conducting surveillance. *See supra*, note 5.

## 2.    The History and Characteristics of the Defendant

The defendant does not have any criminal history, and the government does not contest the assertions of those who have written letters concerning the defendant's family relationships and friendships.  The government also recognizes the defendant's public service, much of which is laudable.

The defendant holds himself out as a protector of the public and "a man of honor and integrity" (ECF No. 358 at 64), and submitted numerous letters attesting to such qualities. But, as is evident from the record, the defendant repeatedly has behaved in ways inconsistent with that persona.

*First*, as detailed above, rather than use his law enforcement training, experience, and contacts to help others, the defendant exploited them to further the illegal repatriation scheme in ways that would not otherwise have been possible.  For example, he relied upon his knowledge of local law enforcement practices to evade detection during his surveillance of Xu Jin's family. (PSR ¶ 58; Tr. 183.)

*Second*, the defendant's private communications in the case depict someone who jokes about endangering others and denigrates them.  (*See, e.g.*, GX 4006B at 3 (text message exchange between defendant and Finning in which defendant provided Xu Jin's and Liu Fang's social security numbers, dates of birth, and New Jersey license numbers, to which Finning responded, "Love you long time," to which defendant replied "Ha"); GX 4019B at 16 (text message to Gallowitz in which defendant, referring to Zhu Feng, wrote "Never heard back from Asian!!"); *id.* at 244-57 (text message exchange between defendant and Gallowitz after locating Xu Jin's residence in which defendant stated he was "waiting for a call" to find out what to do next, to which Gallowitz responded "Yeah.  From NJ State Police about an abduction," to which defendant responded "Lol").)

*Third*, findings by the New York City Civilian Complaint Review Board ("CCRB") further undermine the defendant's portrayal of himself.  (*See* Ex. D.)  Although the defendant claims that the conduct underlying the complaint is "hardly egregious" (ECF No. 358 at 53 n.9), the conduct yet again reflects his lack of respect for others.[18]  And it yet again demonstrates his lack of respect for the law.  After reviewing evidence, including conducting interviews with the defendant and the complainant as well as law enforcement and civilian witnesses, the CCRB investigator found that the defendant's account of events was implausible and noted "Sgt.

---

[18]    As background, a CCRB investigator recommended substantiating five allegations (including three allegations that the defendant abused his authority) by a sixteen-year old boy, who alleged, among other things, that in April 2000, the defendant stopped and searched the complainant without cause and called him "stupid."  Specifically, the allegations the investigator recommended substantiating were that the defendant: (1) abused his authority when he frisked the complainant, (2) abused his authority when the defendant searched the complainant's backpack; (3) abused his authority when the defendant issued a retaliatory summons against the complainant; and (4) was discourteous to the complainant by speaking rudely towards the complainant.  *See* Ex. D at 1.  The investigator did not recommend substantiating an abuse of force allegation.  *See id.*

McMahon's near total lack of credibility."   (Ex. D at 13 ("Based on the strength of [the complainant]'s credibility and Sgt. McMahon's near total lack of credibility, it seems extremely likely that Sgt. McMahon addressed [the complainant] as "stupid" at least once, if not several times."); *see also id.* at 11 ("Sgt. McMahon's account of what took place was not convincing."); *id.* at 11 ("Sgt. McMahon's [separate] claim . . . is also incredible."); *id.* at 11 ("Sgt. McMahon's credibility was further damaged by his claim . . . [which] seemed intended to portray [the complainant] in a negative light and provide further justification for his subsequent search."); *id.* at 12 ("Sgt. McMahon's lack of consistency on these crucial points and others severely damaged his overall credibility.").)  Significantly, the investigator also found that the defendant was "more intent on shielding himself from allegations of misconduct . . . than on providing a truthful account of what took place."  (*Id.* at 11.)  In his sentencing memorandum, the defendant entirely ignores these credibility findings.  But it is telling that the CCRB investigator's observations from twenty-five years ago are so consistent with the defendant's behavior throughout the prosecution of this case.

Separately, the government sympathizes with the defendant's reported medical and mental health ailments (ECF No. 358 at 101-04), but they are not so extraordinary or otherwise of such an unusual nature that the Bureau of Prisons ("BOP") could not accommodate them, and accordingly no departure is warranted.  *See, e.g.*, *United States v. Altman*, 48 F.3d 96, 104 (2d Cir. 1995) (Guidelines "restrict[] departures based on physical condition to defendants with an 'extraordinary physical impairment,' such as those which render a defendant 'seriously infirm'").  Indeed, courts routinely find that the BOP is adequately able to treat conditions such as the defendant's, as well as more serious ones.  *See, e.g.*, *United States v. Barton*, 76 F.3d 499, 502 (2d Cir. 1996) (letter from physician indicating defendant suffered anxiety and depression did not establish extraordinary mental or emotional condition warranting downward departure); *United States v. Farraj*, 211 F. Supp. 2d 479, 480 (S.D.N.Y. 2002) (finding defendant's health condition was "serious enough to require vigilance" but did not render him "seriously infirm," where condition affected defendant's ability to walk for long periods and required monitoring every two months and might, in the future, require additional procedures to remove skin cancer); *see also United States v. Martinez*, 207 F.3d 133, 139 (2d Cir. 2000) ("There is no evidence in the record that [defendant's] diabetes is of a type that cannot be adequately cared for within the prison system."); *United States v. Kurland*, 718 F. Supp. 2d 316, 319 (S.D.N.Y. 2010) (observing "standards for downward departure on medical grounds are rigorous," and declining to apply downward departure for defendant's health issues, including hyperlipidemia, diabetes mellitus, and prostate cancer in remission).

Finally, it bears emphasis that, even though the defendant has heard the testimony about the trauma his actions caused to his victims and has presumably read the victim impact statements, he has demonstrated no remorse for the pain and harm they have suffered.  Nor has he even acknowledged the victims, much less apologized to them.  Instead, the defendant repeatedly has mischaracterized himself as the true victim in the case.  (*See, e.g.*, Ex. A.)  He is not.

For the reasons above, the defendant's history and characteristics, when considered in totality with the other Section 3553(a) factors, do not warrant leniency or a non-custodial sentence as the defendant urges.

3.    <u>The Need for the Sentence to Serve as a Deterrent</u>

The seriousness of the defendant's offenses warrants a term of imprisonment that would deter others both from undermining national security interests by illegally acting on behalf of foreign governments on U.S. soil and from causing substantial harm to victims in the United States by stalking them and their families.  Through its just punishment of the defendant in this case, the Court can send an important and appropriate message that such conduct is grave and those engaging in such activities will receive serious punishment.

The need for general deterrence is of paramount importance given the PRC government's well-established transnational repression activities in the United States – including activities in connection with Operation Fox Hunt – which undermine U.S. laws, norms, and individuals' rights.  Indeed, in recent years, the PRC government repeatedly has engaged in Operation Fox Hunt activities here in this District.  *See, e.g.*, *United States v. An, et al.*, No. 22-CR-460 (E.D.N.Y.) (KAM) (six defendants charged – with one convicted and several at large – of conspiring to and/or acting as illegal agents of PRC government in connection with multi-year scheme in which a PRC national living in United States and various U.S.-based and PRC-based family members were threatened in order to coerce the national's repatriation); *United States v. Ying*, No. 22-MJ-1711 (S.D.N.Y.) (charging at-large PRC national with conspiring to and acting as illegal agent of PRC government in connection with multi-year scheme in which PRC nationals living in United States and various PRC-based family members were threatened in order to coerce the nationals' repatriation, including by detaining a pregnant PRC-based relative, and alleging various conduct undertaken in furtherance of the scheme in the Eastern District of New York).

Notably, the U.S. Department of Homeland Security has warned that the PRC "likely will continue to pursue transnational repression activity" in the United States – including the PRC's "global 'Operation Fox Hunt.'"  *See* Office of Intelligence and Analysis, U.S. Dep't of Homeland Security, "Homeland Threat Assessment: 2024," available at https://www.dhs.gov/sites/default/files/2023-09/23_0913_ia_23-333-ia_u_homeland-threat-assessment-2024_508C_V6_13Sep23.pdf at 7 (last visited Apr. 3, 2025).  The pervasiveness and seriousness of the Operation Fox Hunt conduct in the United States, and here in the Eastern District, underscores the need for general deterrence.  Indeed, during co-defendant Zhu's sentencing, this Court observed: "We've been getting more and more of these prosecutions just as the Government notes in its submission. So it is necessary for the sentence I impose on Mr. Zhu to send a clear message to anyone else, who would seek to work for the Chinese Government for this purpose, and not register, that there will be serious consequences for doing so."  (Zhu Tr. 78.)  A significant sentence of 87 months' imprisonment – unlike the non-custodial sentence the defendant seeks – would serve as a warning to other potential PRC operatives and assets.

Specific deterrence likewise warrants a custodial sentence.  The defendant's continued insistence that he engaged in only "typical" private investigation activities (ECF No. 358 at 7-9, 40) reflects that he believes he did nothing wrong, and suggests he would readily engage in such activities again.  Moreover, the defendant has repeatedly demonstrated his lack of respect for the law, as described in Parts IV.B.2, above, and IV.B.5, below.

4.    The Need to Avoid Unwarranted Sentencing Disparities

A sentence of 87 months' imprisonment – specifically, a sentence of 48 months' imprisonment on Count Two and sentences of 87 months' imprisonment on Counts Three and Four, to run concurrently – would not result in unwarranted sentencing disparities.

With respect to Counts Three and Four, the government has not identified any similarly-situated defendants; for the reasons below, the government does not consider co-defendants Zhu or Zheng similarly situated.  Because the government has not identified any similarly-situated defendants – nor has the defendant cited any – there is no unwarranted sentencing disparity to be avoided.

With respect to Count Two, courts have imposed significant sentences for Section 951 convictions where – as here – the defendant has engaged in a transnational repression scheme, such as Operation Fox Hunt, on behalf of a foreign government.  The Court should avoid unwarranted sentencing disparities by imposing a term of imprisonment, *i.e.*, 48 months on the Section 951 conviction, that is commensurate with the following sentences of 38-60 months' imprisonment imposed upon similarly-situated defendants who were convicted of Section 951 charges based on their involvement in transnational repression schemes:

- *United States v. Li*, No. 24-CR-334 (M.D. Fla.): Li worked at the direction of officers of the PRC Ministry of State Security over an approximately ten-year period to obtain information of interest to the PRC government, including information concerning dissidents and pro-democracy advocates and members of the Falun Gong religious movement; most of the information he provided was publicly available.  Li pleaded guilty to conspiracy to act as an illegal agent of the PRC and was sentenced to 48 months' imprisonment.  He also was fined $250,000.  (ECF No. 39.)

- *United States v. Abouammo*, No. 19-CR-621 (N.D. Cal.): Abouammo was bribed by the Kingdom of Saudi Arabia and the Saudi Royal Family to access, monitor, and convey the confidential user information of anonymous Saudi dissidents that Twitter held.  Such information could have been used by the Saudi government to identify and locate the Twitter users who published the critical posts.  After conviction by trial of violating, *inter alia*, 18 U.S.C. § 951, the Court sentenced Abouammo to 42 months' imprisonment on his illegal foreign agent conviction.[19]  (ECF No. 426.)

- *United States v. Cabrera Fuentes*, No. 20-CR-20129 (S.D. Fla.): Cabrera Fuentes acted under the direction and control of a Russian government official to engage in surveillance of a Russian defector.  Following the Russian

---

[19]    The Ninth Circuit subsequently vacated the sentence and remanded for resentencing based on an unrelated Guidelines calculation for Abouammo's other offenses of conviction.  *See United States v. Abouammo*, No. 22-10348, 2024 WL 4972564 (9th Cir. Dec. 4, 2024).

official's instructions, Cabrera Fuentes arranged for an intermediary to lease a unit to the defector in the Miami area; traveled to Miami to obtain the license plate number and parking location of the defector's car to provide to the Russian official on his next trip to Russia; and took a photo of that defector's car, which he sent to the official.  Cabrera Fuentes pleaded guilty to violating 18 U.S.C. § 951 and was sentenced to 48 months' imprisonment.  (ECF No. 58.)

- *United States v. Doostdar*, No. 18-CR-255 (D.D.C.): Doostdar was a dual U.S.-Iranian citizen who traveled to the United States on behalf of the Iranian government.  He recruited a second individual to attend a rally in New York City protesting the Iranian regime.  At the rally, the second individual photographed the protesters and provided those photos to Doostdar.  Doostdar pleaded guilty to conspiracy to act as an illegal foreign agent and acting as an illegal foreign agent and was sentenced to 38 months' imprisonment.  (ECF No. 121.)

- *United States v. Alvarez*, No. 05-CR-20943 (S.D. Fla.): Alvarez was an agent of Cuba's Directorate of Intelligence and its predecessor intelligence agencies.  Between the late 1980s and 1990s, Alvarez gathered information within the United States on matters of interest to the Cuban government, including informing on anti-Castro individuals and groups and other elements of the Cuban exile community in South Florida.  Alvarez pleaded guilty to conspiracy to act as an illegal foreign agent and was sentenced to 60 months' imprisonment.  (ECF No. 236.)

- *United States v. Dumeisi*, No. 03-CR-664 (N.D. Ill.): Dumeisi, who published an Arabic language newspaper from the United States, was recruited by the Iraqi Intelligence Service to collect information regarding individuals and groups considered to be hostile to the Hussein regime.  After conviction by trial of acting as an illegal foreign agent and conspiracy to act as an illegal foreign agent, Dumeisi was sentenced to 46 months' imprisonment.  (ECF No. 138.)

These cases demonstrate that a sentence of 48 months' imprisonment on Count Two would avoid unwarranted sentencing disparities with sentences imposed on similarly-situated defendants.  Although certain of these defendants were sentenced to terms lower than 48 months' imprisonment, the defendant here is more culpable than those defendants.  Many of those defendants provided sensitive information to foreign governments about individuals living here in the United States, thus indisputably harming those individuals, but – unlike the defendant here – none directly harassed or terrorized their victims.

The defendant's argument that he should receive a lower sentence than his co-defendants is unavailing.  As a threshold matter, the Second Circuit repeatedly has held that the court is not required to consider sentencing disparities between co-defendants.  *See, e.g.*, *United States v. Clinton*, 820 F. App'x 34, 37 (2d Cir. 2020); *see also United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008) ("We have held that section 3553(a)(6) requires a district court to consider

nationwide sentencing disparities, but does not require a district court to consider disparities between co-defendants."). Moreover, the defendant's co-defendants are not similarly situated.

With respect to Zhu Yong, the Court's imposition of a sentence of 24 months' imprisonment is relevant only to the extent it sets a floor, rather than a ceiling, for the sentence imposed here. As this Court is aware, Zhu received a significant downward variance of 24 months' imprisonment, which the Court primarily attributed to Zhu's mental faculties, characterizing him as "not a sophisticated person" and "naive and to a large extent, ignorant, about the harm he was causing these victims," and accordingly finding that he "really failed to understand or appreciate the gravity of what he was doing." (Zhu Tr. 78, 81-82, 89.) Notably, although the defendant's sentencing memorandum liberally cites to the transcript from Zhu's sentencing when he considers doing so helpful, he ignores the Court's express caution that Zhu should not "be cited as trying to promote unwarranted disparities because," as this Court explained, "there are many factors, personal factors, that . . . are at play here." (*Id.* at 89-90.)

In any event, the reasons the Court cited supporting leniency for Zhu are entirely absent in this case. The defendant, a sophisticated former law enforcement officer, fully appreciated the harm the scheme caused to the victims, as well as the potential harm the PRC government would cause if they located the victims. That is clear from the defendant's own text messages, including his text suggesting "harass[ing]" Xu Jin and joking about him being abducted. Put simply, the defendant is more culpable than Zhu; the defendant participated in the illegal harassment and repatriation scheme, knowing its objective, and exploited his law enforcement background to achieve that objective. (*See, e.g.*, GX 4019B at 244-57.) The defendant deserves a higher sentence.

Co-defendant Zheng is even less similarly situated to the defendant. As the Court is aware, Zheng was convicted only of the interstate stalking counts, and his knowledge of and participation in the scheme indisputably was far less than the defendant's. As the Court reasoned in imposing Zheng's sentence, his "actions were limited in scope" and "[h]is mental awareness or maturity . . . [prevented him] from appreciating the gravity of what he was doing or the potential scope of what he was involved in." (Zheng Tr. 43.) The Court further noted that – as the government and Probation agreed – Zheng was a "minor participant in the overall scheme to repatriate" Xu Jin, and "even in the stalking activities he had this one-time involvement." (*Id.*) In contrast, the defendant's role was broader in scope and he did not lack an appreciation of the gravity of his conduct. Zheng's sentence is not an appropriate basis of comparison.

The defendant's argument that he should be sentenced to a non-custodial term because certain defendants are at large and have not stood trial, and therefore have not been sentenced, also fails. Those defendants are not similarly situated to the defendant, who was convicted by a jury of his peers.

Finally, contrary to the defendant's contention (ECF No. 358 at 107-08), the February 5, 2025 memorandum from the Attorney General has no bearing on this case, as it applies to general charging policy, not to charged cases. Nor does the memorandum bear on the need for deterrence. Stalking, harassment, and acting as an illegal agent of a foreign government all remain offenses criminalized by Congress – just as they were when the defendant committed his crimes.

The defendant's citation to an October 24, 2024 report prepared by the House Committee on Oversight and Accountability Majority Staff (*id.* at 108 n.10) is likewise unavailing. *First*, in describing the defendant's prosecution, the report repeatedly asserts that he was prosecuted under the Foreign Agents Registration Act ("FARA"). He was not; Section 951 is an entirely distinct crime, with different elements. *Second*, the report focuses on the defendant's prosecution, highlighting that he "reportedly was unaware that his client for private investigation services, a translation company in New York, was involved with the Chinese government." The report omits that the defendant was convicted by a jury of violating Section 951, which necessarily found that he knew he was acting at the PRC government's direction or control. The report similarly ignores this Court's post-trial decision finding that there was sufficient evidence against the defendant to sustain the verdicts against him. *Third*, in quoting the report's assertion that "[r]ecent public reporting raises a number of questions as to DOJ's enforcement" against the defendant, the defendant fails to note the Committee's sources for that proposition. The Committee cited primarily to articles quoting interviews with the defendant and his wife. That is, the defendant is recycling his own assertions by attributing them to a third party. In sum, the report has no bearing on the instant sentencing, and the Court should reject the defendant's arguments otherwise.

5.     The Need to Promote Respect for the Law

A sentence of 87 months' imprisonment would promote respect for the law. The defendant – a former law enforcement officer who took an oath to protect the public and regularly touts his public services – knowingly engaged in illegal conduct that terrorized individuals living in his own state. As a seasoned and experienced former NYPD sergeant, the defendant could have used his law enforcement background and relationships to report the suspicious circumstances and nature of the work he was hired to do. Instead, he knowingly exploited his background and connections to further an illicit PRC operation and to carry out the surveillance, stalking, and harassment scheme against the victims. In doing so, the defendant harmed the individuals he promised to protect and eroded public trust in the very institution he committed to serve.

Time and again, the defendant has demonstrated his lack of respect for the legal system and the rule of law. During the illegal repatriation scheme, for example, the defendant used his law enforcement contacts to obtain sensitive information from the DEA and HSI, which he then passed to a PRC official. (*See, e.g.*, GX 3051.) He called local law enforcement in advance of conducting surveillance to ensure he would not be caught committing a crime. (PSR ¶ 58; Tr. 1831.) He participated in a scheme to harass Xu Jin's elderly and ill father. (ECF No. 294 at 13-14.) Then, when offered a "nice trip" to the PRC, the defendant proposed harassing Xu Jin. (PSR ¶ 70.) Following his arrest, he repeatedly lied to law enforcement agents during his interview and tried to obstruct the investigation. (*See, e.g.*, ECF No. 228, Ex. 4 at 10, 56, 62-63, 71-72.)

Following his convictions, the defendant referred to the verdicts – returned by a jury of his peers – as an "absolute injustice" and "absolutely outrageous." (Ex. A.) It is plain that the defendant does not respect the rule of law or believe it applies to him.

A substantial sentence will promote respect for the law, by sending the message that a lack of such respect will not be tolerated.

V.    Conclusion

        For the foregoing reasons, given the serious nature of the criminal conspiracy and the defendant's role in that conspiracy – and the threat to U.S. national security posed by the actions of the defendant and his co-conspirators, as well as to the victims who were terrorized because of those actions – the government respectfully submits that a sentence of 87 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

JOHN J. DURHAM
United States Attorney
Eastern District of New York

By:    /s/
Meredith A. Arfa
Irisa Chen
Assistant U.S. Attorneys
(718) 254-7000

SUE J. BAI
Supervisory Official
Department of Justice
National Security Division

By:    /s/
Christine Bonomo
Trial Attorney

Encl.

Cc:    Clerk of the Court (by ECF and Email)
        Counsel of Record (by ECF)